UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
        v.                      )        CRIMINAL NO. 05-40001-FDS
                                )
SAMUEL J. LEWIS                 )

DEFENDANT'S MOTION TO DISMISS AND
FOR FURTHER DISCOVERY

Defendant, Samuel Lewis, respectfully moves that the Court
dismiss all counts of the indictment in the above-entitled
matter. Defendant submits that the United States Attorney's
Office Terrorism Unit's prosecution of Lewis is unique given the
actual conduct that occurred and was undertaken because he is an
African-American who is a devout Muslim. At a minimum, the Court
should schedule a hearing and the government should be ordered to
provide discovery concerning the decision to prosecute because
Lewis has made out a <u>prima facie</u> case that the instant
prosecution was initiated based upon his race and religion.
<u>United States v. Armstrong</u>, 517 U.S. 456 (1996).

## FACTS SURROUNDING THE ALLEGED OFFENSES

### A.    The Government's Allegations

Lewis is charged by indictment with making false statements
when buying firearms from federally licensed firearms dealers
during the period beginning in August 2002 through September
2003. Although the indictment contains 22 counts, the
allegations center on only fifteen transactions for fifteen

weapons; the government has chosen to charge four of the
transactions separately under two similar statutes, and a fifth
transaction is charged three times under similar statutes.

Lewis has no prior record and was legally permitted to
purchase and possess the firearms at issue.  During each
transaction Lewis possessed a valid Massachusetts-issued license
to carry firearms.  He also possessed a Bureau of Alcohol,
Tobacco, and Firearms-issued Curio and Relics license, which
permits the holder to purchase weapons that are more strictly
controlled under the National Firearms Act; this license allowed
Lewis to purchase and possess the short-barreled shotgun that is
the subject of Counts 12, 13 and 21.  In each transaction Lewis
completely and accurately identified himself by providing his
full name, date of birth, social security number, citizenship,
height, weight, and race.  He also provided truthful answers to
questions concerning issues that would prohibit him from
purchasing firearms, such as prior or pending criminal and
domestic abuse cases, substance addiction, and mental health
condition.

Notwithstanding the fact that Lewis suffered no legal
disability and, in fact, legally possessed the proper licenses to
make the purchases, the government alleges two classes of mis-
statements it claims Lewis made on the ATF Form 4473 that is to

accompany each transaction.  First, in an allegation common to each of the fifteen transactions, it contends that the address provided by Lewis was actually his mother's address and that this answer constituted a material false statement.  Second, in an allegation centering on just one of the sales, it claims that Lewis actually purchased the weapon involved for his friend, Clarence Plant, who himself suffered no legal disability to possessing weapons.

Lewis is a 32 year-old African-American man who was born and raised in Worcester.  He has attended college, and two of his brothers are in law enforcement.  His mother lives in Worcester.

Lewis is also a devout Muslim and has been since 1997.  He attends Mosque regularly.

While firearms cases in Massachusetts are ordinarily handled by the Major Crimes section of the United States Attorney's Office, Lewis is being prosecuted by the Terrorism unit.

**B.**    **The ATF Investigation**[1]

Discovery thus far disclosed by the government in this case indicates that the investigation of Lewis began in early September 2002 as the result of a tip by an unnamed source that

---

[1]The facts herein are culled from discovery, including a complaint authored by ATF Special Agent Michael Curran, provided to defendant under the Local Rules.

Lewis, a Worcester resident, was a radical Muslim who had been seen possessing firearms.  ATF Special Agent Michael Curran inquired of the Worcester Police Department who revealed to him that Lewis had been issued and possessed a license to carry firearms.  Curran also queried the Massachusetts Firearms Records Bureau who revealed to him that Lewis had purchased thirty (30) weapons under his name, fifteen of them between August 2002 and September 2003.  A query of ATF's own records revealed that Lewis had been issued a Curio and Relics License that was still active.  Such licenses are issued to gun collectors and allows those collectors to purchase guns in transactions that may otherwise be prohibited by the National Firearms Act.  Curran learned that Lewis had purchased a short-barreled shotgun using the Curio and Relics license.  Curran learned that Lewis had no criminal history.

Curran then interviewed the owner of Wayne's Weaponry in Worcester, the site of several of Lewis' 30 purchases.  The owner verified that Lewis was a frequent customer, was knowledgeable about firearms, and took good care of his firearms.  Lewis also practiced tactical shooting at the attached target range using "double taps" and "triple taps," which mimic the sound of automatic gunfire.  He also related that Lewis had been in his store just nine days before and had purchased a rifle for $350.

The owner further related that he had never had problems with him on the range, but that a man named Anthony Davis had. In an interview with Curran, Davis described a verbal altercation with Lewis over Lewis's tactical shooting. Admitting that he couldn't be sure, Davis opined that Lewis was using an automatic weapon at the range. He also added, according to Curran, that "he had heard that Lewis is a member of a radical group with anti-government views."

Curran schemed to meet with Lewis at 59 Evelyn St. in Worcester, the address listed on many of the firearms transaction forms. When he arrived there with four other law enforcement agents, there was no answer at the apartment listed as belonging to "S. Lewis." One of the agents called a telephone number listed to Lewis and received a call back within a short while. The agent lied to Lewis by indicating he wanted to see him at 59 Evelyn St. about a motor vehicle matter. When Lewis arrived, the agents proceeded to interrogate him about his weapons purchases. In the course of the interrogation, Lewis told the agents he had recently moved from 59 Evelyn St. and had weapons at another address. He also allowed agents to examine two firearms he had on his person. Curran also asked him to retrieve the short-barreled shotgun from the address at which it was stored. Lewis complied and turned the weapon over to Curran.

Curran learned that three days after the interrogation, Lewis contacted the federally licensed firearms dealer from whom he had purchased the weapon and asked how to go about updating his address and transferring the short-barreled shotgun. That same day Lewis notified the Worcester Police Department of his change of address.

Two days later, on October 1, 2003, the Worcester Police Department notified Lewis that it was revoking his license to carry firearms. Lewis requested and received permission to keep the license for a short period while he disposed of the weapons he possessed. The next day, Lewis transferred a rifle and pistol to his friend Clarence Plant and asked him to take possession of his remaining guns. Plant, also an African-American Muslim, has no criminal record and received a license to carry firearms on August 21, 2003.

Lewis turned in his license to carry to Worcester Police a week later on October 9, 2003. By January 9, 2004, Lewis, with the assistance of Plant, had sold all of his remaining weapons to federally licensed firearms dealers.

Curran assembled a list of the firearms Lewis acquired and disposed of since receiving his license to carry. Curran was able to establish that all but eleven of the firearms acquired by Lewis had been sold back to federally licensed firearms dealers.

-6-

Upon contacting an attorney who was representing Lewis in an
effort to regain his license to carry, Curran was given
information about the disposition of all of the remaining guns,
nine of which he was able to confirm as being sold to federally
licensed firearms dealers or to Plant.

In the five weeks that ensued after Lewis legally disposed
of all his guns, Curran and other ATF agents interrogated Plant
five times and searched his home once pursuant to a search
warrant.[2]  According to the government, Plant finally indicated
that Lewis bought two of the weapons, a rifle and pistol, on his
behalf prior to August 23, 2003 when he obtained his own license.
Plant also conceded, however, that he did not take possession of
the guns until well after he had received his license to carry
and took possession of them as part of a paperwork transfer from
Lewis.

In the months following Lewis's voluntary disposal of all of
the guns in his possession, agents made inquiries concerning his
living arrangements during the thirteen-month period in which the
weapons were purchased and came to the conclusion that he did not
primarily reside at his mother's home during many of the gun

---

[2]That search warrant was ostensibly to look for evidence of
violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) committed
by the defendant.

-7-

purchases.  They also interviewed his ex-wife, who excoriated

Lewis' conversion to Islam and his "weird" values, and related to

them that Lewis had traveled to Canada and to Africa once.  This

phase of the investigation concluded no later than June 2004,

five and one-half months before the government sought a criminal

complaint against Lewis.

In the meantime, on August 17, 2004, an ATF-registered

Confidential Informant (CI) approached agents with information

about Lewis.  The informant revealed that Lewis and his family

had moved to Belmont Street in Worcester; that information,

however, was completely incorrect as to (1) the address and

description of the home on Belmont Street, and (2) the floor of

the apartment at that address where Lewis was to have lived.  The

informant went on to tell agents, again erroneously, that Lewis

was planning on leaving on December 21, 2004 to go to a country

where there was a "war" or "crisis."

The CI's disclosure precipitated further investigation of

Lewis's previous living arrangements that apparently cemented the

agents' belief that Lewis did not primarily reside with his

mother as indicated on the ATF forms.  That phase of the

investigation concluded by September 9, 2004.  Two months later,

on August 15, 2004, the government sought a criminal complaint

charging Lewis; agents, however, did not immediately arrest
Lewis.

On November 22, 2004, the CI approached ATF again and
admitted that his information about Lewis leaving on December 21,
2004 was incorrect; instead, he asserted that Lewis was going to
go on his trip "sometime after January 1, 2005."  The CI
suggested that he "presume[d]" that Lewis was going to
"Afghanistan or another Middle Eastern Country [sic]."  Lewis was
arrested the next day.

## LEGAL FRAMEWORK

The equal protection component of the Fifth Amendment is a
constraint on prosecutorial discretion, and thus "the decision
whether to prosecute may not be based on an unjustifiable
standard such as race, religion, or other arbitrary
classification."  United States v. Armstrong, 517 U.S. 456, 464
(internal quotation marks omitted); Oyler v. Boles, 368 U.S. 448,
456 (1962).  "A defendant may demonstrate that the administration
of a criminal law is 'directed so exclusively against a
particular class of person . . . with a mind so unequal and
oppressive' that the system of prosecution amounts to 'a
practical denial' of equal protection of the law."  Armstrong,
supra, 517 U.S. at 464-465.  A claimant pursuing a selective
prosecution claim must ultimately demonstrate that the

prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose. Oyler, supra, 368 U.S. at 456.

A defendant may be entitled to obtain discovery in support of a selective prosecution claim if he can show "some evidence tending to show the existence" of discriminatory effect and discriminatory intent. Armstrong, supra, 517 U.S. at 468. This evidence must consist of some evidence that similarly situated defendants of other races or religions could have been prosecuted but were not. Id. at 469. Although the standard a defendant seeking discovery in aid of a selective prosecution argument is "rigorous," it ought not be "an insuperable task to prove that persons of other races [or religions are] being treated differently" by prosecutors. Id. at 470. Because intent or purpose is functionally impossible to directly prove at the initial discovery phase of a case, discriminatory purpose can be divined from evidence of severe discriminatory effect. United States v. Tuitt, 68 F.Supp.2d 4, 10-13 (D.Mass. 1999), citing United States v. Armstrong, 1996 WL 88550 (U.S. Oral. Arg. 1996). Discriminatory purpose may be demonstrated through circumstantial or statistical evidence. See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands

-10-

a sensitive inquiry into such circumstantial and direct evidence
of intent as may be available.")

Here, investigation of other cases brought by the United
States Attorney's Office for the District of Massachusetts
demonstrates a severe discriminatory effect strongly suggesting
discriminatory purpose.  The investigation thus far reveals that
(1) no defendant beside Lewis has been prosecuted for the conduct
upon which Lewis faces prosecution, (2) a vast number of
Caucasian, non-Muslim individuals similarly situated in that they
have made false statements - false statements more serious than
those purported to have been made by Lewis - are not even
referred for prosecution to the U.S. Attorney's Office, let alone
prosecuted, and (3) adherence to the U.S. Attorney's own
guidelines and publicly stated policies would ordinarily result
in declination of the prosecution of Lewis it has undertaken
here.  Consequently, this is a case where the defendant "has been
singled out for prosecution when others similarly situated have
not been prosecuted and the prosecutor's reasons for doing so
were impermissible."  United States v. Magana, 127 F.3d 1, 8 (1st
Cir. 1997).

## EVIDENCE OF SELECTIVE PROSECUTION

**I.    Government Prosecutions for Violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A).**

The U.S. Probation Office has provided the names of all defendants who have been convicted of violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) over the past three years to the Federal Defender Office.  <u>See</u> May 15, 2005 Letter of S.U.S.P.O. Jennifer Sinclair, attached hereto (in electronic form) as Exhibit A.  In addition, defendant has identified one pending prosecution for violations of 18 U.S.C. § 922(a)(6).  A summary of the completed and pending prosecutions is attached hereto as Exhibit B.

The cases disclosed in the Probation Department's response, as well as the pending charge, facially suggest disparate treatment; defendant is apparently the only defendant in the last three years whom the U.S. Attorney's Office for the District of Massachusetts has seen fit to charge with a violation of 18 U.S.C. § 924(a)(1)(A) in addition to a violation of 18 U.S.C. § 922(a)(6).[3]  In any event, review of the offense conduct in each

---

[3]As one court has noted, there is "a considerable overlap in the conduct proscribed by" § 922(a)(6) and § 924(a)(1)(A). <u>United States v. Evans</u>, 848 F.2d 1352, 1363 (5th Cir. 1988).  In essence, the difference between the two statutes is an issue of proof: § 922(a)(6) requires that the government prove that the defendant made a false statement with intent to deceive as to a matter material to the lawfulness of the sale of firearms, while

-12-

of these cases demonstrates that Lewis's conduct in using his
mother's address is several magnitudes of seriousness below that
otherwise prosecuted by the USAO for the District of
Massachusetts.  In every other prosecution under 18 U.S.C. §
922(a)(6) brought to conclusion by this USAO, the buyer was
either himself a convicted felon or knew that the person on whose
behalf s/he was purchasing the weapon had a prior criminal record
that prohibited him from purchasing weapons.  Moreover, the
simple existence of a prior conviction alone was rarely, if ever,
enough to result in prosecution.  Rather, the convicted felon -
either the purchaser or, in the straw purchase context, the
receiver - had a significant and serious criminal history that
included crimes of violence or drug trafficking offenses.  Many
times the transactions made by straw purchasers were done for
cash or other tangible consideration.

    Here, by way of contrast, Lewis has no criminal record
whatsoever.  Similarly, Clarence Plant, whom the government
accuses of being the receiver in the straw purchase counts, had
no criminal record.  Indeed, unlike every other prosecution

---

§ 924(a) substitutes proof only that the information was required
to be kept by the dealer for the materiality requite.  Id.  For
the sake of convenience, this Motion will generally refer to both
the offenses charged here (and those similar to them) as §
922(a)(6) violations.

brought by the USAO, neither Lewis nor Plant was under any disability at all; Plant himself could have, consistent with federal law, purchased the weapons himself without any intervention by Lewis, if intervention there was.

As set forth more fully below, that the cases brought by the USAO for the District of Massachusetts under 18 U.S.C. § 922(a)(6) in this district universally involve the acquisition of firearms by felons - directly, through straw purchase, or through later distribution - is consistent with the implicit or explicit policies adopted by law enforcement intimately involved in such prosecutions.[4]  Consequently, the prosecution of Lewis is prima facie a radical departure from existing practices warranting dismissal or, at a minimum, further discovery as to why the government has chosen to prosecute Lewis for the conduct at issue.  See Tuitt, supra, 68 F.Supp.2d at 14 (discovery in pursuit of selective prosecution claim ordered where defendant

---

[4]In a prior filing, the government cited United States v. Norris, 39 Fed. Appx. 361, 364 (7th Cir. 2001), an unpublished Seventh Circuit case, in support of its contention that a false address on an ATF 4473 form is material.  See Docket Entry #12, Memorandum regarding Government's Motion for Detention as to Samuel J Lewis.  Unlike the instant matter, however, the USAO in Indiana did not bring the false address as a stand-alone charge. Instead, Norris was charged and convicted of many counts of falsely denying that he had a criminal conviction and transportation of weapons by a convicted felon.  See Id. at 361.

demonstrated "complete absence of such prosecutions of whites in the chosen time period").

Defendant submits that such an unexplainable departure, coming as it does in a prosecution by the USAO's terrorism unit of a devout Muslim, warrants dismissal.[5]  In any event, the USAO should be called upon to produce a non-race or non-religion criteria to justify this prosecution.

## II.  Vast Numbers of Caucasian and Non-Muslim Who Have Made False Statements on ATF 4473 Forms Are Not Criminally Prosecuted, Even for Misrepresentations Far More Serious than Those Allegedly Made by Lewis.

A defendant may be entitled to dismissal or, at the very least, further discovery if he presents some evidence that similarly situated defendants of other races or religions could have been prosecuted but were not.  Armstrong, supra, 517 U.S. at 468.  Lewis submits that there is irrefutable evidence that defendants of other races and religions have not been prosecuted for similar and far more serious representations than were made here.  First, as an initial matter Lewis submits that prosecution for the de minimis conduct here is so sui generis as to raise a prima facie inference of selective prosecution given his race and

_____

[5]Moreover, review of the cited cases also discloses that, other than in the instant matter, ATF has never taken the extraordinary step of seeking and obtaining a search warrant of a home to search for evidence of violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A).

religion.  Second, examination the larger pool of potential

defendants amenable to prosecution under § 922(a)(6), all of whom

have made misrepresentations more serious than those made by

Lewis, compels the conclusion that similarly situated non-African

American and non-Muslim individuals are not being prosecuted.

**A.  Charging Lewis for Misrepresentations of His Address and for Purchasing Two Firearms in Conjunction with His Friend Who Was Not Federally Prohibited from Possessing a Firearm Is Per Se Evidence of Selective Prosecution Where No Other § 922(a)(6) Prosecution Has Been Undertaken On Remotely Similar Facts.**

Lewis submits that, when considering the claim of selective

prosecution on the facts alleged here, the universe of similarly

situated individuals should include all individuals who have made

de minimis misrepresentations solely about their residence or

have acted as a straw purchaser for an individual not prohibited

from possessing a weapon under federal law.  The difficulty with

measuring the USAO's office in light of that universe is that, as

demonstrated supra and infra, no other person has been prosecuted

under § 922(a)(6) remotely similar to this unique set of facts.

Defendant submits that an analysis based on the approach used in

evaluating equal protection violations in jury selection is

helpful.  See Batson v. Kentucky, 476 U.S. 79, 93-99 (1986).

Under this analysis, the USAO's unique and unprecedented

prosecution of Lewis, and African-American Muslim, is a <u>per</u> <u>se</u> violation of the equal protection clause of the <u>Fifth</u> <u>Amendment</u>.

<u>Batson</u> and its progeny considered the procedure by which trial courts should analyze whether a prosecutor, through the use of peremptory challenges, engaged in the purposeful or deliberate denial of minority participation on juries. <u>Id.</u> at 84-88. The Court approved of a procedure by which trial courts were to evaluate whether a prosecutor's action violated the equal protection clause - a procedure very much like that established by <u>Armstrong</u>. First, a defendant must make a <u>prima</u> <u>facie</u> case that he is a member of a protected class and that the prosecutor has exercised peremptory challenges to remove from the venire members of that protected class. <u>Batson</u>, <u>supra</u>, 476 U.S. at 96. In so doing, the Court made clear that a "single invidiously discriminatory government act" could constitute discrimination prohibited under the equal protection clause of the <u>Fifth</u> <u>Amendment</u>. <u>Id.</u> at 95. Once the opponent of the challenge has made out a <u>prima</u> <u>facie</u> case of discrimination, the burden of production shifts to the proponent of the strike to come forward with a protected class-neutral explanation, after which the trial court must decide whether the opponent of the strike has proved purposeful discrimination. <u>Johnson v. California</u>, 125 S. Ct. 2410, 2416 (2005).

-17-

Here, the government's prosecution under § 922(a)(6) of
Lewis, an African-American Muslim, based on his misrepresentation
of his residence address and otherwise legal purchase of two
firearms on his non-prohibited friend's behalf, is facially a
single invidiously discriminatory act that could constitute
discrimination without regard to a showing of similarly situated
individuals.  The USAO's decision to charge Lewis under these
facts - where none had been charged before or has been since - is
akin to a prosecutor's decision to peremptorily challenge the
lone member of a protected class on a jury.  While no pattern of
discrimination is present when a prosecutor makes the single
challenge, the inference given to such a challenge given the
context is that the challenge is potentially a violation of equal
protection.  Consequently, courts after <u>Batson</u> have long held
that the use of a peremptory challenge to remove the only
prospective juror who belongs to the same discrete group as the
defendant by itself may constitute a prima facie case of
impropriety or discrimination in the use of the challenge.  <u>See</u>,
<u>e.g.</u>, <u>Morse v. Hanks</u>, 172 F.3d 983, 985 (7th Cir. 1999); <u>United
States v. Bergodere</u>, 40 F.3d 512, 516 (1st Cir. 1994); <u>United
States v. Horsley</u>, 864 F.2d 1543, 1544-1546 (11th Cir. 1989); <u>See
also</u> <u>United States v. Roan Eagle</u>, 867 F.2d 436, 441 (8th
Cir.)(noting that party can make prima facie case that challenges

were improper by showing that 100% of prospective jurors in party's discrete group were challenged).

The government's decision to alone charge Lewis, a member of the protected classes of both race and religion, on the basis of the de minimis conduct alleged is directly analogous to the exercise of a peremptory to remove the lone member of a protected class from a jury venire.  Both choices - a prosecutor eliminating a protected juror and a prosecutor charging a protected defendant with a violation on unprecedented and unique facts - immediately facially raise the specter of an equal protection violation.  Given the context of the charging decision, the Court should at a minimum conduct an evidentiary hearing to determine whether the government can provide a protected class-neutral explanation for why it chose to charge Lewis in this case.  See Horsley, supra, 864 F.2d at 1546 (remand required where prosecutor exercised peremptory challenge to remove sole African-American juror and failed to "give a clear and reasonably specific explanation of his legitimate reasons" for challenge).

**B.** **Review of the FBI Background Check and Referral Prosecution Process Reveal Vast Numbers of Prosecutable Violations of § 922(a)(6), A Significant Number of Which Are Necessarily Caucasian and Non-Muslim, that Are Not Prosecuted.**

An ATF form 4473 is required for every purchase of a firearm from a federally licensed firearms dealer. The express purpose of the form is to vindicate the dictates of the Brady Handgun Violence Protection Act (Brady Act), which mandates a background check, which includes examination of criminal history, to determine whether an individual is prohibited by law from possessing a firearm. To that end, the form is used by either a state agency or, more commonly, by the FBI's National Instant Background Check System (NICS) to perform a background check on the individual proposing to purchase a firearm. Review of data culled from the NICS demonstrate that a vast number of individuals who make much more material mis-statements than Lewis did are amenable to criminal prosecution under either 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A). Moreover, an overwhelming majority of these similarly situated, non-prosecuted individuals are Caucasian and/or non-Muslim.

1.    **Vast Numbers of Potential 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) Violations Are Identified Through Background Checks.**

The Brady Act requires potential firearms purchasers who, as Lewis did, buy weapons through a federally licensed firearms dealer ("FFL") to undergo a background check to determine whether they are prohibited from possessing weapons. Because a potential purchaser certifies under oath that he is not a prohibited person, it also provides a reliable method for determining whether a violation of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) has occurred. As is set forth below, these provisions of the Brady Act also provide a bonanza of potentially prosecutable cases, of which only a small fraction are actually accepted for prosecution. All of the potentially prosecutable cases involve misrepresentations far more material and culpable than those allegedly made by Lewis.

a.    **The Background Check Process**[6]

The Gun Control Act of 1968 identified nine categories of persons prohibited from possessing firearms. These included (1)

_____

[6]This summary of the background check process is taken from the U.S. Department of Justice, Office of Inspector General Report Number I-2004-006 titled "Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Enforcement of Brady Act Violations Identified Through the National Instant Criminal Background Check System (hereinafter "OIG Report"). A copy of the OIG Report is attached to this motion as Exhibit C.

those indicted for or convicted of a felony, (2) fugitives from justice, (3) those addicted to controlled substances, (4) those identified as mentally defective or incompetent, (5) illegal aliens, (6) those dishonorably discharged from the military, (7) those who have renounced U.S. citizenship, (8) those who are subject to restraining orders, and (9) those convicted of misdemeanor domestic violence crimes.  The Brady Act, passed in 1993, established a three-day waiting period and established a background check system to determine whether individuals fell into one of the nine prohibited categories.

To begin the background check, a potential purchaser must complete an ATF Form 4473 and provide confirmatory photo identification to the FFL.  The form requests biographical data and a specific "yes" or "no" answer pertaining to each of the nine prohibited categories.  A "yes" to any of the questions results in an immediate denial of the sale by the dealer.  If the prospective buyer answers "no" to all of the categories, the FFL must request a background check through NICS before selling the firearm.  This is done by calling either a local "point of contact" or the FBI, who maintains and operates the NICS databases.

According to its mission statement, the FBI's NICS Section is responsible for "aggressively reviewing and analyzing

available records in accordance with the provisions of the Brady [Act] and regulations thereunder."

The FBI searches three databases for disqualifying information including criminal history, restraining orders, active warrants, immigration violations, illegal aliens, person who have renounced their citizenship, persons adjudicated mentally defective, dishonorably discharged persons, and controlled substance abusers.  If no matching record is found, the FBI notifies the FFL that it can proceed with the transfer.

If a matching record is found, the FBI seeks more detailed information about the record that is matched.  If the further examination reveals prohibitive criteria, NICS personnel advise the FFL to deny the firearm transactions.  The FBI also electronically transmits the denials to the ATF.  The FBI rejection rate of applications it reviewed during the period 1999-2004 was 1.4%.  See Exhibit D, supra, Background Checks for Firearms Transfers, 2004.

### b.    The Nature of the Typical 4473 False Statement

According to a U.S. Department of Justice Bureau of Justice Statistics Bulletin, lying about criminal history (including domestic violence convictions and restraining orders) resulted in the bulk (80%) of FBI NICS denials.  See Exhibit D, supra,

Background Checks for Firearms Transfers, 2004. Approximately 5% lied when they said they were not fugitives, 2% lied about being a lawfully-admitted alien, .5% lied about their mental disability, and 8% lied about drug addiction. The remaining 4% were identified as having lied about "other" items, including dishonorable discharges and renouncement of U.S. citizenship.

     c.   **ATF'S Handling of Confirmed False Statements**

The ATF reviews denials received from the FBI at its Brady Operations Branch and refers denials that require additional investigation to the appropriate local ATF office. In some cases the NICS denial occurs after the firearm has been transferred;[7] in such a case, ATF immediately collect as much information as possible concerning the transaction and the reasons for the denial and contacts the local ATF office to immediately investigate and retrieve the firearm. If a sale is denied and no weapon is sold, the Brady Operations Branch will either simply close the case or refer the circumstances of the denial to the

---

[7]This occurs because, under the Brady Act, a transfer cannot be delayed more than three days. If the denial has not been issued because a FBI NICS examiner is still collecting information about the prohibiting factor, the FFL nevertheless is obligated to transfer the firearm. This is termed a "default proceed;" if and when the person is later discovered to be prohibited, NICS characterizes its decision as a "delayed denial."

local ATF Field Division office for review, possible investigation, and prosecution.

The ATF Field Division and satellite offices will "retrieve" a firearm that has been issued to a prohibited person as a result of a delayed denial. The local office will investigate all other denials only in cases that have "prosecutorial merit." After investigation, the ATF offices may refer the prohibited persons to their respective United States Attorney's Offices for prosecution. These cases are normally charged as false statement cases under 18 U.S.C. § 922(a)(6) as a result of the individual lying about their prohibited status.

This process, however, results in only a tiny fraction of cases actually being prosecuted. According to the OIG Report, during a two year period only 154 individuals - <u>less than one percent</u> of the individuals nationwide identified through NICS as having committed Brady Act violations by misrepresenting their prohibited status - were prosecuted.[8]

---

[8]Admittedly, there are ways other than through NICS background checks by which a § 922(a)(6) violation will come to the attention of investigators and later, USAO's. As the OIG Report points out, referrals come from investigation and prosecutions of illegal gun traffickers and "straw purchasers," defined as "individuals with clean records who purchase firearms for prohibited individuals." Exhibit C at 13. However, the NICS referrals provide a significant source of ATF to USAO referrals and provide a reliable benchmark for comparison because they provide standardized rejection criteria.

**d.    Investigative and Prosecutorial Referrals**

According to the OIG Report, in the calendar years 2002 and 2003 the FBI NICS office referred 1,973 instances of verified ATF Form 4473 misrepresentations in the Northeast area to the ATF Brady Operations Branch.  While all of the 1,973 instances necessarily involved 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) violations, only 370 of these were referred to the Boston Field division for further investigation.  According to Exhibit D, supra, Bureau of Justice Statistics Bulletin, Background Checks for Firearms Transfers, 2004, the FBI identified 746 involved misrepresentations made to FFL's in Massachusetts that resulted in rejection over the six year period 1999-2004.  Id. at 4.  Given the ATG referral rate, approximately 335 of these representations were likely referred to local ATF offices in the District of Massachusetts.[9]

Despite this cornucopia of confirmed violations of § 922(a)(6) by individuals with verified prohibiting factors, the United States Attorney's Office did not prosecute any of the

---

[9]The Boston Field Division is responsible for six states - Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.  According to United States Census Bureau statistics, the population of these six states totals 14.2 million people, with about 45% of that total - 6.4 million people - living in the District of Massachusetts.  Thus, the 167 figure represents 45% of the confirmed violations presumably made to the Boston Field Division.

persons identified by NICS as a prohibited person who had lied about it on the ATF Form 4473 during the calendar years 2002 and 2003, and does not appear to have done so since.  Instead, its Terrorism Unit has chosen to charge Samuel Lewis, an African-American Muslim who has no record, is not otherwise prohibited, and, even assuming the government's straw purchase allegation to be true, has never transferred a weapon to a prohibited person with violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A).

> **2.  The Race and Religion of Massachusetts Gun Purchasers and Owners Reveals That Most Brady Act Violators Are Caucasian.**

ATF Form 4473 requests racial identification information when applying for firearms transfer approval.  It does not, however, request religious affiliation.  In any event, neither the OIG Report (nor any other documents available to the public) give identifying information, racial or otherwise, of those that NICS has denied approval to, that the FBI has alerted ATF about, that the Brady Operations Branch has notified local offices concerning, or that ATF agents have referred to the USAO.[10]

---

[10]Should the Court order further discovery, defendant has requested the ATF Form 4473's themselves, or at the very least identification of the racial makeup, of the pool of those referred by the Brady Operations Branch to the Boston Field Division Office.

Demographic information, however, is available to suggest likely patterns of gun purchasing and ATF rejections.

> **a.    Comparison of Gun Purchasing Between Caucasians and African Americans and Pool of Likely Caucasians Amenable to Prosecution Under § 922(a)(6).**

According to a 2002 Massachusetts Department of Public Health Survey, attached hereto as Exhibit E, 12.9% of Massachusetts adults possessed a firearm in their home. Id. at 73. Whites were more likely than blacks to possess a weapon, with whites keeping a firearm at a rate of 14.2% and blacks possessing a weapon at 5.4%. Id. at 72-73. The rates were lower than, but comparable to, a National Institute of Justice Study (attached hereto as Exhibit F) that reveals 27% of whites possessed a weapon versus 16% of blacks who identified themselves as possessing a firearm. Id.

The racial breakdown for the population of Massachusetts, provided by the United States Census Bureau for 2002, reveals that 84.5% of the population is white and 5.5% identified themselves as African-American or Black.

Assuming even that possession and, therefore, completion of an ATF 4473 Form is level across racial lines, the raw percentage of whites that are part of the 335 likely investigative referrals results in the conclusion that 285 Caucasian applicants lied on

the ATF Form and were referred to the ATF for investigation and possible prosecution in the period of 1999-2004.  None appear to actually have been prosecuted.  When considering that Caucasians are 163% more likely to own a firearm than an African-American, that number rises precipitously.

        **b.    Comparison of Gun Possession Between Muslims and Non-Muslims and Pool of Likely Non-Muslims Amenable to Prosecution Under § 922(a)(6).**

ATF Form 4473 does not request religious affiliation and defendant was unable to locate any study breaking down possession or purchase of firearms by religious affiliation.  According to the website adherents.com, a collection of studies of religious affiliation, .4% of Massachusetts residents identify themselves as adherents to Islam, while 82.3% identified themselves as "Christian."  See http://www.adherents.com/adhloc/Wh_200.html. Applying that percentage to the 335 likely investigative referrals generated from NICS referrals to ATF results in the conclusion that 276 of the individuals who lied on the ATF Form 4473 were self-identified Christians versus 1.3 Muslims likely to have lied and been referred for prosecution.

C.    **The Race and Religion of Similarly Situated Individuals in Massachusetts Compels the Conclusion that Caucasian and Non-Muslims Are Not Being Prosecuted for More Serious Conduct Than That Which Lewis Is Accused of Engaging In Here.**

When considered against the racial and religious make-up of the firearm purchasing public, the NICS and Bureau of Justice Statistics data concerning identification and referral of confirmed violations of 18 U.S.C. § 922(a)(6) leads inescapably to the conclusion that many Caucasians similarly situated in regard to amenability for charges under the statute are not being prosecuted in the District of Massachusetts.  The conclusion is even more stark when considered independently and in conjunction with those non-Muslims not prosecuted.  Moreover, as noted above, these individuals were amenable for prosecution for the much more serious offense of misrepresenting facts crucial to determining whether the individual was prohibited.  Given the statistical background in which the instant prosecution has been brought, the inference that defendant's race and/or religious affiliation played a crucial role in the decision to charge is inescapable.

**III. Prosecution of Lewis on the Facts As Alleged, Given that He Has No Criminal Record and Did Not Seek to Transfer Firearms to A Prohibited Person, Is Contrary to the USAO's Own Clearly Established Policy for Accepting § 922(a)(6) Prosecutions.**

The USAO does not circulate its guidelines for acceptance of prosecution of individuals who have lied on the ATF Form 4473. Review of the OIG Report and public statements as to the goals and objectives of gun prosecutions, however, further reveal the unique and unprecedented nature of the charges brought against Lewis.

**A.    The OIG Report Confirms that the Decision to Prosecute § 922(g)(6) Violation Based on a Misrepresentation in the ATF Form 4473 Is Contingent on the Existence and Nature of the Criminal History Involved.**

The Office of Inspector General was tasked to review ATF's enforcement of violations of the Brady Act identified through the NICS.  A specific part of that task was to determine "the extent to which Brady Act violations were referred to and prosecuted by the U.S. Attorneys' offices (USAO)."  Exhibit ? at I (Executive Digest).  The OIG Report tried to determine why, given the large volume of violations identified by NICS and referred to ATF, so few prosecutions were actually undertaken.  The OIG review revealed the following:

- ATF Special Agents generally felt that the vast majority of NICS referral subjects were not a danger to the public

-31-

because the prohibiting factors are often minor or based on incidents that occurred many years in the past, id. at 20;

• ATF Special Agents believed that "bad guys" generally do not purchase their firearms through legitimate dealers; instead they have someone with a clean record perform a straw purchase through an FFL, id.;

• In many cases, notifying the prohibited person that he was in violation of the law was sufficient to stop the behavior and retrieve any weapons possessed, thus relieving ATF the time-consuming task of investigating the violation, id. at 25.

• Agents viewed NICS referrals and investigations as "detracting from more important cases, such as those involving firearms traffickers, gangs, arsons, and explosives," id. at 29;

• Written USAO guidelines directs the Brady Operations Branch to consider the age of a prohibiting conviction before referring Brady Act cases, as a more remote prohibiting conviction is not even worth the effort of investigation and a prosecutorial decision, id. at 30.

Consequently, an ATF policy memorandum dated June 17, 1999 directed that Brady Act NICS "referrals meeting the criteria set by ATF and respective U.S. Attorneys should be processed according to the severity of the disqualifying convictions, the presence of multiple attempts to purchase firearms, and the availability of division resources." Id. at 29.

Although never explicitly revealed by the OIG Report,[11] the nature of "ATF and respective U.S. Attorney" criteria to accept prosecutions of Brady Act violations is crystal clear:  the presence of significant, recent criminal history in conjunction with circumstances indicating that the purchases were for active criminal use.[12]  In the instant matter, agents and the USAO office, despite a protracted investigation, had no reliable evidence of either.

---

[11]The OIG Report refers to many efforts in the years 1999-2003 to compel USAO's to promulgate prosecution guidelines for use by the Brady Operations Branch to determine which cases to refer for further investigation.  Id. at 30-33.  The report notes that not all USAO offices have done this and some offices have been resistant to providing specific written guidelines.  Id. at 31.  It is unclear whether the USAO for the District of Massachusetts has provided written or other guidance to ATF concerning Brady Act violations.

[12]In its July 9, 2004 response to criticism in the OIG Report that it did not have sufficiently clear and detailed NICS guidelines for referrals, ATF disclosed that it was in the final stages of reviewing ATF Order 3310.4C, titled Integrated Violence Reduction Strategy, which was to include "a section of the investigation of straw purchase and false statement violations resulting from NICS checks."  OIG Report at 57.  Defendant requested, through a Freedom of Information Act letter, a copy of that Order.  In response, ATF advised defendant that, fifteen months after it told OIG the Order was "in the final stages of review prior to printing," the Order was still in draft form and thus exempt from release.  See Exhibit G, attached hereto.

**B.  All Available Evidence, Including Public Statements by the USAO for the District of Massachusetts, Demonstrates that Discretion Has Always Been Exercised to Decline Prosecutions Based on Conduct Similar to Or Even More Egregious Than That Committed by Lewis.**

Prosecutorial guidelines, written and unwritten, further sharply limit the number of cases accepted by USAOs even when ATF considers or makes a referral for prosecution.  According to the OIG Report, in the two year period of 2002-2003, ATF formally referred only 230 cases, culled from 120,000 individuals identified as having lied on the ATF Form 4473, for prosecution. Forty-five (45) of these formal referrals were declined.  In reality, as the OIG Report notes, actual prosecution declination was even higher because ATF Field Office practice was to determine whether the USAO was interested in accepting the case <u>before</u> submitting a formal request.  <u>Id.</u> at 47-48.  USAOs took into account "jury appeal" and consequently would reject cases where Brady Act violations were based on applicant misrepresentations of an old conviction without subsequent criminal activity or of a conviction for a non-violent crime. <u>Id.</u> at 48-49.  USAOs were similarly hesitant to accept cases where, notwithstanding the misrepresentation of a lack of prior criminal conviction, a potential defendant was otherwise "on notice" that his or her possession of a firearm was illegal, had attempted to purchase a long gun (rather than a handgun), or was

-34-

prohibited because he was a fugitive.  <u>Id.</u> at 49.  Of particular
note, given the context of the instant prosecution, the OIG
Report found that a person prohibited for a noncriminal reason
would not be prosecuted notwithstanding the fact that he had lied
about that characteristic:

> <u>Absent any criminal record</u>, persons who are prohibited
> because they are illegal or nonimmigrant aliens, have
> received dishonorable discharges from the military,
> have renounced their citizenship, or have been
> adjudicated mentally defective <u>are generally not
> prosecuted</u>.

<u>Id.</u> at 50 (emphasis supplied).  The prosecutorial directive that
ATF show that a gun has wound up or was intended to wind up in
the possession of a person with criminal record before a
prosecutor will even consider prosecution of the case under §
922(a)(6) is borne out by the actual behavior of the USAO for the
District of Massachusetts.  As shown in Part I, <u>supra</u>, the
District of Massachusetts USAO has never before, at least in the
recent age of the Brady Act, brought a prosecution under §
922(a)(6) "absent a criminal record" being involved.  Indeed, the
record of prosecutions reveals that not only must a criminal
record be involved, but it must be substantial and recent.

The District of Massachusetts USAO's own publicly announced
policy starkly reveals its own priorities and thus the
unprecedented nature of the charges brought against Lewis.

-35-

Responding to a gun safety group's criticism that the USAO was
not aggressively prosecuting purchasers who lied during
background checks, the United States Attorney responded that his
office "ha[s] limited resources . . . [w]e're very confident that
when appropriate, federal charges are being brought." Boston
Globe, Pg. B3, May 15, 2003 (attached hereto as Exhibit H). To
the additional allegation that the USAO had persistently refused
to bring federal charges against people who lied on the
background check forms, the then-Chief of the Major Crimes unit
in the USAO responded by noting, "We are really focused on
violent offenders with guns . . . [s]omeone with a 20 year-old
conviction on his record who tries to buy a firearm is not the
kind of person who logically should be prosecuted as a federal
criminal." Id.

     Samuel Lewis did not lie about a 20 year-old conviction
because he has none. He did not lie about his criminal record at
all, because he has none. He did not lie about being an alien
because he is a U.S. citizen. He did not lie about drug
addiction or mental status because he does not take drugs of any
kind and is a highly functional professional. He did not lie
about anything that would make him a prohibited person. Even
upon the government's evidence, his misrepresentation as to
residence address was completely devoid of any of the factors

identified by the Bureau of Alcohol, Tobacco and Firearms, United States Attorney's Offices nationally, or the United States Attorney for the District of Massachusetts locally, that would even warrant investigation, let alone prosecution, in the ordinary course of events.  The inescapable inference, given the facts and the course of the investigation that occurred, is that Samuel Lewis is being prosecuted because his is an African-American man who, in a post 9/11 America, is a devout Muslim. Such a prosecution is barred by the Equal Protection Clause of the Fifth Amendment and must be dismissed.

CONCLUSION

        For the foregoing reasons, defendant submits that this unique prosecution must be dismissed.

REQUEST FOR A HEARING AND FURTHER DISCOVERY

        Even if dismissal is not immediately warranted, defendant submits that he has established a prima facie case of selective prosecution:  "If the defendant alleges facts that tend to show that []he has been selectively prosecuted and that raise a reasonable doubt about the propriety of the government's purpose, then []he is entitled to an evidentiary hearing unless the government "puts forward adequate countervailing reasons to refute the charge and the court is persuaded that the hearing will not be fruitful." United States v. Graham, 146 F.3d 6, 9

(1st Cir. 1998)(internal quotations, ellipses, and citations

omitted).  Defendant requests a hearing at which the government

should be required to set forth any non-protected class reasons

underlying its decision to initiate this prosecution, and for the

Court to resolve factual issues concerning that decision.  In aid

of that hearing, defendant requests that the government be

ordered to produce the following discovery:

1.    Complete information regarding prosecutions commenced in the
      District of Massachusetts under 18 U.S.C. §§ 922(a)(6) and
      924(a)(1)(A) from January 1, 2001 through the present,
      including the race, age, religious affiliation and sex of
      the defendants.

2.    Information regarding the number of instances of sales or
      attempted sales in the District of Massachusetts where
      regulatory, law enforcement, or other agents have identified
      false statements made on a ATF Form 4473 from January 1,
      2001 through the present, including the race, age, religious
      affiliation, and sex of the transferor and transferee.

3.    Information regarding any instances of misstatements on an
      ATF Form 4473 regarding the applicant's residence address.

4.    Information regarding investigations of 18 U.S.C. §§
      922(a)(6) and 924(a)(1)(A) violations investigated by
      federal agents within the District of Massachusetts from
      January 1, 2001 through the present, including the race,
      age, religious affiliation, and sex of the transferor and
      transferee, whether or not they resulted in referrals for
      prosecution.

5.    Information regarding any search warrants sought by or in
      conjunction with the United States Attorney's Office for the
      District of Massachusetts where the objective of the warrant
      was to recover evidence of a violation of 18 U.S.C. §§
      922(a)(6) and 924(a)(1)(A) from January 1, 2001 through the
      present, including the race, age, religious affiliation and
      sex of the target of the warrant.

-38-

6.    Information regarding the referrals of prohibited persons, as identified by the Bureau of Alcohol, Tobacco and Firearms ("ATF") Brady Operations Branch through the National Instant Criminal Background Check System ("NICS"), received by the Boston ATF NICS coordinator in connection with enforcement of the Brady Act since its inception, including copies of the completed ATF Form 4473 and identifying racial information.

7.    The ATF guidelines or standards by which it determines whether NICS denials have "prosecutorial merit" warranting further investigation and possible prosecution.

8.    The number of referrals of prohibited persons determined by investigation to have lied on ATF Form 4473 by the ATF Field Division or satellite offices to the United States Attorney's Office for the District of Massachusetts since the inception of the Brady Act in 1998.

9.    The prosecutorial guidelines by which the United States Attorney's Office for the District of Massachusetts accepts or declines prosecutions of referrals of prohibited persons for violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A).

10.   The prosecution memorandum prepared in connection with the decision to prosecute defendant in the instant matter.


                              SAMUEL LEWIS
                              By His Attorney,


                              /s/ Timothy Watkins
                              Timothy G. Watkins
                              Federal Defender Office
                              408 Atlantic Ave. 3rd Floor
                              Boston, MA  02110
                              Tel: 617-223-8061


                              -39-

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### PROBATION OFFICE

**John M. Bocon**
Chief U.S. Probation Officer

1 Courthouse Way
Suite 1200
Boston, MA 02210
(617) 748-4200
Fax -(617) 748-9185

June 17, 2005

Ms. Courtney Roberts
Federal Defender Officer
408 Atlantic Avenue
Third Floor, Suite 328
Boston, MA 02210

Dear Ms. Roberts:

Below is a list of the defendant names and their docket numbers for those who were convicted of 18:922(a)(6). We found no records for 18:924(a)(1)(A).

| | |
|---|---|
| Barbosa, Juan | Dkt#03-40009 |
| Barboza, William | Dkt#03-40009 |
| Bourgeois, Robert | Dkt#01-40027 |
| Brodeur, Kevin | Dkt#01-30040 |
| Castillo, Aldris | Dkt#90-30013 |
| Depina, Domingos | Dkt#99-10252 |
| Hanrahan, Sara | Dkt#00-10329 |
| Hughes, John Patrick | Dkt#99-10405 |
| Johnson, Tammy L. | Dkt#02-10411 |
| Lebert, Frederick | Dkt#99-10327 |
| Lehtonen, Michael | Dkt#00-10308 |
| Offley, Eric D. | Dkt#01-10246 |
| Perez, Rafael | Dkt#02-30025 |
| Pleasants, William | Dkt#99-10248 |
| Smith Lindell | Dkt#03-30019 |
| St. Onge, Kris | Dkt#03-10395 |
| Wilson, Harold | Dkt#98-30013 |

Please call me at 617-748-9209 if you require further assistance.

Sincerely,

Jennifer D. Sinclair
Senior U.S. Probation Officer

**EXHIBIT A**

## SUMMARY OF COMPLETED AND PENDING PROSECUTIONS FOR VIOLATIONS OF 18 U.S.C. § 922(a)(6)

1. **United States v. Juan Barbosa**
2. **United States v. William Barbosa**,
   **No. 03-4009-NMG**

   The Barbosas are Hispanic brothers who were observed renting firearms, buying ammunition, and taking target practice at local shooting range. The range policy was to have individuals provide photo identification and to fill out and sign release forms affirming that guests had not been convicted of a crime punishable by law for more than one year. Each Barbosa denied that he was a felon. In fact, each had been convicted of serious drug felonies in the past.

   **SOURCE:** Indictment, Presentence Report Offense Conduct

3. **United States v. Robert Bourgeois**,
   **No. 01-40007-NMG**

   Bourgeois, who had an extensive criminal history including a prior felony conviction, lied about that status when he completed an ATF 473 to buy three guns.

   **SOURCE:** Plea Agreement

4. **United States v. Kevin Brodeur**,
   **No. 01-30040-MAP**

   Brodeur and another individual received money from a person Brodeur knew to be a convicted felon and with that money bought guns and associated items for him. Brodeur admitted that he lied when buying the guns and associated items by stating that he was not buying the guns for someone else.

   **SOURCE:** Indictment

5. **United States v. Aldris Castillo**,
   **No. 90-30013-FEF**

   Information could not be obtained about this case due to its age at inception. Because of its age, it does not appear relevant as a comparable defendant.

EXHIBIT A

SOURCE:

6.  **United States v. Domingos DePina**,
    **No. 99-10252-PBS**

Domingos DePina, an African-American, purchased guns from federally licensed dealers three times between 1994 and 1997.  On each occasion, DePina falsely stated on the AFT Form 4473 that he was the actual buyer of the firearms when in fact he was not.  An investigation revealed that DePina had purchased three firearms from another federally licensed dealer between 1994 and 1996 and another firearm in 1997.  DePina admitted to selling the firearms to support a drug habit.  Individuals who DePina knew to have felony criminal records picked out the guns for DePina to buy and gave him money to do so.  Once purchased, DePina would immediately exchange the weapon outside of the store for the promised money.

**SOURCE:** Indictment, Presentence Report Offense Conduct

7.  **United States v. Sarah Hanrahan**,
    **No. 00-10329-WGY**

Hanrahan, who is white, admitted that she had purchased seven firearms at New England Sportsman, Inc.  At each purchase Hanrahan completed the ATF Form 4473 and each time she claimed she was the actual purchaser of the firearm.  She sold all the firearms to Robb Rose, a convicted felon, who was friends with her boyfriend, Shane Farr.  Farr was subsequently arrested with one of the weapons, an Intratec, model CAT 9, 9mm pistol.  Hanrahan herself had multiple arrests for assault and battery, possession of cocaine, possession with intent to distribute cocaine, and possession of marijuana.

**SOURCE:** Indictment, Presentence Report Offense Conduct

8.  **United States v. John Patrick Hughes**,
    **No. 99-10405-REK**

A sporting goods store reported that Hughes had purchased eleven guns over the course of three purchases in one week, and had done so on one occasion when accompanied by two other men. Investigation disclosed that one of the guns was recovered in the possession of a convicted felon, an acquaintance of Hughes', in

EXHIBIT A

connection with an armed assault and car jacking.  Hughes was
indicted for falsely stating on the ATF Form 4473 that he was the
actual purchaser of the weapon and was later convicted for also
denying that he was a drug-addicted person.

   **SOURCE:**   United States v. Hughes, 95 F.Supp.2d 49 (D.Mass.
               2000)

9.   **United States v. Tammy L. Johnson,**
     **No. 02-10327-PBS**

   Tammy L. Johnson is an African-American woman who admitted
that she bought six firearms for her brother, Mack Fludd, in
South Carolina on three separate occasions.  At each purchase
Johnson completed the ATF Form 4473 and each time she claimed she
was the actual purchaser of the firearms.  She knew that her
brother was unable to purchase the weapons on his own because he
had a criminal record.  Fludd would pick out the weapons he
wanted her to purchase and she immediately gave all the firearms
to him; he transported the weapons to and sold them in the Boston
area.  (Fludd was later sentenced in South Carolina to a term of
292 months for participating in a series of such transactions.)

   **SOURCE:** Indictment, Presentence Report Offense Conduct

10.  **United States v. Frederick M. Lebert,**
     **No. 99-10327-RWZ**

   Lebert, a former police officer who is white, purchased a
shotgun from a federally licensed firearms dealer on April 24,
1999.  At the purchase Lebert completed the ATF Form 4473 and in
it denied that he had been convicted of a felony.  In fact, he
had been previously convicted in federal court of firearms
felonies in 1985.  (Lebert was later sentenced to three years'
probation.)

   **SOURCE:**   Indictment, March 21, 2000 Order (Dkt. Entry #21),
               Attorney Report

11.  **United States v. Michael P. Lehtonen,**
     **No. 00-10308-REK**

   Between March and May of 1999, police recovered four
firearms following three separate shootings involving African-

-3-

EXHIBIT A

American and Cape Verdean males in Brockton.  Upon further
investigation, law enforcement traced the firearms back to
Lehtonen, who had purchased the firearms from legitimated
licensed dealers.  Agents interviewed Lehtonen who admitted to
purchasing the above firearms in addition to a Smith and Wesson
9mm pistol and a Smith and Wesson .380 caliber pistol, and
ammunition for a boyhood friend, Jonathan Parker, a convicted
felon.  Lehtonen purchased the weapons on five separate occasions
by falsely stating on each of the AFT Form 4473 that he was the
actual buyer of the firearms when in fact he was not.  Parker had
provided the funds for weapons and paid Lehtonen for making the
transactions.

   **SOURCE:** Indictment, Presentence Report Offense Conduct

12.  **United States v. Eric D. Offley**,
     **No. 01-10246-JLT**

   Offley is Cape Verdean.  On three separate occasions he
purchased a total of six firearms from a federally licenced
dealer in Westport, Massachusetts.  Each time he completed the
ATF Form 4473 and indicated that he was the actual purchaser of
the firearm when in fact he was purchasing the weapons for three
other individuals with criminal records.  Moreover, he was
subject to a restraining order taken out by his girlfriend when
he possessed two of the firearms.

   **SOURCE:** Indictment, Presentence Report Offense Conduct

13.  **United States v. Rafael Perez**,
     **No. 02-30025-MAP**

   Perez, who is Hispanic, came to the attention of ATF agents
because of reports of a number of suspicious firearms purchases.
Resulting surveillance and subsequent statements revealed that
Perez purchased over 15 weapons from federally licensed firearms
dealers, including at least one semiautomatic assault weapon,
which he immediately distributed to at least two others.  In
making the purchases, Perez falsely stated in ATF 4473 forms that
he was the actual buyer of the firearms.

   **SOURCE:** Presentence Report Offense Conduct

14. **United States v. William Pleasants**,
    **No. 99-10248-MLW**

Pleasants, who is African-American, applied five times to purchase firearms from federally licensed dealers; he was denied twice but was successful three times. Each time he completed the ATF Form 4473 and responded "No" to the question which asked if he had ever been convicted in any court of a crime for which the judge could have imprisoned him for more than one year. In fact, however, Pleasants had been convicted of arson, illegal firearms possession twice, and rape. The unsuccessful attempts were thwarted when the instant background check revealed the prior convictions.

**SOURCE:** Indictment, Presentence Report Offense Conduct

15. **United States v. Lindell Smith**,
    **No. 03-30019-MAP**

Smith, who possessed a valid firearms license, purchased a total of five handguns for two individuals who themselves were prohibited from purchasing because of their respective criminal histories, a fact of which Smith was aware. On each occasion Smith falsely represented on the ATF 4473 form that he was the actual purchaser of the weapon at issue. Smith received $150 for each gun he purchased.

**SOURCE:** Indictment

16. **United States v. Kris St. Onge**,
    **No. 03-10395-WGY**

St. Onge is a Caucasian man who purchased weapons from federally licensed firearms dealers on six different occasions. Each time he completed an ATF 4473 in which in falsely claimed to be the actual buyer; in fact, he was purchasing the weapons for delivery to another. Moreover, St. Onge lied in the forms when he stated that he was not addicted to a controlled substance when in fact he was.

**SOURCE:** Indictment

**EXHIBIT A**

17. **United States v. Harold Wilson, et. al.,**
    **No. 98-30013-FHF**

    Wilson, himself unable to purchase firearms due to his
extensive criminal history, elicited the assistance of Henry
Troy, a legally blind individual with an ATF card to obtain 31
firearms.  On each occasion Troy falsely stated that he was
buying the weapons for himself when in fact he was buying them on
behalf of and at the direction of Wilson, who then obliterated
the serial numbers and sold the weapons on the streets knowing
they were to be used for illegal purposes in committing other
crimes.  Very few of the weapons were ever recovered.

    **SOURCE:** Sentencing hearing transcript

18. **United States v. Vito Resto,**
    **No. 05-30016-MAP**

    This prosecution is currently pending in the Western
Division before Judge Ponsor.  Resto, while under state court
indictment for offenses arising out of a shooting incident,
purchased weapons and ammunition on two different occasions.  At
the time of each of the purchases, Resto also had a significant
criminal history including convictions for drug trafficking,
armed robbery, and prior firearms possession.  On each occasion
he falsely stated that he had not been convicted of a felony, a
fact which if disclosed would have prohibited sale of the weapons
to him.

    **SOURCE:** Government memorandum



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Enforcement of Brady Act Violations Identified Through the National Instant Criminal Background Check System

## Report Number I-2004-006

### `July 2004

# EXECUTIVE DIGEST

The Office of the Inspector General (OIG) reviewed the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) enforcement of violations of the Brady Handgun Violence Prevention Act of 1993 (Brady Act) (Public Law 103-159) that are identified through the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS). Specifically, we reviewed the extent to which the ATF investigated violations of the Brady Act referred by the FBI, whether the ATF retrieved firearms issued to prohibited persons in a timely manner, and the extent to which Brady Act violations were referred to and prosecuted by the U.S. Attorneys' offices (USAO).

The Gun Control Act of 1968 (GCA) (Public Law 90-618) established nine categories of persons prohibited from possessing firearms.[1] The Brady Act of 1993 created a 3-day waiting period before a purchaser can take possession of a firearm, and it established a background check system – the NICS – that firearms dealers were required to contact before the transfer of any firearm to ensure that a person receiving a firearm was not prohibited under the GCA from possessing firearms. The FBI implemented the NICS on November 30, 1998. To verify the eligibility of a prospective firearms purchaser, Federal Firearms Licensees (FFL) request a NICS check through either the FBI or a state point of contact (POC). During calendar years (CY) 2002 and 2003, the FBI processed 8.5 million NICS background checks and state POCs processed 8.2 million NICS background checks.

To conduct background checks on potential firearms purchasers, the FBI must rely on state criminal history records and records on other prohibited categories that are not totally complete and accessible. As a result, the FBI cannot always obtain complete background information within the 3-day waiting period. The law allows any FFL to transfer a firearm at the end of the 3-day waiting period regardless of whether the background check has been completed. Some prohibited persons thus

---

[1] These nine categories are: (1) those under indictment for or convicted of a crime punishable by imprisonment for a term exceeding one year; (2) fugitives from justice; (3) unlawful users and/or addicts of any controlled substances; (4) those adjudicated as mentally defective or who have been involuntarily committed to a mental institution or otherwise judged incompetent to handle their own affairs; (5) illegal aliens or aliens admitted to the United States under a nonimmigrant visa; (6) those dishonorably discharged from the U.S. Armed Forces; (7) those who have renounced their U.S. citizenship; (8) subjects of a protective order; and (9) those convicted of a misdemeanor crime of domestic violence.

U.S. Department of Justice                                                    i
Office of the Inspector General
Evaluation and Inspections Division

receive firearms when the background check takes longer than three days to complete.

The FBI refers to the ATF the names of all prohibited persons who attempted to or succeeded in obtaining a firearm from an FFL. The ATF is responsible for promptly retrieving firearms transferred to persons found to be prohibited subsequent to the 3-day processing deadline and for investigating those referrals from the FBI that meet the USAOs' prosecutorial guidelines. During CYs 2002 and 2003, the FBI referred a total of 7,030 cases to the ATF in which persons that it identified as prohibited succeeded in obtaining firearms ("delayed denial" cases). The FBI also referred a total of 121,909 "standard denial" cases in which background checks were completed in time to prevent a prohibited person from obtaining a firearm.

At the ATF, the Brady Operations Branch reviews the FBI referrals and forwards those denials that require a firearm retrieval or that meet the USAOs' prosecutorial guidelines to the NICS coordinator in the appropriate ATF division office. Each NICS coordinator reviews the referrals and disseminates them to the appropriate field or satellite office for investigation.

**RESULTS IN BRIEF**

The ATF is responsible for retrieving firearms expeditiously from persons prohibited by the GCA from possessing firearms. We found that although the ATF normally has been able to retrieve the firearms eventually, the retrievals were not always timely. We also found that ATF special agents did not sufficiently document retrievals or provide assurance that a prohibited person no longer had access to the firearm.

Since 1998, the ATF has made progress in screening standard denial cases referred by the FBI. However, we found that the Brady Operations Branch and the ATF division offices were still referring standard denial cases to the ATF field offices that lacked prosecutorial merit, thereby increasing the workload of already overburdened field investigators and delaying the investigation of prosecutable cases. Cases without prosecutorial merit were being referred due to the lack of sufficient USAO prosecutorial guidelines, inadequate screening by some ATF divisions, inadequate communication, and insufficient training and guidance.

The Brady Operations Branch was using broad guidelines synthesized from jurisdiction-specific guidelines prepared by multiple USAOs. As a result, ATF division office personnel were required to perform additional screening using more specific individual USAO guidelines in order to

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division                                        ii

determine whether a case merited investigation. Further, we found that the ATF had not allocated sufficient resources to the Brady Operations Branch to enable it to fully execute its responsibilities. Insufficient staffing resulted in extensive NICS case backlogs, which delayed the referral process and affected the timeliness of investigations. Also, the ATF had not provided funds for technological modifications of its case tracking and referral system to improve the operational efficiency of the Brady Operations Branch.

Our review also found that few NICS cases are prosecuted. During CYs 2002 and 2003, only 154 (less than 1 percent) of the 120,000 persons who were denied during the NICS background check were prosecuted. Historically, USAOs have been unsuccessful in achieving convictions in many of these cases and consequently have been unwilling to expend their limited resources on prosecuting most NICS cases.

**The ATF Does Not Always Make Timely Firearms Retrievals**

We identified delays in retrieving firearms in 65 of the 188 cases (35 percent) we reviewed for which investigations were completed. In 28 of these 65 cases (43 percent), it took from four months to over a year to retrieve the firearm. We identified a number of reasons for these delays:

- The Brady Operations Branch did not have the technological capability to transfer the delayed denials directly to the field and satellite offices, and instead routed the denials through the division NICS coordinators. Not all NICS coordinators were timely in forwarding these denials to the field offices.

- Insufficient staffing at some ATF field and satellite offices made it difficult for special agents to investigate the large volume of labor-intensive NICS cases in addition to conducting other high-priority investigations, such as those involving firearms trafficking, explosives, and arsons. In addition, the large geographic territories some of the field offices cover make retrieving a firearm a time-consuming process.

- ATF special agents did not consider most of the prohibited persons who had obtained guns to be dangerous and therefore did not consider it a priority to retrieve the firearm promptly.

- The ATF had not established timeliness standards for retrieving firearms and did not track the retrieval process.

U.S. Department of Justice                                                                        iii
Office of the Inspector General
Evaluation and Inspections Division

These delays increase the risk that prohibited persons may use the illegally obtained firearm to harm others or to otherwise commit a crime.  In one of our sampled cases, for instance, the prohibited person fired the weapon at another person's car and was subsequently charged by local law enforcement with aggravated assault.

**The ATF's Firearms Retrieval Procedures Are Inadequate**

We noted deficiencies in the ATF field office procedures for initiating retrievals, documenting who took possession of firearms relinquished by prohibited persons, and verifying and documenting that third parties receiving the firearms were not themselves prohibited from possessing firearms.

Before sending an agent to retrieve a firearm, field offices in some cases sent a contact letter to the prohibited person requesting that the firearm be voluntarily surrendered.  According to the ATF special agents we interviewed, these letters generally elicited a high response rate.  However, we found that the effectiveness of these letters was diminished because the ATF field offices were not always timely in sending the contact letters, did not specify a time frame in the letter for the recipient to respond, and did not always take timely action if there was no response.

When delayed denials occur, the ATF allows prohibited persons to relinquish their firearms to FFLs or to third parties of their own choosing.  In some instances, the ATF learns that state or local law enforcement agencies have seized a firearm it is attempting to retrieve.  In these cases, we found that the ATF special agents handling retrievals did not always verify and document what became of the firearms.  In more than half (55 percent) of the 101 cases in our sample in which the firearm was recovered, there was no documented evidence in the investigative case file of the recovery.  As a result, there was no assurance that the prohibited person had relinquished control of the firearm.

In addition, of the 59 sampled cases involving third party transfers, only 24 cases (41 percent) contained evidence that the special agent had conducted a background check to verify that the third party was not prohibited.  Failure to verify the prohibited status of the third party can result in the firearm being transferred from one prohibited person to another.

U.S. Department of Justice                                                                iv
Office of the Inspector General
Evaluation and Inspections Division

**ATF Field Offices Receive Too Many Standard Denial Cases That Are Unlikely to Be Prosecuted**

The case management system used by the Brady Operations Branch does not identify cases by USAO jurisdiction. Therefore, the Brady Operations Branch applied broad guidelines rather than guidelines specific to particular USAOs when screening cases for prosecutorial merit. The result is that too many standard denial cases without prosecutorial merit are referred to the divisions and field offices. The case management system also cannot route referrals directly to the field investigators, thereby delaying retrievals. If the case management system was modified to identify cases by USAO jurisdiction and allow direct referrals to the field offices, the Brady Operations Branch could screen standard denials using specific USAO guidelines and then refer cases with prosecutorial merit directly to the field investigators, bypassing the NICS coordinators. This would eliminate the need for NICS coordinators to perform additional screening and therefore should improve the timeliness of the referrals to the field offices.

Our review identified other reasons why the field offices were receiving an excessive number of standard denial referrals that were not likely to be prosecuted:

- The USAOs had not provided sufficient prosecutorial guidelines. We found that of the 25 USAOs included in our review, 8 had not provided written prosecutorial guidelines to the ATF. Of the 17 guidelines, 1 was not sufficiently specific to identify cases likely to result in successful prosecutions.

- Not all ATF division offices screened NICS cases before forwarding them to a field office. We found that the NICS coordinators at 6 (35 percent) of the 17 division offices that receive referrals from the Brady Operations Branch were not screening referrals for prosecutorial merit.[2] At these locations, the field offices had the burden of screening the cases.

- The NICS coordinators lacked training and written guidance. The ATF had not held a NICS coordinator training conference since 2000. That conference was attended by only 6 of the 17 current coordinators who regularly receive NICS referrals. Further, the

---

[2] Six divisions are in POC states and do not receive referrals from the Brady Operations Branch.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division                                                    v

ATF had not provided the NICS coordinators with standardized written guidance on procedures for screening referrals.

- <u>The Brady Operations Branch was unnecessarily forwarding alien cases to the division offices.</u>  The GCA generally prohibits illegal and nonimmigrant aliens from possessing firearms.  The Brady Operations Branch routinely refers NICS cases involving denials for aliens to the Department of Homeland Security's Bureau of Immigration and Customs Enforcement (ICE).  However, we found that the Brady Operations Branch also forwarded alien cases to the ATF division offices.  The division and field offices often closed these cases without investigation because they did not involve other prohibiting factors.  Our sample of 200 standard referrals included 22 alien cases, none of which contained any other prohibiting factors such as criminal records.

- <u>ATF field personnel did not provide feedback to the Brady Operations Branch or the NICS coordinators on referrals that did not meet USAO prosecutorial guidelines.</u>  We found that the division office NICS coordinators did not forward to the field offices 36 to 95 percent of the standard denial referrals they received from the Brady Operations Branch.  In addition, several of the field office group supervisors told us that they did not investigate the majority of the referrals they received from their NICS coordinators.  In both these of situations, the field office group supervisors failed to communicate to the NICS coordinators and the NICS coordinators failed to communicate to the Brady Operations Branch that these types of cases lacked prosecutorial merit.  In the absence of specific prosecutorial guidelines, it is particularly important for the field investigators to provide feedback to the NICS coordinators or the Brady Operations Branch on the categories of referrals not being investigated.  The information could have been used to reduce the number of cases without prosecutorial merit that they refer to the field offices.

U.S. Department of Justice                                                            vi
Office of the Inspector General
Evaluation and Inspections Division

**Some Denied Persons Are Subsequently Determined by the ATF Not to Be Prohibited**

We found that 69 (35 percent) of the 197 delayed denials and 16 (8 percent) of the 200 standard denials that we sampled were applicants who subsequently were found not to be prohibited from possessing a firearm. This situation occurred for several reasons: (1) the subject's firearm rights had been restored under state law, (2) the subject's prohibition for a misdemeanor crime of domestic violence did not meet the federal criteria, or (3) a protective order had expired or was about to expire.

Erroneous denials in which a person is found not to be prohibited cannot always be prevented or detected easily. These denials are usually due to incomplete information in the states' automated criminal history records and require the ATF to review states' records to determine whether prohibiting factors exist.

**Improvements Are Needed in the Brady Operations Branch**

We found that the Brady Operations Branch does not have sufficient resources to execute its responsibilities effectively. Insufficient staffing resulted in extensive NICS case backlogs during peak seasons, which delayed the referral process and affected the timeliness of investigations of standard denials. As of December 2003, the Brady Operations Branch had a backlog of 9,230 NICS referrals. As of mid-June 2004, a backlog of 2,819 NICS referrals remained. Subsequent to our review, the ATF Brady Operations Branch Chief submitted a request to ATF headquarters for two contract employees to supplement the specialist staff. As of mid-June 2004, this request had not been funded.

We also found that insufficient funds were provided for upgrading computer hardware and software to improve the operational efficiency of the Brady Operations Branch. These upgrades would allow the Brady Operations Branch specialists to scan and automatically forward FFL and court documents to the division offices, enable Brady Operations Branch management to monitor the processing timeliness, allow specialists to document the qualifying criteria, enlarge the space for specialists to type their comments, and allow specialists to automatically identify instances in which the prohibited person either made or attempted multiple purchases. The Brady Operations Branch requested funds to upgrade its computer system but did not receive this funding.

U.S. Department of Justice                                                                                    vii
Office of the Inspector General
Evaluation and Inspections Division

**Few NICS Cases Are Prosecuted**

A June 28, 2001, memorandum from the Attorney General directed the U.S. Attorneys to "make it a priority to enforce the law against those persons who attempt to subvert the legitimate crime prevention objectives of the Brady Act and to incorporate this new focus into [their] comprehensive prosecutive efforts."  During CYs 2002 and 2003, approximately 120,000 cases were referred by the FBI to the Brady Operations Branch.  Of these cases, the ATF formally referred only 230 to the USAOs, and the USAOs accepted 185, or 80 percent for prosecution.[3]  Of these cases, 154 were prosecuted.

We believe that the number of referrals and prosecutions is low because of the difficulty in obtaining convictions in NICS cases.  These cases lack "jury appeal" for various reasons.  The factors prohibiting someone from possessing a firearm may have been nonviolent or committed many years ago.  The basis for the prohibition may have been noncriminal (e.g., a dishonorable discharge from the U.S. military).  It is also difficult to prove that the prohibited person was aware of the prohibition and intentionally lied to the FFL.  We were also told that in parts of the United States where hunting historically has been part of the regional culture, juries are reluctant to convict a person who attempted to purchase a hunting rifle.

**RECOMMENDATIONS**

Our recommendations focus on the need to centralize at the Brady Operations Branch the screening and referral of NICS cases that the ATF receives from the FBI examiners.  Centralization would reduce delays in getting firearm retrieval cases to the ATF field investigators and make it more likely that only standard denial cases with prosecutorial merit are referred to them.

We recommend that:

1.  The ATF should modify its NFORCE system to allow the Brady Operations Branch to refer delayed denials directly to the appropriate ATF field office.

2.  The ATF should use non-agent personnel to handle the administrative tasks related to NICS cases.

---

[3] Field investigators informally refer cases to the U.S. Attorney in order to determine interest in prosecution.  The number of information referrals is not tracked in NFORCE, ATF's cases management system.

3. The ATF should establish timeliness standards for firearm retrievals and develop a system for ATF field office management to monitor and report on compliance with these standards.

4. The ATF should revise its standard initial contact letter to include a response time frame and should direct its personnel to send the letters on a timely basis, to track responses to the letters, and to take timely action to retrieve the firearms when the letters are unsuccessful in eliciting a response.

5. The EOUSA should ensure that annually each USAO provide the ATF with specific prosecutorial guidelines for NICS cases.

6. The ATF should examine the feasibility of enabling Brady Operations Branch specialists to identify NICS cases by federal judicial district, thereby enabling the ATF to consolidate all its NICS referral screening at the Brady Operations Branch. In the interim, the ATF should require all division office NICS coordinators to screen NICS standard denial referrals and refer to the field offices only those cases that meet USAO prosecutorial guidelines.

7. The ATF should provide annual training to the NICS coordinators and develop a NICS coordinator handbook.

8. The ATF Brady Operations Branch should refer to the field offices only those alien cases that meet the USAO prosecutorial guidelines.

9. The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch of those referrals that do not meet USAO guidelines.

10. The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch and the FBI NICS Section of trends in inappropriate referrals of non-prohibited persons. Also, require that the field office personnel, via the division office NICS coordinators, provide to the FBI NICS Section the names of those individuals that the ATF determines not to be prohibited and documentation to support the reason for the person's non-prohibited status.

U.S. Department of Justice                                                                    ix
Office of the Inspector General
Evaluation and Inspections Division

11. The ATF should ensure that the Brady Operations Branch is sufficiently staffed to minimize backlogs and sufficiently funded to implement necessary automated system modifications.

12. The FBI should distinguish delayed denials from standard denials on its daily electronic transfers of denial transactions to the ATF.

U.S. Department of Justice                                                          x
Office of the Inspector General
Evaluation and Inspections Division

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................1

    Purpose  .........................................................................1

    Background .......................................................................1

    Scope and Methodology of the OIG Review ......................................14

**RESULTS OF THE REVIEW**........................................................16

    The ATF Does Not Always Make Timely Firearms Retrievals .............. 16
          Recommendations ...................................................23

    Firearms Retrieval Procedures Are Inadequate .................................24
          Recommendation ....................................................29

    ATF Field Offices Receive Too Many Standard Denial Cases
    That Are Unlikely to Be Prosecuted ....................................29
          Recommendations ...................................................37

    Some Denied Persons Are Subsequently Determined
    by the ATF Not to Be Prohibited .......................................38
          Recommendation ....................................................42

    Improvements Are Needed in Brady Operations Branch ..................42
          Recommendations ...................................................46

    Few NICS Cases Are Prosecuted......................................................47

**CONCLUSION** .............................................................................52

**APPENDIX I:**  States and Their Level of Participation in the NICS.........54

**APPENDIX II:**  Number of Standard Denials Either Closed by
the ATF Brady Operations Branch or Sent to the ATF Field Divisions
for Investigation (CY 2002 and CY 2003)… ..........................................55

**APPENDIX III:**  Number of NICS Cases Received by the ATF
Field Divisions From the ATF Brady Operations Branch
(CY 2002 and CY 2003) ........................................................................56

**APPENDIX IV:**  ATF Comments on the Draft Report ............................57

**APPENDIX V:**  EOUSA Comments on the Draft Report ........................63

**APPENDIX VI:**  FBI Comments on the Draft Report..............................65

**APPENDIX VII:**  OIG Analysis of ATF, EOUSA, and FBI Comments ......67

# INTRODUCTION

## Purpose

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is responsible for ensuring that firearms remain out of the hands of persons prohibited by law from possessing firearms (prohibited persons) and for investigating criminal attempts to evade the requirements of the Brady Handgun Violence Prevention Act (Brady Act) of 1993 (Public Law 103-159).

The Office of the Inspector General (OIG) reviewed the ATF's enforcement of violations of the Brady Act identified through the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS).  Specifically, we reviewed the extent to which the ATF investigated Brady Act violations referred to it by the FBI, whether the ATF timely retrieved firearms issued to prohibited persons, and the extent to which Brady Act violations were referred to and prosecuted by the U.S. Attorneys' offices (USAO).

## Background

### Legislative History of the NICS

The Gun Control Act of 1968 (GCA), Public Law 90-618, established rules and regulations for persons engaged in the business of buying and selling firearms.[4]  The GCA also identified nine categories of persons prohibited from possessing firearms:

- Those under indictment for or convicted of a crime punishable by imprisonment for a term exceeding one year;

- Fugitives from justice;

- Unlawful users and/or addicts of any controlled substances (defined by convictions, multiple arrests, or drug test failures);

---

[4] Title 18, U.S.C. Chapter 44, Section 922.

- Those adjudicated as mentally defective or who have been involuntarily committed to a mental institution or otherwise judged incompetent to handle their own affairs;

- Illegal aliens or aliens admitted to the United States under a nonimmigrant visa;

- Those dishonorably discharged from the U.S. Armed Forces;

- Those who have renounced their U.S. citizenship;

- Subjects of a protective order (excluding ex parte orders); and

- Those convicted of a misdemeanor crime of domestic violence.

The Brady Act, enacted on November 30, 1993, created a 3-day waiting period before a purchaser can take possession of a firearm. It also established a background check system that firearms dealers were required to contact before the transfer of any firearm to ensure that the person receiving it was not prohibited under the GCA from possessing a firearm.[5] The NICS, developed by the FBI in coordination with the ATF and local and state law enforcement agencies, became operational on November 30, 1998.

**The NICS Process**

To purchase a firearm, a person must provide photo identification to the federal firearms licensee (FFL) and complete ATF Form 4473 (Firearm Transaction Record). This form requires the prospective buyer to provide biographical data and to check a "yes" or "no" box pertaining to each of the nine categories of prohibited persons. If the prospective buyer checks a "yes" box for any of the categories, the FFL must deny the sale. If the prospective buyer checks a "no" box for all of the categories, the FFL must request a background check through the NICS before transferring the firearm. To do this, the FFL calls either a state point of contact (POC) or the FBI.[6] Those contacting the FBI can either phone

---

[5] The Brady Act applies only to federally licensed firearms importers, manufacturers, and dealers. The law does not apply to the transfer of firearms between two licensees, only between a licensee and a nonlicensee.

[6] Currently, 14 states have full POC authority, and 9 states have partial POC authority (i.e., the states perform background checks for handgun purchases and/or handgun permits; the FBI performs background checks for long gun purchases). In the

one of two FBI contracted call centers or conduct their own background check by accessing the NICS E-Check system via the Internet.[7]

During calendar year (CY) 2002, the NICS processed 8.5 million background checks (4.3 million by the FBI; 4.2 million by POC states). During CY 2003, the NICS processed 8.5 million background checks (4.5 million by the FBI; 4 million by the POC states). The number of background checks has remained relatively constant since the NICS was implemented in November 1998, as shown in Figure 1.

**Figure 1:  Number of NICS Background Checks Processed CY 1998-2003**



Source: FBI NICS

When a name is submitted for a background check, the NICS searches three databases for disqualifying information:

---

remaining 27 states (plus Washington, D.C.; the Northern Mariana Islands; the U.S. Virgin Islands; Guam; and Puerto Rico), the FFLs deal directly with the FBI.  See Appendix I for details.

[7] The FBI initiated the NICS E-Check system on August 19, 2002.  The system functions similarly to the call center.  The FFL can log onto the system and check the status of the background check 24 hours a day.  As of December 31, 2003, a total of 3,252 FFLs were enrolled and actively using the NICS E-Check option, and a total of 72,890 transactions had been processed.  Although this option is currently available only to FFLs who process their background checks through the FBI, the FBI is planning to extend this option to FFLs located in POC states.

---

- The Interstate Identification Index (III) for information on criminal history;

- The National Crime Information Center (NCIC) for information on protective orders, active felony or misdemeanor warrants, and immigration violations; and

- The NICS Index for information provided by federal, state, and local agencies on other prohibited categories (such as illegal aliens, persons who renounced their citizenship, persons adjudicated mentally defective, persons dishonorably discharged from the military, and controlled substance abusers).[8]

If the call center operator finds no matching records in any of the three databases, the operator advises the FFL to proceed with the firearms transfer.  The call center operator provides the FFL with a NICS transaction number, which the FFL is required to record on ATF Form 4473.  According to the FBI, in CY 2003, call center operators gave an immediate "proceed" response 74 percent of the time.

If a matching record is found, the operator transfers the call to the FBI's NICS Section for review and evaluation by a NICS examiner, who has access to detailed information on criminal records and other disqualifiers (which the call center operator does not).  In CY 2003, call center operators transferred 26 percent of the calls to NICS examiners.  The examiner determines whether the NICS record is complete, whether the record matches the prospective buyer, and whether the record indicates that the person is prohibited from possessing a firearm.  If the data field "Country of Citizenship" contains anything other than "United States," the NICS automatically initiates an Immigration Alien Query (IAQ) through the Department of Homeland Security's Bureau of Immigration and Customs Enforcement's (ICE) databases.  If the name match is not valid (i.e., the person purchasing the firearm is not the same person with the record) or if no prohibitive criteria exist, the NICS examiner gives the FFL permission to proceed.  If prohibitive criteria exist, the NICS examiner advises the FFL

---

[8] Federal agencies authorized to provide information to the NICS include the Department of Defense, the Department of Homeland Security's Bureau of Immigration and Customs Enforcement, the Department of State, the U.S. Coast Guard, and the Department of Veterans Affairs.

to deny the firearm transaction. In CY 2003, NICS examiners provided the FFL with an immediate determination as to whether the person was prohibited for 18 percent of the 26 percent of the requests sent to the NICS Section.

If more research is needed to make a determination, the NICS examiner advises the FFL to delay the firearm transaction (additional research was required in 8 percent of the CY 2003 requests).[9] Once the research is completed, the NICS examiner relays the results to the FFL.

In CY 2002, the FBI denied 60,739 transactions (1.4 percent of the total transactions); in CY 2003, the FBI denied 61,170 transactions (1.4 percent of the total transactions). In over half of these denials, the person either had been convicted of or was under indictment for felonies or had been convicted of domestic violence crimes, as shown in Table 1.

**Table 1:  Reasons for NICS Denials**
**CY 2002 and CY 2003**

| Reason | CY 2002 | | CY 2003 | |
|---|---|---|---|---|
| | Total | Percent | Total | Percent |
| Felony | 25,814 | 42.5 | 23,636 | 38.6 |
| Domestic Violence | 10,811 | 17.8 | 10,523 | 17.2 |
| Drug Addict | 4,009 | 6.6 | 4,918 | 8.1 |
| Fugitive | 2,430 | 4.0 | 2,874 | 4.7 |
| Mentally Ill | 243 | 0.4 | 315 | 0.5 |
| Other* | 17,432 | 28.7 | 18,904 | 30.9 |
| **Total** | **60,739** | **100.0** | **61,170** | **100.0** |

Source: FBI NICS

* "Other" includes aliens, persons dishonorably discharged from the U.S. Armed Forces, persons who have renounced their citizenship, and persons who are prohibited by a state from possessing a firearm.

If the NICS examiner has not made a determination by the end of the third business day, the NICS examiner advises the FFL of its right under the Brady Act to allow the firearm transfer, a "default proceed."

---

[9] For example, the records may indicate that the individual was arrested for a particular crime, but not whether the individual was convicted. To determine this, the NICS examiner will need to contact the appropriate state. If the FBI has not made a determination after three business days, the FFL may, but is not required to, transfer the firearm.

---

This situation occurred with 73,500 background checks in CY 2002 (1.73 percent of the total processed) and with 84,520 background checks in CY 2003 (1.93 percent of the total processed).[10]  The NICS examiner continues to research the case to determine whether any prohibitive criteria exist.  If the person is subsequently found to be prohibited from possessing a firearm and the NICS examiner determines that the FFL transferred the firearm, the NICS examiner issues a "delayed denial."

FFLs transferred firearms to persons that the FBI identified as prohibited in 3,429 cases in CY 2002 and 3,601 cases in CY 2003.  During these two years, over 60 percent of firearm transfers went to persons prohibited because they were convicted of or were under indictment for felonies or were convicted of misdemeanor crimes of domestic violence.  See Table 2 for details.

**Table 2:  Firearm Retrieval Referrals – Reasons for Denials**

| Reason | CY 2002 | | CY 2003 | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Felony-Related | 1,203 | 35.1 | 1,140 | 31.7 |
| Domestic Violence | 1,052 | 30.7 | 1,170 | 32.5 |
| Fugitives | 421 | 12.3 | 482 | 13.4 |
| Drug Addicts | 307 | 9.0 | 418 | 11.6 |
| State Prohibitions | 146 | 4.3 | 200 | 5.6 |
| Protective Order | 65 | 1.9 | 57 | 1.6 |
| Aliens | 43 | 1.2 | 113 | 3.1 |
| Mentally Ill | 14 | 0.4 | 8 | 0.2 |
| Other* | 5 | 0.1 | 4 | 0.1 |
| Dishonorable Discharge | 3 | 0.0 | 9 | 0.2 |
| Renounced Citizenship | 0 | 0.0 | 0 | 0.0 |
| Unknown | 170 | 5.0 | 0 | 0.0 |
| **Total** | **3,429** | **100.0** | **3,601** | **100.0** |

Source: FBI NICS

* "Other" includes disqualifiers identified during research that were not included in the existing databases (e.g., when the NICS examiner calls a locality, he or she may find out that there is an active warrant or an arrest exists that had not been entered into NCIC or III).

---

[10] According to the FBI, default proceeds occur primarily because many states either do not have automated criminal history records or their automated criminal history records do not show the disposition (e.g., convictions or acquittals) of felony arrests, and manual efforts to determine such information took longer than three business days.

The FBI refers all denials, including both delayed denials and standard denials (prohibited persons who attempted to purchase a firearm but were denied within three business days) to the ATF's Brady Operations Branch.

## Department of Justice (DOJ) Components Involved in the NICS Process

### The FBI

The FBI operates and maintains the NICS. According to its mission statement, the FBI's NICS Section is responsible for "aggressively reviewing and analyzing available records in accordance with the provisions of the Brady Handgun Violence Prevention Act of 1993 and regulations thereunder."

The NICS Section is one component within the FBI's Criminal Justice Information Services (CJIS) Division. The CJIS, located in Clarksburg, West Virginia, also includes program operations pertaining to NCIC, Uniform Crime Reporting, and fingerprint identification.

As of January 2004, the NICS Section consisted of 513 employees and was in the process of adding 35 employees. According to FBI officials, NICS staffing generally has remained stable since the NICS was implemented. NICS examiners are available to accept calls seven days a week, from 8 A.M. to 1 A.M., closing only on Christmas day.

The monthly workload has remained stable since the NICS was first implemented, peaking during September through December and declining during May through July. FBI NICS officials stated that they are able to predict the hourly volume of calls and therefore are able to ensure that the phone lines are adequately staffed during peak hours and to rotate their staff to other tasks during slow periods. The busiest day of the year for firearm sales typically is December 23, which in 2003 hit a new high with 54,000 NICS transactions.

### The ATF Brady Operations Branch

The ATF's Brady Operations Branch in Martinsburg, West Virginia, reviews NICS denials received from the FBI and refers denials that require additional investigation to the appropriate ATF division office. The Brady Operations Branch also serves as a liaison with the FBI on

NICS issues, responds to firearms dealer inquiries regarding the NICS, and analyzes data from NICS denials to identify trends of illegal firearms trafficking and other crimes.

As of April 2004, the Brady Operations Branch consisted of 14 employees and 1 contractor, including 7 specialists who review FBI NICS referrals. Each specialist is responsible for the denials pertaining to specific ATF divisions.

The FBI electronically transmits both delayed denials and standard denials daily to the Brady Operations Branch. The Branch's specialists process delayed denials immediately and forward them to the field. To do this, a specialist electronically accesses the transaction screen to review the FBI notes on the denial; contacts the FFL for a copy of ATF Form 4473; and, if necessary, accesses various law enforcement databases to verify criminal history data. The specialist also contacts local law enforcement, court clerks, or others for copies of supporting documentation. The specialist then adds any applicable notes pertaining to the denial and saves the referral. This action automatically creates a case in NFORCE, the ATF's electronic case management system, and transfers it to the NICS coordinator at the appropriate ATF field division office. The specialist also faxes or mails to the appropriate NICS coordinator copies of documents obtained from the FFL or local criminal justice or other public agencies. Because delayed denials require that the ATF retrieve the firearm, all cases are forwarded to the field for immediate action.

Standard denials are processed in the order received. In contrast to the delayed denials, only a small percentage of standard denials are forwarded to the field because of the large volume (approximately 60,000 a year) and limited investigative resources. As a result, the specialists forward only those cases that have prosecutorial merit.[11] These cases are processed and forwarded in a manner similar to the delayed denials.

During CY 2002, the Brady Operations Branch forwarded 7,897 (13.2 percent) of the 59,778 standard denials it processed to the field. During CY 2003, the Branch forwarded 5,606 (10.7 percent) of the 52,606 standard denials it processed to the field. The proportion of

---

[11] To determine prosecutorial merit, the Brady Operations Branch uses criteria the ATF field divisions obtain from the individual USAOs in their regions. In general, cases determined to have prosecutorial merit are those involving recent or multiple offenses, violent offenders, or patterns of escalating violence.

standard denial referrals forwarded to those not forwarded is shown in Figure 2.[12]

**Figure 2:  Number of Standard Denials Either Closed by the ATF Brady Operations Branch or Sent to the ATF Field Divisions for Investigation
CY 2002 and CY 2003**



Source:  ATF Brady Operations Branch

**ATF Division Offices**

During CYs 2002 and 2003, the Brady Operations Branch forwarded 6,286 delayed denial referrals and 13,503 standard denial

---

[12] The Brady Operations Branch usually receives only those denials processed by the FBI, not by POC states.  Therefore, those ATF division offices encompassing states for which the FBI performs all NICS checks, such as the New Orleans division office, have a greater volume than those encompassing states for which the FBI performs only some of the NICS checks.  For an unknown reason, during CY 2002 and 2003, the Brady Operations Branch received two denials from California (a POC state). See Appendix I for the level of participation by individual states.  See Appendix II for details on the number of denials processed and referred to the division offices by the Brady Operations Branch.

referrals to 17 of its 23 division offices for further investigation.  Figure 3 shows the number of each type of referral sent to each ATF division office.[13]

### Figure 3:  Number of NICS Cases Received by the ATF Field Divisions From the ATF Brady Operations Branch CY 2002 and CY 2003



Source: ATF Brady Operations Branch

Each ATF division office designates a NICS coordinator to process the referrals from the Brady Operations Branch.  Eleven of the NICS coordinators (65 percent) at the 17 division offices that receive referrals

---

[13] Six of the ATF field divisions (Atlanta, Chicago, Los Angeles, Philadelphia, San Francisco, and Washington, D.C.) are not included in the chart.  These divisions encompass only POC states and therefore received no NICS referrals from the Brady Operations Branch during our review period.  Although Florida is categorized as a POC state, the FBI sometimes conducts NICS checks for pawnbrokers (In Florida, pawnbrokers are authorized, but not mandated to conduct a NICS background check at the time of the pawn).  Therefore the ATF division offices in Miami and Tampa do receive some NICS referrals.  See Appendix III for details on the number of referrals sent to each ATF division office.

are special agents.[14]  All NICS coordinators have other duties; 12 of the 17 NICS coordinators told us that they spend less than 30 percent of their time on NICS activities.

Each NICS coordinator conducts further reviews of the referrals and disseminates them to the appropriate field or satellite office.[15]  The extent of the additional review varies among the division offices.  At some division offices, the NICS coordinator only identifies the appropriate field or satellite office and forwards the referral to that office.  At other division offices, the NICS coordinator immediately forwards the delayed denials to the appropriate field or satellite office but further screens the standard denials to ascertain prosecutorial merit, using written or verbal USAO criteria or the NICS coordinator's knowledge of the types of cases that have been prosecuted by the USAOs.

### ATF Field and Satellite Offices

When the division NICS coordinator determines that a referral requires a retrieval or merits investigation, the coordinator electronically transfers the referral to the resident agent in charge (RAC) or group supervisor at the appropriate field or satellite office, who then usually assigns the referral to a special agent for investigation.

For delayed denials, an ATF special agent at the field or satellite office is required to retrieve the firearm from the prohibited person.  Although this action is termed a "retrieval," it is rare that the special agent physically retrieves the firearm.  This action is only taken when the prohibited person is considered dangerous or when the prohibited person is uncooperative in disposing of the firearm.  Other actions categorized by the ATF as retrievals include voluntary return of the firearm by the prohibited person to the FFL, abandonment of the firearm by the prohibited person, seizure by local law enforcement (which usually occurs when the prohibited person has committed a crime), or a third party transfer (in which a prohibited person is permitted to transfer the firearm to a third party of his or her choosing, provided that the third party does not reside with the prohibited person and agrees not to

---

[14] Of the remaining six coordinators, two are investigative analysts or assistants, two are intelligence research specialists, one is an inspector, and one is a secretary.

[15] The ATF has 194 investigative field offices or groups, 56 satellite offices, and 23 intelligence groups.

provide the prohibited person with access to the firearm).  The ATF may refer these prohibited persons to USAOs for prosecution, depending on the circumstances of the cases.[16]

For standard denials, the ATF investigates only those cases that have prosecutorial merit.  In those cases, the prohibited persons may be referred to USAOs for prosecution, depending on the outcome of the investigation.

### The USAOs

The 94 USAOs prosecute criminal violations of federal laws.  In NICS cases, prospective firearm purchasers are normally charged with intentionally lying on ATF Form 4473 by not indicating their prohibited status.  NICS cases are generally prosecuted under two statutes:  Title 18 U.S.C. 922(a)(6) and Title 18 U.S.C. 924(a)(1)(A).  Title 18 U.S.C. 922(a)(6) states that it is unlawful:

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.[17]

Title 18 U.S.C. 924(a)(1)(A) states that whoever "knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for an license or exemption or relief from disability under the provisions or this chapter" shall be fined under this title, imprisoned not more than five years, or both.

---

[16] For example, cases involving old or nonviolent prohibiting factors or in which it is difficult to prove that the individual intentionally lied on the ATF Form 4473 are not likely to be referred for prosecution.

[17] According to Title 18 U.S.C. 924(a)(2), the penalty for violations of Title 18 U.S.C. 922(a)(6) is a fine, imprisonment of not more than ten years, or both.

Table 3 shows the number of referrals USAOs received under those two statutes, case filings (instances in which formal charges were filed), and case terminations (convictions, acquittals, or dismissals) during fiscal years (FY) 2002 and 2003. The referrals include ATF referrals of Brady Act cases identified through the NICS. According to the Executive Office for U.S. Attorneys (EOUSA), these referrals also include prosecutions of illegal gun traffickers and "straw purchasers" (individuals with clean records who purchase firearms for prohibited individuals). The EOUSA's case management system, the Legal Information Office Network System (LIONS), categorizes case data by federal statute and fiscal year, and therefore we were unable to obtain specific data related to NICS cases for CYs 2002 and 2003.

**Table 3: Referrals, Case Filings, and Case Terminations Under Title 18 U.S.C. 922(a)(6) and Title 18 U.S.C. 924(a)(1)(A), By Defendant FY 2002 and FY 2003**

|  | FY 2002 | FY 2003 | Totals |
|---|---|---|---|
| **Referrals** | 922 | 1,059 | 1,981 |
| **Cases Filed** | 772 | 825 | 1,597 |
| **Cases Terminated** | 734 | 686 | 1,420 |

Source: Executive Office for U.S. Attorneys

The prosecutorial results of ATF investigations of NICS referrals initiated during CYs 2002 and 2003 are shown in Table 4. This table shows the number of defendants referred to the USAO, accepted by the USAO for prosecution, prosecuted, and found guilty.

**Table 4: Prosecutorial Results of ATF NICS Cases Referred CY 2002 and CY 2003[18]**

| Category | CY 2002 | CY 2003 | Totals |
|---|---|---|---|
| Defendants Referred | 141 | 89 | 230 |
| Defendants Accepted | 116 | 69 | 185 |
| Defendants Prosecuted | 91 | 63 | 154 |
| Guilty Verdicts | 90 | 63 | 153 |

Source: ATF

---

[18] "Defendants referred" represents those persons referred by the ATF to a USAO for prosecution. "Defendants accepted" represents persons whose cases were accepted by a USAO or who were indicted by a grand jury. "Defendants prosecuted" represents those defendants whose charges were not dismissed after indictment. "Guilty verdicts" represents those defendants who were found guilty, pled guilty, or pled nolo contendere (that is the defendant did not accept or deny responsibility for the charges but agreed to accept punishment).

## Scope and Methodology of the OIG Review

We conducted our fieldwork from November 2003 through March 2004.  Our review encompassed only those NICS background checks performed by the FBI, not by the POC states.  At ATF headquarters, we interviewed officials from the Office of Firearms, Explosives, and Arson and the Office of Field Operations and obtained workload statistics on the ATF's field office operations.

In January 2004, we visited the FBI's NICS Section in Clarksburg, West Virginia.  We toured the facility, obtained workload data, and interviewed relevant officials.

During January 2004, we also visited the ATF's Brady Operations Branch in Martinsburg, West Virginia.  While on site, we interviewed the Branch Chief, the specialists and their supervisor, the information technology manager, and others.  We also obtained workload statistics. In addition, we reviewed a random sample of 100 denial transactions forwarded to the ATF Brady Operations Branch by the FBI during CYs 2002 and 2003 to determine whether the FBI was referring denials to the ATF on a timely basis and whether the Brady Operations Branch specialists were processing denials on a timely basis, properly referring denials to ATF field offices in accordance with USAO criteria, and adequately documenting the basis for their decisions.

During February 2004, we visited ATF division offices and USAOs in New Orleans, Louisiana; Kansas City, Missouri; St. Paul, Minnesota; and Columbus, Ohio.  At the ATF division offices, we interviewed the special agent in charge (SAC); the assistant special agents in charge (ASAC); the NICS coordinator; a group supervisor or RAC located in, or responsible for, each state within the division (we selected the field office with the largest volume of NICS referrals in that state); and other officials.  At each division office, we reviewed a random sample of 50 standard denials and 50 delayed denials that had been forwarded to the division office by the Brady Operations Branch during CYs 2002 and 2003.  For the standard denials, we reviewed whether the division or field office's decision to close the case or initiate an investigation was made in accordance with USAO guidelines and whether the investigation was opened and completed on a timely basis.  For the delayed denials, we reviewed whether the investigation was opened and closed on a timely basis, the firearm was recovered from the prohibited person, the firearm was used in the commission of a crime prior to recovery, and the decision

to refer the case for prosecution was made in accordance with USAO guidelines.  At the USAOs, we interviewed U.S. Attorneys (USA) and Assistant U.S. Attorneys (AUSA) responsible for prosecuting NICS cases.

During March 2004, we called the designated NICS coordinators assigned to the 19 ATF division offices that we did not visit to obtain information on procedures, training, and workloads.

We also obtained information and statistics from the EOUSA and the ATF on referrals and prosecutions of NICS cases.

# RESULTS OF THE REVIEW

## The ATF Does Not Always Make Timely Firearms Retrievals

**When firearms are transferred to prohibited persons, it is important that the ATF retrieve these firearms expeditiously for public safety. We found, however, that although the ATF is generally successful in retrieving these firearms, the retrievals are not always timely.[19] As a result, there is an increased risk that these prohibited persons may use the illegally obtained firearms to harm others or to otherwise commit a crime.**

Of the 188 delayed denial referrals in our sample for which investigations were completed, the ATF resolved 110 (59 percent) of the cases within a month and 158 (84 percent) within three months.[20] Results varied during the 1-month resolution period among the four divisions included in our sample: 74 percent in the Kansas City division, 61 percent in the Columbus division, 57 percent in the St. Paul division, and 43 percent in the New Orleans division.[21]

Because some cases can reasonably take longer than a month to resolve, we reviewed the investigative case files to determine whether any showed delays in case resolution. We defined delays as two weeks or more to initiate an investigation or two weeks of unexplained inactivity once the investigation had begun. Using these criteria, we determined

---

[19] The ATF retrieved the firearm in 97 percent of the cases in our sample that required a firearm retrieval.

[20] We were usually unable to determine the date that the division NICS coordinator transferred the case to the field office. Therefore, we used the date the delayed denial was received by the division office as the start date. We considered resolution to occur when either the firearm was retrieved or the special agent determined that a retrieval was not required (i.e., the special agent determined that the individual was not prohibited or that the FFL did not transfer the firearm and therefore a retrieval was unnecessary). Also, our sample of 200 delayed denials included 9 cases that were in the process of being investigated and three cases that were denials based on a state, not federal, prohibition (in these cases the retrievals were conducted by the appropriate state). We did not include these 12 cases in the timeliness statistics.

[21] The ATF no longer has timeliness standards for firearm retrievals. The ATF special agents we spoke with generally thought that 30 days was a reasonable expectation for retrieval.

---

that delays occurred in 65 (35 percent) of the 188 cases.  Of the four divisions in our sample, we determined that delays occurred in 49 percent of our New Orleans sample (24 cases), 37 percent of our St. Paul sample (17 cases), 30 percent of our Columbus sample (14 cases), and 21 percent of our Kansas City sample (10 cases).

Figure 4 shows the amount of time it took the ATF to resolve the 188 delayed denials and the number of cases in which delays occurred.

**Figure 4:  Processing Times and Timeliness
Sample of Delayed Denials**



Source:  OIG Sample

Cases in which delays occurred included the following examples:

- A case involving a person prohibited from possessing firearms due to a felony conviction for second degree battery was referred by the Brady Operations Branch to the appropriate division office on November 16, 2002, for a firearms retrieval.  According to the case management log, the case was opened and closed on September 23, 2003, more than 10 months later.  On that date, the ATF field office verified that the subject was a prohibited person and the subject was located and interviewed.  The subject claimed that his firearm had been stolen from his vehicle in March or April 2003.  He had not reported the theft to local authorities.

- A case involving a person prohibited from possessing a firearm due to a misdemeanor domestic violence conviction was referred by the Brady Operations Branch to the appropriate division office on November 28, 2002.  The case was initially handled on a timely basis – during December the case agent verified that the subject was prohibited, sent a letter to the subject, and spoke with the subject by telephone.  The subject agreed to transfer the firearm to a third party not yet identified.  The subject was never heard from again.  The case agent attempted to contact the subject by telephone in February and May 2003.  A visit was not made to the subject's residence until December 2003 (the subject was not home), a year after the initial referral.  As of February 2004, the firearm had not been retrieved.  According to ATF division office officials, some of the delay can be attributed to the original case agent's assignment to military duty and the failure of the field office supervisor to reassign the agent's caseload to other agents on a timely basis.

- A case involving a person prohibited from possessing a firearm due to a misdemeanor domestic violence conviction was referred by the Brady Operations Branch to the appropriate division office on October 31, 2002, for a firearms retrieval.  According to the case management log, the RAC e-mailed the case agent on December 19, 2002, inquiring about the apparent inactivity on the case.  Two months later, on February 25, 2003, the case agent sent a letter to the subject.  The special agent first spoke to the subject on April 2, 2003, four months after the case was received, to discuss the subject's disposal of the firearm.

- A case involving a person prohibited from possessing a firearm due to a felony conviction for vehicular manslaughter was referred by the Brady Operations Branch to the appropriate division office on August 3, 2002, for a firearms retrieval.  According to the case management log, no action was taken until eight months later on April 14, 2003, when a database query was run to locate the subject's current residence.  According to the management log, the delays were due to the agent's criminal caseload.  The special agent visited the subject on June 3, 2003, and found that the subject possessed five other long guns, all of which were subsequently transferred to his daughter's possession.

Our review identified a number of reasons for these delays, as discussed below.

<u>Delayed Denials Are Not Forwarded Directly to Field Offices</u>

The Brady Operations Branch does not electronically transfer delayed denials directly to the appropriate ATF field or satellite office for investigation.  Instead, it transfers the delayed denials to one of 17 ATF division offices, which in turn is supposed to immediately transfer them to the appropriate ATF field or satellite office.  Not only does this process create an unnecessary step, but it also delays initiating a firearm retrieval when the NICS coordinator does not transfer these cases timely.

In addition, because carrying out NICS responsibilities is a part-time function for the NICS coordinators, they do not always access the system on a daily basis.  As a result, it can be several days before a coordinator notices the delayed denial.  In addition, unless the division has assigned a back-up coordinator, absences by the coordinator due to other assignments or annual or sick leave can result in additional delays.  In fact, at one of the divisions we visited, the field offices attributed excessive delays in 14 of the 100 cases in our sample to delays on the part of the NICS coordinator in forwarding the cases to the field.  Of these cases, five involved firearm retrievals.  The amount of time it took to forward these cases to a field office ranged from 3 months to 13 months.

Delays in referring these denials to the field also diminish the sense of urgency among special agents.  A group supervisor at one of the field offices that had not been receiving denial referrals timely stated that the attitude among his special agents was that if delayed denials were not a priority for the division office, why should they be a priority for the field offices.

We discussed with Brady Operations Branch officials the alternative of bypassing the division offices and referring the delayed denials directly to the field and satellite offices.  The officials agreed that this would improve the timeliness of the process, but stated that NFORCE is technically unable to transfer these cases to the field offices.  They further stated that a couple of years ago the ATF considered developing such a direct case system, but the project was dropped due to a lack of funding.

<u>NICS Subjects Are Not Considered Dangerous</u>

The special agents we spoke with generally commented that they do not consider the vast majority of NICS referral subjects a danger to the public because the prohibiting factors are often minor or based on incidents that occurred many years in the past. For example, one group supervisor cited a retrieval case in which the person was prohibited from owning a firearm because of a felony conviction for stealing four hubcaps from a car. In another example, a Brady Operations Branch specialist cited a case where the person was prohibited due to a 1941 felony conviction for stealing a pig. We also were told that "bad guys" generally do not purchase their firearms through legitimate dealers; instead, they have someone with a clean record purchase the firearm for them (known as a "straw purchase") through an FFL, buy a firearm on the black market, or purchase the firearm at a flea market or gun show from a non-FFL.[22] Because agents do not consider most NICS subjects dangerous, they do not consider it urgent to retrieve the firearms.

Some of the 500 NICS cases we reviewed supported this perception.[23] Of the 229 instances in our samples for which we could identify the date of the crime, 110 (48 percent) of the crimes had occurred at least 5 years previously (30 of these, or 13 percent, had occurred at least 20 years previously). These cases included a breaking and entering from 1958, a check forgery from 1959, a burglary from 1968, an attempted burglary from 1963, and a domestic violence case from 1964. Further, some of the prohibiting factors in our sample were for nonviolent crimes such as:

- Fugitive warrants for failure to pay a shoplifting fine, passing bad checks, or traffic violations, and

- Felony convictions for shoplifting, theft of public benefits, fraudulent use of a credit card, forgery, failure to pay child support, or sales tax evasion.

It is understandable that ATF special agents prioritize their workloads by focusing on subjects who are perceived as a greater danger to the community. However, each retrieval represents a person who illegally possesses a firearm. Because someone has committed only

---

[22] Only FFLs are required to perform NICS checks.

[23] This includes 400 NICS cases we reviewed at the four ATF division offices and 100 NICS cases we reviewed at the Brady Operations Branch.

nonviolent crimes in the past does not mean that he or she is not capable of using the illegally obtained firearm to commit a violent crime.

In fact, our sample includes a case in which a person who was prohibited from owning a firearm because of a nonviolent crime (possession of marijuana) subsequently used the 9mm pistol he had purchased to commit a violent crime.  In this instance, an ATF field office special agent had initiated a timely investigation, but placed it on hold after a month because he could not locate the subject (the subject provided a fictitious address to the FFL).  Eight months later, the local police department notified the special agent that the subject had been arrested for aggravated assault using the illegally obtained firearm.

<u>Staffing and Geographic Constraints Exist</u>

All 10 of the division office SACs and ASACs and 10 of the 13 field office RACs and group supervisors we interviewed stated that they had insufficient resources to investigate the volume of NICS referrals their offices received.  This is particularly true at the satellite offices, often staffed by only one or two special agents.  For example, the St. Paul SAC noted that the satellite office in Missoula, Montana, is staffed by one agent who currently has a backlog of about 30 NICS cases in addition to a substantial criminal caseload.

Because of resource limitations, ATF special agents often are pulled from processing NICS cases to work on arson, firearms trafficking, and explosion cases.  To reduce NICS case backlogs, the field offices either periodically shut down all other operations for a month or more or detail special agents from the division offices or other field offices to help out.

NICS investigations are labor- and time-intensive.  The special agent must first determine whether the person is actually prohibited from possessing a firearm and whether the firearm was transferred to the person.  This requires examining criminal histories, obtaining court records, obtaining contact names and addresses, attempting to contact the person, confirming those instances in which the person either returned the firearm to the FFL or transferred the firearm to a third party, and on occasion contacting local law enforcement agencies to determine whether the person is a threat.

Along with staffing shortages, the large geographic territories covered by some of the ATF field offices contribute to the delays in

retrieving firearms. Some of the larger states contain few ATF field offices. The special agents generally retrieve more firearms in rural areas than in urban areas where ATF field offices are often located. When a field office territory covers hundreds of miles, a firearm retrieval can consume a special agent's entire day. Because of potential danger, two special agents are required to perform a retrieval. Because of these factors, special agents sometimes wait until they have multiple retrievals or other investigations to conduct in an area.

The lack of resources to investigate all NICS cases has been a continuing problem. An ATF policy memorandum dated December 5, 2000, stated, "Since the full implementation of the Brady Bill in November 1998, we have experienced a critical shortage of investigative resources necessary for meeting our NICS/Brady investigation and other statutory responsibilities." In November 2001, the Department of the Treasury's OIG report on the ATF's NICS program noted staffing deficiencies related to the large influx of NICS cases and recommended that the ATF develop case workload studies and staffing models to assess and respond to the NICS program's impact on field division resources.[24] Although the ATF agreed in its response to implement this recommendation, our review found that the problems detailed in the Treasury OIG report continue to exist.

One of the field offices in an ATF division we visited is using its investigative analyst, who is supervised by the RAC, to perform administrative tasks associated with a NICS investigation, such as sending initial contact letters to prohibited persons who obtained firearms and making the arrangements for third party transfers. Special agents are needed only when a firearm retrieval is required. According to the RAC, using an investigative analyst for these tasks has significantly reduced the NICS special agent workload in his field office.

Because of the shortage of support personnel in many field offices, using investigative analysts to work NICS cases usually is not feasible. In lieu of using support personnel to assist with NICS cases, special agents suggested hiring contractors, preferably retired ATF special agents or ex-law enforcement personnel, to perform these functions. We believe

---

[24] See *Protecting the Public: Bureau of Alcohol, Tobacco and Firearms Could Improve its National Instant Criminal Background Check System Program*, Department of the Treasury, Office of the Inspector General, OIG-02-004, November 1, 2001. The ATF was located within the Department of the Treasury until January 24, 2003, when the majority of the ATF was transferred to the DOJ.

this merits consideration, since requiring special agents to perform these primarily administrative duties is not an efficient use of resources.

### No Timeliness Standards Exist

We found that the ATF does not have timeliness standards for firearm retrievals. When the NICS was first initiated, the ATF required its agents to initiate a delayed denial investigation and retrieve the firearm within five days of receiving the case. In fact, the ATF's procedural guidelines, "NFORCE and NICS/Brady Referrals," still refer to these as "5-day turn-around" cases. Some of the special agents in the field stated this standard was unreasonable. A June 17, 1999, ATF policy memorandum stated, "In responding to the delayed referrals the 5-day reporting requirement is no longer in effect." The memorandum did not establish different standards, instead stating, "Priority consideration should be given to referrals where a firearm has been transferred." The memorandum further stated, "Since the persons receiving the firearm in these instances maybe [sic] a prohibited person, it is imperative that investigations be initiated per established criteria in a timely manner."

Because the retrieval of firearms from prohibited persons is an ATF priority, we believe that the ATF should establish timeliness performance standards and track field office performance. Due to the lack of standards and timeliness monitoring, ATF management is unable to quickly identify and address delays in retrieving firearms.

ATF management disagreed that timeliness standards should be established for the completion of a case. Instead, subsequent to our review, they revised the written procedures to state, "It is imperative that delay denials be handled promptly and not be allowed to linger without investigative action." We do not believe that this general admonition is sufficient. In our opinion, the ATF should establish standards to ensure timely firearm retrievals.

## RECOMMENDATIONS

**Recommendation 1:** The ATF should modify its NFORCE system to allow the Brady Operations Branch to refer delayed denials directly to the appropriate ATF field office.

**Recommendation 2:** The ATF should use non-agent personnel to handle the administrative tasks related to NICS cases.

**Recommendation 3:** The ATF should establish timeliness standards for firearm retrievals and develop a system for ATF field office management to monitor and report on compliance with these standards.

**Firearms Retrieval Procedures Are Inadequate**

**The ATF's use of a contact letter requesting that a prohibited person voluntarily dispose of the firearm does not always result in timely retrievals because of delays in sending the letters and the lack of a time frame in which the recipient must respond. The ATF also fails to monitor responses and to take timely action when a prohibited person does not respond to the letter. In addition, the ATF does not adequately document all retrievals or, in the case of third party transfers, does not always document that the third party is not prohibited from possessing a firearm. As a result, there is not adequate verification that retrievals are performed in accordance with ATF procedures.**

<u>Deficiencies in the Use of Initial Contact Letters</u>

In many cases, giving a prohibited person the opportunity to voluntary surrender an improperly transferred firearm before sending an agent to retrieve it is an efficient use of ATF resources. We noted, however, that ATF field offices did not always send contact letters on a timely basis, did not specify a time frame for the person to respond, and did not always take action timely if there was no response.

ATF policy allows a standardized "contact letter" for prohibited persons who inappropriately received firearms as a result of a NICS delayed denial. The contact letter advises the recipient that records indicate that he or she is prohibited from possessing a firearm and asks the person to contact the ATF field office regarding options for lawfully disposing of the firearm. The contact letter is not used if the investigation is likely to result in prosecution of the recipient of a firearm.

At the four ATF divisions we visited, we found a wide variance in the use of contact letters. Overall, in the 123 cases in our sample that required a firearm retrieval, 31 initial contact letters (25 percent of the

cases) were sent.[25]  Of the four ATF divisions in our sample, special agents in the St. Paul division used initial contact letters most often (12 letters representing 40 percent of their required retrieval cases), and special agents in the Kansas City division used initial contact letters least often (2 letters representing 7 percent of their required retrieval cases).

The general consensus of the division and field office agents we interviewed was that contact letters were effective in retrieving firearms. In their opinion, most of the persons they contacted did not realize that they were prohibited from owning firearms and were cooperative when asked to dispose of the firearms.  One group supervisor stated that when his office sent a contact letter, the prohibited person responded 90 percent of the time.  Another group supervisor noted that one of the satellite offices had a 100 percent success rate with contact letters.  In our sample, 16 of the 31 contact letters sent (52 percent) resulted in the person promptly disposing of the firearm.

Because of this successful response rate, sending contact letters can be an effective and efficient way for ATF to retrieve firearms. However, to be most effective, the ATF should send the letters promptly, specify a time frame for response, and take timely action if there is no response.  We identified deficiencies in all of these areas.

We found cases with extensive delays between the time when the division office received the referral and when the initial contact letter was sent.  Of the 29 initial contact letters in our sample for which we were able to determine the dates they were sent, 8 (28 percent) were sent a month or more after the case was received by the field.  In four of these cases, the delays were slightly over a month; in the other four cases, the delays ranged from 48 days to 202 days.  The latter cases are described in Table 5.

---

[25] Of our total sample of 200 delayed denials, only 123 required a firearm retrieval.  Of the remaining 77 cases, 74 did not require a retrieval because ATF special agents subsequently determined upon further research either that the person was not prohibited from owning a firearm or that the FFL had not transferred the firearm.  In some cases, the FFL will contact the person when the FFL is informed by the NICS examiner of the delayed denial, and the person will voluntarily return the firearm to the FFL.  The remaining three cases were forwarded to the Columbus division office by the Brady Operations Branch "for investigative purposes only."  According to a Brady Operations Branch specialist, the state of Ohio prohibits anyone with a drug conviction from possessing a firearm.  Because these denials are based on state prohibitors, not federal prohibitors, the state of Ohio is responsible for the firearms retrieval, not the ATF.

**Table 5:  Examples of Delays in Sending Initial Contact Letters**

| Amount of Delay | Reason for Prohibition | Reason for Delays |
|---|---|---|
| 48 days | Misdemeanor domestic violence conviction | Unable to determine |
| 62 days | Felony conviction (possession of sawed-off shotgun) | Case was assigned to single-agent satellite office |
| 185 days | Misdemeanor domestic violence conviction (beat pregnant wife) | Field office cited other investigative priorities as the reason for the delay |
| 202 days | Felony indictment (criminal mischief) | Field office cited other investigative priorities as the reason for the delay |

Source: OIG Sample

In addition, the ATF's standard contact letter does not specify a time frame within which the firearm's owner must contact the ATF.  The letter states only that the recipient should contact the ATF "as soon as possible."  Further, the ATF has no guidelines for how long the field should wait before following up.  One group supervisor we spoke with had established his own policy, requiring that his agents take action to retrieve a firearm if the person did not respond within 48 hours.  All the other field offices we contacted indicated that the individual case agent decided when to follow up.  In addition, we found that in 7 of the 31 cases (23 percent), the field office sent a second letter.

To maximize the effectiveness of contact letters, the ATF needs to revise its letters to include a response time frame, improve its timeliness in sending the letters, monitor the response time, and take timely action when the letter is not effective in garnering a response.

<u>Special Agents Do Not Always Document Third Party Transfers, Returns of Firearms to the FFL, and Seizures of Firearms by Local Law Enforcement</u>

The ATF rarely seizes a firearm from a prohibited person.[26]  In most instances, the prohibited person opts to transfer the firearm to a third party or return the firearm to the FFL.  In some cases, the prohibited person voluntarily surrenders the firearm to local law

---

[26] This is only done if the prohibited person is perceived as dangerous or if the prohibited person refuses to dispose of the firearm.

enforcement officials, or local law enforcement officials seize the firearm. In our sample, of the 114 completed cases requiring a firearm retrieval, 59 (51 percent) involved third party transfers, 36 (32 percent) involved returns to the FFL, 12 (10 percent) involved seizures by either the ATF or local law enforcement agencies, and 4 (4 percent) involved abandonments.[27]

In cases in which the ATF does not seize the firearm, it is important for the ATF to document that the prohibited person no longer possesses the firearm and therefore that its retrieval actions were successful. The ATF does have written policies requiring documentation of third party transfers. According to a December 5, 2000, ATF policy memorandum, "Should the firearm be transferred to a 3rd person, the acknowledgement (Exhibit 3) signed by the original purchaser, the 3rd party AND the investigating agent must be executed and made a part of the investigative file." We were unable to find similar written requirements for documenting returns of firearms to the FFLs or for seizures by local law enforcement agencies.

We noted significant documentation deficiencies in our sample. For example:

- Of the 59 cases in which the subject transferred the firearm to a third party, there was no evidence in 25 of the investigative case files (42 percent) that a written acknowledgement form was obtained.

- Of the 36 cases in which the subject returned the firearm to the FFL, there was no documented evidence in 27 of the investigative case files (75 percent) of this return.

- Of the six cases in which the firearm was either seized by or surrendered to a local law enforcement agency, there was no documented evidence in three of the investigative case files (50 percent) of this transaction.

We found considerable disagreement among ATF field special agents as to whether documentation is required, particularly in third

---

[27] In the remaining three cases (3 percent), the ATF was unable to locate the prohibited person. In our sample of 200 delayed denial referrals, the 123 referrals that required a firearm retrieval included 9 cases in which the investigation had not been completed at the time of our review.

party transfers.  Despite the requirements of the policy memorandum, some special agents told us that they believed that a verbal assurance from a third party was sufficient.  We disagree.  In addition to the intrinsic value of having such documentation, the documentation could be used as an evidentiary tool should the third party be prosecuted for violating the agreement by allowing the prohibited person to have access to the firearm.

ATF management agreed with our findings and, subsequent to our review, revised its written procedures to require that special agents document third party transfers, returns of firearms to the FFLs, and seizures of firearms by local law enforcement agencies.

Background Checks of Third Parties Are Not Always Conducted or Documented

According to a December 5, 2000, ATF policy memorandum, third party transfers "should be made to a non-prohibited individual." According to an ATF headquarters official, although the policy does not specifically require that the ATF agent conduct a background check of the individual to whom the firearm is transferred, the ATF expects the agent to conduct an independent check instead of relying solely on the word of the third party.

We found, however, that of the 59 cases in our sample in which there was a third party transfer, in only 24 cases (41 percent) did the investigative case file indicate that a background check had been performed on the person to whom the firearm was being transferred.  For the four ATF division offices we visited, the percentage of cases for which there was documentation ranged from 7 percent (1 case out of 14) in the Columbus division to 58 percent (11 cases out of 19) in the St. Paul division.

ATF management agreed with our findings and, subsequent to our review, revised its written procedures to require the special agent to ensure that the third party is not a prohibited person.

**RECOMMENDATION**

**Recommendation 4:**  The ATF should revise its standard initial contact letter to include a response time frame and should direct its personnel to send the letters on a timely basis, to track responses to the letters, and to take timely action to retrieve the firearms when the letters are unsuccessful in eliciting a response.

**ATF Field Offices Receive Too Many Standard Denial Cases That Are Unlikely to Be Prosecuted**

> **The ATF does not ensure that only those standard denial referrals that appear to have prosecutorial merit are referred to its field offices for investigation.  This practice unnecessarily increases the workload of the special agents in the field.**

By all accounts, the ATF considers the investigation of standard denials to be a low priority.  All of the SACs, ASACs, RACs, and group supervisors we spoke with stated that, with the exception of firearm retrievals, NICS cases were not a priority.  This field attitude reflects ATF headquarters policy.  An ATF policy memorandum dated June 17, 1999, stated that NICS cases, "are not to be worked at the expense of higher priority investigative matters as determined by the respective Division management team.  Because of our limited resources, [standard] referrals meeting the criteria set by ATF and respective U.S. Attorneys should be processed according to the severity of the disqualifying convictions, the presence of multiple attempts to purchase firearms, and the availability of division resources."

Field special agents also told us that NICS cases required extensive time and resources, but were rarely prosecuted.  Special agents we interviewed called the cases "pointless and overwhelming" and a "drain on resources" and stated that they can "barely keep up" with the workload.  One group supervisor stated that his agents "cringe" when assigned a NICS case.  They also view these cases as detracting from more important cases, such as those involving firearms traffickers, gangs, arsons, and explosives.  Although the special agents we spoke with acknowledged the need for firearm retrievals, they saw little purpose in investigating a standard case in which the NICS successfully prevented a prohibited person from purchasing a firearm.

We believe that the number of standard denials referred to field offices should be limited to cases that meet USAO prosecutorial guidelines. Our review found that ATF field offices are receiving too many standard denial referrals that are unlikely to be prosecuted according to USAO guidelines. This is adding unnecessary work to busy field investigators' caseloads and taking resources away from investigations of other crimes. The standard denial cases need to be better screened by both the Brady Operations Branch specialists and the division office NICS coordinators.

Over the years, the Brady Operations Branch has improved its screening process for standard denials it receives from the FBI. According to Brady Operations Branch management, the proportion of the standard denials it referred to the field has been reduced from a high of 40 to 50 percent, when the program was first initiated in 1999, to 22 percent in FY 2003 and 17 percent in FY 2004. Although the number of standard denials sent to the field offices has been reduced, our review identified improvements that could be made to further reduce the workload. These improvements are discussed in the following sections.

<u>The USAOs Have Not Provided Sufficient Prosecutorial Guidelines</u>

While USAO prosecutorial guidelines are a critical tool for the ATF to manage its NICS case workload, we found that not all USAOs provided written guidelines. The Brady Operations Branch uses the guidelines to screen the 60,000 referrals it receives annually, sending only those cases that meet the USAO guidelines to the ATF division offices for investigation. The Brady Operations Branch can only identify NICS referrals by ATF division, and therefore it uses broader composite USAO guidelines developed from the specific USAO guidelines available for that division. For example, if individual USAO guidelines within a particular division specify different ages of felony convictions, the Brady Operations Branch will apply the oldest age to all the NICS referrals within that division. The division NICS coordinators generally use the more specific USAO guidelines to further screen the referrals they receive from the Brady Operations Branch, thereby limiting the number of NICS cases referred to the ATF's field offices.

We found that the guidelines that the USAOs provided were not always current or sufficiently specific to be useful. We also found that some of the division offices had received guidelines from their respective USAOs and were using them to perform their own screening, but had not forwarded these guidelines to the Brady Operations Branch as requested.

Further, due to system limitations, Brady Operations Branch specialists are only able to identify NICS cases by federal judicial district, which greatly limits the extent of the screening that can be performed.

The ATF first instructed its division directors to obtain their respective USAO's guidelines via a policy memorandum dated June 17, 1999. At that time, only half of the USAOs responded in writing to the request. In 2003, the Brady Operations Branch made a similar request to the ATF division offices, and only half of the divisions responded. A January 29, 2003, memorandum from the Attorney General to all U.S. Attorneys, the ATF Acting Director, all ATF special agents in charge, and the EOUSA Director also stressed the importance of USAO prosecutorial guidelines for combating gun crimes. The memorandum stated, "To make the most of ATF's investigative resources, it is crucial that the U.S. Attorneys and ATF have a clear understanding of the guidelines for cases to be referred for Federal prosecution and cases that should be referred for state prosecution." The memorandum further directed the USAs and corresponding ATF special agents in charge to meet and confer on prosecutorial guidelines and criteria to ensure that they are fully coordinated on the investigation and prosecution of gun crimes.

However, as of April 2004, the Brady Operations Branch had been able to compile written criteria for only 7 of the ATF's 17 division offices that receive NICS referrals. The Brady Operations Branch chief stated that he was not sure whether the lack of responsiveness was due to the USAOs not responding or the division offices not following up.

In addition to reviewing the USAO guidelines used by the Brady Operations Branch, we obtained information on the available guidelines from the NICS coordinators and group supervisors or RACs at the four ATF division offices we visited (encompassing 25 of the 94 USAOs). Of these 25 USAOs, 8 had not provided guidelines to the ATF. Several of the ATF field office group supervisors told us that some of the USAOs are reluctant to provide written guidelines. One AUSA we spoke with stated that developing standard guidelines is not practical because of the range of gun crimes.

We believe that the USAOs should provide written guidelines to the ATF. The USAOs can add a qualifier to their guidelines stating that they will accept cases that do not meet the guidelines on a case-by-case basis, already a practice at those locations that have guidelines. In addition, standard guidelines are possible and are done by some USAOs that

develop guidelines based on analyses of the cases that they successfully prosecute.

To be useful to the ATF, the guidelines also need to be specific and realistic.  Fourteen of the 17 guidelines we reviewed appeared to be sufficiently specific.  These guidelines identified the prohibiting factors most likely to result in successful prosecutions and set parameters for these factors, specifying types of crimes, ages of convictions, and numbers or patterns of convictions.[28]  One of the remaining three guidelines was overly broad because it merely listed all the prohibiting factors and stated that the USAO was interested in seeing *all* cases.  Overly broad guidelines do not help the ATF screen cases.  We were unable to assess the quality of two guidelines because they were not available at the division offices during our visit.

We also found that some guidelines were not realistic.  For example, one NICS coordinator told us that he generally screens out any standard referrals in which a prohibited person attempted to purchase a long gun.  He stated that the USAOs in the division's region will not accept these cases because they are in "hunting country," where these cases generally lack jury appeal.[29]  Our discussions with representatives from one of the USAOs in the district confirmed this.  However, we noted that none of the written prosecutorial guidelines included the qualifier that a prohibited person who purchased a long gun would normally not be prosecuted.  In addition, because priorities change, it is important that the USAOs review and update their guidelines annually.  We generally found that this was not occurring.

Brady Operations Branch specialists currently can distinguish each denial transaction only by ATF division office, not by federal judicial district.  Brady Operations Branch management agreed that the capacity to screen by individual federal judicial district would help reduce the volume of referrals to the field offices because they would be able to screen for criteria specific to a particular USAO instead of using broader criteria.  They stated that with additional funding, FFL identification numbers could be matched to a particular federal judicial district.

---

[28] In general, the types of cases more likely to be prosecuted were those involving violent offenders, more recent crimes, career criminals, and patterns of escalating violence.

[29] "Jury appeal" refers to those cases that are more likely to result in a conviction.

Developing the technological capacity to enable the Brady Branch specialists to screen using individual USAO guidelines would eliminate the need for the NICS coordinators to perform additional screening.  In the interim, more complete USAO guidelines would help the NICS coordinators better screen NICS referrals.

### More Screening Needs to Be Done by the Division Offices

Although additional screening by NICS coordinators at the ATF division offices can reduce the flow of standard denial cases to the field offices, we found that not all NICS coordinators screen these cases.  Six (35 percent) of the 17 division offices that receive referrals from the Brady Operations Branch are not screening referrals before forwarding them to the appropriate field or satellite office.[30]

Our sample of 50 standard denials selected from each of four division offices we visited showed a wide variation in the number referred to field and satellite offices.  One (Columbus) performed no screening, and therefore forwarded 100 percent of the standard denials it received. Of the three division offices that screened the standard denials, New Orleans screened out 6 percent (forwarding 94 percent), Kansas City screened out 36 percent (forwarding 64 percent), and St. Paul screened out 84 percent (forwarding 16 percent).

One NICS coordinator stated that his field offices want to see all standard denials because they view them as having potential intelligence value.  This argument is questionable because initial screening done by the Brady Operations Branch leaves the division offices with only a small fraction of the standard denials to review.  In our opinion, NICS coordinators who do not further screen denial referrals are transferring the burden to the busy field offices.

### NICS Coordinators Need Training and Written Guidance

The ATF could improve its screening of NICS cases by providing training and guidance to the NICS coordinators.  During our telephone interviews with NICS coordinators, we found some of the coordinators were unfamiliar with the NICS program.  For example, a NICS coordinator assigned to an ATF division with a large NICS workload had little understanding of the NICS process and mistakenly believed that the

---

[30] The ATF division offices in Boston, Charlotte, Columbus, Dallas, Miami, and Seattle do not screen referrals.

FBI, not the Brady Operations Branch, was sending her copies of court documents.

We found that few of the NICS coordinators received training on the NICS program.  Only six of the current NICS coordinators had attended the last NICS training conference, which was held in 2000.  The majority of the NICS coordinators we spoke with indicated that they would like to attend a NICS conference.  According to the Chief of the Brady Operations Branch, the Branch used to host NICS coordinator conferences but had not done so for several years due to the lack of funding.  In April 2004, the Chief informed us that a 1-week conference has been tentatively scheduled for the summer of 2004, pending funding approval.  The conference is to be held at the Brady Operations Branch and is to include a site visit to the FBI NICS Section.

In addition, the ATF has not provided the NICS coordinators with written guidance, which would provide more consistency in screening cases.

### Fewer Alien Cases Should Be Forwarded to the Division Offices

We found that the Brady Operations Branch unnecessarily forwarded to the ATF division offices standard denial referrals pertaining to aliens that did not meet USAO guidelines.  Further, the ATF has not issued any guidance to its division and field offices on what actions to take in relation to these cases.  As a result, some division and field offices close these cases upon receipt without taking action; others refer these cases to the local ICE office, unaware that the Brady Operations Branch has already made the referral.

Illegal aliens and aliens admitted to the United States under a nonimmigrant visa are prohibited from possessing firearms.[31]  The Brady

---

[31] While illegal aliens and aliens admitted to the United States under a nonimmigrant visa are generally prohibited from possessing or purchasing firearms in the United States, there are some exceptions: (1) nonimmigrant aliens who possess a valid hunting license or permit lawfully issued by a U.S. state; (2) nonimmigrant aliens entering the United States for "sporting" purposes (e.g., to compete in a competitive shooting event or to display firearms at a trade show); (3) certain diplomats; (4) designated officials of foreign governments or distinguished foreign visitors; (5) foreign law enforcement officers entering the United States on official law enforcement business; and (6) persons who have received a waiver from the U.S. Attorney General.  A nonimmigrant who falls into one of these categories must reside in the United States at least 90 days prior to purchasing a firearm from an FFL.

Operations Branch specialists forward to ICE all cases in which the person has indicated on ATF Form 4473 that he or she has a foreign place of birth. The following types of cases are also forwarded to the appropriate ATF division office:

- If the alien received a firearm, the case is treated similarly to a nonalien case and forwarded as a delayed denial for the purposes of retrieving the firearm.

- If the alien did not receive a firearm but has a prohibiting criminal record (e.g., is a convicted felon), the case is treated similarly to a non-alien case and forwarded for investigative purposes.

- If the alien does not have any other prohibiting factors, the specialist may forward the case for "informational purposes" if the alien is in the United States illegally or if ICE's records are inconclusive as to the alien's status.

The ATF has not provided procedural guidance to the field on how to handle these referrals. As a result, we found that NICS coordinators and field special agents were unclear on what actions to take on these cases. Two of the NICS coordinators we spoke with stated that they routinely close all cases that involve aliens as they receive them; the other 15 NICS coordinators stated that they refer these cases to the field for resolution. None of the field staff we spoke with were aware that the Brady Operations Branch routinely referred these cases to ICE. As a result, some of the division and field personnel also refer these cases to ICE.[32] In fact, based on our review it appears that the only action, if any, the field offices take in relation to these types of cases is to refer them to ICE.

None of the cases in our sample that pertained to the alien prohibition resulted in investigations. Of our sample of 200 standard referrals, 22 (11 percent) were denials due to the alien prohibition. In none of these 22 cases did the person have a criminal record or other prohibiting factors. None of these cases resulted in investigative action – 6 were closed immediately upon receipt by the NICS coordinator, while

---

[32] One NICS coordinator told us that she no longer refers these cases to the local ICE office because ICE officials at that office told her they were not interested.

the remaining 16 were forwarded to a field office where 14 were closed by a special agent without investigative action.[33]

In our opinion, the Brady Operations Branch should refer to the field only those alien cases that require a firearm retrieval or that meet USAO prosecutorial guidelines.  If, however, the ATF determines that there is some useful purpose in referring these cases to the field, it needs to develop guidance to communicate its expectations about how the field offices are to respond.

<u>Better Communication Needed Within the ATF</u>

The volume of standard referrals being sent to the field could be greatly reduced with improved communication among the Brady Operations Branch, the ATF division offices, and the ATF field offices.

During our site visit, Brady Operations Branch specialists stated that they did not regularly receive feedback on the appropriateness of the standard denial referrals they sent to the field and therefore did not know whether they were screening effectively.  Without knowing how successful their referrals are, the specialists are unable to modify their procedures.  The only feedback mechanism the specialists currently have is to access NFORCE to look up what actions the field offices took in relation to specific referrals.

We found that some of the division office NICS coordinators were closing a substantial amount of the standard denial referrals as they received them from the Brady Operations Branch.  At one of the division offices we visited, the NICS coordinator closed 42 of the 50 (84 percent) standard denial cases in our sample; at another division office, the NICS coordinator closed 18 of the 50 (36 percent) standard denial referrals in our sample.  In addition, four other NICS coordinators we contacted by phone estimated that they close from 40 percent to 95 percent of the standard denial referrals they receive.

In our opinion, if the NICS coordinators are closing a large percentage of the standard denial referrals they receive, then these are inappropriate referrals from the Brady Operations Branch.  To reduce the number of standard denial referrals being received, the NICS coordinators need to analyze their rationale for not referring the cases for investigation and provide feedback to the Brady Operations Branch.  If

---

[33] The remaining two cases have not yet been closed; however the investigative files do not indicate that any investigative action has taken place.

the Brady Operations Branch specialists were aware of the types of cases actually being investigated by the field, they could close those types of cases instead of referring them to the division office.

The special agents in the field offices need to communicate similar information back to their NICS coordinators. Several of the group supervisors we spoke with stated that they closed out the majority of the referrals they received from their NICS coordinators. However, the group supervisors and RACs should ask the NICS coordinators to cease sending particular types of referrals to the field offices. It is not constructive, as is the current practice, for special agents to question the rationale for particular cases being sent to them by the NICS coordinator. Instead, they need to provide the NICS coordinator with specific guidance for screening cases.

## RECOMMENDATIONS

**Recommendation 5:** The EOUSA should ensure that annually each USAO provide the ATF with specific prosecutorial guidelines for NICS cases.

**Recommendation 6:** The ATF should examine the feasibility of enabling Brady Operations Branch specialists to identify NICS cases by federal judicial district, thereby enabling the ATF to consolidate all its NICS referral screening at the Brady Operations Branch. In the interim, the ATF should require all division office NICS coordinators to screen NICS standard denial referrals and refer to the field offices only those cases that meet USAO prosecutorial guidelines.

**Recommendation 7:** The ATF should provide annual training to the NICS coordinators and develop a NICS coordinator handbook.

**Recommendation 8:** The ATF Brady Operations Branch should refer to the field offices only those alien cases that meet the USAO prosecutorial guidelines.

**Recommendation 9:** The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch of those referrals that do not meet USAO guidelines.

**Some Denied Persons Are Subsequently Determined by the ATF Not to Be Prohibited**

> **After performing additional research, the ATF frequently determines that the denied individual is not prohibited from possessing a firearm. Generally this occurs because the FBI could not readily determine the individual's prohibited status due to inaccurate and incomplete automated state records.**

We found that 69 of the 197 (35 percent) delayed denials and 16 of the 200 (8 percent) standard denials in our sample were applicants who should not have been prohibited from purchasing a firearm.[34] Special agents in each of the four divisions we visited stated that this was a common occurrence. Although the investigative files did not specify why the subjects in our sample were found not to be prohibited, our discussions with ATF personnel identified several reasons why this generally occurs: (1) the subject's firearm rights had been restored under state law, (2) the subject's prohibition for a misdemeanor crime of violence did not meet the federal criteria, or (3) a protective order had expired or was about to expire. These circumstances are discussed in detail in the following sections.

<u>Firearm Rights Have Been Restored</u>

Currently, when a federal crime is the prohibiting factor, the person's firearm rights can only be restored through a presidential pardon.[35] In relation to persons prohibited from possessing firearms due to a criminal conviction, the GCA states: "Any conviction which has been expunged, or set aside or for which a person has been pardoned or has

---

[34] Although our sample included 200 delayed denials, 3 were referred to the state for retrieval action instead of to the ATF and therefore we did not include these cases in this analysis. See footnote 25 for additional details.

[35] Title 18 U.S.C. Section 925(c) states that an individual may apply to the Secretary of the Treasury for "relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, transportation of firearms, and the Secretary many grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of such relief would not be contrary to the public interest." This function was delegated to the Director of the ATF. Congress has not authorized funding for this program since October 1992, and therefore the ATF no longer performs this function.

---

had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." [36]

All but two states have provisions for restoring firearm rights.[37] Firearm rights are restored automatically or through application. The conditions for restoration vary greatly among the states by age (juveniles versus adults), type of crime, and the time frame between release from prison or parole and restoration of rights. In some states, restoration rights specifically apply only to convicted felons, which may result in a paradoxical situation in which someone convicted of a misdemeanor crime of domestic violence is permanently barred from owning a firearm, while someone who kills his spouse has his firearm rights restored after serving his sentence.

Twenty-one states automatically restore firearm rights upon release from prison or completion of parole.[38] Forty-five states have provisions for restoring firearm rights through application.[39] A person, after a specified waiting period in which no additional crimes have been committed, can submit an application to the appropriate authority for restoration. Again, the conditions vary widely among the states.

Because these provisions affect the person's right to possess a firearm, it is important for FBI NICS examiners, Brady Operations Branch specialists, NICS coordinators, and ATF special agents to be familiar with them. Automatic restorations should readily be identified by FBI NICS examiners and Brady Operations specialists. Although we were unable to verify employee expertise in applicable state law, FBI NICS and Brady Operations Branch management assured us that their employees, who are assigned cases for particular states, have expertise

---

[36] 18 U.S.C. Section 921(a)(20).

[37] Statistics on states' restorations of rights provisions used in this section were extracted from the *Survey of State Procedures Related to Firearm Sales, Midyear 2002*, published by the DOJ's Bureau of Justice Statistics, October 15, 2003 (revised version) and from ATF P 5300.5 *State Laws and Published Ordinances – Firearms* (2003 – 24th Edition). The two states that do not have provisions for restoration rights are Alabama and Vermont.

[38] In six of these states, automatic restoration only applies to juveniles.

[39] In 21 of these states, restoration of firearm rights only occurs through pardons or expungements of records.

in the applicable state laws.  Because it is difficult for FBI NICS management to ensure that the automatic restoration provisions are taken into account when determining whether to deny a firearm to a person, the ATF should report exceptions back to the FBI.  Currently there is no mechanism to do so.

Restoration of rights through application is much more difficult for the FBI NICS examiner to ascertain.  According to FBI NICS management, states are responsible for entering the names of persons whose rights have been restored into one of the criminal databases (III or NCIC).  If this is properly done, the NICS check should identify not only the prohibiting factor, but also the restoration.  However, considering the inaccessibility and incompleteness of some state criminal history records, it is unlikely that restoration information will be identified during the NICS check.[40]

Domestic Violence Criteria Were Not Met

Of the 85 cases in our sample closed by the ATF division, field, or satellite office because the person was determined not to be prohibited from possessing firearms, 27 (32 percent) had been denied under the prohibition for conviction of misdemeanor crimes of domestic violence.

For a misdemeanor crime of domestic violence to qualify as a federal prohibitor for firearms possession, certain criteria must be met, some of which are not readily apparent from the records included in the criminal databases.  Before initiating an investigation or retrieving a firearm, the ATF special agent often needs to review court documents to determine whether all the prohibiting criteria are met.  These criteria are:

- The offense must have an element of either using or attempting to use physical force or threatening the use of a deadly weapon;

- The defendant, at the time the crime was committed, must have had a relationship with the victim, specifically that of a spouse or ex-spouse, parent, or guardian; sharing a child in common;

---

[40] The problems of inaccessible and incomplete state criminal history records were noted by the General Accounting Office (GAO) in the following reports: *Gun Control: Implementation of the National Instant Criminal Background Check System*, GAO/GGD/AIMD-00-64 (February 2000); *Gun Control: Options for Improving the National Instant Criminal Background Check System*, GAO/GGD-00-56 (April 2000); *Gun Control: Opportunities to Close Loopholes in the National Instant Criminal Background Check System*, GAO-02-720 (July 2002); and *National Criminal History Improvement Program: Federal Grants Have Contributed to Progress*, GAO-04-364 (February 2004).

cohabiting or having cohabited with the victim; or similarly situated to a spouse, parent, or guardian of the victim;

- The defendant must have been represented by counsel or knowingly and intelligently have waived the right to counsel at the time of his or her conviction;

- The defendant must have been entitled to a jury trial or knowingly and intelligently have waived the right to have the case tried by a jury; and

- The defendant must not have had the conviction expunged or set aside, or received a pardon or a restoration of firearm rights.[41]

To qualify under this prohibition, the person does not have to have been convicted specifically for a misdemeanor crime of domestic violence. According to Title 9, Section 1117 of the United States Attorneys' *Criminal Resource Manual*, this prohibition includes all misdemeanors that involve the use or attempted use of physical force (e.g., simple assault, assault and battery), if the offense is committed by one of the defined parties.

In some states, few crimes of domestic violence qualify as prohibiting factors. For example, most domestic violence cases in Louisiana do not meet the criteria because any misdemeanor for which the punishment is a fine of $1,000 or less or imprisonment for six months or less is tried without a jury.[42] Most domestic violence crimes are charged as either simple battery or aggravated assault, which fall below the level requiring a jury trial. The defendant also does not have the right to counsel. Therefore, under these criteria, a person with a domestic violence conviction in Louisiana is not prohibited from possessing a firearm.

In some cases, a person's prohibited status cannot be determined without a review of court records. In these cases, it is difficult for the FBI NICS examiner to obtain the information within the 3-day period. However, wherever possible the ATF should try to identify trends in inappropriate referrals and communicate these to FBI NICS in order to

---

[41] 18 U.S.C. Section 921.

[42] Louisiana Code of Criminal Procedures Article 779, Trial of Misdemeanors, Section A.

---

reduce the number of inappropriate denials.  For example, if the ATF identifies that persons in a particular state are never prohibited because the legal process in that state does not meet the prohibitive criteria, the ATF needs to communicate this to the FBI NICS Section.

<u>Protective Orders Have Expired</u>

Being under an active protective order is one of the prohibiting factors for possessing a firearm.  If a protective order has expired when the ATF begins its investigation, the ATF will not initiate a firearms retrieval or investigation because the person is no longer prohibited from possessing a firearm.  This occurred in 7 of the 85 cases (8 percent) in our sample closed by the division, field, or satellite office.  These cases could be screened more efficiently by the division office NICS coordinator or a contract or administrative employee instead of being assigned to a special agent.

**RECOMMENDATION**

**Recommendation 10:**  The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch and the FBI NICS Section of trends in inappropriate referrals of non-prohibited persons.  Also, require that the field office personnel, via the division office NICS coordinators, provide to the FBI NICS Section the names of those individuals that the ATF determines not to be prohibited and documentation to support the reason for the person's non-prohibited status.


**Improvements Are Needed in Brady Operations Branch**

**The ATF Brady Operations Branch periodically has extensive workload backlogs due to insufficient staffing and operational inefficiencies resulting from technological limitations.**

The Brady Operations Branch has made significant progress in processing NICS referrals since its establishment in January 2000.[43]  In October 2000, the FBI began forwarding denials to the Brady Operations Branch on a daily basis (prior to this, the denials were forwarded every two weeks).  In August 2002, the ATF NICS Referral (ANR), the system

---

[43] This is the date when the first permanent staff was hired.  Prior to this, field special agents were detailed on a rotating basis.

used by the ATF to receive referrals from the FBI, was integrated with the ATF's NFORCE system. This enabled ATF division office personnel to access a NICS denial file once the Brady Operations Branch specialist processed the denial. Prior to this, the Brady Operations Branch had to mail or fax the referral information to the division offices. These changes have made the referral process more timely and efficient.

However, funding constraints have hindered its continued progress. Part of the problem results from the Brady Operations Branch not having a separate budget and therefore having little control over its yearly funding. In the following sections, we discuss the impact these funding constraints have had on processing NICS referrals. We also discuss a technological modification needed to improve the referral process.

<u>Additional Staffing Is Needed to Ensure Timely Processing</u>

During our review, we noted excessive backlogs occurring at the Brady Operations Branch during the peak processing season (October through December). Brady Operations Branch specialists told us that it generally takes them four months to process the large volume of referrals received during this period. Although denials requiring firearms retrievals are processed and referred to the appropriate division offices on the same day as they are received, the standard denials are queued and processed by each specialist in the order received. As a result, the standard denials received by the Brady Operations Branch during the peak season may not be transferred to the field for investigation for three to four months. And because cases are processed in the order received, there is no priority processing of cases that merit prosecution, such as those in which the subject is considered a danger to the community.

At the time of our January 2004 site visit, the Brady Operations Branch was experiencing extensive workload backlogs as shown in Figure 5.



Source: ATF Brady Operations Branch

According to Brady Operations Branch management, the extensive current backlogs are due to an overall increase in workload (an additional 5,300 referrals from the prior year), the transfer of a high-producing specialist, and insufficient staff. Management stated that during this past peak season, FBI NICS was sending 300 to 400 referrals a day for processing to the seven Brady Operations Branch specialists. As of June 2004, substantial backlogs still existed. According to a Brady Operations Branch official, as of June 10, 2004, 2,819 standard denial referrals were still awaiting processing.

The specialists we interviewed concurred with management's assessment of the reasons for the backlogs. During interviews with each of the specialists, they stated that during this past peak season they were each receiving up to 90 referrals a day. In December 2003 and January 2004, their individual backlogs ranged from 700 to 2,000 cases. The specialists told us that generally they start falling behind on their workload in November and are not able to catch up until April or May. All of the specialists we spoke with agreed that additional permanent staff is needed to prevent backlogs, with the general consensus that at least two specialists are required.

Brady Operations Branch management agreed with the specialists' assessment that at least two additional specialists were needed. They noted that the number of specialists has decreased from nine when the

Brady Operations Branch was first established to seven.  Further, there is a possibility of workload increases if any additional POC states decide to turn their operations over to FBI NICS because of dwindling state resources.[44]

When contacted in April 2004, the Brady Operations Branch Chief stated that they had put in a request for two contract employees to supplement the specialist staff.  He also mentioned that an additional permanent specialist position had been approved.  As of June 2004, the contractor positions had not yet been funded.

Computer System Limits Efficiency

Brady Operations Branch officials told us that funding during the past three years has not increased sufficiently to support technological modifications to improve efficiency.  Primary among the needs is modifying the ANR computer system to include digital imaging, which would allow Brady Operations Branch specialists to scan documents, such as ATF Form 4473 and court records, into the system and send them electronically to ATF division offices.  Currently, these documents are faxed or mailed by the Brady Operations Branch to the ATF division office NICS coordinators, who must in turn fax or mail these documents to the field offices.  Other modifications would enable Brady Operations Branch management to monitor processing timeliness, require specialists to document the qualifying criteria, enlarge the space for specialists to type their comments, and allow the specialists to automatically identify instances in which the prohibited person either made or attempted to make multiple firearms purchases.

Brady Operations Branch officials told us that in 2003 they had submitted a request to ATF headquarters for $760,000 for 25 modifications to ANR.  In April 2004, the Brady Operations Branch Chief told us that the funding request had been denied.  When questioned about the funding request, an ATF headquarters official cited other funding priorities as the reason for the denial.

---

[44] The state of Indiana dropped out of the POC program in October 2003. During our review, FBI NICS and Brady Operations Branch managers stated that several other states were considering dropping out of the POC program due to funding issues.

<u>The FBI Needs to Distinguish Delayed Denials from Standard
Denials</u>

Currently the FBI NICS Section's daily electronic transfer of denials
to the Brady Operations Branch does not distinguish between delayed
denials and standard denials. Because delayed denials have a higher
priority – a prohibited person has received a firearm that needs to be
retrieved – they need to be removed from the queue and immediately
forwarded to the appropriate ATF division office for action.

The identification of the delayed denials is currently a manual
process. Daily, the FBI NICS Section sends by facsimile an initial
firearms retrieval notification for each denial in which the firearm has
been transferred to a prohibited person. The Brady Operations Branch
logs and files the facsimiles in the "pending" drawer to await the
corresponding electronic submission. When the electronic transfer is
received, the Brady Operations Branch specialist retrieves the faxes and
pulls the denial out of the electronic queue for processing. The Brady
Operations Branch also checks the fax log entries against the electronic
submission to ensure that all the delayed denials appear on the
electronic submission.

In our opinion, this is an unnecessarily cumbersome process for
both the FBI NICS Section and the Brady Operations Branch. Delayed
denials should be distinguished from standard denials on the daily
electronic submission. According to Brady Operations Branch officials,
the FBI NICS Section has agreed to implement this modification but has
put it on the "back burner" because it is a low priority. In April 2004, we
contacted the FBI NICS Section Chief about this issue. He also agreed
that it appeared to be a beneficial modification. He later informed us
that he had submitted a program change request for the modification,
but that he was advised that, due to the existing backlog of requested
computer enhancements, this would not be implemented until at least
the end of CY 2005.

**RECOMMENDATIONS**

**Recommendation 11:** The ATF should ensure that the Brady
Operations Branch is sufficiently staffed to minimize backlogs and
sufficiently funded to implement necessary automated system
modifications.

**Recommendation 12:**  The FBI should distinguish delayed denials from standard denials on its daily electronic transfers of denial transactions to the ATF.


**Few NICS Cases Are Prosecuted**

**Despite the large number of Brady Act violations identified by the FBI, these violations rarely have been prosecuted.  Historically, the USAOs have been unsuccessful in achieving convictions in many of these types of cases.  Consequently, they have been unwilling to prosecute most NICS cases.**

A June 28, 2001, memorandum from the Attorney General directed the U.S. Attorneys to "make it a priority to enforce the law against those persons who attempt to subvert the legitimate crime prevention objectives of the Brady Act and to incorporate this new focus into [their] comprehensive prosecutive efforts."  The memorandum further stated, "Persons who violate federal gun laws will find a determined adversary in this Administration, this Department, and in each United States Attorney.  As the nation's prosecutors, you must send a clear message: gun crime means hard time."

We found that very few NICS cases are prosecuted.  During CYs 2002 and 2003, the USAOs prosecuted only 154 (less than 1 percent) of the 120,000 persons who were found to be a prohibited person during the NICS background check.  Of the 400 NICS cases in our sample, only 8 cases had been referred by the ATF to a USAO for prosecution (another 2 involved subjects who were already under arrest for other crimes and were being prosecuted by the state).[45]

During this period, the ATF formally referred a total of only 230 cases to the USAOs (185, or 80 percent were accepted for prosecution).  These numbers reflect only formal referrals and not the number of informal referrals made by the ATF.  Most of the ATF special agents at the 13 field offices we contacted stated that before preparing a formal referral, their office's practice was to first contact the USAO and

---

[45] Of these eight referrals, two persons were prosecuted and found guilty, one was prosecuted and found not guilty, three were declined, and two were pending at the time of our review.  Two of the declined cases were subsequently accepted and prosecuted by the state.

determine whether the USAO was interested in accepting the case. These informal referrals were not quantified in NFORCE, but generally were documented in a management case log, which is part of the investigative case file.[46]  Because the ATF does not formally track informal referrals, we were unable to determine the actual number of cases that the ATF field offices referred to the USAOs.

Although the number of prosecutions is low, we concluded that this has more to do with the nature of the cases than with the unwillingness of the USAOs to prosecute.  In fact, the ATF special agents we spoke with (located in 13 different states) and SACs and ASACs (located in four divisions) consistently complimented their USAO's willingness to prosecute NICS cases.  They consistently commented that it was difficult to find a "good" NICS case to refer to the USAO because these cases generally lacked jury appeal.

They said lack of jury appeal was the result of several factors:

- The NICS denial was based on an old conviction and the prohibited person has no record of subsequent criminal activity. Of the 229 cases in our samples where we could determine the dates of convictions, in 110 cases the prohibiting conviction occurred at least 5 years prior to the attempted firearms purchase (48 percent of the cases in which we could determine a date); in 30 of these cases, the prohibiting conviction occurred at least 20 years prior (13 percent of the cases in which we could determine a date).[47]  The oldest crimes in our sample were a breaking-and-entering case from 1958, an attempted burglary case from 1963, and a misdemeanor crime of domestic violence case from 1964.

- The NICS denial was based on a felony conviction for a nonviolent crime.  Nonviolent crimes in our sample included passing bad checks, failure to pay child support, sales tax evasion, shoplifting, theft of public benefits, and fraud.  One of the Brady Operations Branch specialists told us that he once

---

[46] Of the 381 delayed and standard denial cases in our sample that had been completed, there were indications in 43 files (11 percent) that the case had informally been referred to the USAO, where it was declined.

[47] We were not always able to readily determine the age of the prohibiting conviction from the documentation provided to us.  The 229 cases include cases from both our Brady Operations Branch sample (100 cases sampled) and our field office sample (400 cases sampled).

received a denial for a 1941 felony conviction for stealing a pig. A special agent at one of the field offices cited a 1969 felony for stealing four hubcaps from a car.

- <u>It is not evident that the person was aware that he or she was prohibited from possessing a firearm</u>.  According to Section 1117 of the U.S. Attorneys' *Criminal Resource Manual*, one of the factors to be used in determining if a particular case merits federal prosecution is whether the potential defendant was "on notice" that his or her possession of a firearm was illegal.[48] Several ATF special agents stated that when they contact individuals, many said they did not realize they were prohibited from possessing a firearm.  Some knew that they had been convicted of a crime, but did not realize that the charge was a felony.  Others did not realize that they were subject to the prohibition of misdemeanor crimes of domestic violence because they actually were charged with another type of offense, such as assault or disorderly conduct.

- <u>The person attempted to purchase a long gun, not a handgun</u>.  Several ATF special agents stated that it was difficult to prosecute long gun cases in those states where hunting is a popular sport.  Agents said that jurors in these states often believe that a person should have the right to purchase a long gun for hunting purposes, and therefore they are less likely to convict prohibited persons who attempt to purchase long guns for lying to the FFL concerning their prohibited status.

- <u>The person is prohibited for being a fugitive</u>.  Title 18 U.S.C. Section 921(a)(15) defines a fugitive from justice as "any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding."  FBI NICS denies a firearm to any person who has an outstanding warrant from another state under the federal prohibitor "fugitive from justice."  However, to prosecute these types of cases, there would have to be evidence that the reason the person left the state was to avoid prosecution or giving testimony in a criminal proceeding.  These conditions are difficult to prove.  Even if there was evidence that the person left the state for these

---

[48] Other factors to consider are the date of the previous conviction, the circumstances under which the firearm was obtained, the existence of indicators of current potential for violence, available alternatives to federal prosecution, and whether false statements were made.

reasons, the case may not be prosecutable if the basis for the warrant is not considered to have prosecutorial merit, e.g., if the warrant is for crimes such as traffic violations or for shoplifting.

- The person is prohibited for noncriminal reasons.  Absent any criminal record, persons who are prohibited because they are illegal or nonimmigrant aliens, have received dishonorable discharges from the military, have renounced their citizenship, or have been adjudicated mentally defective are generally not prosecuted.

Based on our review of 400 NICS investigative files, in all but one case we agreed with the ATF's assessment that the cases failed to meet USAO prosecutorial guidelines.[49]  The eight cases in our sample that had been referred for prosecution represented more egregious cases.  These included:

- A person who was denied a firearm because he was indicted for felony child abuse (the subject was also a felon who had been previously convicted on an arson charge).  A search of the subject's premises resulted in the recovery of 11 firearms that the subject said he was "holding for a friend."  When questioned, the subject stated that he "forgot he wasn't supposed to have firearms."

- A person with an active restraining order against him.

- A person who was denied as a felon because he was convicted under a federal charge for the unlawful making of a destructive device and under a state charge for attempted homicide and the use of a dangerous weapon.  These charges stemmed from a 1989 incident where the subject tried to run over a sheriff's deputy and was found to have two sticks of dynamite in his truck.  The subject was also arrested in 1995

---

[49] This case was a standard denial for a person prohibited on the basis of a conviction for misdemeanor crime of domestic violence.  The case appeared to meet the USAO's prosecutorial guidelines because the crime was recent (four months prior to the attempted firearm purchase) and there appeared to be a pattern of violence (the person had been charged with felony charges of aggravated assault twice in the past two years).  We brought this particular case to the ATF's attention and ATF agents agreed that the case appeared to meet the USAO's prosecutorial guidelines.  Subsequent to our review, agents contacted the USAO, who later declined prosecution.

for kidnapping, rape, and assault (he was convicted of unlawful restraint).

- A person who purchased two handguns even though he had been convicted of a misdemeanor crime of domestic violence the preceding year.

- A person who was convicted of felony possession of marijuana with intent to deliver and who purchased a 9mm handgun one week after his conviction.

# CONCLUSION

The ATF is responsible for ensuring that firearms remain out of the hands of prohibited persons and for investigating criminal attempts to evade the Brady Act's requirements. The FBI refers to the ATF the names of all prohibited persons who either attempted to or succeeded in obtaining a firearm from an FFL. The ATF's responsibilities are then twofold: to promptly retrieve those firearms that were transferred to persons subsequently found to be prohibited and to investigate those referrals that have prosecutorial merit.

Due to the risk to the public, it is imperative that the ATF quickly retrieve firearms possessed by prohibited persons. We found, however, that although the ATF is almost always able to retrieve these firearms, the retrievals are not always timely. We identified excessive delays in retrieving the firearms in 65 of the 188 cases (35 percent) we reviewed for which investigations were completed. In 28 of these 65 cases (43 percent), it took from four months to over a year to retrieve the firearm. At the four locations we visited, ATF field staff attributed these delays to the failure of one of the NICS coordinators to refer these cases to the field offices in a timely manner and to the lack of sufficient field special agents to deal with large volumes of labor-intensive NICS referrals, wide geographic territories, and other competing investigative priorities. In addition, although the ATF considers firearms retrievals to be a priority, it has not established performance standards for timeliness, and therefore ATF management is unable to determine whether the retrievals are being performed on a timely basis. We also found that the ATF special agents were not documenting sufficiently firearms recoveries involving transfers of the firearm to a third party, returns of the firearm to the FFL, or seizures of the firearm by local law enforcement. Further, they were not documenting that background checks were conducted to ensure that the third party was not prohibited from possessing a firearm.

In addition, although the ATF has made progress since the program was initiated in 1998 to limit the number of referrals sent to the field offices for investigation, the field offices still are receiving too many standard denial referrals that do not have prosecutorial merit. USAO prosecutorial guidelines are a critical tool used by the ATF to determine which NICS cases to investigate. However, we found that not all of the USAOs have provided sufficient prosecutorial guidelines to the ATF. We also found that the ability of the ATF to sufficiently screen the NICS

referrals, and therefore prioritize the NICS case workload, was hampered by the failure of some division office NICS coordinators to screen the referrals before forwarding the cases to a field office; the lack of training and written guidance for the NICS coordinators; the Brady Operations Branch's unnecessary forwarding of noncriminal alien cases to the division offices; and the overall lack of communication among the Brady Operations Branch specialists, the division office NICS coordinators, and field office special agents regarding the types of cases meriting investigation.

Funding constraints had hurt the effectiveness of the Brady Operations Branch's operations with staffing shortages resulting in large workload backlogs. Further, the Brady Operations Branch has been unable to implement systems modifications that would make the referral process more efficient. Specifically, the Brady Operations Branch does not have the technological capability to both distinguish NICS denials by federal judicial districts (and therefore specific USAO prosecutorial guidelines) and route the denials directly to the field offices. As a result, the NICS denials must be routed to the field offices through the division office NICS coordinators, who generally also perform further screening of the  standard referrals using more specific USAO prosecutorial guidelines.

We also found that less than 1 percent of the individuals who committed Brady Act violations were prosecuted. However, most NICS cases do not meet prosecutorial guidelines due to the age of the prohibiting convictions, the nonviolent or noncriminal nature of many of the prohibiting factors, the difficulty in proving intent to deceive, the type of firearm involved, and other factors.

We made 12 recommendations to improve the operation of the ATF's investigations, retrieval, and prosecution of Brady Act violations. We believe that the ATF's and the Department's implementation of these changes will significantly improve the enforcement of Brady Act violations identified through the NICS.

# APPENDIX I:  STATES AND THEIR LEVEL OF PARTICIPATION IN NICS

**FULL PARTICIPANTS (14):**  States that conduct their own NICS checks for all firearms purchases and for permits for handguns and long guns.

| | | |
|---|---|---|
| California | Hawaii | Pennsylvania |
| Colorado | Illinois | Tennessee |
| Connecticut | Nevada | Utah |
| Florida | New Jersey | Virginia |
| Georgia | Oregon | |

Note:  The FBI performs pre-pawn checks for Florida.

**PARTIAL PARTICIPANTS (9)**:
States that conduct their own NICS checks for handgun permits, while the FBI conducts the NICS checks for long gun purchases.

| | | |
|---|---|---|
| Iowa | Nebraska | North Carolina |
| Michigan | New York | |

States that conduct their own NICS checks for handgun purchases, while the FBI conducts the NICS checks for long gun purchases.

| | | |
|---|---|---|
| Maryland | Washington | Wisconsin |
| New Hampshire | | |

**NONPARTICIPANTS (27 States; 4 Territories or Commonwealths; Washington D.C.):**  States where the FBI conducts all NICS checks on both handguns and long guns.

| | | |
|---|---|---|
| Alabama | Louisiana | Ohio |
| Alaska | Maine | Oklahoma |
| Arizona | Massachusetts | Rhode Island |
| Arkansas | Minnesota | South Carolina |
| Delaware | Mississippi | South Dakota |
| Idaho | Missouri | Texas |
| Indiana | Montana | Vermont |
| Kansas | New Mexico | West Virginia |
| Kentucky | North Dakota | Wyoming |
| Guam | Puerto Rico | Washington, D.C. |
| U.S. Virgin Islands | Northern Mariana Islands | |

# APPENDIX II:  NUMBER OF STANDARD DENIALS EITHER CLOSED BY THE ATF BRADY OPERATIONS BRANCH OR SENT TO THE ATF FIELD DIVISIONS FOR INVESTIGATIONS (CY 2002 AND CY 2003)

| ATF Field Division | Referral Status | | |
|---|---|---|---|
| | Not Referred | Refer-Standard | Total Processed |
| New Orleans | 10,953 | 1,047 | 12,000 |
| St. Paul | 10,049 | 1,122 | 11,171 |
| Charlotte | 10,286 | 800 | 11,086 |
| Dallas | 9,730 | 950 | 10,680 |
| Columbus | 9,276 | 1,292 | 10,568 |
| Seattle | 7,188 | 1,298 | 8,486 |
| Houston | 7,294 | 1,092 | 8,386 |
| Phoenix | 6,340 | 688 | 7,028 |
| Louisville | 5,924 | 869 | 6,793 |
| Kansas City | 5,134 | 1,493 | 6,627 |
| Nashville | 5,110 | 705 | 5,815 |
| Detroit | 4,648 | 734 | 5,382 |
| New York | 2,211 | 624 | 2,835 |
| Baltimore | 2,367 | 325 | 2,692 |
| Boston | 1,603 | 260 | 1,863 |
| Tampa | 571 | 131 | 702 |
| Miami | 195 | 73 | 268 |
| San Francisco | 2 | 0 | 2 |
| **Total** | **98,881** | **13,503** | **112,384** |

Source:  Brady Operations Branch

# APPENDIX III:  NUMBER OF NICS CASES RECEIVED BY THE ATF FIELD DIVISIONS FROM THE ATF BRADY OPERATIONS BRANCH (CY 2002 AND CY 2003)

| ATF Field Division | Referral Status | | Total Cases Referred |
| | Refer-Delayed | Refer-Standard | |
|---|---|---|---|
| Kansas City | 594 | 1,493 | 2,087 |
| Seattle | 635 | 1,298 | 1,933 |
| New Orleans | 820 | 1,047 | 1,867 |
| Columbus | 507 | 1,292 | 1,799 |
| St. Paul | 582 | 1,122 | 1,704 |
| Houston | 384 | 1,092 | 1,476 |
| Dallas | 503 | 950 | 1,453 |
| Louisville | 398 | 869 | 1,267 |
| Charlotte | 376 | 800 | 1,176 |
| Phoenix | 472 | 688 | 1,160 |
| Nashville | 336 | 705 | 1,041 |
| Detroit | 216 | 734 | 950 |
| New York | 153 | 624 | 777 |
| Baltimore | 118 | 325 | 443 |
| Boston | 110 | 260 | 370 |
| Tampa | 62 | 131 | 193 |
| Miami | 20 | 73 | 93 |
| **Total** | **6,286** | **13,503** | **19,789** |

Source:  Brady Operations Branch

# APPENDIX IV:  ATF COMMENTS ON THE DRAFT REPORT



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

JUL  -9  2004      Washington, DC 20226      903000:JS
8310

MEMORANDUM TO:  Assistant Inspector General for Evaluation and Inspections

FROM:  Director

SUBJECT:  Response to the Office of Inspector General's (OIG)
Draft Report: Review of the Bureau of Alcohol, Tobacco,
Firearms and Explosives' Enforcement of Brady Act Violations
Identified through the National Instant Criminal Background
<u>Check System, A-2004-001.</u>

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appreciates the
opportunity to respond to the recommendations from the OIG's above-cited draft report.
Although we were previously aware of and acting to improve many areas included in
your findings, we welcome constructive criticism of our programs as this independent
evaluation process typically helps us improve our ability to effectively plan and manage
our resources efficiently.

As you know, ATF's move to the Department of Justice established an agency with a
more focused mission that reaffirms the importance of preventing the criminal misuse of
firearms and explosives.  As part of the Department of Justice, we are becoming a
stronger, more effective law enforcement and regulatory agency.  One part of our mission
is to vigorously enforce the Federal firearms laws, which includes National Instant
Criminal Background Check System (NICS) referrals from the FBI.

We strongly believe that one of the principal activities of successful firearms enforcement
efforts is the effective referral of firearms denials received from the FBI's NICS
Operation Center.  As such, ATF continues to assess our practices and procedures to
ensure that we are constantly improving this complex process.

By way of example, ATF Order 3310.4C, Integrated Violence Reduction Strategy, which
includes a section on the investigation of straw purchase and false statement violations
resulting from NICS checks, is in the final stages of review prior to printing.    Through
these guidelines, ATF will provide additional guidance for the field on improving its
NICS procedures and taking appropriate actions necessary to meet or exceed
recommendations regarding documentation of NICS referrals.

2

Assistant Inspector General for Evaluation and Inspections

In general, ATF believes there is a need to increase its resources dedicated to firearms investigations and we have addressed this need in our FY 2006 budget submission.

Our responses to your recommendations are as follows:

**1.  Modify its case management system to allow the Brady Operations Branch to refer delayed denials directly to the appropriate ATF field office.**

ATF does not concur with this recommendation.

ATF believes that decentralizing the process at the division office level would not improve the processing of NICS referrals.  The special agent in charge (SAC) of each division office needs to be aware of the types and level of investigative activity being performed by assigned special agents.  The SAC, in cooperation with U.S. Attorneys, needs to be able to analyze and prioritize the referrals based on individual law enforcement priorities.  This can best be accomplished when the delayed denials, as well as standard denials, flow through the SAC office.

Alternatively, ATF believes that improving communications through the NICS Coordinators and Brady Operations Branch would better serve to improve the process. ATF intends to focus on this issue in future training.

**2.  Use non-agent personnel to handle the administrative tasks related to NICS cases.**

ATF does not concur with this recommendation.

While ATF agrees with your assessment that some of the administrative tasks related to NICS cases could be, and in some cases currently are, handled by non-agent personnel, ATF believes that it would be very costly to employ and train additional contractors or other ATF personnel to assist with NICS cases, especially when the need does not appear to be crucial.  First, the volume of referrals of delayed denials has been steadily reduced since the inception of NICS, and we expect this trend to continue.  Therefore, we do not believe it is appropriate to dedicate contractor resources to an area with a declining workload.  In addition, clearly established written referral guidelines, which come from, or are approved by, the U.S. Attorney's Office (USAO) would serve to further reduce the number of referrals to a level that could be managed by existing ATF special agents and field support personnel.  This is an issue ATF continues to pursue with the USAOs throughout the country.  Finally, ATF firmly believes that although investigative assistants and analysts can assist with the administrative tasks related to a NICS case, this is a limited role and only ATF special agents, who are trained professionals in firearms investigations can determine the type and immediacy of any action that should be taken in response to a particular referral.

3

Assistant Inspector General for Evaluation and Inspections

**3. Establish timeliness standards for firearm retrievals and develop a system for ATF field office management to monitor and report on compliance with these standards.**

ATF concurs with this recommendation, in part.

The monitoring of firearm retrievals is the direct responsibility of the field supervisors. The nature and complexity of NICS referrals dictates that they should be examined and investigated on a case-by-case basis. Depending on the nature of the referral, we are sometimes unable to meet a specific deadline on firearms retrievals. Therefore, a specific "timeliness standard" cannot be applied to all cases. In addition, special agents are not always afforded the luxury of making contact with the individuals on the first, second, or even third attempt. However, ATF agrees that general timeliness standards could be established. ATF is in the process of drafting instructions to the field that will mandate that an investigation be initiated within 30 days of receipt of the referral. The referral will also require that agents document in N-FORCE investigative activity at least once every 30 days until the case is recommended for prosecution, the firearm is recovered, or the case is closed.

**4. Revise its standard initial contact letter to include a response timeframe and direct its personnel to send the letters on a timely basis, track responses to the letters, and take timely action to retrieve the firearms when the letters are unsuccessful in eliciting a response.**

ATF concurs with this recommendation.

ATF will be issuing to all field offices a memorandum that will recommend all initial contact letters be sent certified and return receipt requested. The contact letter will also be amended to state that the recipient of the letter must contact ATF within 14 days of receiving the letter.

In addition, ATF Order 3310.4C, Integrated Violence Reduction Strategy, will direct agents to track cases within N-FORCE to ensure that actions are timely.

**5. Examine the feasibility of enabling Brady Operations Branch specialists to identify NICS cases by Federal judicial district so that they can be screened using specific USAO guidelines. In the interim, require that all division office NICS coordinators screen standard denial referrals and refer to the field office only those cases that meet USAO prosecutorial guidelines.**

ATF concurs with this recommendation.

ATF believes USAO guidelines are at the core of a successful NICS referral program. Since the beginning of the Brady Operations Branch NICS referrals system, ATF has

4

Assistant Inspector General for Evaluation and Inspections

continually sought USAO guidelines in order to streamline the referral process. To date eight field divisions have provided tailored criteria from the USAO's; however, none are specific to particular judicial districts.

The Brady Operations Branch is currently involved in a pilot program with the Boston Field Division to have each of the USAO's provide specific NICS criteria so that the Branch can begin referring cases under specific guidelines by judicial district.

Under current ATF guidelines, NICS coordinators should already be screening standard denial referrals and referring to the field offices only those cases that meet USAO prosecutorial guidelines.

**6. Provide annual training to the NICS coordinators and develop a NICS coordinator handbook.**

ATF concurs with this recommendation.

In the past, ensuring that coordinators have the necessary training has been problematic because of a high turnover of personnel in that position. However, ATF's Brady Operations Branch has scheduled a conference with all NICS Coordinators in August 2004, and a NICS handbook will be provided at the conference.

**7. Require that Brady Operations Branch refer to the field offices only those alien cases that meet the USAO prosecutorial guidelines.**

ATF concurs with this recommendation.

ATF agrees that the Brady Operations Branch should refer only those alien cases that meet USAO prosecutorial guidelines; however, ATF has not been provided specific USAO guidelines applicable to alien cases. As a result, until ATF receives such guidance, the Brady Operations Branch will continue to refer to the field only those alien denials that result from both firearm and immigration violations. For example, if an alien's case fits the current referral guideline to be referred as a firearms case, the Brady Operations Branch forwards it to the respective division while also notifying Immigration and Customs Enforcement (ICE). However, if the denial of a transfer to an individual was based only on an immigration violation, a referral is prepared and forwarded only to ICE.

**8. Require that division office NICS coordinators and field office personnel notify the Brady Operations Branch of referrals that did not meet USAO guidelines.**

ATF concurs with this recommendation.

Should ATF receive previously mentioned guidelines from each USAO, the number of standard denials forwarded to field offices will be dramatically reduced. In the interim,

5

Assistant Inspector General for Evaluation and Inspections

the Brady Operations Branch will work with the NICS coordinators to determine whether there are additional screening guidelines employed by the field divisions that can be introduced and utilized by the Brady Operations Branch.  By ensuring that the field and the Brady Branch are using the same screening guidelines, we believe we can decrease the number of unnecessary referrals.

**9.  Require that division office NICS coordinators and field office personnel notify the Brady Operations Branch and the FBI NICS Section of trends of inappropriate referrals of non-prohibited persons.  Also, require that field office personnel, via the division office NICS coordinators, provide to the FBI NICS Section the names of those individuals that the ATF determines not to be prohibited and documentation to support the reason for the person's non-prohibited status.**

ATF concurs with this recommendation.

ATF developed and introduced N-Force to assist investigators in gathering, reporting, and accessing investigative case data with a goal of reducing the amount of time spent on administrative functions by special agents. This computer tracking system for investigations indicates that approximately 10 percent of the NICS referrals forwarded to the field by Brady Operations Branch are closed as "Not a Prohibited Person" as a result of subsequent investigation.  The remaining 90 percent are cases involving confirmed prohibited persons.

Whenever "trends" are identified, ATF will report these to the Brady Operations Branch and FBI NICS Section.   In the early stages of the Brady Law, the percentage of denials, which were later determined as not prohibited, was much larger than it is today because the process has evolved and improved.

ATF will establish a method by which the field can capture nonprohibited referrals and supply that information to the Brady Operations Branch who will in turn notify the FBI NICS Section.

**10.  Ensure that the Brady Operations Branch is, and continues to be sufficiently staffed to minimize backlogs and sufficiently funded to implement necessary automated system modifications.**

ATF concurs with this recommendation.

ATF agrees that the Brady Operation Branch needs additional staffing as well as improvements to the ATF NICS Referral System.  However, many operational areas within ATF are also in pressing need of personnel and resources.   ATF must carefully allocate its resources in accordance with priorities established by the Department of Justice and ATF among the full array of activities.  We will ensure that the Brady

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

6

Assistant Inspector General for Evaluation and Inspections

Operations Branch is sufficiently staffed to fulfill its mission. Toward this end, we are hiring two data entry contractors.

**Conclusion:**

ATF will employ a well-balanced strategy to ensure that NICS delayed and standard denials are acted upon in a timely fashion. Additionally, ATF will maximize the use of our available resources. ATF faces a number of emerging challenges in the years ahead, which dictate that ATF utilize innovative solutions and technology in its strategies to accomplish goals we have set. ATF will continue, in the years to come, to look for ways to improve our business practices.

If you have any questions regarding this response, please contact, Carol Campbell Audit Liaison, Office of Inspection, at (202) 927-8276.

Carl J. Truscott

# APPENDIX V:  EOUSA COMMENTS ON THE DRAFT REPORT



**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Office of the Director*

RFK Main Justice Building, Room 2616          (202) 514-2121
950 Pennsylvania Avenue, NW
Washington, DC  20530

JUL 1 5 2004

Paul A. Price
Assistant Inspector General
 for Evaluation and Inspections
Office of the Inspector General
U.S. Department of Justice

> Re: Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Enforcement
> of Brady Act Violations Identified Through the National Instant Criminal Background
> Check System (A-2004-001)

Dear Mr. Price:

This is in response to your recent memorandum which accompanied your draft report in the above-referenced matter.

Your draft report included one recommendation for the Executive Office for United States Attorneys (EOUSA):

> Ensure that annually each USAO provides the ATF with specific
> prosecutorial guidelines for NICS cases.

EOUSA concurs with the recommendation insofar as it seeks to ensure better communications between the U.S. Attorney's Offices (USAOs) and their counterpart ATF offices regarding the prosecution of NICS cases.  In July 2001, EOUSA directed all USAOs to review and revise their respective NICS case guidelines in accordance with the Attorney General's directive of June 28, 2001, and the USAOs complied with this request.  In light of the above recommendation, EOUSA will take steps to encourage each USAO to review these guidelines annually, to update the guidelines if necessary, and to ensure that any updated guidelines are provided to ATF.

The Honorable Paul A. Price
Page 2

     Thank you for the opportunity to respond to your recommendation.  If you should have any questions, please do not hesitate to contact me.

     Sincerely,

*Mary Beth Buchanan*

Mary Beth Buchanan
Director

# APPENDIX VI:  FBI COMMENTS ON THE DRAFT REPORT



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

July 2, 2004

Mr. Paul A. Price
Assistant Inspector General
   for Evaluation and Inspections
Office of the Inspector General
Department of Justice
950 Pennsylvania Avenue, Northwest
Washington, D.C.  20530-0001

Dear Mr. Price:

     Reference is made to your memorandum dated June 15, 2004, addressed to Carl J. Truscott, Director, Bureau of Alcohol, Tobacco, Firearms and Explosives; Mary Beth Buchanan, Director, Executive Office for U.S. Attorneys and Robert S. Mueller [sic], Director, Federal Bureau of Investigation.

     In response to Recommendation 12, on page 47, of the Review of the Bureau of Alcohol, Tobacco, Firearms (ATF), and Explosives' Enforcement of Brady Act Violations Identified through the FBI-National Instant Criminal Background Check System [NICS] document A-2004-001, the FBI-NICS Section would like to make known that Program Change Request (PCR) number 2602 initiated on April 13, 2004, will allow for the marking of all transactions that require a firearm retrieval (referred to by ATF as delayed denials).  The change to the FBI-NICS will allow the separation and daily transfer of two separate files to the ATF. One file will contain the standard denials.  The second file will contain what FBI-NICS refers to as firearm retrievals or ATF calls delayed denials.

     Firearm retrievals are transactions where the FBI-NICS Section has determined the subject purchasing the firearm to be prohibited after the third business day, but where the firearm transferred at some point between the third business day and when the determination was reached.  These transactions are verified by the FBI-NICS Section's Firearm Retrieval Team who then notifies the Brady Operations Branch of the ATF.

Mr. Paul A. Price

      This PCR has been prioritized with the other PCRs needed by the FBI-NICS Section.  Its implementation would be September 2005, barring any congressionally mandated system changes between now and then.  In the interim, the Firearm Retrieval Team can continue to provide the ATF Brady Operations with the list and/or information regarding these transactions.

                Sincerely yours,

                Steven C. McCraw
                Assistant Director
                Inspection Division

2

U.S. Department of Justice              66
Office of the Inspector General
Evaluation and Inspections Division

# APPENDIX VII:  OIG ANALYSIS OF ATF, EOUSA, AND FBI COMMENTS

On June 16, 2004, the Office of the Inspector General (OIG) sent copies of the draft report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Executive Office for U.S. Attorneys (EOUSA), and the Federal Bureau of Investigation (FBI) with a request for written comments.  The ATF, EOUSA, and FBI responded to us in separate memoranda dated July 9, July 15, and July 2, 2004, respectively.  The ATF concurred with eight of the ten recommendations that required its action.  The ATF did not concur with our recommendation to modify the NFORCE system to allow the Brady Operations Branch to refer delayed denials directly to the appropriate ATF field office, or our recommendation to use non-agent personnel to handle the administrative tasks related to NICS cases.  The EOUSA and the FBI concurred with the recommendations (one each) that required their action.  Our analysis of the components' comments follows.

## RECOMMENDATIONS

**Recommendation 1:**  The ATF should modify its NFORCE system to allow the Brady Operations Branch to refer delayed denials directly to the appropriate ATF field office.

Status:  **Unresolved – Open.**

Summary of ATF Response.  The ATF did not concur with this recommendation.  The ATF stated that it did not believe that decentralizing the referral process would improve the processing of NICS referrals.  In addition, the ATF stated that the special agents in charge (SAC) of its division offices need to be aware of the types and level of investigative activity being performed by assigned special agents and need to be able to analyze and prioritize the referrals based on individual law enforcement priorities.

OIG Analysis.  We disagree with the ATF's rationale for not implementing this recommendation.  At none of the four ATF division offices we visited did the SACs review, analyze, or prioritize the delayed denials.  Instead, the NICS coordinators at the division offices received the delayed denials directly from the Brady Operations Branch and forwarded them, without additional review, to the appropriate field office for investigation and retrieval of the firearms.  The resident agents in

charge or group supervisors at the field offices were the ones responsible for reviewing, analyzing, and prioritizing the NICS referrals. Therefore, in our opinion, sending the delayed denials to the division offices served no useful purpose. In fact, we found that the process actually caused delays in retrieving firearms in those instances when the division office NICS coordinator failed to forward the delayed denials to the field offices in a timely manner. Accordingly, we believe that having the Brady Operations Branch bypass the ATF division offices and send the delayed denials directly to the field office for firearm retrievals would improve the timeliness of the process. Please reconsider this response and let us know by September 10, 2004, whether the ATF will modify its NFORCE system.

**Recommendation 2:** The ATF should use non-agent personnel to handle the administrative tasks related to NICS cases.

Status: **Unresolved – Open.**

Summary of ATF Response. The ATF did not concur with this recommendation. While the ATF acknowledged the benefits of using non-agent personnel in this capacity, it stated that the cost of hiring and training non-agent personnel would outweigh the benefits. Specifically, the ATF stated that: 1) the volume of delayed denials has steadily declined since the implementation of the NICS, a trend that the ATF expects to continue; 2) clearly established written referral guidelines provided by the U.S. Attorneys' offices (USAO) would further reduce the number of referrals to a manageable level; and 3) the role of non-agent personnel would be limited and only ATF special agents would be able to determine the type and immediacy of actions to be taken in response to a particular referral.

OIG Analysis. We disagree with the ATF's rationale for not implementing the recommendation. First, according to data contained in the FBI's annual NICS operations reports, although the volume of delayed denials was declining after CY 2000, the number of delayed denials increased from 3,429 in CY 2002 to 3,601 in CY 2003. Our concern, however, is not with the overall number of delayed denials, but with the disproportionate number of delayed denials received by some of the ATF divisions, notably New Orleans, Seattle, St. Paul, and Kansas City. Even within those districts, a small handful of the field offices receive the majority of the retrievals. Our review found that these field offices often experienced extensive delays in conducting NICS investigations and in retrieving firearms from prohibited persons.

Special agents at these locations cited the volume of NICS referrals, the labor-intensive nature of NICS investigations, and other competing priorities as reasons for the extensive delays. The use of non-agent personnel at these locations to perform the largely administrative tasks associated with NICS investigations would allow the special agents to perform firearm retrievals more expeditiously.

Second, clearly established USAO prosecutorial guidelines would help reduce only the number of standard denial referrals, not delayed denial referrals. Because a standard denial only involves the prohibited person's *attempted* purchase of a firearm, ATF special agents initiate an investigation only if the prohibited person is likely to be prosecuted by the USAO. However, because delayed denials involve a prohibited person who has successfully obtained a firearm, ATF special agents must take action in all cases to retrieve the firearm regardless of whether the case is ultimately referred for prosecution. Therefore, the field offices' volume of delayed denial cases is not affected by the existence of or lack of USAO prosecutorial guidelines.

Third, we agree it would not be appropriate for non-agent personnel to determine the type and immediacy of actions to be taken in response to a particular referral. Instead, non-agent personnel could be used to perform the administrative tasks necessary to assist the special agent in making these determinations. These administrative tasks include researching state laws to determine the individual's prohibited status, obtaining court records, performing database searches to obtain the prohibited person's address, sending contact letters and arranging third party transfers of firearms at the request of the special agent, and confirming those instances in which the person either returned the firearm to the FFL or transferred the firearm to a third party.

In summary, we believe that the ATF's practice of requiring special agents to perform the extensive administrative tasks associated with NICS cases is not an efficient use of its resources and has, in some instances, delayed the retrieval of firearms from prohibited persons. Accordingly, we believe that using non-agent personnel to assist special agents at those field offices that receive a high volume of NICS cases would be a more efficient and effective use of the ATF's resources. Please reconsider this response and let us know by September 10, 2004, whether the ATF will use non-agent personnel to handle the administrative tasks related to NICS cases.

**Recommendation 3:**  The ATF should establish timeliness standards for firearm retrievals and develop a system for ATF field office management to monitor and report on compliance with these standards.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF partially concurred with the recommendation.  In its response, the ATF stated that while it agreed that general timeliness standards could be established, it did not believe that a uniform timeliness standard could be applied to each NICS case.  The ATF stated that it is in the process of drafting instructions to the field mandating that an investigation be initiated within 30 days of receipt of the referral and that its special agents document in the ATF case management system (NFORCE) what investigative activity has occurred at least once every 30 days until the case is recommended for prosecution, the firearm is recovered, or the case is closed.

OIG Analysis.  We agree with the ATF that it would not be feasible to expect all NICS investigations to adhere to a singular timeliness standard.  However, we believe that the establishment and monitoring of timeliness standards are necessary to alert ATF field office management to delays in retrieving firearms and to enable management to take timely corrective action to address the delays.  The ATF's proposed timeliness standards appear to be reasonable and meet the intent of the recommendation.  In its response, the ATF did not address the second part of the recommendation regarding the reporting of instances of noncompliance by ATF field management.  During our review, we found that the ATF division office SACs and ATF headquarters managers were generally unaware when specific field offices were experiencing excessive delays in retrieving firearms.  Therefore, we believe that for oversight purposes, field management should regularly report on its compliance with the timeliness standards.  We consider the recommendation resolved, but will keep it open until the ATF provides:  1) a copy of the instructions issued to its field offices pertaining to the timeliness standards and 2) documentation of the system by which ATF field office management will report on their office's compliance with the timeliness standards.

**Recommendation 4:**  The ATF should revise its standard initial contact letter to include a response time frame and should direct its personnel to send the letters on a timely basis, to track responses to the letters, and to take timely action to retrieve the firearms when the letters are unsuccessful in eliciting a response.

<u>Status</u>:  **Resolved – Open.**

<u>Summary of ATF Response</u>.  The ATF concurred with the recommendation and stated that it will:  1) issue a memorandum to all its field offices to send the contact letters by certified mail with a return receipt requested, 2) amend the contact letter to require the recipient to contact the ATF within 14 days of receiving the letter, and 3) issue an ATF order to direct the special agents to track cases in NFORCE to ensure that actions are timely.

<u>OIG Analysis</u>.  We consider the recommendation resolved, but will keep it open until the ATF provides a copy of:  1) the memorandum issued to its field offices regarding the issuance of contact letters, 2) the amended contact letter, and 3) ATF Order 3310.4C.

**Recommendation 5:**  The EOUSA should ensure that annually each USAO provide the ATF with specific prosecutorial guidelines for NICS cases.

<u>Status</u>:  **Resolved – Open.**

<u>Summary of EOUSA Response</u>.  The EOUSA concurred with the recommendation and stated that in July 2001 it directed all USAOs to review and revise their respective NICS case guidelines in accordance with the Attorney General's directive of June 28, 2001, and that the USAOs had complied with this request.  Further, the EOUSA stated that it will take steps to encourage each USAO to review its prosecutorial guidelines annually, update the guidelines when necessary, and provide updated guidelines to the ATF.

<u>OIG Analysis</u>.  Based on our review, the EOUSA's response that all USAOs had prepared NICS case guidelines is not accurate.  We found that 8 of the 25 USAOs included in our review did not have written guidelines.  Based on the EOUSA's response of encouraging each USAO to update such prosecutorial guidelines, we consider the recommendation resolved, but will keep it open until the EOUSA provides us with a copy of the prosecutorial guidelines prepared by each USAO.

**Recommendation 6:**  The ATF should examine the feasibility of enabling Brady Operations Branch specialists to identify NICS cases by federal judicial district, thereby enabling the ATF to consolidate all its

NICS referral screening at the Brady Operations Branch.  In the interim, the ATF should require all division office NICS coordinators to screen NICS standard denial referrals and refer to the field offices only those cases that meet USAO prosecutorial guidelines.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and stated that: 1) it had initiated a pilot project to have the Brady Operations Branch screen NICS cases from the Boston division office using specific federal judicial district standards and 2) under current ATF guidelines, all division office NICS coordinators should already be screening standard denial referrals and referring to the field offices only those cases that meet USAO prosecutorial guidelines.

OIG Analysis.  With the initiation of its pilot project, the ATF appears to be taking appropriate steps to implement the first part of the recommendation.  However, it is unclear from the ATF's response whether the second part of the recommendation has been adequately addressed.  Although the ATF's response indicates that all division office NICS coordinators already should be screening standard denial cases and referring to the field offices only those cases that meet USAO prosecutorial guidelines, our review found that this was not being done at 6 of the 17 ATF division offices that received referrals from the Brady Operations Branch.  We consider the recommendation resolved, but will keep it open until the ATF provides: 1) documentation showing the results of the pilot project and the ATF's decision on whether to expand the pilot project to encompass all ATF divisions and 2) documentation showing that the 6 ATF division offices that were not screening the NICS referrals are now doing so.

**Recommendation 7:**  The ATF should provide annual training to the NICS coordinators and develop a NICS coordinator handbook.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and stated that the ATF's Brady Operations Branch has scheduled a NICS coordinator conference for August 2004 and has prepared a NICS handbook, which will be disseminated at the conference.

OIG Analysis.  We consider the recommendation resolved, but will keep it open until the ATF provides:  1) the NICS coordinator conference agenda and list of conference participants and 2) a copy of the NICS handbook.

**Recommendation 8:**  The ATF Brady Operations Branch should refer to the field offices only those alien cases that meet the USAO prosecutorial guidelines.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and stated that it would continue to refer to the field only those alien denials that result from both firearm violations (e.g., those that meet USAO prosecutorial guidelines).  The ATF further stated that if the denial was based solely on an immigration violation, the referral would be forwarded only to the Department of Homeland Security's Bureau of Immigration and Customs Enforcement (ICE) and not to the ATF field offices.

OIG Analysis.  Although the ATF states that it does not refer to its field offices the names of individuals who were denied solely based on immigration violations, our review found that this was occurring.  In our sample review of 200 standard referrals, we identified 22 such cases.  Therefore, if it is the ATF's policy not to forward these types of cases to its field offices, apparently not all Brady Operations Branch specialists are complying with the policy.  We consider the recommendation resolved, but will keep it open until the ATF provides documentation to show that this policy has been adequately communicated to the Brady Operations Branch specialists.

**Recommendation 9:**  The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch of referrals that do not meet USAO guidelines.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and stated it would ensure that the Brady Operations Branch and the ATF field divisions were using the same screening guidelines.

OIG Analysis.  The ATF's response of ensuring that the Brady Operations Branch and the ATF field divisions are using the same screening guidelines only partially addresses the recommendation.  The ATF also needs to instruct its division NICS coordinators and field office personnel to report any referrals they receive that do not meet the screening guidelines.  This feedback will help alert Brady Operations Branch management to any problems occurring in the referral process. We consider the recommendation resolved, but will keep it open until the ATF provides documentation showing that it has established a mechanism for its field divisions to provide feedback to the Brady Operations Branch on receiving referrals that do not meet the screening guidelines.

**Recommendation 10:**  The ATF should require division office NICS coordinators and field office personnel to notify the Brady Operations Branch and the FBI NICS Section of trends in inappropriate referrals of non-prohibited persons.  Also, the ATF should require that the field office personnel, via the division office NICS coordinators, provide to the FBI NICS Section the names of those individuals that the ATF determines not to be prohibited and documentation to support the reason for the non-prohibited status.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and agreed to:  1) report trends in inappropriate referrals of non-prohibited persons to both the Brady Operations Branch and the FBI NICS Section and 2) establish a method by which the field can capture non-prohibited referrals and supply that information to the Brady Operations Branch, which in turn will notify the FBI NICS Section. In its response, the ATF also stated that its review of NFORCE data indicated that only 10 percent of the NICS referrals forwarded to the field by the Brady Operations Branch were closed as "Not a Prohibited Person" as a result of subsequent investigation and that the remaining 90 percent pertained to confirmed prohibited persons.

OIG Analysis.  The ATF's statement that 90 percent of the NICS referrals forwarded to the field by the Brady Operations Branch pertained to confirmed prohibited persons is not accurate.  NICS coordinators and field office managers process standard denials and delayed denials differently.  A standard denial is first reviewed to determine whether the case meets USAO prosecutorial guidelines and therefore merits investigation.  If the case does not meet USAO prosecutorial guidelines,

the second step, which is to determine whether the person is actually prohibited, will not be performed.  Instead, the NICS coordinator or field office manager will close the case in NFORCE under the categories "No Potential," "Did Not Meet Federal/State Guidelines," or has "No Prosecutive Merit."  In contrast, a delayed denial is first reviewed to determine whether the person is actually prohibited prior to initiating a firearms retrieval.  Because of these different approaches, the ATF can identify only what percentage of the delayed denials pertain to confirmed prohibited persons and cannot do the same for standard denials.  On the basis of our review, we believe that the percentage of persons subsequently found not to be prohibited is significantly higher than the 10 percent cited by the ATF.  As indicated in the report, 69 of the 197 delayed denials we reviewed were closed because the person was determined not to be prohibited.

Regardless of this issue, the ATF concurred with the recommendation.  We consider the recommendation resolved, but will keep it open until the ATF provides:  1) written policies or procedures requiring the NICS coordinators to report trends in inappropriate referrals of non-prohibited persons to both the Brady Operations Branch and the FBI NICS Section and 2) documentation of the established methodology for capturing non-prohibited referrals and supplying that information to the Brady Operations Branch and to the FBI NICS Section.

**Recommendation 11:**  The ATF should ensure that the Brady Operations Branch is sufficiently staffed to minimize backlogs and sufficiently funded to implement necessary automated system modifications.

Status:  **Resolved – Open.**

Summary of ATF Response.  The ATF concurred with the recommendation and agreed that the Brady Operations Branch required additional staffing, as well as improvements to the ATF NICS.  The ATF stated that many operational areas within the ATF are also in pressing need of personnel and resources and that it must carefully allocate its resources in accordance with Department and ATF priorities.  The ATF agreed to ensure that the Brady Operations Branch was sufficiently staffed and stated that it is in the process of hiring two data entry contractors.

OIG Analysis.  The ATF's addition of two contractors to the Brady Operations Branch's staffing should address the Branch's short-term staffing needs.  However, some of our other recommendations to centralize the screening function at the Brady Operations Branch may increase the workload of the Branch and require additional staff, and therefore the ATF also needs to plan for the Branch's long-term staffing needs.  In its response, the ATF did not specifically address what steps it was taking to ensure that the Brady Operations Branch is sufficiently funded to implement necessary automated system modifications.  We believe that these modifications are essential to improving the efficiency and effectiveness of the NICS referral process and that the ATF should seek additional funding for these modifications.  We consider the recommendation resolved, but will keep it open until the ATF provides: 1) documentation that the two contractors have been hired, along with a description of their duties, and 2) documentation of the efforts made by the ATF to obtain funding for the Brady Operation Branch's automated system modifications.

**Recommendation 12:**  The FBI should distinguish delayed denials from standard denials on its daily electronic transfers of denial transactions to the ATF NICS Referral System.

Status:  **Resolved – Open.**

Summary of FBI Response.  The FBI concurred with the recommendation and stated that on April 13, 2004, it initiated a program change request to allow for the marking of those denial transactions requiring a firearm retrieval.  This change will result in the daily transfer of two files to the ATF – one containing standard denials and one containing delayed denials.  Because of other priorities, the FBI projected that the system change would not be implemented until September 2005.

OIG Analysis.  We consider the recommendation resolved, but will keep it open until the FBI provides documentation that the required system change has been implemented.

**U.S. Department of Justice**
Office of Justice Programs

**Bureau of Justice Statistics**
# Bulletin

October 2005, NCJ 210117

# Background Checks for Firearm Transfers, 2004

Michael Bowling, Ph.D.
Gene Lauver
*Regional Justice Information Service*

Matthew J. Hickman, Ph.D.
Devon B. Adams
*Bureau of Justice Statistics*

The Brady Handgun Violence Prevention Act (Brady Act) mandates criminal history background checks on persons applying to purchase firearms from federally licensed firearm dealers, Federal Firearm Licensees (FFL's). This Bulletin reports the number of applications for firearm transfers and permits, rejections that resulted from background checks, and reasons for rejection for selected States during 2004.

The permanent provisions of the Brady Act became effective on November 30, 1998. The act established the National Instant Criminal Background Check System (NICS) and requires a background check by the Federal Bureau of Investigation (FBI) or a State point of contact (POC) on persons applying to receive firearms from an FFL.

The Bureau of Justice Statistics (BJS) began the Firearm Inquiry Statistics (FIST) program in 1995 to collect information on background checks conducted by State and local agencies. The State and local data — when combined with FBI NICS data — provide national estimates of the total number of applications and rejections resulting from the Brady Act and similar State laws.

## Highlights

**Background checks of applications for firearm transfers since implementation of the Brady Act**

| Applications for firearm transfer | National total during — | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 1994-2004 |
| Received | 8,084,000 | 7,831,000 | 7,806,000 | 7,958,000 | 61,632,000 |
| Rejected | 126,000 | 126,000 | 136,000 | 151,000 | 1,228,000 |
| Rejection rate | 1.6% | 1.6% | 1.7% | 1.9% | 2.0% |

Note: All counts are rounded. See notes on table 1.

• From the inception of the Brady Act on February 29, 1994, to December 31, 2004, more than 61 million applications for firearm transfers or permits were subject to background checks. About 1,228,000 were rejected.

• Total applications for firearm transfers or permits increased 3.2% nationwide, from 7,831,000 in 2003 to 8,084,000 in 2004.

• State and local agencies conducted background checks on 42% of the total applications for firearm transfers or permits in 2004, while the FBI was responsible for the remainder.

• In 2004, 126,000 (1.6%) of approximately 8,084,000 applications for firearm transfers or permits were rejected by the FBI or State and local agencies.

• In 2004 the rejection rate for applications checked by the FBI (1.4%) was lower than that for checks by State and local agencies (1.8%).

• A felony conviction or indictment was the most common reason for rejection during 2004 by State or local agencies (50%) and the FBI (38%).

• A domestic violence misdemeanor conviction or restraining order was the second most common reason for rejection by State or local agencies (16%).

• Other criminal history was the second most common reason for rejection by the FBI (25%).

• An estimated 1,500 persons were arrested in 2004 for an outstanding warrant or submission of false information on an application, according to checking agencies reporting arrests to FIST.

• In 2004 ATF referred for prosecution 1,140 cases involving false information on applications for firearm transfers. These referrals are based on prosecutorial criteria provided by the individual U.S. attorney offices.

In 2004 FIST collected information from almost 700 State and local agencies, including 17 statewide POC's that conduct their own checks under Federal and State laws. The FBI also compiled data on the inquiries or transactions handled by the NICS section.[1]

Nearly all applications included in the 2004 FIST survey were subject to a NICS check, as well as checks that fulfilled any additional State requirements. A small number of applications were subject only to checks required by State laws. (See *Components of the national firearm check system* on page 9 for further details.)

### National estimates

In 2004, 8,084,000 applications for firearms transfers or permits were filed, an increase of 3.2% over the 7,831,000 applications filed in 2003 (table 1). In addition to the nearly 4.7 million applications for firearm transfers processed by the FBI in 2004, State and local checking agencies processed 3.4 million applications.

In the first 6 years of the permanent Brady period, the FBI and State and local agencies received about 49 million applications. State and local agencies received 12.7 million applications during the interim Brady period (1994-98). Most of the applications in the interim period were for handgun transfers. Under the permanent provisions, background checks for long guns were added, greatly increasing the volume of checks.

---

[1]The number of background checks handled by State POC's, as reported by the National Instant Criminal Background Check System (NICS) may be higher than the estimates reported here because multiple inquiries or transactions for the same application are processed. FIST only counts the first of multiple inquiries.

**Table 1. Number of applications and estimates of rejections for firearm transfers, 1994-2004**

| | Total | | |
| | Number of applications | | Rejection |
| | Received | Rejected | rate |
|---|---|---|---|
| Total | 61,632,000 | 1,228,000 | 2.0% |
| **Interim period** | | | |
| 1994-98[a] | 12,740,000 | 312,000 | 2.4% |
| **Permanent Brady** | 48,892,000 | 916,000 | 1.9% |
| 1998[b] | 893,000 | 20,000 | 2.2 |
| 1999 | 8,621,000 | 204,000 | 2.4 |
| 2000 | 7,699,000 | 153,000 | 2.0 |
| 2001 | 7,958,000 | 151,000 | 1.9 |
| 2002 | 7,806,000 | 136,000 | 1.7 |
| 2003 | 7,831,000 | 126,000 | 1.6 |
| 2004 | 8,084,000 | 126,000 | 1.6 |

Note: Counts are rounded. Statistics for national totals from 1999 to 2004 combine FIST estimates of the number of checks and rejections done by State and local agencies and the FBI number of actual transactions and rejections reported by the NICS operations reports. Data through November 29, 1998, are primarily for handguns. For information about FIST estimates before 1998 see *Presale Handgun Checks, the Brady Interim Period, 1994-98* (NCJ 175034) <http://www.ojp.usdoj.gov/bjs/abstract/phc98.htm>.
[a]March 1, 1994 - November 29, 1998.
[b]November 30 - December 31, 1998. Counts are from the *National Instant Criminal Background Check System (NICS) Operations Report* (November 30, 1998 - December 31, 1999) and may include multiple transactions for the same application.

Since the inception of the Brady Act, State and local agencies have conducted more than 21 million background checks. The FBI accounted for more than 26 million background checks under the permanent provisions of the Brady Act. When a background check produces evidence of factors that disqualify an applicant from receiving a firearm, the application is rejected. (See *Definitions* on page 10 for more detail.)

In 2004 checking agencies rejected 126,000 applications, the same number rejected in 2003. State and local agencies rejected 62,000 applications in 2004, a 1.8% rejection rate. The FBI rejected nearly 64,000 applications, a 1.4% rejection rate. The overall rejection rate in 2004 was 1.6%, the same rate as in 2003.

Since the inception of the Brady Act, more than 61 million applications for firearm transfers have been checked. Of the total, 1,228,000 applications, or 2.0%, were rejected.

### State approval systems

State systems for approval of a prospective firearm purchaser can be classified as "instant approval," "purchase permit," "exempt carry permit," or "other approval" systems.

#### Instant approval systems

Instant approval (instant check) systems require a seller to transmit the applicant's information to a checking agency by telephone or computer. The checking agency is required to respond to the seller at once or as soon as possible (generally within 3 business days). State agencies conducted over 1.9 million instant checks in 2004, and about 37,000 (1.9%) of the applications were rejected (table 2). From 1999 to 2004 State instant approval systems received 13.1 million applications, rejecting 346,000 (2.6%).

The FIST survey also included applications for two types of State permits. Federal law does not mandate a permit to purchase firearms.

*Purchase permit systems*

These systems require firearm purchasers to obtain, after a background check, a government-issued document (such as a permit, license, identification card, or other document) that must be presented to a seller in order to receive a firearm. Most agencies issuing purchase permits operate under State statutes that allow between 7 and 30 days to complete a background check. In 2004 State and local agencies received 710,000 applications for purchase permits, while 15,000, or 2.2%, were rejected. From 1999 to 2004, 4.3 million applications for purchase permits were received by State and local agencies, of which 92,000 were rejected (2.1%).

*Exempt carry permit systems*

An exempt carry permit is not required for purchase but can be used to exempt the holder from a background check at the point of sale. A permit is exempt if it is issued after a check that includes the NICS and meets other requirements of the Brady Act under a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) regulation and 18 U.S.C. 922 (t).

Agencies issuing ATF-approved exempt carry permits usually request a check by sending information to the FBI. Some permits are only exempt under State law, including Indiana and Minnesota carry permits.

Nine States reported complete state-wide data on exempt carry permits for 2004. State agencies received 161,000 exempt carry permit applications, of which 3,000 were rejected (1.9%). Local agencies received 192,000 applications for exempt carry permits and rejected 2,000 (1.0%). From 1999 to 2004 State and local agencies received 2,044,000 applications for exempt carry permits, rejecting 41,000 or 2.0%.

*Other types of approval systems*

Other approval systems require a seller to transmit the applicant's information to a checking agency by mail, telephone, or computer. The checking agency is not required to respond immediately but must respond before the end of a State statutory time limit, generally within 7 to 10 days. Other types of approval systems processed 401,000 applications in 2004 (predominately in California), and rejected 4,000 (or 1%).

From 1999 to 2004 these systems received 2.8 million applications, rejecting 29,000 (or 1%).

| | State agencies issuing exemptions | | |
| | Applica-tions | Rejec-tions | Rejection rate |
|---|---|---|---|
| Alaska | 1,062 | 22 | 2.1% |
| Arizona | 17,685 | 1,248 | 7.1 |
| Arkansas | 4,762 | 53 | 1.1 |
| Indiana* | 69,814 | 709 | 1.0 |
| North Dakota | 2,431 | 2 | 0.1 |
| South Carolina | 9,520 | 321 | 3.4 |
| Texas | 27,134 | 452 | 1.7 |
| Utah | 8,127 | 104 | 1.3 |
| Wyoming | 1,032 | 26 | 2.5 |

Note: The States listed reported statewide data for 2004.
*State exempt only.

---

**Table 2. FIST estimates, by type of agency and approval system and total FBI checks, 1999-2004**

| | 2004 | | | 1999-2004 | | |
| Type of checks conducted | Applications | Rejections | Rate of rejection | Applications | Rejections | Rate of rejection |
|---|---|---|---|---|---|---|
| **State agencies** | | | | | | |
| **Total** | 2,852,910 | 51,422 | 1.80% | 18,650,587 | 439,587 | 2.36% |
| Instant checks | 1,983,149 | 37,312 | 1.88 | 13,139,763 | 346,033 | 2.63 |
| Purchase permits | 363,549 | 7,244 | 1.99 | 1,937,883 | 42,663 | 2.20 |
| Carry permits | 161,455 | 3,116 | 1.93 | 1,090,063 | 24,808 | 2.28 |
| Other approvals | 344,757 | 3,750 | 1.09 | 2,482,878 | 26,083 | 1.05 |
| **Local agencies** | | | | | | |
| **Total** | 595,568 | 10,745 | 1.80% | 3,633,987 | 68,370 | 1.88% |
| Purchase permits | 346,710 | 8,218 | 2.37 | 2,394,730 | 49,225 | 2.06 |
| Carry permits | 192,352 | 1,976 | 1.03 | 953,606 | 16,562 | 1.74 |
| Other approvals | 56,506 | 551 | 0.98 | 285,651 | 2,583 | 0.90 |
| Unadjusted State and local total | 3,448,478 | 62,167 | 1.80 | 22,284,574 | 507,957 | 2.28 |
| Adjustment (see note) | (49,687) | -- | -- | (386,724) | -- | -- |
| **State and local total (FIST)** | 3,398,791 | 62,167 | 1.83% | 21,897,850 | 507,957 | 2.32% |
| **FBI total** | 4,685,018 | 63,675 | 1.36% | 26,993,908 | 407,892 | 1.51% |
| **National total (FIST and FBI)** | 8,083,809 | 125,842 | 1.56% | 48,891,758 | 915,849 | 1.87% |

Note: Agencies that conduct checks for exempt carry permits in Alaska, Arkansas, Mississippi, North Dakota, South Carolina, Texas, and Wyoming request that the FBI conduct the background check, but the State agency makes the decision to reject. Thus, the total number of applications in these States is included in the FBI checks, but the number of rejections is included in the State and local checks. Totals for the 6-year period include December 1998.

**Analysis of rejection rates**

*FBI reporting*

Among the States for which the FBI conducted both long gun and handgun background checks for transfers in 2004, rejection rates ranged from 2% for Alaska to less than 1% for Kansas, Massachusetts, Maine, Missouri, Rhode Island, and West Virginia (table 3).

Rejection rates in Massachusetts and Rhode Island may have been low in part because these States require a background check by a local agency separate from the NICS check. The local background check may eliminate some applicants before a NICS check is necessary. Delaware is similar because the State Police conduct a check separate from the NICS process. In 2004 the Delaware State Police reported a rejection rate of 3.8% that included checks of mental health records, while the FBI rejection rate for Delaware was 1.6%.

*Statewide reporting*

In 2004 the FIST survey obtained statewide data from 15 NICS points of contact and Delaware. These 16 States processed checks for 2.2 million applications in 2004, rejecting 40,000 (or 1.8%) (table 4).

Rejection rates varied slightly in 2004 by the type of statewide approval system. Purchase permits (2.0%), instant checks (1.9%), and exempt carry permits (1.9%) had the highest rates, and other approval systems had a lower rate (1.1%). The rejection rates for individual States surveyed in 2004 ranged from 0.2% in Connecticut to 3.8% in Delaware.

Among the lowest rejection rates in 2004 were instant checks in New Jersey (0.3%) and Illinois (0.7%), where an instant check at the time of transfer is the second step required for approval of prospective firearm owners. During the first step of the process — application for the requisite permit or ID card — the rejection rate is considerably higher in Illinois (2.3%),

| | 2004 | | | 1999-2004 | | |
|---|---|---|---|---|---|---|
| | Total transactions | Total rejections | Rejection rate | Total transactions | Total rejections | Rejection rate |
| Total | 3,384,017 | 40,257 | 1.2% | 18,062,231 | 268,219 | 1.5% |
| Alaska | 40,504 | 816 | 2.0% | 230,607 | 5,923 | 2.6% |
| Alabama | 229,997 | 3,400 | 1.5 | 1,320,342 | 22,364 | 1.7 |
| Arkansas | 158,366 | 2,495 | 1.6 | 905,734 | 17,933 | 2.0 |
| Delaware | 16,424 | 255 | 1.6 | 100,708 | 1,591 | 1.6 |
| Idaho | 75,553 | 1,265 | 1.7 | 385,768 | 8,598 | 2.2 |
| Kansas | 99,007 | 920 | 0.9 | 577,177 | 6,367 | 1.1 |
| Kentucky | 234,974 | 2,567 | 1.1 | 1,351,916 | 19,031 | 1.4 |
| Louisiana | 172,421 | 3,046 | 1.8 | 1,029,466 | 19,817 | 1.9 |
| Massachusetts | 112,996 | 94 | 0.1 | 261,150 | 746 | 0.3 |
| Maine | 52,665 | 374 | 0.7 | 293,892 | 2,001 | 0.7 |
| Minnesota | 227,846 | 2,438 | 1.1 | 1,000,363 | 11,722 | 1.2 |
| Missouri | 209,316 | 1,921 | 0.9 | 1,183,929 | 14,272 | 1.2 |
| Mississippi | 152,294 | 1,520 | 1.0 | 908,048 | 11,396 | 1.3 |
| Montana | 83,545 | 1,234 | 1.5 | 421,958 | 7,781 | 1.8 |
| North Dakota | 34,690 | 386 | 1.1 | 182,027 | 2,026 | 1.1 |
| New Mexico | 81,546 | 1,156 | 1.4 | 474,077 | 7,595 | 1.6 |
| Ohio | 327,040 | 4,122 | 1.3 | 1,771,068 | 27,708 | 1.6 |
| Oklahoma | 173,188 | 1,875 | 1.1 | 930,241 | 13,270 | 1.4 |
| Rhode Island | 10,054 | 79 | 0.8 | 60,590 | 502 | 0.8 |
| South Dakota | 50,323 | 607 | 1.2 | 245,250 | 3,537 | 1.4 |
| Texas | 672,995 | 8,103 | 1.2 | 3,493,357 | 53,641 | 1.5 |
| West Virginia | 132,846 | 1,077 | 0.8 | 747,225 | 7,388 | 1.0 |
| Wyoming | 35,427 | 507 | 1.4 | 187,338 | 3,010 | 1.6 |

**Table 3. Rejection rates for selected FBI States, 1999-2004**

Note: States are those for which the FBI conducted all checks under permanent Brady. The total for the 6-year period includes December 1998.

more similar than the second step to the national average of 1.6%.

Generally, the higher rejection rates in 2004 occurred in States that implemented an instant approval system on or after the effective date of the Brady Act, including Colorado (3.3%) and Tennessee (2.4%). Approval systems established before the Brady Act, such as California (1.1%) and Virginia (1.1%), generally had lower rates that varied little from year to year.

*Local reporting*

Local agencies mainly conduct checks for purchase and exempt carry permits. In 2004 local agencies received 596,000 applications, of which 11,000 (1.8%) were rejected. Rejection rates varied among local agencies by size of the population served, by the jurisdiction, and by the type of permit.

| Population served | Local rejection rates by population served and type of permit, 1999-2004 | |
|---|---|---|
| | 2004 | 1999-2004 |
| **Purchase permits** | | |
| Over 100,000 | 3.40% | 2.72% |
| 10,000 to 100,000 | 1.59 | 1.70 |
| Under 10,000 | 1.04 | 1.30 |
| **Exempt carry permits** | | |
| Over 100,000 | 1.07% | 1.87% |
| 10,000 to 100,000 | 1.14 | 1.41 |
| Under 10,000 | 0.49 | 1.06 |

Rejection rates for purchase permits were highest in jurisdictions with a population over 100,000 and lowest in those under 10,000. Rejection rates for exempt carry permits were highest in jurisdictions with populations between 10,000 and 100,000, and lowest in the smallest jurisdictions. Overall, local agency rejection rates in 2004 were higher for purchase permits than for exempt carry permits.

There was a similar pattern during the permanent Brady period: rejection rates for purchase and exempt carry permits were highest in jurisdictions with populations over 100,000 and lowest in those under 10,000.

*Availability of records*

All States maintain databases that record felony convictions, and many maintain data on other disqualifying factors such as fugitive status, court restraining orders, mental illness, and domestic violence misdemeanor convictions. States differ as to the degree of automation used in record searching and whether records are in a central database or in county courts or other local agencies.

As of December 31, 2001, 49 States had automated at least some records in their criminal history files. Automation expanded from 1999 to 2001, as the number of States with fully automated criminal history files increased from 21 to 27. (See *Survey of State Criminal History Information Systems, 2001,* NCJ 200343).

Checking agencies often encounter delays when they access incomplete records. The most frequent delays occur when researching the final disposition of a criminal charge indicated in an arrest or indictment record. If the final disposition cannot be found during the time allowed for a background check, the agency must decide, based on Federal or State law, whether the application will be approved, denied, or delayed pending further research. A State's rejection rate may tend to be lower if an approval is mandated and higher if a denial is mandated.

The Brady Act allows a transfer to proceed if a disqualifying record is not found within the 3 business day limit for a NICS check. Some States have laws and regulations that allow their agencies to deny or delay a transfer if an incomplete record is being researched when the time limit expires. These types of rules may partially account for the comparatively high rejection rates in States such as Colorado and Tennessee.

**Reasons for rejection**

Half of all rejections for firearm transfers among State and local checking agencies (about 31,000 applications in 2004) occurred because the applicant either had a felony conviction or was under felony indictment (table 5). The second most common reason for rejection was a domestic violence misdemeanor conviction or restraining order (about 16% of rejections or approximately 10,000 applications). Other common reasons for rejections were the presence of a State law prohibition (9% of rejections) and an applicant's status as a fugitive (8.3%).

The FBI reported that 38% of their rejections were for felony-related

**Table 4. Number of firearm purchase applications received and rejected by State agencies, 1999-2004**

| | 2004 | | | 1999-2004 | | |
|---|---|---|---|---|---|---|
| | Number of applications | Rejections | Rejection rate | Number of applications | Rejections | Rejection rate |
| **All statewide agencies** | 2,220,505 | 39,833 | 1.8% | 13,027,657 | 299,198 | 2.3% |
| California | 313,584 | 3,325 | 1.1% | 2,209,735 | 22,047 | 1.0% |
| Colorado | 146,518 | 4,852 | 3.3 | 810,359 | 35,344 | 4.4 |
| Connecticut[a] | 57,557 | 124 | 0.2 | 347,130 | 1,013 | 0.3 |
| Delaware | 9,845 | 372 | 3.8 | 58,779 | 2,696 | 4.6 |
| Florida | 298,279 | 6,632 | 2.2 | 1,588,022 | 37,713 | 2.4 |
| Georgia | 193,813 | 3,227 | 1.7 | 1,250,997 | 45,502 | 3.6 |
| Hawaii[b] | 6,842 | 104 | 1.5 | -- | -- | -- |
| Illinois[a] | 436,951 | 7,455 | 1.7 | 2,378,697 | 42,139 | 1.8 |
| Purchase permits | 279,511 | 6,347 | 2.3 | 1,415,243 | 34,611 | 2.4 |
| Instant checks | 157,440 | 1,108 | 0.7 | 963,454 | 7,528 | 0.8 |
| Maryland | 23,663 | 347 | 1.5 | 166,492 | 2,977 | 1.8 |
| New Hampshire[c] | 13,667 | 134 | 1.0 | 79,812 | 991 | 1.2 |
| New Jersey[a,b] | 79,176 | 879 | 1.1 | 478,378 | 5,587 | 1.2 |
| Purchase permits | 43,708 | 781 | 1.8 | 257,768 | 4,861 | 1.9 |
| Instant checks | 35,468 | 98 | 0.3 | 220,610 | 750 | 0.3 |
| Oregon | 128,363 | 2,400 | 1.9 | 606,357 | 13,272 | 2.2 |
| Tennessee | 205,784 | 4,945 | 2.4 | 1,288,796 | 60,436 | 4.7 |
| Utah[d] | 65,222 | 2,146 | 3.3 | 400,525 | 11,470 | 2.9 |
| Virginia | 207,823 | 2,348 | 1.1 | 1,167,509 | 15,020 | 1.3 |
| Wisconsin[c] | 33,418 | 543 | 1.6 | 196,019 | 2,991 | 1.5 |

Note: Each of the 16 listed States reported complete statewide data for applications and rejections in 2004. Pennsylvania reported 379,369 instant checks for 2004, but the number rejected is unavailable. An estimate for Nevada was included in the national estimate.
[a]Connecticut, Illinois, and New Jersey conduct checks on permits, ID cards, and transfers.
[b]Hawaii and New Jersey permits are issued locally, but counts are reported by the State.
[c]Counts in this table include handguns only for these States.
[d]Applications for carry permits are listed separately elsewhere.

**Table 5. Reasons for rejection of firearm transfer applications, 1999-2004**

| Reason for rejection | FBI | | State and local agencies | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 1999-2004 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1999-2004 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Felony indictment/conviction | 37.6 | 51.9 | 49.6 | 44.8 | 51.8 | 57.7 | 57.6 | 72.5 | 57.2 |
| Other criminal history[a] | 25.0 | 16.6 | -- | -- | -- | -- | -- | -- | -- |
| Domestic violence | | | | | | | | | |
| Misdemeanor conviction | 11.5 | 13.0 | 12.6 | 11.7 | 10.4 | 10.6 | 8.9 | 9.0 | 10.3 |
| Restraining order | 5.1 | 4.5 | 3.4 | 3.8 | 3.5 | 3.7 | 3.3 | 2.1 | 3.2 |
| State law prohibition | -- | -- | 9.0 | 10.4 | 9.9 | 7.0 | 4.7 | 3.5 | 6.9 |
| Fugitive | 4.6 | 3.5 | 8.3 | 7.8 | 8.0 | 5.8 | 4.3 | 5.0 | 6.2 |
| Illegal alien | 2.0 | 1.2 | 0.6 | 1.1 | 0.8 | 0.4 | 0.2 | 0.2 | 0.5 |
| Mental illness or disability | 0.5 | 0.4 | 2.7 | 2.4 | 1.4 | 1.2 | 1.0 | 0.5 | 1.4 |
| Drug use | 9.1 | 6.3 | 1.5 | 1.8 | 1.3 | 1.0 | 0.7 | 1.0 | 1.1 |
| Local law prohibition | -- | -- | 0.1 | 1.2 | 0.9 | 0.5 | 0.2 | 0.2 | 0.5 |
| Other[b] | 4.7 | 2.5 | 12.3 | 14.9 | 12.0 | 12.1 | 19.2 | 6.0 | 12.7 |

--Not available or not applicable.
[a]Includes State prohibitors, multiple DUI's, non-NCIC warrants, and other unspecified criminal history disqualifiers.
[b]Includes juveniles, persons dishonorably discharged from the Armed Services, persons who have renounced their U.S. citizenship, and other unspecified persons.

reasons (about 24,000 applications), followed by other criminal history disqualifiers (about 16,000 applications, or 25%), which includes State prohibitors. A domestic violence misdemeanor conviction or restraining order accounted for 17% of the rejections (about 11,000 applications). Other common reasons for rejection were an applicant's drug use (9.1%) or status as a fugitive (4.6%).

Although a felony conviction or indictment was the most common reason for rejection by both State and local law enforcement during 2004, the State agencies rejected for this reason more frequently (59%) than the local agencies (28%). State agencies were more likely to reject an applicant because of fugitive status while local agencies were more likely to base a rejection on a State or local prohibitor, drug addiction, or mental illness.

| Reason for rejection | Rejections, 1999-2004 | |
|---|---|---|
| | State | Local |
| Total | 100% | 100% |
| Felony indictment/conviction | 59.3 | 27.9 |
| Domestic violence | | |
| Misdemeanor conviction | 10.2 | 10.7 |
| Restraining order | 3.3 | 1.8 |
| State law prohibition | 6.3 | 15.9 |
| Fugitive | 6.6 | 1.1 |
| Illegal alien | 0.5 | 0.5 |
| Mental illness or disability | 1.2 | 4.2 |
| Drug use | 0.7 | 7.0 |
| Local law prohibition | 0.1 | 6.7 |
| Other* | 11.8 | 24.4 |

*Includes juveniles, persons dishonorably discharged from the Armed Services, persons who have renounced their U.S. citizenship, and other unspecified persons.

During the permanent Brady period, the number of rejections by State and local agencies for reasons other than felony conviction or indictment increased 28% (from 57,000 to 73,000). The percentage of rejections for nonfelony reasons increased from 28% to 58%. Over the same period the total number of rejections fell 38%, and the number of felony-related rejections decreased 64% (table 6).

States have used funds from NCHIP to flag criminal history records that contain a domestic violence misdemeanor conviction or protection order. Forty-six States now submit data to the NCIC Protection Order File, which

became operational in May 1997 and includes over 920,000 records as of July 2005.

### Appeals of denials

Specific procedures for appealing the denial of a firearm purchase or permit are codified in Federal law and in the laws of nearly all States that process background checks. The most

common procedure provides an appeal to the checking agency and a subsequent appeal to a court.

Eighteen States provide an appeal to the checking agency for a person who is denied a firearm purchase or a permit required for a purchase (table 7). (In eight other States, local agencies may reconsider their

---

**Table 6. Trends in applications, rejections, and reasons for rejection during the permanent Brady period, among all agencies conducting such checks, 1999-2004**

| | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | Percent change, 1999-2004 |
|---|---|---|---|---|---|---|---|
| Inquiries | 8,084,000 | 7,831,000 | 7,806,000 | 7,958,000 | 7,699,000 | 8,621,000 | -6.2% |
| Rejections | 126,000 | 126,000 | 136,000 | 151,000 | 153,000 | 204,000 | -38.2 |
| Felons rejected | 53,000 | 53,000 | 65,000 | 87,000 | 88,000 | 147,000 | -63.9 |
| All other | 73,000 | 73,000 | 71,000 | 64,000 | 65,000 | 57,000 | 28.1 |
| Percent felony | 42% | 42% | 48% | 58% | 58% | 72% | |
| Felons per 1,000 inquiries | 6.6 | 6.8 | 8.3 | 10.9 | 11.4 | 17.0 | -61.4 |

Note: Counts are rounded. See notes on table 1.

---

**Table 7. Appeals of denied applications, 2004**

| | Appeal forums | | | Statewide agencies | | |
|---|---|---|---|---|---|---|
| State | Denying agency | Other agency or official[a] | Court | Number of appeals | Percent appealed (appeals/denials) | Number of denials reversed[b] |
| California | ■ | -- | -- | -- | -- | -- |
| Colorado | ■ | -- | -- | 1,801 | 37.1 | 723 |
| Connecticut | ■ | ■ | -- | -- | -- | -- |
| Delaware | ■ | -- | ■ | -- | -- | -- |
| Florida | ■ | -- | -- | 1,508 | 22.7 | 443 |
| Georgia | ■ | -- | ■ | -- | -- | -- |
| Illinois | ■ | -- | -- | -- | -- | -- |
| Indiana | ■ | -- | ■ | -- | -- | -- |
| Iowa[c] | -- | -- | -- | -- | -- | -- |
| Maryland | ■ | -- | ■ | 0 | 0.0 | 0 |
| Massachusetts[c] | -- | -- | ■ | -- | -- | -- |
| Michigan[c] | -- | -- | -- | -- | -- | -- |
| Minnesota[c] | -- | -- | ■ | -- | -- | -- |
| Missouri[c] | -- | -- | ■ | -- | -- | -- |
| Nebraska[c] | -- | -- | -- | -- | -- | -- |
| Nevada | ■ | -- | -- | -- | -- | -- |
| New Hampshire | ■ | -- | ■ | -- | -- | -- |
| New Jersey | ■ | -- | -- | -- | -- | -- |
| North Carolina[c] | -- | -- | -- | -- | -- | -- |
| Oregon | ■ | -- | -- | 1,581 | 65.9 | 144 |
| Pennsylvania | ■ | ■ | ■ | 3,783 | 50.5 | 1,573 |
| Tennessee | ■ | -- | -- | 4,548 | 92.0 | 2,464 |
| Utah | ■ | -- | -- | -- | -- | -- |
| Virginia | ■ | -- | -- | 13 | 0.6 | 13 |
| Washington[c] | -- | -- | ■ | -- | -- | -- |
| Wisconsin | ■ | -- | ■ | -- | -- | -- |

Note: Includes States that provide a specific appeal procedure.
--Not available or not applicable.
■State has type of appeal forum.
[a]A different agency from the one that denied the application.
[b]The number of appeals reversed may include appeals from prior years.
[c]Although not required by law, a local agency may reconsider its decision to deny an application.

decisions although they are not required to do so by law.) Some agencies allow a denied person to initiate a review with a telephone request. Another 18 States provide an appeal to a court, and in 2 States a government officer in a department separate from the checking agency performs an administrative review.

Other agencies involved in appeals are those that maintain criminal histories or other records which could disqualify an applicant. An appellant may be required to contact the agency that supplied a criminal history or another record that caused a denial.

Appeals often arise when an applicant denies being the individual named in a disqualifying record found by the checking agency. To resolve the identity question, the appellant will ordinarily submit fingerprints for comparison with Federal and/or State arrestee records. If the appellant's prints do not match any records on file, the denial may be reversed.

Another common appeal arises when an applicant is denied because of a felony arrest or charge without a

recorded disposition. The applicant can have the denial reversed by submitting court records to prove that the charge was subsequently dismissed. The vast majority of disputed denials are resolved at the administrative level, and turn on the accuracy of records rather than interpretation of law.

Of the 916,000 denials by the FBI and State and local agencies in the first 6 years of the permanent Brady period, 138,000 (15%) were appealed (table 8). Of the appealed denials, 49,000 (36%) were reversed.

In 2004 checking agencies that reported data to FIST received 23,000 appeals of denials, of which 8,500 (or 37%) were reversed. Of the 62,000 denials issued in 2004 by State and local agencies, 13,000 (or 21%) were appealed. Of the appealed denials, 5,500 (or 42%) were reversed.

The FBI NICS Appeal Services Team (AST) reviews and investigates appeals of NICS denials. Of the 64,000 denials issued by the FBI in 2004, 10,000 (or 16%) were appealed. About 3 in 10 appeals resulted in the denial being overturned.

In the aggregate, the number of reversals of denials is only 0.1% (49,000 reversals/ 48,892,000 checks).

**Denied persons subject to arrest**

Persons prevented from receiving a firearm or a permit by a background check may be subject to arrest and prosecution if they are wanted in an outstanding warrant or have submitted false information on their application (table 9). When a check identifies a wanted person, the checking agency generally will inform the agency that entered the warrant, in addition to notifying the agency with jurisdiction over the fugitive's location or place of residence. A statewide fugitive apprehension unit may also be informed.

Many checking agencies notify ATF of persons who submit false information on a Federal firearm transaction record or fail to disclose required information. If a misrepresentation violates State law, the checking agency will inform the agency with jurisdiction either over the location of the transaction (usually a dealer's premises) or over the applicant's residence, or both agencies.

In seven States persons who falsify an application or attempt an illegal transfer are reported to a special police unit to make an arrest determination. In some States all persons denied a firearm are reported to a special police unit. Of the States reporting for 2004, Virginia had the largest number of arrests of denied persons due to outstanding warrants or other reasons.

### Table 8. Number of appeals reported, by type of agency, 1999-2004

| Type of agency | Number of appeals | Percent appealed | Number reversed | Percent reversed |
|---|---|---|---|---|
| Total | 138,154 | 15.1% | 49,159 | 35.6% |
| FBI | 60,812 | 14.9% | 18,396 | 30.3% |
| State | 76,423 | 17.4 | 30,446 | 39.8 |
| Local | 919 | 1.3 | 317 | 34.5 |

### Table 9. Notification procedures of State points of contact (POC's) regarding denied persons subject to arrest, 2004

| State | Notice of outstanding warrant — Agency with jurisdiction[a] | Notice of outstanding warrant — Special State unit[b] | Notice of false application or illegal attempt to buy — Agency with jurisdiction[a] | Notice of false application or illegal attempt to buy — Special State unit[b] | ATF |
|---|---|---|---|---|---|
| California | ■ | -- | -- | -- | -- |
| Colorado | ■ | -- | ■ | -- | ■ |
| Connecticut | ■ | -- | -- | ■ | -- |
| Delaware | ■ | -- | ■ | -- | ■ |
| Florida | ■ | -- | ■ | -- | ■ |
| Georgia | ■ | -- | ■ | -- | ■ |
| Illinois | ■ | -- | -- | ■ | ■ |
| Indiana | ■ | -- | ■ | -- | ■ |
| Maryland | -- | ■ | -- | ■ | ■ |
| Nevada | ■ | -- | ■ | -- | ■ |
| New Hampshire | ■ | -- | ■ | -- | ■ |
| New Jersey | ■ | ■ | -- | ■ | -- |
| Oregon | ■ | -- | ■ | -- | -- |
| Pennsylvania | ■ | -- | ■ | -- | ■ |
| Tennessee | ■ | -- | ■ | -- | ■ |
| Utah | ■ | -- | ■ | -- | ■ |
| Virginia | -- | ■ | -- | ■ | ■ |
| Wisconsin | ■ | -- | ■ | -- | ■ |
| Totals | 16 | 4 | 10 | 7 | 12 |

--Not applicable or not available.
[a]May include Federal, State, or local agencies that issued a warrant or have jurisdiction over the site of the transaction or the denied person's residence.
[b]Includes units within the same agency as the checking unit.

| State | Number of arrests in 2004 |
|-------|---------------------------|
| Colorado | 215 |
| Connecticut* | 27 |
| Delaware | 7 |
| Georgia | 98 |
| Oregon | 98 |
| Pennsylvania | 343 |
| Virginia* | 702 |

*A statewide unit made arrests for false applications or illegal attempts to buy in this State; arrests in other States listed were those made by local agencies, which may not always be reported to the State.

During the permanent Brady period, over 8,000 persons have been arrested, according to checking agencies reporting arrests to FIST (table 10). The number of arrests may be higher because some State and local agencies did not report their arrests.

*Firearm retrievals*

The NICS and several State systems do not prohibit a Federal Firearm Licensee from transferring a firearm to a buyer, when the dealer has not received a response within 3 business days of requesting a check (termed an "open" by the NICS). A checking agency may continue to research an incomplete record even after a transfer has occurred. If a disqualifying record is found at a later date (termed a "delayed denial" by the ATF), the dealer will be contacted to determine if the applicant completed the transaction and received a firearm.

ATF is informed when the FBI discovers that a firearm was transferred to a prohibited person. A State checking agency that discovers a delayed denial may inform a statewide firearms unit, local law enforcement, or ATF.

*Prosecutions*

In 2004 ATF referred for prosecution 1,140 cases involving false information provided on applications for firearm transfers (ATF form 4473). These referrals are based on prosecutorial criteria provided by the individual U.S. attorney offices.

**Table 10. Number of arrests reported, by type of agency, 1999-2004**

| Type of agency | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1999-2004 |
|----------------|------|------|------|------|------|------|-----------|
| Total | 1,509 | 1,473 | 1,742 | 1,964 | 1,327 | 301 | 8,316 |
| State | 1,497 | 1,430 | 1,697 | 1,901 | 1,294 | 295 | 8,114 |
| Local | 12 | 43 | 45 | 63 | 33 | 6 | 202 |

**Background**

*Prohibited persons*

The Federal Gun Control Act (GCA), 18 U.S.C. 922, prohibits transfer of a firearm to a person who —

• is under indictment for, or has been convicted of, a crime punishable by imprisonment for more than 1 year
• is a fugitive from justice
• is an unlawful user of, or is addicted to, any controlled substance
• has been adjudicated as a mental defective or committed to a mental institution
• is an illegal alien or has been admitted to the United States under a nonimmigrant visa
• was discharged from the U.S. Armed Forces under dishonorable conditions
• has renounced U.S. citizenship
• is subject to a court order restraining him or her from harassing, stalking, or threatening an intimate partner or child
• has been convicted in any court of a misdemeanor crime of domestic violence.

In addition the GCA prohibits transfers of long guns to persons under 18 and transfers of handguns to persons under 21. The GCA categories of prohibited persons are the prevailing minimum for all States. Many States have similar prohibitions and have enacted additional categories of prohibited persons, such as those who have committed alcohol-related or juvenile offenses. (See *Survey of State Procedures Related to Firearm Sales, Midyear 2004* <www.ojp.usdoj.gov/bjs/abstract/ssprfs04.htm>.)

*Brady Act provisions*

The Brady Act amended the GCA and included interim provisions, 18 U.S.C. 922(s), in effect from February 29, 1994, until November 29, 1998. The U.S. Department of Justice, with the States, developed the NICS during the 57-month interim period, as authorized by the permanent provisions of the Brady Act, 18 U.S.C. 922(t).

Since November 30, 1998, the NICS has allowed a licensee to contact the system by telephone or other electronic means for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate Federal or State law.

In addition to regulation of handgun sales, the permanent Brady provisions mandate that licensees request background checks on long gun purchasers and persons who redeem a pawned firearm. Licensees have the option of requesting a NICS check on persons who attempt to pawn a firearm.

*National Criminal History Improvement Program (NCHIP)*

The Brady Act established the grant program NCHIP to ensure immediate availability of complete and accurate State records. The Firearm Inquiry Statistics Program (FIST), collecting statistics on background checks, is one of many NCHIP programs.

NCHIP is designed to assist States to develop or improve existing criminal history records systems and to establish an interface with the NICS and other national record systems. Grant funds have also supported direct technical assistance, evaluation, and research related to improving nonfelony records within the States.

To date, over $495 million has been awarded to States to assist them in establishing and enhancing criminal records which support the FBI's record system. All States have received funding under the NCHIP program.

## Components of the national firearm check system

Over 3,000 Federal, State, and local agencies conduct background checks on persons who apply to purchase a firearm or for a permit that can be used to make a purchase. Variations in Federal and State procedures for determining firearm possession eligibility are summarized below.

### Overview of the NICS

Prospective firearm transferees undergo a NICS check requested by a dealer or present a State permit that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has qualified as an alternative to the point-of-transfer check. Qualifying permits are those that —

(1) allow a transferee to possess, acquire, or carry a firearm, and
(2) were issued not more than 5 years earlier by the State in which the transfer is to take place, after verification by an authorized government official that possession of a firearm by the transferee would not be a violation of law.

A permit issued after November 29, 1998, qualifies as an alternative only if its approval process included a NICS check. Many qualifying permits may be used for multiple purchases while valid. However, State laws often provide that a permit will be revoked if the holder is convicted of an offense or otherwise becomes ineligible after receiving the permit.

Prior to transferring a firearm subject to permanent Brady requirements, a licensee must receive a completed Firearm Transaction Record (ATF form 4473).

A licensee initiates a NICS check by contacting either the FBI or a point of contact (POC) agency designated by State government. Most inquiries are initiated by telephone. In 2002 the FBI added online checking (known as E-Check) as another means to contact the NICS, and about 50,000 inquiries were made by this method in 2004.

The FBI or POC checks available Federal, State, and/or local databases and responds with a notice to the licensee that the transfer may proceed, may not proceed, or is delayed pending further review of the transferee's record.

### State and local NICS participation

Each State government determines the extent of its involvement in the NICS process. Three forms of State involvement currently exist:

• A full POC requests a NICS check on all firearm transfers originating in the State.
• A partial POC requests a NICS check on all handgun transfers; licensees in the State are required to contact the FBI for NICS checks for long gun transfers.
• The State does not maintain a POC; licensees are required to contact the FBI for NICS checks on all firearm transfers originating in the State.

The FBI conducts all NICS checks for 28 States and POC agencies conduct all NICS checks in 14 States. In eight States NICS checks are conducted by POC agencies on handgun transfers and by the FBI on long gun transfers (see *Appendix A*). The FBI also conducts all NICS checks for the District of Columbia, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

Participation in the NICS by POC agencies includes initiating checks on persons who apply for qualified State permits. Generally, POC agencies conduct a background check that incorporates Federal and State requirements. In a few States with full or partial participation, the FBI conducts the NICS check on certain pawn transactions instead of the POC. Most States have designated a single agency with statewide jurisdiction as their NICS point of contact; some States have multiple points of contact, which are usually county sheriffs or local police departments. (For agencies conducting firearm checks, see *Appendix B* on the BJS website <http://www.ojp.usdoj.gov/bjs/abstract/bcft04.htm>.)

The NICS is integrated with most State instant approval, purchase permit, or other approval systems. Twenty-nine States maintained approval systems for purchase or permits required for purchase during 2004. Sixteen States operated instant check systems; 12 required purchase permits; and 5 maintained other types of approval systems. (Connecticut, Illinois, and New Jersey are each counted twice because they operated separate purchase permit and instant check systems; Minnesota is counted twice because it gives the buyer the options of a purchase permit or an "other approval" process). During 2004, 19 States issued carry permits that exempted the holder from a check under the permanent Brady law or a State law or both.

In addition to the Brady Act's regulation of sales by licensed dealers, some States require background checks for firearm transfers that occur between unlicensed persons at gun shows or other locations. A few States require a mandatory waiting period after a purchaser applies and before a firearm transfer can be made, regardless of when a background check is completed.

### Parallel State systems

If agencies that conduct checks under State law are unable to access the NICS, licensees in that State are required to contact the FBI for approval of transfers. Thus, prospective transferees in these States are required to undergo a permit or point-of-transfer check by a State or local agency and a NICS check by the FBI. Seven States in 2004 (Delaware, Indiana, Massachusetts, Minnesota, Missouri, New Jersey, and Rhode Island) maintained firearm check systems that can be described as parallel to the NICS process.

For more information on approval systems in specific States, see *Survey of State Procedures Related to Firearm Sales, Midyear 2004* <www.ojp.usdoj.gov/bjs/abstract/ssprfs04.htm>.

## Definitions

*Appeal* is an objection by the denied person to an agency's decision.

*Application* for firearm transfer is information submitted by a person to a State or local checking agency to purchase a firearm or obtain a permit that can be used for a purchase; includes information submitted directly to a checking agency or forwarded by a prospective seller.

*Exempt carry permit* is a State carry permit (issued after a background check) that exempts the holder from a check at the time of purchase under an ATF regulation or State law.

*Instant check (instant approval) systems* require a seller to transmit a purchaser's application to a checking agency by telephone or computer; the agency is required to respond immediately or as soon as possible.

*Other approval systems* require a seller to transmit a purchaser's application to a checking agency by telephone or other electronic means; the agency is not required to respond immediately but must respond before the end of the statutory time limit.

*Permanent Brady period* is the period that began on November 30, 1998, when the permanent provisions of the Brady Act became effective.

*Purchase permit systems* require a prospective firearm purchaser to obtain, after a background check, a government-issued document (called a permit, license, or identification card) that must be presented to a seller to receive a firearm.

*Rejection* occurs when an applicant is prohibited from receiving a firearm or a permit that can be used to receive a firearm, due to the finding of a disqualifying factor during a background check.

*Transactions* are inquiries to the Federal NICS system and may include more than one inquiry per application.

## Methodology

### Data collection procedures

The Regional Justice Information Service (REJIS), through a cooperative agreement with BJS under the Firearm Inquiry Statistics (FIST) program, collected the data from Federal, State, and local agencies.

Participating agencies supplied data on paper or diskette, or electronically. Several different forms were provided to meet the varying office procedures of the agencies. In addition REJIS wrote special software distributed free of charge to requesting agencies. This software was designed to simplify the record tabulating functions of the agency. It also helped to reduce the burden of keeping the statistical data because a capability of the software was to automatically report the data needed for the study. In all cases the data that the agency sent to REJIS contained only statistical information and would not allow the identification of an individual. The software also assists agencies in purging records after the delay time specified by law.

Information collected included counts of firearm transfer or permit applications made to an agency, applications rejected by the agency, and the reasons for rejection. Other data collected included the number of denials appealed by applicants and the number of persons who were arrested by an agency after a background check caused a denial. Many checking agencies do not handle appeals and arrests through the entire process and may have only limited information on the outcomes of such events.

### Determining populations

To estimate the application and rejection rates within a given area, the agency population was needed and was determined as follows: The stratification classification of the county was based on the size of the largest city within the county. If cities within a county were conducting their own background checks, their populations were subtracted from the county population. If a municipal agency

provided services for other selected municipalities, then populations for those municipalities were added to the populations of the reporting municipality. If an agency participating in the study relied upon other jurisdictions to conduct background checks, they were replaced by those other jurisdictions.

State and local checking agencies were stratified by size of the population served: State agencies that served an entire State population; local agencies that served a population greater than 100,000; local agencies that served a population between 10,000 and 100,000; and local agencies that served a population of less than 10,000. Population size was based on 2000 Census Bureau information. The population categories were chosen to be consistent with those used by the FBI when conducting similar studies.

All agencies serving a population greater than 100,000 were asked to contribute data in 2004. The number of agencies in the survey is shown by population category:

| Population served | Number of agencies |
|---|---|
| Total | 682 |
| Statewide | 28 |
| Over 100,000 | 40 |
| 10,000 to 100,000 | 333 |
| Under 10,000 | 281 |

In some States one statewide agency conducts background checks for purchase and another agency (or division within an agency) issues ATF-approved permits. Care was taken not to count State populations twice in the estimation process. This situation of dual agencies conducting background checks did not occur among local agencies.

### Estimation procedures

Based on data provided by both sets of agencies, national estimates were developed using population weighting factors. When an agency did not provide data for all months, a simple linear extrapolation or interpolation was used to generate a 12-month total.

Agencies with rejection rates over four standard deviations above the average standard rejection rate were classified as outliers and their data were not used for projection of estimates. In addition, rejection rates that could not be determined with sufficient accuracy were not used. The estimates do not include U.S. Territories or the District of Columbia.

Estimation based on State population was used to determine the number of carry permit applications and rejections in Mississippi.

Pennsylvania reported 379,369 instant checks, included in the FIST national estimate, and 123,721 applications for nonexempt carry permits. Pennsylvania provided the combined number of denials of all applications, which was prorated to obtain the number of denials of instant checks.

The accuracy of the estimates presented in this report depends on two types of errors: nonsampling and sampling. In this study, nonsampling error may occur from the following: nonresponse; differences in the methods checking agencies use to process, code, store, and retrieve their information; differences in interpretation of the survey questions; and activities that delay personnel from completing the survey.

In any sample survey, the full extent of nonsampling error is never known. However, steps were taken to minimize the potential for error. Extensive telephone follow-ups were made to encourage responses, answer questions about misunderstood requests, and generally assist in assembling the information in a useable form. Extensive verification of the data ensured the accuracy of the numbers. Agencies providing data were asked to review and revise their reports, and various quality checks were performed in receiving and processing the data.

**Appendix A. National Instant Criminal Background Check System: Checking agencies — FBI or State point of contact— for firearm transfers, 2004**

| State | FBI conducts checks for all firearms | POC conducts checks for all firearms | POC - handguns FBI - long guns |
|---|:---:|:---:|:---:|
| Alabama | ■ | | |
| Alaska | ■ | | |
| Arizona | ■ | | |
| Arkansas | ■ | | |
| California | | ■ | |
| Colorado | | ■ | |
| Connecticut | | ■ | |
| Delaware | ■ | | |
| Florida | | ■ | |
| Georgia | | ■ | |
| Hawaii* | | ■ | |
| Idaho | ■ | | |
| Illinois | | ■ | |
| Indiana | ■ | | |
| Iowa* | | | ■ |
| Kansas | ■ | | |
| Kentucky | ■ | | |
| Louisiana | ■ | | |
| Maine | ■ | | |
| Maryland | | | ■ |
| Massachusetts | ■ | | |
| Michigan* | | | ■ |
| Minnesota | ■ | | |
| Mississippi | ■ | | |
| Missouri | ■ | | |
| Montana | ■ | | |
| Nebraska* | | | ■ |
| Nevada | | ■ | |
| New Hampshire | | | ■ |
| New Jersey | | ■ | |
| New Mexico | ■ | | |
| New York | ■ | | |
| North Carolina* | | | ■ |
| North Dakota | ■ | | |
| Ohio | ■ | | |
| Oklahoma | ■ | | |
| Oregon | | ■ | |
| Pennsylvania | | ■ | |
| Rhode Island | ■ | | |
| South Carolina | ■ | | |
| South Dakota | ■ | | |
| Tennessee | | ■ | |
| Texas | ■ | | |
| Utah | | ■ | |
| Vermont | ■ | | |
| Virginia | | ■ | |
| Washington* | | | ■ |
| West Virginia | ■ | | |
| Wisconsin | | | ■ |
| Wyoming | ■ | | |
| **Totals** | **28** | **14** | **8** |

Note: Includes check on purchase or permit required for purchase.
*States with multiple points of contact.

The online version of this report offers the *Methodology* and a State-by-State appendix table describing the agencies doing background checks. Access the report at <http://www.usdoj.gov/bjs/abstract/bcft04.htm>.

**Office of Justice Programs**
Partnerships for Safer Communities
http://www.ojp.usdoj.gov

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Lawrence A. Greenfeld is director.

BJS Bulletins present the first release of findings from permanent data collection programs such as the Firearm Inquiry Statistics program. State and local officials have cooperated in reporting the data presented.

Michael Bowling and Gene Lauver of REJIS and Devon B. Adams and Matthew J. Hickman of BJS wrote this Bulletin. David M. Naglich and Ronald J. Frandsen of REJIS collected and analyzed the FIST data presented. Terry Tomazic, Ph.D., professor of research methodology at St. Louis University, provided statistical consultation. At BJS, Steven K. Smith reviewed the report. Tom Hester edited the report.

October 2005, NCJ 210117

# Massachusetts Department of Public Health

**Health Survey Program**
**Center for Health Information, Statistics, Research, and Evaluation**

# A Profile of Health Among Massachusetts Adults, 2002

Results from the Behavioral Risk Factor Surveillance System

*Mitt Romney ~ Governor*
*Kerry Healey ~ Lieutenant Governor*
*Ronald Preston ~ Secretary of Health and Human Services*
*Christine C. Ferguson ~ Commissioner of Public Health*
*Sue Thomson ~ Deputy Commissioner of Public Health*

*Center for Health Information, Statistics, Research, and Evaluation*
*Bruce B. Cohen ~ Acting Director*
*Gerald F. O'Keefe ~ Acting Director*
*Zi Zhang ~ Director, Health Survey Program*

*April 2004*

# ACKNOWLEDGEMENTS

This report was prepared by the staff of the Health Survey Program:

> Christine Macaluso, MSPH, Epidemiologist
> Nahara Borja, MPH, Epidemiologist
> Xuelei Pan, PhD, Research Analyst
> Susan Keyes, DrPH, MPH, Senior Research Analyst
> Zi Zhang, MB, MPH, Director

We wish to express our gratitude to the residents of Massachusetts who participated in this survey, and to ORC Macro, Inc. and the dedicated interviewers who helped make this survey possible. We would also like to express our gratitude to Deborah Klein Walker Ed.D., whose guidance and support when she was Associate Commissioner of the Department of Public Health were critical to the success of the Massachusetts Behavioral Risk Factor Surveillance System.

For further information about this report, about the Behavioral Risk Factor Surveillance System, or the Health Survey Program, please contact: Zi Zhang, Health Survey Program, Center for Health Information, Statistics, Research, and Evaluation, Massachusetts Department of Public Health, 2 Boylston Street , 6th floor, Boston, MA 02116. Telephone: (617) 988-3395. Email: zi.zhang@state.ma.us

# TABLE OF CONTENTS

**Page**

**ACKNOWLEDGEMENTS** ii
**EXECUTIVE SUMMARY** 1
**INTRODUCTION** 7
What is the BRFSS? 7
About This Report 7
Demographic Profile of BRFSS Population 9
Map of Massachusetts EOHHS Regions 10

**RESULTS**
**1. Overall Health Measures**
Section 1.1: Overall Health Status 12
Section 1.2: Quality of Life 14
**2. Health Care Access and Utilization**
Section 2.1: Health Care Access 18
Section 2.2: Dental Health Care 20
**3. Risk Factors and Preventive Behaviors**
Section 3.1: Tobacco Use 24
Section 3.2: Smoking Cessation 26
Section 3.3: Environmental Tobacco Smoke 28
Section 3.4: Alcohol Use 30
Section 3.5: Overweight and Obesity 32
Section 3.6: Physical Activity 34
Section 3.7: Fruit and Vegetable Consumption 36
Section 3.8: Flu Shot and Pneumonia Vaccine 38
**4. Chronic Health Conditions**
Section 4.1: Diabetes 42
Section 4.2: Asthma 44
Section 4.3: Disability 46
**5. Cancer Screening**
Section 5.1: Colorectal Cancer Screening 50
Section 5.2: Prostate Cancer Screening 52
Section 5.3: Breast Cancer Screening 54
Section 5.4: Cervical Cancer Screening 56
**6. Women's Health**
Section 6.1: Calcium Intake and Osteoporosis 60
Section 6.2: Family Planning 62
**7. Childhood Health**
Section 7.1: Asthma in Children 66
Section 7.2: Health Care Access for Children 67
Section 7.3: Dental Sealant and Children 68
**8. Other Topics**
Section 8.1: HIV Testing 70
Section 8.2: Firearms 72
Section 8.3: Illicit Drug Use 74
Section 8.4: Seatbelt Use 76
Section 8.5: Sexual Assault 78

**APPENDIX**
Summary of 2002 Behavioral Risk Factor Surveillance Survey Results 82
BRFSS Methodology 84
Technical Notes 86
Key Links 88

## Section 8.2: Firearms

All respondents were asked whether firearms were kept in or around their home. Respondents were asked to include weapons such as pistols, shotguns, and rifles; but not BB guns, starter pistols, or guns that cannot be fired. They were also asked to include those kept in a garage, outdoor storage area, or motor vehicle. The percentages of Massachusetts adults ages 18 and older who reported that firearms were kept in their home is presented here.

FIREARMS (Table 8.2)
- 13% of Massachusetts adults reported that firearms were kept in or around their homes
- Men were twice as likely as women to report keeping firearms in or around their home
- Adults in the 55-64 age group were the most likely to keep firearms in or around their home compared with other age groups
- White adults were more likely than adults in other race-ethnicity groups to report keeping firearms in or around their home
- Adults in the Western region of the state were more likely than adults in other regions of the state to report keeping guns in or around their home

| TABLE 8.2 – FIREARMS AMONG MASSACHUSETTS ADULTS, 2002 | | | |
|---|---|---|---|
| | ANY FIREARMS NOW KEPT IN OR AROUND HOME | | |
| | CRUDE | AGE–ADJUSTED | |
| | % | % | 95% CI |
| OVERALL | 12.9 | 13.0 | (11.9-14.0) |
| GENDER | | | |
| MALE | 18.0 | 18.2 | (16.3-20.0) |
| FEMALE | 8.4 | 8.6 | ( 7.5 -9 .8) |
| AGE GROUP | | | |
| 18–24 | 12.2 | | ( 8.2-16.3)* |
| 25–34 | 8.5 | | ( 6.5-10.5)* |
| 35–44 | 13.6 | | (11.4-15.7)* |
| 45–54 | 14.3 | | (11.8-16.7)* |
| 55–64 | 19.6 | | (16.3-23.0)* |
| 65–74 | 11.4 | | ( 8.6-14.3)* |
| 75 AND OLDER | 11.8 | | ( 8.6-14.9)* |
| RACE-ETHNICITY** | | | |
| WHITE | 14.2 | 14.2 | (13.0-15.4) |
| BLACK | 5.4 | 6.2 | ( 2.2-10.2) |
| HISPANIC | 4.4 | 4.6 | ( 2.3 - 6.9) |
| ASIAN | 8.7 | 10.1 | ( 2.0-18.2) |
| EDUCATION | | | |
| < HIGH SCHOOL | 9.8 | 10.0 | ( 5.9-14.0) |
| HIGH SCHOOL | 16.3 | 16.5 | (14.1-18.9) |
| COLLEGE 1–3 YRS | 13.9 | 14.2 | (12.1-16.3) |
| COLLEGE 4+ YRS | 10.8 | 11.1 | ( 9.4-12.7) |
| HOUSEHOLD INCOME | | | |
| <$25,000 | 8.6 | 8.7 | ( 6.5-10.9) |
| $25–34,999 | 12.6 | 12.8 | ( 9.5-16.0) |
| $35–49,999 | 15.9 | 16.3 | (13.3-19.2) |
| $50–74,999 | 16.4 | 15.8 | (12.9-18.8) |
| $75,000+ | 15.0 | 16.0 | (13.2-18.8) |
| REGION | | | |
| I–WESTERN | 22.9 | 22.8 | (19.2-26.4) |
| II–CENTRAL | 16.0 | 15.8 | (12.8-18.8) |
| III–NORTH EAST | 10.6 | 10.7 | ( 8.4-13.1) |
| IV–METRO WEST | 8.8 | 8.9 | ( 6.9-10.8) |
| V–SOUTH EAST | 14.7 | 14.6 | (12.2-17.0) |
| VI–BOSTON | 5.5 | 6.0 | ( 3.8 - 8.2) |

\* Confidence interval presented is for the crude (age specific) rate in the previous column.
\*\* White, Black and Asian race categories refer to non-Hispanic.

U.S. Department of Justice

Office of Justice Programs

*National Institute of Justice*



# National Institute of Justice

## R e s e a r c h   i n   B r i e f

*Jeremy Travis, Director*                                          *May 1997*

## Issues and Findings

**Discussed in this Brief:** Results of a nationally representative telephone survey (1994) on private ownership and use of firearms by American adults. The survey provides the most complete data available on the private stock of firearms in the United States.

**Key issues:** With nearly 200 million guns in private hands, firearms have an important impact on the quality of life in America. What is the size and composition of the Nation's private gun inventory? What are the methods of, and reasons for, acquiring firearms? How are firearms stored? How frequently are guns used against criminal attackers?

**Key findings:** The survey data and analysis yielded the following results:

• In 1994, 44 million Americans owned 192 million firearms, 65 million of which were handguns. Although there were enough guns to have provided every U.S. adult with one, only 25 percent of adults actually owned firearms; 74 percent of gun owners possessed two or more.

• The proportion of American households that keep firearms appears to be declining.

• Sixty-eight percent of handgun owners also possessed at least one rifle or shotgun.

*continued…*

# Guns in America: National Survey on Private Ownership and Use of Firearms

*by Philip J. Cook and Jens Ludwig*

The United States is unique among wealthy nations in its vast private inventory of firearms. The nearly 200 million guns in private hands are used in part for recreation, mostly hunting and target shooting. But what engenders the most public controversy over firearms is their use against people during either the commission of or defense against crime.

Gun advocates regard firearms as an important crime deterrent and source of protection, while control advocates denounce guns for the damage they do in the hands of criminals. What both groups can agree on is that widespread ownership of firearms has an important impact on the quality of life in America.

To learn more about the role of firearms, the National Institute of Justice (NIJ) sponsored—through a grant to the Police Foundation—a nationally representative telephone survey in 1994 on private ownership and use of firearms by American adults (see "Firearms Survey Methodology"). This Research in Brief reports some of the survey's more important findings, including the following:

• Size, composition, and ownership of the Nation's private gun inventory.

• Methods of, and reasons for, firearms acquisition.

• Storage and carrying of guns.

• Defensive use of firearms against criminal attackers.

## Gun ownership

**Prevalence.** According to conventional wisdom, about half of American households own guns, a belief affirmed by a long series of national polls dating back to 1959.[1] Yet data from the 1994 telephone survey (National Survey of Private Ownership of Firearms—NSPOF) indicate that just 35 percent (plus or minus 1.3 percent) of households own guns. This estimate may be somewhat off the mark but not by much. Conventional wisdom appears out of date.

The best available survey series on gun ownership is the General Social Survey (GSS), conducted by the National Opinion Research Center. Its estimates have been lower than some others, in the range of 40 to 43 percent during the 1990s. In particular, the GSS estimate for 1994 was just 41 percent. Another telephone survey in 1994 produced a still lower estimate for gun ownership, 38 percent of households.[2]

## Issues and Findings

*continued…*

• Gun ownership was highest among middle-aged, college-educated people of rural small-town America. Whites were substantially more likely to own guns than blacks, and blacks more likely than Hispanics.

• The most common motivation for owning firearms was recreation. Forty-six percent possessed a gun primarily for protection against crime.

• There were 13.7 million firearm transactions in 1993–1994, including 6.5 million handguns. About 60 percent of gun acquisitions involved federally licensed dealers.

• About 211,000 handguns and 382,000 long guns were stolen in noncommercial thefts in 1994.

• Slightly more than half of all privately owned firearms were stored unlocked; 16 percent of firearms were stored unlocked and loaded.

• In 1994, about 14 million adults (approximately one-third of gun owners) at least once carried a firearm in their vehicles or on their person for protection.

• Evidence suggests that this survey and others like it overestimate the frequency with which firearms were used by private citizens to defend against criminal attack.

*Target audience:* Criminal justice and public health researchers and practitioners. Legislators and policy-makers at all levels of government.

**Concentration.** Despite enough guns in private hands to provide every adult in America with one, only one-quarter of adults actually own firearms. Those who have one gun usually have several: 74 percent possessed two or more in 1994.

Gun ownership is quite concentrated but not more so than for other durable goods. In marketing circles, the "80/20 rule" suggests that the top fifth of all consumers of a product typically account for four-fifths of all purchases by value. NSPOF data indicate that the top 20 percent of firearm owners possessed 55 percent of privately owned firearms.[3] Of gun owners in 1994, 10 million individuals owned 105 million guns, while the remaining 87 million guns were dispersed among 34 million other owners.

Persons owning several guns tended to have varied collections, including rifles, shotguns, and handguns.[4] We find that 68 percent of handgun owners also owned at least one rifle or shotgun, suggesting some experience and interest in the sporting uses of guns. Exhibit 1 provides additional data on the composition of private gun collections.

**Demographic patterns.** In 1994 gun ownership was far from uniformly distrib-uted across the population, as is evident from exhibit 2. Most striking is the gender gap: 42 percent of men but just 9 percent of women owned guns at the time of NSPOF. (The gap is even wider when the focus is on whether the respondent ever owned a gun.) With respect to race, whites were substantially more likely to own guns than blacks (27 versus 16 percent), and blacks more likely than Hispanics (16 versus 11 percent). But for handguns alone, the ownership rates among blacks and whites were nearly equal (13.1 versus 16.5 percent).

Gun ownership (and handgun ownership) was highest among middle-aged,[5] college-educated people of rural and small-town America. But one of the best predictors of gun ownership was the presence of firearms in the respondent's childhood home. People whose parents possessed guns were three times as likely as others to own one themselves. In fact, 80 percent of all current gun owners reported that their parents kept a firearm in the home.

**Motivations.** The most common motivation for owning firearms was recreation. As shown in exhibit 3, about 35 percent of gun owners (15 million people, 8 percent of the adult public) hunted in 1994, and about an equal percentage engaged



*Exhibit 1. Composition of Gun Ownership (1994)[a]*

Own 1 12%

Own 2+ 8%

Own Handguns Only 20%

Own 1 13%

Own Both 44%

Own 2+ 23%

Own Long Guns Only 36%

a. There were 44 million gun owners in 1994.

*Exhibit 2. Gun Ownership Patterns (NSPOF Estimates, 1994)*



*Exhibit 3. Recreational Use of Firearms—Percentage of Gun Owners Who Hunt, Do Other Sport Shooting, Do Neither*

in sport shooting other than hunting. Given the substantial overlap between the two groups, about half (23 million) of the Nation's 44 million gun owners participated in a gun sport during 1994. Of those who owned only handguns in 1994, 40 percent used them recreationally, almost entirely for sport shooting other than hunting.

Another reason cited for firearm ownership was self-protection. Overall, 46 percent of gun owners possessed firearms (usually handguns) primarily for protection against crime (41 percent for males; 67 percent for females). Almost three-quarters of those who owned only handguns kept them primarily for self-protection. Of course, some people seek the protection of a gun because they may be disproportionately likely to lead risky lives or associate with violent people.[6] Those who had been arrested for nontraffic offenses were more likely to own firearms (37 percent compared to 25 percent in the general population).

But most persons do not own guns, and the NSPOF included several items to find out why. In 1994, about two-thirds of gunless adults were actively opposed to having guns in their homes because they viewed guns as dangerous, "im-moral," or otherwise objectionable. The remaining one-third were at least open to the possibility of obtaining firearms and might do so if their financial condition or motivation became stronger. For many, the needed moti-



**Note:** The average number of days hunters said they spent hunting in 1994 was 16.4 days. The average number of days sport shooters said they spent sport shooting in 1994 was 18.6 days.

# Firearms Survey Methodology

The NIJ-sponsored National Survey of Private Ownership of Firearms (NSPOF) was conducted by Chilton Research Services of Drexel Hill, Pennsylvania, during November and December 1994. Data collected by the survey were analyzed by the authors of this Research in Brief.

The telephone survey employed a list-assisted random-digit-dial sampling method, in which every residential telephone number had the same likelihood of being selected. Each household selected in this fashion was scheduled for as many calls as needed (up to a maximum of six) to make contact with the appropriate person and complete the interview. When a household was first contacted, the interviewer asked to speak with the adult in the household who had the most recent birthday. Because this method randomizes the selection of respondents from among the adults living in the household, the NSPOF was a probability sample of adults in the United States.*

Minimums were established for the number of completed interviews with racial minorities and gun-owning households. Such households were more likely than others to be included in the final sample. Sampling weights were calculated to adjust for this design feature and for other sociodemographic differences between the sample and the U.S. adult population.

Although these adjustments improved the quality of population estimates based on the NSPOF, some types of estimates may still be biased. As in every survey, some sample members refused to cooperate and others were never home when the interviewer called. The concern is that these nonrespondents may tend to differ from the general population (and the completed sample) in relevant ways. The scope of that potential problem is usually indicated by the response rate.

In the absence of a single accepted definition of "response rate," two reasonable

definitions yield figures of 44 and 59 percent for the NSPOF. Thus, nonresponse bias in our estimates is a real possibility. Nonetheless, the response rate for this survey is no lower than for other well-executed telephone surveys, and there is no reason to believe that this survey used a less representative sample than others.**

Most of the estimates contained in this Research in Brief rely on the responses of those who personally owned firearms. The estimates do not rely on the reports of those who did not personally own a gun but lived in a gun-owning household because our analysis of the NSPOF data suggests that the survey respondents were often unwilling or unable to report on guns owned by other adults in the household. For example, we find that in households headed by married couples, women were much less likely to report a gun in the house (which in most cases would belong to their husbands) than were men.

* For details about the GENESYS method employed by Chilton or other survey issues, see Brick, J.M., J. Waksberg, D. Kulp, and A. Starer, "Bias in List-Assisted Telephone Samples," *Public Opinion Quarterly*, 59:218–235. Also: Waksberg, J., "Sampling Methods for Random Digit Dialing," *Journal of the American Statistical Association*, 73:40–46, 1978.

** Kleck, G., and M. Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun," *Journal of Criminal Law and Criminology*, 86(1):150–187, Fall 1995. They reported a response rate of 61 percent for their national telephone survey of gun ownership and defensive gun use. In calculating this response rate, they excluded all sample members whom they were unable to contact. By their definition, the NSPOF response rate would be higher than 61 percent.

## 1994 National Survey of Private Ownership of Firearms (NSPOF)

**Objectives:** Provide national estimates for:
• Adult ownership of guns, by gun type.
• Sources and motivations for gun acquisition.
• Firearm safety and storage.
• Defensive use of firearms.
• Attitudes toward gun control.

**Sample:** Probability sample of 2,568 noninstitutionalized adults aged 18 and over who are fluent in English or Spanish and live in households with a telephone.

**Method:** Telephone interview with one randomly selected adult from each household.

**Population estimates:** Weighted averages of relevant responses. Standard errors for estimates of population-prevalence rates range up to 1.4 percentage points, somewhat higher for prevalence estimates within subpopulations.

vation may have come from an increased concern about crime: nearly 5 percent of respondents reported that they planned to obtain a gun for protection against crime within a year.

## The stock of guns in private hands

The NSPOF-based estimate for the total number of privately owned firearms is 192 million: 65 million handguns, 70 million rifles, 49 million shotguns, and 8 million other long guns (exhibit 4). Of the handguns, 48 percent were revolvers, 40 percent semiautomatics, and 12 percent were reported as "some other type of handgun" by respondents.

The millions of guns in private hands included everything from cheap .22-caliber "snubbies" to finely made high-powered rifles worth thousands of dollars. The variety of firearm designs reflects the multiplicity of uses for which they are intended and also influences the weapons' capacities for harm. Firearm regulations place special restrictions on commerce in short-barreled guns (because they are easily concealed and disproportionately used in crime) and on large-capacity magazines.

From our analysis, we find that the magazine capacity of one-fifth of all handguns was 10 or more rounds (exhibit 4B). The barrel of about one in six handguns was 3 inches or shorter (exhibit 4C).[7] Comparing handguns acquired in 1993 or 1994 with those acquired prior to 1993 permitted examination of changes in the demand for different kinds of handguns over time. Handguns acquired more recently were more likely to have large magazine capacities (37.8 versus 14.1 percent held 10 or more rounds) and were less likely to be of small caliber, defined as .32 or under (28.6 versus 38 percent). (See exhibit 4D.)

## Transactions

**Acquisitions.** To date, little information has been available about gun flows in the United States. The potential importance of this information is its use in evaluating regulation of firearms commerce. For example, the Gun Control Act of 1968 restricts interstate shipments to federally licensed firearm dealers (FFLs), who in turn are required to follow laws regulating retail transfers. Transactions not involving FFLs, known as the "secondary market," typically do not require recordkeeping and are exempt from the Federal requirement (for handguns) of a waiting period and criminal record check.[8] Moreover, secondary market transactions are not subject to regulatory oversight. Thus, knowing the volume of informal transfers that do or do not involve FFLs would be useful.

The average firearm in circulation in 1994 was acquired by its present owner in 1981, with the average handgun having been acquired in 1983. Persons owning handguns in 1994 acquired about 28 percent of them in 1993–1994, compared with 20 percent of long guns. An estimated 13.7 million transactions occurred during 1993–1994, including 6.5 million involving handguns. Sixty percent of long guns and 68 percent of handguns were new at the time of acquisition by their 1994 owners during the 1993–1994 period.

How do people typically acquire firearms? As shown in exhibit 5, almost all guns acquired during 1993 and 1994 were either purchased by the respondent (73 percent) or received as a gift (19 percent). The remaining 8 percent were obtained through inheritance, a swap of some kind, or other means.

*Exhibit 4. Gun Stock Characteristics (1994)*

### 4A. Estimates of Number of Guns

|  | Number in millions |
|---|---|
| Handguns | |
| Revolvers | 31 |
| Semiautomatics | 26 |
| Other | 8 |
| Total | 65 |
| Rifles | |
| Semiautomatics | 28 |
| Other | 42 |
| Total | 70 |
| Shotguns | 49 |
| Other long guns | 8 |
| **Total All Guns** | **192** |

### 4B. Magazine Capacity of Handgun Stock [a]

| Number of Rounds | Percentage of Handgun Stock |
|---|---|
| 1–9 rounds | 79% |
| 10 or more rounds | 21% |

a. The average number of rounds is 8.1.

### 4C. Length of Barrel

| | Percentage of All Handgun Stock | Percentage of Handguns With Caliber .32 or Under [b] |
|---|---|---|
| 1–3 inches | 17% | 37%[c] |
| 4–5 inches | 38% | 31%[c] |
| 6 or more inches | 45% | 38%[c] |

b. The percentage of all handgun stock having a caliber .32 or under is 34 percent.
c. These percentages are not of all guns but only of those identified in the middle column.

**Exhibit 4. Gun Stock Characteristics (1994) (continued)**

**4D. Magazine Capacity and Barrel Length by Time of Acquisition**

| | Handguns Acquired Prior to 1993 (N=234) | | Handguns Acquired in 1993 or 1994 (N=91) | |
|---|---|---|---|---|
| Magazine Capacity [d] | Percentage of All Handguns | | Percentage of All Handguns | |
| 1–9 rounds | 85.9% | | 62.2% | |
| 10 or more rounds | 14.1% | | 37.8% | |
| Length of Barrel [e] | Percentage of Handgun Stock | Percentage With Caliber .32 or Under | Percentage of Handgun Stock | Percentage With Caliber .32 or Under |
| 1–3 inches | 17.6% | 40.8% | 17.4% | 33.7% |
| 4–5 inches | 35.9% | 30.5% | 41.6% | 31.1% |
| 6 or more inches | 46.5% | 43.4% | 41.0% | 22.6% |

d. The average number of rounds for guns acquired before 1993 is 7.6. For guns acquired in 1993 or 1994 it is 9.5.
e. The percentage of all handguns acquired prior to 1993 having a caliber .32 or under is 38 percent. The percentage of all handguns acquired in 1993 or 1994 having a caliber .32 or under is 28.6 percent.

The predominant sources of guns, unsurprisingly, were stores (60 percent). Other important sources included family members and acquaintances. The 3 percent of respondents who indicated that they obtained guns "through the mail" (which is illegal for all but FFLs) may have misremembered or may have referred to a mail-order purchase arranged through an FFL.

The average gun obtained in 1993 and 1994 was worth $392 at the time of transfer, with little difference between handguns and long guns. Fewer than 1 in 20 guns acquired during those 2 years were valued at less than $100.

Fifty-seven percent of firearms were obtained from stores, pawnshops, or other sources that the respondents were certain to have been federally licensed firearm dealers. Some respondents were not sure about whether the source was an FFL. Others indicated that the source was an FFL but then reported that the transaction was a trade rather than a cash sale or that the source was an acquaintance or family member. If those cases are included, the proportion increases to 64 percent.

We conclude that approximately 60 percent of gun acquisitions involved an FFL and hence were subject to

**Exhibit 5. Methods and Sources for Gun Acquisition in 1993 and 1994 (NSPOF Estimates)**

| | Percentage for Long Guns (N=121) | Percentage for Handguns (N=128) | Percentage for All Guns (N=251) |
|---|---|---|---|
| **What Best Describes How You Obtained Your Gun?** | | | |
| Bought it | 69 | 77 | 73 |
| Received it as a gift | 22 | 16 | 19 |
| Traded something for it | 3 | 2 | 3 |
| Inherited it | 5 | 4 | 5 |
| **From What Source Did You Obtain This Gun?** | | | |
| Gun store | 33 | 55 | 43 |
| Pawnshop | 5 | 8 | 6 |
| Other store | 18 | 3 | 11 |
| Gun show or flea market | 4 | 4 | 4 |
| Through the mail | 3 | 3 | 3 |
| Member of the family | 22 | 12 | 17 |
| Friend or acquaintance | 12 | 13 | 12 |
| Other | 5 | 3 | 4 |

Federal regulations on such matters as out-of-State sales, criminal history checks, and recordkeeping. A somewhat higher percentage of handgun acquisitions than long gun acquisitions involved FFLs. The remaining acquisitions, amounting to about 2 million per year, were off-the-books transfers in the secondary market.

**Thefts.** A major theme highlighted in a 1986 survey of incarcerated felons was that theft was an important means of obtaining firearms for those with criminal intentions: 32 percent of surveyed felons had stolen their most recently acquired handgun.[9]

Based on the NSPOF, an estimated 0.9 percent of all gun-owning households (269,000) experienced the theft of one or more firearms during 1994. About 211,000 handguns and 382,000 long guns were stolen in noncommercial thefts that year, for a total of 593,000 stolen firearms. Those estimates are subject to considerable sampling error but are consistent with earlier estimates of about half a million guns stolen annually.[10]

## Gun safety

**Gun storage.** Of 1,356 accidental deaths by gunshot in 1994, 185 involved children 14 years old and younger.[11] For each such fatality, there are several accidental shootings that cause serious injury. Guns were also the means of destruction in 19,590 suicides, 210 involving children 14 or younger. For these reasons, safe handling and storage of firearms have attracted the attention of the public health community.

We found that 20 percent of all gun-owning households had an unlocked, loaded gun in the home at the time of the survey. This figure was substantially higher among handgun-owning households than among households with long guns only—30 percent versus 7 percent.

Slightly more than half of firearms of either type were stored unlocked, but handguns were much more likely to be loaded. Reflecting their predominant use in self-defense, handguns were likely to be stored in bedrooms or vehicles of owners or even on their person, while most long guns were kept in gun closets or other out-of-the-way places (exhibit 6).

Although training programs usually include suggestions on how to store guns safely, it does not appear that trainees are paying attention. More than half (56 percent) of owners had received some form of "formal" training from the military, law enforcement, National Rifle Association, National Safety Council, or other source. As a group, owners who received such training were no less likely than others to keep guns loaded and unlocked. This surprising result is consistent with other recent studies.[12]

However, a more detailed analysis of NSPOF data that examined the effects of different formal training programs separately indicated one exception: training programs such as those offered by local affiliates of the National Safety Council were associated with a significant reduction in the likelihood of keeping a gun unlocked and loaded. This result speaks well of that training, the trainees, or both.

## Carrying

Carrying a gun outside the home, especially in an urban area, is problematic because the public is at risk if the carrier is reckless or inclined to violence. For that reason, carrying a firearm in a vehicle or on the person is subject to a variety of State and local regulations. In most States, carrying a concealed gun is prohibited or restricted to those who have obtained a special license. At the same time, many States have reacted to public concerns about crime by enacting laws under which most citizens can usually obtain a

---

*Exhibit 6. Storage Method and Location of Firearms (NSPOF Estimates)*

| | Percentage for Long Guns (N=437) | Percentage for Handguns (N=352) | Percentage for All Guns (N=789) |
|---|---|---|---|
| ***Storage Method/Location*** | | | |
| Gun loaded | 11 | 55 | 26 |
| Gun loaded and unlocked | 7 | 34 | 16 |
| ***Where Gun Kept*** | | | |
| Bedroom | 17 | 37 | 24 |
| Gun closet | 53 | 26 | 44 |
| Other closet | 19 | 11 | 17 |
| In vehicle or on person | 1 | 16 | 6 |
| Other | 10 | 8 | 10 |

concealed-carry permit. Currently, 31 States have passed such laws.

About 14 million adults (approximately one-third of gun owners) carried firearms for protection at least once during the 12 months preceding NSPOF. Four million of them indicated that they carried guns for protection "in connection with work." Two-thirds who carried guns kept them in their vehicles, while the others sometimes carried them on their person.

The occupations of respondents who report carrying guns in connection with work are quite diverse. Somewhat surprisingly, only a quarter of this group were employed in the protective service field. The questionnaire does not distinguish between those who are required by their employers to carry firearms as part of their occupational duties and those who do so on their own initiative. In any event, an estimated 3 million adults who were not in law enforcement or security carried firearms for protection on the job in 1994.

The majority (56 percent) of those who carried firearms outside of work did so fewer than 30 days per year, but a substantial minority (22 percent) rarely left home without a gun. On any given day, 1.1 million people were carrying guns on their person outside the workplace, while another 2.1 million stored guns in their cars or trucks.

Some correlates of gun carrying are worth noting. Males who carried guns in 1994 were about $2^1/_2$ times as likely to have been arrested for a nontraffic offense as other men (15 percent versus 6 percent). And a disproportionate share of gun carriers resided in the South, where the prevalence of carrying guns was almost double that of the rest of the Nation.

## Defensive gun uses

**NSPOF estimates.** Private citizens sometimes use their guns to scare off trespassers and fend off assaults. Such defensive gun uses (DGUs) are sometimes invoked as a measure of the public benefits of private gun ownership. On the basis of National Crime Victimization Survey (NCVS) data, one would conclude that defensive uses are rare indeed, about 108,000 per year. But other surveys yield far higher estimates of the number of DGUs. Most notable has been a much publicized estimate of 2.5 million DGUs, based on data from a 1994 telephone survey conducted by Florida State University professors Gary Kleck and Mark Gertz.[13] The 2.5 million figure has been picked up by the press and now appears regularly in newspaper articles, letters to the editor, editorials, and even Congressional Research Service briefs for public policymakers.

The NSPOF survey is quite similar to the Kleck and Gertz instrument and provides a basis for replicating their estimate. Each of the respondents in the NSPOF was asked the question, "Within the past 12 months, have you yourself used a gun, even if it was not fired, to protect yourself or someone else, or for the protection of property at home, work, or elsewhere?" Answers in the affirmative were followed with "How many different times did you use a gun, even if it was not fired, to protect yourself or property in the past 12 months?" Negative answers to the first DGU question were followed by "Have you *ever* used a gun to defend yourself or someone else?" (emphasis in original). Each respondent who answered yes to either of these DGU questions was asked a sequence of 30 additional questions concerning the most recent defensive gun use in which the respondent was involved, including the respondent's actions with the gun, the location and other circumstances of the incident, and the respondent's relationship to the perpetrator.

Forty-five respondents reported a defensive gun use in 1994 against a person (exhibit 7). Given the sampling weights, these respondents constitute 1.6 percent of the sample and represent 3.1 million adults. Almost half of these respondents reported multiple DGUs during 1994, which provides the basis for estimating the 1994 DGU incidence at 23 million. This surprising figure is caused in part by a few respondents reporting large numbers of defensive gun uses during the year; for example, one woman reported 52!

### Exhibit 7. Defensive Gun Use (DGU) Estimates for 1-Year Recall Period (1994)—Comparison of NSPOF with Kleck and Gertz Estimates

| 1 Year | NSPOF Estimates | | Kleck and Gertz |
|---|---|---|---|
| | *All DGUs Against Persons* (N=45) | *DGUs Meeting Kleck and Gertz Criteria** (N=19) | (N=66) |
| Estimated number of defenders (in millions) | 3.1 | 1.5 | 2.5 |
| Estimated number of DGUs (In millions) | 23.0 | 4.7 | n/a |

* In their 1995 DGU study, Kleck and Gertz presented estimates based on only the DGU reports that met certain criteria (see text).

A somewhat more conservative NSPOF estimate is shown in the column of exhibit 7 that reflects the application of the criteria used by Kleck and Gertz to identify "genuine" defensive gun uses. Respondents were excluded on the basis of the most recent DGU description for any of the following reasons: the respondent did not see a perpetrator; the respondent could not state a specific crime that was involved in the incident; or the respondent did not actually display the gun or mention it to the perpetrator.

Applying those restrictions leaves 19 NSPOF respondents (0.8 percent of the sample), representing 1.5 million defensive users. This estimate is directly comparable to the well-known estimate of Kleck and Gertz, shown in the last column of exhibit 7. While the NSPOF estimate is smaller, it is statistically plausible that the difference is due to sampling error. Inclusion of multiple DGUs reported by half of the 19 NSPOF respondents increases the estimate to 4.7 million DGUs.

**Some troubling comparisons.** If the DGU numbers are in the right ballpark, millions of attempted assaults, thefts, and break-ins were foiled by armed citizens during the 12-month period. According to these results, guns are used far more often to defend against crime than to perpetrate crime. (Firearms were used by perpetrators in 1.07 million incidents of violent crime in 1994, according to NCVS data.)

Thus, it is of considerable interest and importance to check the reasonableness of the NSPOF estimates before embracing them. Because respondents were asked to describe only their most recent defensive gun use, our compari-

sons are conservative, as they assume only one defensive gun use per defender. The results still suggest that DGU estimates are far too high.

For example, in only a small fraction of rape and robbery attempts do victims use guns in self-defense. It does not make sense, then, that the NSPOF estimate of the number of rapes in which a woman defended herself with a gun was more than the total number of rapes estimated from NCVS (exhibit 8). For other crimes listed in exhibit 8, the results are almost as absurd: the NSPOF estimate of DGU robberies is 36 percent of all NCVS-estimated robberies, while the NSPOF estimate of DGU assaults is 19 percent of all aggravated assaults. If those percentages were close to accurate, crime would be a risky business indeed!

NSPOF estimates also suggest that 130,000 criminals are wounded or killed by civilian gun defenders. That number also appears completely out of line with other, more reliable statistics on the number of gunshot cases.[14]

The evidence of bias in the DGU estimates is even stronger when one recalls that the DGU estimates are calculated using only the most recently reported DGU incidents of NSPOF respondents; as noted, about half of the respondents who reported a DGU indicated two or more in the preceding year. Although there are no details on the circumstances of those additional DGUs, presumably they are similar to the most recent case and provide evidence for additional millions of violent crimes foiled and perpetrators shot.



**Exhibit 8. Defensive Gun Uses Compared to Total Crime Counts (1994)**

(In Thousands)

| | NSPOF (DGUs) | NCVS (Crimes) |
|---|---|---|
| Rape and Attempts | 322 | 316 |
| Aggravated Assault | 462 | 2,478 |
| Robbery | 466 | 1,299 |

**False positives.** Regardless of which estimates one believes, only a small fraction of adults have used guns defensively in 1994. The only question is whether that fraction is 1 in 1,800 (as one would conclude from the NCVS) or 1 in 100 (as indicated by the NSPOF estimate based on Kleck and Gertz's criteria).

Any estimate of the incidence of a rare event based on screening the general population is likely to have a positive bias. The reason can best be explained by use of an epidemiological framework.[15] Screening tests are always subject to error, whether the "test" is a medical examination for cancer or an interview question for DGUs. The errors are either "false negatives" or "false positives." If the latter tend to outnumber the former, the population prevalence will be exaggerated.

The reason this sort of bias can be expected in the case of rare events boils down to a matter of arithmetic. Suppose the true prevalence is 1 in 1,000. Then out of every 1,000 respondents, only 1 can possibly supply a "false negative," whereas any of the 999 may provide a "false positive." If even 2 of the 999 provide a false positive, the result will be a positive bias—regardless of whether the one true positive tells the truth.

Respondents might falsely provide a positive response to the DGU question for any of a number of reasons:

• They may want to impress the interviewer by their heroism and hence exaggerate a trivial event.

• They may be genuinely confused due to substance abuse, mental illness, or simply less-than-accurate memories.

• They may actually have used a gun defensively within the last couple of years but falsely report it as occurring in the previous year—a phenomenon known as "telescoping."

Of course, it is easy to imagine the reasons why that rare respondent who actually did use a gun defensively within the time frame may have decided not to report it to the interviewer. But again, the arithmetic dictates that the false positives will likely predominate.

In line with the theory that many DGU reports are exaggerated or falsified, we note that in some of these reports, the respondents' answers to the followup items are not consistent with respondents' reported DGUs. For example, of the 19 NSPOF respondents meeting the more restrictive Kleck and Gertz DGU criteria (exhibit 7), 6 indicated that the circumstance of the DGU was rape, robbery, or attack—but then responded "no" to a subsequent question: "Did the perpetrator threaten, attack, or injure you?"

The key explanation for the difference between the 108,000 NCVS estimate for the annual number of DGUs and the several million from the surveys discussed earlier is that NCVS avoids the false-positive problem by limiting DGU questions to persons who first reported that they were crime victims. Most NCVS respondents never have a chance to answer the DGU question, falsely or otherwise.

**Unclear benefits and costs from gun uses.** Even if one were clever enough to design a questionnaire that would weed out error, a problem in interpreting the result would remain. Should the number of DGUs serve as a measure of the public benefit of private gun possession, even in principle? When it comes to DGUs, is

more better? That is doubtful, for two kinds of reasons:

• First, people who draw their guns to defend themselves against perceived threats are not necessarily innocent victims; they may have started fights themselves or they may simply be mistaken about whether the other persons really intended to harm them. Survey interviewers must take the respondent's word for what happened and why; a competent police investigation of the same incident would interview all parties before reaching a conclusion.

• Second and more generally, the number of DGUs tells us little about the most important effects on crime of widespread gun ownership. When a high percentage of homes, vehicles, and even purses contain guns, that presumably has an important effect on the behavior of predatory criminals. Some may be deterred or diverted to other types of crime. Others may change tactics, acquiring a gun themselves or in some other way seeking to preempt gun use by the intended victim.[16] Such consequences presumably have an important effect on criminal victimization rates but are in no way reflected in the DGU count.

## Conclusions

The NSPOF provides the most complete data available on the private stock of firearms in the United States, including the kinds of guns owned, by whom they are owned, and for what purpose they were acquired. When asked, handgun owners usually gave self-protection as their primary motive for owning guns, while long-gun owners mentioned hunting or target shooting. Other findings support the conclusion that handguns are much more likely than long guns to be kept

unlocked and ready for use in the home and to be carried in public; they are much less likely to be used in sporting activities. Despite those differences, demographic and socioeconomic patterns of firearm ownership in 1994 were similar for handguns and long guns; in fact, most handgun owners also owned one or more long guns.

A fair conclusion is that the more fundamental divide is not between handgun and long-gun owners but between those who own guns and those who do not. Those who like guns, have some experience with them, and have the means to obtain them tend to keep several for various purposes. But most of the adult public turns elsewhere for recreation and protection against crime.

Over time, the relative importance of self-protection and sport as motivations for gun acquisition and use has changed. Perhaps as a result of the increasing urbanization of America, the overall prevalence of gun ownership appears to be declining, as is participation in hunting. Proportionately fewer households owned firearms in 1994 than was true in the 1960s and 1970s, and the younger cohorts are entering into gun ownership at slower rates than previous ones. When people do acquire guns now, the motivation is more likely self-defense than in the past: The mix of new firearms sold in 1994 was equally divided between handguns and long guns, whereas 25 years earlier twice as many long guns were sold.[17]

The NSPOF does not provide much evidence on whether consumers who buy guns for protection against crime get their money's worth. The NSPOF-based estimate of millions of DGUs each year greatly exaggerates the true number, as do other estimates based

on similar surveys. Much debated is whether the widespread ownership of firearms deters crime or makes it more deadly—or perhaps both—but the DGU estimates are not informative in this regard.

For other purposes, the NSPOF is a reliable reference. Such information is vital to the evaluation of the ongoing debate over government regulation of gun transactions, possession, and use.

## Notes

1. For example, the December 1993 Gallup Poll estimated that 49 percent of households possessed a gun.

2. Kleck, G., and M. Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun," *Journal of Criminal Law and Criminology*, 86(1):150–187, Fall 1995.

3. For a discussion of the "80/20" rule, see Clotfelter, C.T., and P.J. Cook, *Selling Hope: State Lotteries in America*, Cambridge, Massachusetts: Harvard University Press, 1989. It is possible that if one could adjust for the value of guns, the degree of concentration would be still greater and better fit the rule.

4. Fifty-five percent of all individuals who owned four or more guns had at least one in each of these three categories.

5. The NSPOF offers evidence that gun ownership is declining. Not only were middle-aged people more likely to own a gun in 1994 than those under age 40, but they were also more likely to have acquired a gun by age 21.

6. Surveys of juvenile delinquents and adult felons confirm the importance of self-defense as a motive for gun possession by active criminals. For juvenile de-

linquents, see Sheley, J.F., and J.D. Wright, *Gun Acquisition and Possession in Selected Juvenile Samples*, Research in Brief, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, December 1993. For adult felons, see Wright, J.D., and P. Rossi, *Armed and Considered Dangerous*, Hawthorne, New York: Aldine, 1986.

7. Of some interest, given the controversy over the "Saturday Night Special," is that most short-barreled handguns were not .22 caliber; two-thirds were in excess of .32 caliber, the same as for longer barreled handguns.

8. Cook, P.J., S. Molliconi, and T.B. Cole, "Regulating Gun Markets," *Journal of Criminal Law and Criminology*, 86(1):59–92, Fall 1995.

9. Wright and Rossi, 1986, 183.

10. The standard error for this point estimate is about four-tenths of a percentage point. Thus, the 95-percent confidence interval ranges from around 0.1 percent to 1.7 percent of gun-owning households. Cook,

**Quick Access to NIJ Publication News**

For news about NIJ's most recent publications, including solicitations for grant applications, subscribe to JUSTINFO, the bimonthly newsletter sent to you via e-mail. Here's how:

• Send an e-mail to listproc@ncjrs.org

• Leave the subject line blank.

• Type subscribe justinfo your name (e.g., subscribe justinfo Jane Doe) in the body of the message.

Or check out the "What's New" section at the Justice Information Center home page: http://www.ncjrs.org.

Molliconi, and Cole, 1995, use data from the National Crime Victimization Survey for the period 1987–1992 to estimate 511,000 stolen guns per year.

11. Monthly Vital Statistics Report, Department of Health and Human Services, 45(3S), September 30, 1996. Table 16.

12. Hemenway, D., S.J. Solnick, and D. Azrael, "Firearm Training and Storage," *Journal of the American Medical Association*, 273(1):46–50, 1995.

13. Kleck and Gertz, 1995.

14. In 1994 about 17,000 people were shot dead in criminal assaults and justifiable homicides. Given what we know about the case fatality rate, fewer than 100,000 nonfatal gunshot woundings were known to the police. (See Cook, P.J., "The Case of the Missing Victims," *Journal of Quantitative Criminology*, 1985). Presumably, the true number of justifiable shootings was just a fraction of this total.

15. Hemenway, D., "Survey Research and Self-defense Gun Use: An Explanation of Extreme Overestimates," Harvard Injury Control Center Discussion Paper, 1996.

Philip J. Cook, Ph.D., is ITT/Sanford professor of public policy studies, Duke University, and Jens Ludwig, Ph.D., is assistant professor of public policy, Georgetown University.

The national survey was supported under grant number 93–IJ–CX–0017, awarded to the Police Foundation by the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice.

This Research in Brief is available online at the Justice Information Center home page (http://www.ncjrs.org) and available through fax-on-demand (800–851–3420 or 301–251–5518; ask for document number 1026). The full-length report, as submitted to NIJ by the authors and on which this Research in Brief is based, may be obtained through interlibrary loan or, for a fee, as a photocopy from the National Criminal Justice Reference Service (call 800–851–3420 for cost and other information).

The Police Foundation has published *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, which is based on the full-length report submitted to NIJ by the authors. For ordering information, call 202–833–1460 or write to the Police Foundation, Attn: Publications, 1001 22nd Street N.W., Washington, D.C. 20037.

16. Cook, P.J., "The Technology of Personal Violence." In M. Tonry (ed.), *Crime and Justice: A Review of Research* (Vol. 14), Chicago: University of Chicago Press, 1–71, 1991.

17. Cook, P.J., "Notes on the Availability and Prevalence of Firearms," *American Journal of Preventive Medicine*, 9 Supp:33–38, May/June 1993.

Findings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, Bureau of Justice Statistics, Office of Juvenile Justice Delinquency Prevention, and the Office for Victims of Crime.*

**NCJ 165476**

---

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

*Washington, DC  20531*

———————————————

Official Business

Penalty for Private Use $300

BULK RATE
POSTAGE & FEES PAID
DOJ/NIJ
Permit No. G–91



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

OCT 1 1 2005

Washington, DC 20226

www.atf.gov

OCT - 6 2005

REFER TO:  PJC/ 05-1626

Federal Defender Office
District of Massachusetts
ATTN: Timothy G. Watkins, Esq.
408 Atlantic Avenue, 3rd Floor
Boston, MA 02110

Dear Mr. Watkins:

This is in response to your Freedom of Information Act (FOIA) request for information
you believe to be maintained by the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF).

Please be advised that the ATF Order you requested – ATF O 3310.4C, is still in draft
form and thus is exempt from release pursuant to Title 5 U.S.C. 552(b)(5).  You also
requested documents related to a pilot program with the ATF Boston Field Division and
the United States Attorney's Office.  This program never materialized, therefore there are
no documents related to your request.

Insofar as your request has been denied, you have the right to request an administrative
appeal.  Your request  must be in writing and addressed to the U.S. Department of
Justice, Office of Information and Privacy, Flag Building, Suite 570, Washington, DC
20530-0001.  If you submit an appeal, please state that your appeal concerns an ATF
FOIA request, and refer to case number PJC/05-1626.  Your appeal must be received
within sixty days of the date of this letter.

Sincerely,

Peter J. Chisholm
Senior Disclosure Specialist

GUN SAFETY GROUP CITES LAG IN US PROSECUTIONS ASSERTS DEALERS BYPASSED I

1 of 1 DOCUMENT

Copyright 2003 Globe Newspaper Company
The Boston Globe

May 15, 2003, Thursday ,THIRD EDITION

**SECTION:** METRO/REGION; Pg. B3

**LENGTH:** 922 words

**HEADLINE:** GUN SAFETY GROUP CITES LAG IN US PROSECUTIONS ASSERTS DEALERS BYPASSED IN FOCUS ON STREET CRIME

**BYLINE:** By Thanassis Cambanis, Globe Staff

**BODY:**

Federal authorities in Massachusetts have failed to target gun dealers despite a raft of laws that would allow them to do so and a concerted campaign to prosecute gun crimes, according to a report by a gun safety group released yesterday.

"There simply is no deterrent against illegal activity that puts guns in the wrong hands, because so few are prosecuted," said Michael Harrington, who co-authored the Americans for Gun Safety Foundation's report on what it called an "enforcement gap" in federal gun prosecutions.

The report accuses federal prosecutors of ignoring gun dealers and gun purchasers who lie during background checks.

US Attorney Michael Sullivan yesterday dismissed the study as misleading, saying his office aggressively targets gun crimes and focuses federal resources on cases where it has the greatest impact.

"Our experience disputes the conclusions of this report," Sullivan said. "It wouldn't make sense to prosecute every single case federally when a state prosecution would produce a better result."

Massachusetts has some of the toughest state gun laws in the nation. Federal crimes carry fixed - and usually quite stiff - minimum prison sentences for those convicted. In Massachusetts, state laws for gun criminals also carry harsh minimum penalties, creating the unusual situation in which a gun dealer or a felon in possession of a firearm might face more jail time if prosecuted in state court.

For example, Sullivan cited the case of a Plymouth man who bought firearms legally but then sold them to drug dealers in Brockton. In the federal system, the man would have faced a maximum sentence of seven years in prison, while state laws enabled a district attorney to charge the same man with crimes carrying a minimum sentence of 15 years.

Sullivan has put firearms cases at the center of his nuts-and-bolts approach to crime, and has pushed his prosecutors to bring as many cases as possible against armed violent offenders.

But according to Americans for Gun Safety, Sullivan is following a national trend to employ only federal gun statutes that target street criminals, ignoring laws that prohibit selling firearms to a minor, possessing firearms in a school zone, or improperly selling guns at a dealership.

Federal prosecutors in Massachusetts have brought no charges within the last three years for those three offenses.

"You have limited resources," Sullivan said. "We're very confident that when appropriate, federal charges are being brought."

According to the report, there are 2,002 federally licensed firearms dealers in Massachusetts. Over the last three years, however, not a single federal case has been brought against firearms dealers in Massachusetts, even though law enforcement seizes hundreds of "crime guns" every year in Massachusetts - the vast majority of them from within the state.

GUN SAFETY GROUP CITES LAG IN US PROSECUTIONS ASSERTS DEALERS BYPASSED I

Federal prosecutors say that there is no evidence gun dealers here have broken the law and that the US Bureau of Alcohol, Tobacco, and Firearms carefully traces every gun used in a crime.

According to Americans for Gun Safety, almost all the federal gun cases brought - about 75 percent of those in Massachusetts - target street criminals.

"They're looking at a tiny slice of the problem," said Matt Bennett, a spokesman for Americans for Gun Safety. "They're ignoring what we see as the biggest problem, which is the black market for guns."

The report also points to a persistent refusal to bring federal charges against people who lie on the background check forms required to purchase a gun.

According to Americans for Gun Safety, based in Washington, D.C., approximately 7,200 people lied on their background check forms in Massachusetts over the last three years, but only 10 were prosecuted in federal court.

Federal prosecutors said that "lying and buying," as that particular crime is known, should not be the focus of their efforts.

"We are really focused on violent offenders with guns," said James F. Lang, chief of the major crimes unit in Sullivan's office. "Someone with a 20-year-old conviction on his record who tries to buy a firearm is not the kind of person who logically should be prosecuted as a federal criminal."

At the heart of the Americans for Gun Safety's criticism is the charge that the Bush administration has not taken advantage of existing federal gun laws to crack down on gun peddlers, even as it has improved the Clinton administration's track record in pursuing armed street criminals.

"The federal government needs a comprehensive strategy to use existing laws to investigate, prosecute, and eliminate the black market that supplies guns to criminals, drug dealers, gangs, and kids," Harrington said.

Marianne C. Hinkle, the federal prosecutor in charge of community crime in Sullivan's office, meets every week with district attorneys across the state to review gun cases and decide whether state or federal prosecution is likely to lead to the highest sentence, Sullivan said.

Annual federal gun prosecutions in Massachusetts have nearly doubled since 2000. Last year, the US attorney's office in Massachusetts brought 54 gun cases statewide, excluding Springfield, and in the first four months of this year has brought 22 cases.

"We have a full plate. In fact, the plate is overflowing," Sullivan said. "Gun crime in Massachusetts is not being ignored. The only way things could get any better would be for the actual gun crime statistics to go down."

Thanassis Cambanis can be reached at tcambanis@globe.com.

**GRAPHIC:** PHOTO, MICHAEL SULLIVAN Calls study misleading

**LOAD-DATE:** May 16, 2003