UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                       )   CRIMINAL NO. 05-40001-FDS
     v.              )
                       )
                       )
SAMUEL J. LEWIS,       )
a/k/a SHAHEED LEWIS,   )
                       )
        Defendant.    )
                       )
                       )

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS AND FOR FURTHER DISCOVERY**

The United States of America, by Michael J. Sullivan, United States Attorney, and B. Stephanie Siegmann, Assistant United States Attorney for the District of Massachusetts, hereby opposes Defendant's Motion to Dismiss for selective prosecution on the grounds that the Defendant has failed to meet his heavy burden of establishing by clear evidence that his prosecution resulted from intentional and purposeful discrimination.  Similarly, the Defendant's alternative request for further discovery should also be denied because the Defendant has failed to produce credible evidence of both discriminatory effect and discriminatory intent as required by United States v. Armstrong, 517 U.S. 456, 465 (1996).  Accordingly, Defendant's motion should be denied in its entirety.

## STATEMENT OF FACTS

<u>BACKGROUND</u>

During an investigation involving stolen firearms, in August 2003, Samuel J. Lewis a/k/a Shaheed Lewis ("Lewis" or the "Defendant") was brought to the attention of Special Agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives of the United States Department of Justice ("ATF") as a possessor of multiple firearms. <u>See</u> Affidavit of Special Agent Michael Curran ("Curran Aff.") at ¶3 filed herewith. Subsequently, ATF received additional information that the Defendant was in the possession of an unregistered machine gun and was a member of a radical group with Anti-American beliefs. <u>Id.</u> As a result, ATF opened an investigation of Lewis that confirmed purchases of over 30 firearms in a three-year period and developed evidence of criminal conduct with respect to 16 of those firearm purchases. <u>Id.</u> at ¶ 5.

The Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF") jointly investigated this case with ATF. <u>Id.</u> at ¶ 4. During interviews of three separate, unrelated individuals conducted between late 2003 and 2004, ATF and JTTF became aware of a disturbing pattern of conduct. In addition to a large number of firearm purchases (described below), the Defendant was described as a violent person who espoused beliefs of engaging in jihad and traveling overseas in or about December 2004/January

2005.  Id. at ¶¶ 6-12.

The evidence developed during this joint investigation revealed that between November 2000 and October 2003, Lewis (while for the most part unemployed and receiving public assistance) purchased approximately 32 firearms.  Id. at ¶ 5. Despite assertions to the contrary by the defense, not all of these firearms have been located; three of the 32 firearms have still not been located.  Id. at ¶¶ 31-32.  Prior to being indicted, Lewis was provided an opportunity through his attorney to account for the disposition of all his firearms.  Id. at ¶ 31.  No records were produced as to the whereabouts of three pistols: (1) Beretta pistol, .32 caliber, serial number DAA175590; (2) Browning pistol, .9mm caliber, serial number 245NX51198; and (3) Glock pistol, .40 caliber, serial number NC448US.  Id. at ¶ 32.  As of this date, these three firearms remain missing in that ATF does not know who currently possesses them and where they are being stored, which raises serious safety concerns as the Court is undoubtedly aware.

The Illegal Firearms Transactions

Based upon the records obtained from the federally licensed firearms dealers and interviews conducted during this investigation, in acquiring 16 of the 32 firearms (a Mossberg short-barreled shotgun, Norinco assault rifle and three other rifles, and pistols of various calibers) the Defendant made false

written statements on fifteen[1] ATF Forms 4473, Firearms
Transaction Records, and one ATF Form 4 (also for the purchase of
the Mossberg).  Id. at ¶ 13.  An individual who purchases a
firearm from a federally licensed dealer must complete ATF Form
4473, which is the official firearms transaction record for
intrastate, over-the-counter sales.  Id. at ¶ 16.  The dealer is
required to maintain these records at its place of business.
Form 4473 requires the purchaser to identify himself, provide a
valid "residence address", date and place of birth, social
security number or other identifying number, and state of
residency.  Id.  In addition, the purchaser must certify that he
is the actual purchaser of the firearm and state whether he is a
citizen of the United States.  The purchaser must also answer
questions regarding his eligibility to lawfully possess firearms,
including whether he is currently charged with a crime, has been
convicted of a felony, uses narcotic drugs, or has ever been
adjudicated mentally defective.  Finally, the purchaser must sign
Form 4473 certifying that his answers are true and correct.  Id.

    Under the National Firearms Act, for any purchase of a
Mossberg, short-barreled easily concealed shotgun, and other
firearms deemed inherently dangerous, the purchaser must also
complete an ATF Form 4 and submit a full set of fingerprints with

---

[1]The Defendant purchased two firearms in the same
transaction.

their application.  Id. at ¶ 18.  Form 4 is an application for a
tax paid transfer and registration of firearms regulated under
the National Firearms Act.  Id.  Similar to Form 4473, Form 4
requests information from the purchaser regarding the purchaser's
name and address, asks a number of questions regarding the
purchaser's eligibility to lawfully possess firearms, and
requires the purchaser to sign the form declaring under the
penalties of perjury that the application is true and correct.
After the purchaser completes Form 4, it is submitted to ATF for
approval.  Id. at ¶ 34.  In this case, ATF approved Lewis'
application to purchase the Mossberg after reviewing the
paperwork and the certification of the Worcester Chief of Police
that he had no information indicating Lewis would use the firearm
for unlawful purposes and that Lewis' possession of such a
firearm would not violate the law.  After ATF approved his
application, Lewis purchased the Mossberg and at the time of
purchase, completed another Form 4473 related to this
transaction.

The Defendant baldly asserts that he used his Curios and
Relics license to purchase the Mossberg.  Although the government
does not dispute that the Defendant had obtained a Curio and
Relics license, this license was not, and could not, be used by
the Defendant in any of the charged transactions.  Id. at ¶ 34.
None of the firearms purchased in the charged transactions

5

qualify as curios or relics.[2]  Id.  Further, Curio and Relics licenses do not allow collectors to purchase guns in transactions that may otherwise be prohibited by the National Firearms Act. Id.

In all 16 of the firearms transactions at issue here, the Defendant made false statements on the Forms 4473 and Form 4 about his residential address (the place where the purchased firearms would be stored).  Id. at ¶ 17.  In two of these transactions, the purchase of a H&K pistol in August 2002 and Bushmaster rifle in January 2003, in addition to lying about his residential address, the Defendant also made false statements about the identity of the actual buyer.  Id.

With regards to the residence address, on two of the Forms 4473 the Defendant completed and signed in August 2003, he falsely stated that he lived at a prior address of a house he

_____

[2] To qualify as curios or relics, firearms must fall within one of the following categories:

(a) Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

(b) Firearms which are certified by the curator of a municipal, State or Federal museum which exhibits firearms to be curios or relics of museum interest; and

(c) Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event.

27 C.F.R. § 478.11.

rented from December 1999 to December 2001 (2 Fairlawn Drive, Worcester) and on the other forms 4473 and ATF Form 4, he falsely stated he lived at 59 Evelyn Street, Worcester (his mother's address), which is a subsidized property for the elderly and disabled. Id. at ¶ 13. From October 2002 until September 2003, Lewis participated in Worcester Housing Authority's Transitional Housing Program (a homeless shelter program) and resided with his second wife, Pamela Cortez, and three children in U.S. Housing and Urban Development ("HUD") public housing at 236 Constitution Avenue in Worcester. Id. at ¶ 14. However, when Lewis purchased 14 firearms during this time period, he provided a false residential address of 59 Evelyn Street, Worcester on ATF forms. The Evelyn Street location is a HUD elderly/disabled housing complex where LEWIS' mother resides.[3] Id. Lewis did not and could not (because he was neither elderly nor disabled) reside at 59 Evelyn Street. Id.

With regards to the identity of the actual purchaser for the purchases of a H&K pistol and Bushmaster rifle, Lewis falsely indicated on the ATF Forms 4473 completed for these transactions

_____

[3] 59 Evelyn Street is actually an apartment building and Lewis' mother lives at 59 Evelyn Street, Apt. 503. Lewis, however, only used his mother's street address when filling out the Forms 4473. He omitted any apartment number and also used three different zip codes. These omissions and slight modifications of his residential address present further evidence of Lewis' desire to conceal where the firearms would be stored.

that he was the actual buyer of these firearms when in fact Lewis bought the pistol and rifle for Clarence Plant ("Plant"), a longtime friend of Lewis and a person who Lewis knew did not have a license to carry firearms at that time.  Id. at ¶ 15.

As a result of these false statements, the Defendant was charged in a 22 count indictment with violating three statutes. First, in Counts 1, 3, 6, 12, and 15,[4] the Defendant is charged with making materially false written statements in connection with the acquisition of firearms from licensed firearms dealers in violation of 18 U.S.C §922(a)(6).  Second, in Counts 2, 4-5, 7-11, 13-14, and 16-20, the Defendant is charged with a separate crime of knowingly making false statements with respect to information required to be kept by licensed firearms dealers -- ATF Forms 4473 -- in violation of 18 U.S.C. §924(a)(1)(A).[5]

---

[4]With the exception of Count 1, these transactions involve the purchases of the most dangerous firearms, the Mossberg, an easily concealable short-barreled shotgun, and the Norinco, an assault rifle, and the transactions in which the defendant lied on ATF Form 4473 about being the actual purchaser, when in fact he was purchasing the firearms for another person, Clarence Plant.  Count 1 involves the defendant's purchase of a Glock .40 caliber pistol.

[5] Both Sections 922(a)(6) and 924(a)(1)(A) criminalize false statements made on ATF forms in connection with the acquisition of firearms but constitute separate offenses with different maximum penalties and proof requirements.  Materiality is an essential element of a §922(a)(6) violation but not of a violation under §924(a)(1)(A).  United States v. Evans, 848 F.2d 1352, 1363-64 (5th Cir. 1988) (although Sections 922(a)(6) and 924(a)(1) both criminalize false statements in connection with the acquisition of firearms, government is only required to prove materiality under 922(a)(6)); see United States v. Nelson, 221

Third, in Count 21, the Defendant is charged with making a false statement on an ATF Form 4, National Firearms Act Application, in connection with the acquisition of a Mossberg, Model 51683, short-barreled 12 gauge shotgun, in violation of 28 U.S.C. §5861(l).  For the convenience of the Court, a description of what is charged in each Count of the Indictment -- the firearms purchased and false information provided in each transaction -- is contained on pages 12-14 of Special Agent Curran's affidavit.

        Interview of the Defendant

    On September 26, 2003, Special Agent Curran and other law enforcement officers went to 59 Evelyn Street, apartment 503, to interview the Defendant.  Id. at ¶ 27.  One of the purposes of this interview was to obtain and/or examine an AR-15 rifle that was suspected of being converted to an automatic machine gun.

---

F.3d 1206, 1210 (11th Cir. 2000) (both provisions prohibit false statements but Sections 922(a)(6) and 924(a)(1)(A) differ in terms of requirement to prove materiality and maximum penalties). Because a federally licensed firearms dealer is required to maintain ATF Form 4473 in its records, a false statement with respect to any information on that form violates §924(a)(1)(A). See Nelson, 221 F.3d at 1209 (licensed firearms dealers required to keep records containing information about the identity of individuals who buy firearms).  There is no bar to charging both violations of § 922(a)(6) and §924(a)(1)(A).  The Courts that have addressed this issue have found that it was neither duplicitous nor multiplicitous to charge both violations.  United States v. Evans, 848 F.2d 1352, 1363 (5th Cir. 1988) (in rejecting multiplicity argument found weight of authority supports view that 922(a)(6) and 924(a) create separate offenses); United States v. Buck, 548 F.2d 871, 876-77 (9th Cir. 1977) (not duplicitous to charge both sections 922(a)(6) and 924(a)(4)).

Id. Lewis was not at the 59 Evelyn Street address provided on his ATF Forms 4473. Id. State Trooper Michael Sampson called the Defendant and left a message for him. The Defendant called Trooper Sampson back. Id. Trooper Sampson told Lewis that he was in the parking lot at Evelyn Street and wished to speak to him about a motor vehicle matter. Id.

Shortly thereafter, the Defendant met the law enforcement officers in the parking lot of 59 Evelyn Street. Id. When the Defendant arrived at the parking lot, the law enforcement officers told him that they wished to speak with him regarding firearms. Id. The Defendant agreed to talk with the officers. During this conversation, the Defendant claimed to reside at the Evelyn Street address as well as another location, which he refused to disclose at that time. Id. When asked about the firearms that he had recently purchased, the Defendant stated that these firearms and his paperwork were at another location, with the exception of two firearms he was carrying with him, a Beretta .40 caliber pistol and Smith and Wesson . 40 caliber pistol. Id. The Defendant stated that he had an AR-15 rifle, a short-barreled Mossberg, and a Romanian rifle at an another location. Id. When asked why he did not have the Mossberg with him or at the address listed on the ATF registration form (59 Evelyn Street, Apt. 503), the Defendant then stated that he had actually moved out of Evelyn Street recently and was in the

10

process of updating his address with ATF. <u>Id.</u>

The Defendant told the officers that he had his Mossberg at another location and he would retrieve it for the officers. <u>Id.</u> at ¶ 28. The officers followed the Defendant to 236 Constitution Avenue. <u>Id.</u> Although the Defendant refused to allow the officers to enter his apartment, he did turn over the Mossberg to the officers. <u>Id.</u>

<u>Clarence Plant</u>

Plant, like Lewis, is an African American convert to the Muslim faith. <u>Id.</u> at ¶ 22. Special Agent Curran interviewed Plant several times. Initially, Plant denied knowing anything about the whereabouts of the Bushmaster rifle purchased by Lewis. <u>Id.</u> On January 20, 2004, a search warrant was executed on Plant's home[6] and the Bushmaster rifle that was unlawfully purchased by Lewis was recovered. <u>Id.</u> Shortly after the search was conducted, Plant admitted that Lewis had in fact purchased the Bushmaster rifle and H&K pistol on his behalf. <u>Id.</u>

On January 21, 2004, Plant voluntarily provided Special Agent Curran with a detailed statement describing how and why

_____

[6] Special Agent Curran sought this search warrant as a result of concerns that the Bushmaster, which resembles an AR-15 rifle, was unlawfully converted to an automatic machinegun, and constituted evidence of a crime, violation of 18 U.S.C. § 922(a)(6). Despite the Defendant's assertions to the contrary, ATF agents are authorized to seek and obtain search warrants to search residences and other locations for evidence of violations of 18 U.S.C. §922(a)(6). Curran Aff. at ¶ 22.

Lewis purchased firearms for him.  Id. at ¶ 23. Plant stated that
beginning in August 2002, Lewis offered to purchase firearms for
Plant.  According to Plant, in August 2002, Lewis told Plant that
since he (Lewis) had a license to carry firearms in Massachusetts
and Plant did not, Lewis could purchase firearms at gun shops for
him.  Id.  At that time, both men understood that since Plant was
not licensed to carry firearms, he was unable to legally obtain
and possess them.  Id.  According to Plant, Lewis suggested that
if Plant were to give him money, Lewis could purchase firearms
for Plant in Lewis' name.  Id.  Plant accepted Lewis' offer to
purchase firearms for him.  Id.

Plant stated that on August 9, 2002, Lewis purchased a H&K
pistol, model USP Compact, .45 caliber, serial number 29-006531,
at Sparky's Gun Shop, a federally licensed firearms dealer
located in Webster, Massachusetts, for Plant.  Id. at ¶ 24.
Lewis used money provided by Plant to purchase this firearm.  Id.

According to Plant, Lewis purchased a second firearm for him
in January 2003.  In approximately December 2002, Lewis offered
to purchase Plant a Bushmaster rifle knowing that Plant still did
not have a license to carry firearms.  Id. at ¶ 25.  Plant again
provided Lewis the money, approximately $800, to purchase the
Bushmaster rifle.  Plant stated that Lewis purchased the
Bushmaster rifle for him on January 21, 2003 from Sparky's Gun
Shop.  Id.

12

According to Plant, after Lewis was interviewed by ATF in late September 2003 (described above), Lewis transferred, on paper, the H&K pistol and Bushmaster rifle to Plant.  Id. at ¶ 26.  The transfer documents were dated October 2, 2003.  Plant had obtained his license to carry in August 2003.  According to Plant, in October 2003, at approximately the time Lewis was approached by ATF, Lewis gave Plant's H&K pistol and Bushmaster rifle to Plant to store at his residence, and filled out state paperwork to accompany this transfer.  Id.  No additional money was exchanged between Plant and Lewis at this time.  Id.

Possible Terrorism Connection

In support of the Defendant's claim of selective prosecution, he points to the fact that this case is being prosecuted by the Anti-Terrorism and National Security Unit instead of the Major Crimes Unit and no similar firearm charges have ever been brought in this district.  By implication, the Defendant attempts to prove racial and religious discrimination based upon the mere fact that traditionally firearm charges of this type have not been brought.  The actual facts are far more benign and justify the charges brought in this case.  This prosecution arose out of a joint investigation by the FBI's JTTF and ATF of Lewis, during which information was learned that reasonably led investigators and prosecutors to believe that the Defendant presented a risk to national security.  The United

13

States Attorney Office decided to address that risk through a criminal prosecution.

In several interviews conducted during this investigation, witnesses described the Defendant as being a member of a radical group with Anti-American views, someone who wished to commit jihad and die while committing jihad, and travel overseas. Even his own friend, Clarence Plant, advised law enforcement that the Defendant uses the name "Shaheed," a muslim name meaning martyr.

In October 2003, Andrew Davis, a National Rifle Association firearms instructor told Special Agent Curran that he had observed Lewis with two other men, armed with pistols and an AR-15 rifle,[7] performing tactical shooting exercises at Wayne's Weaponry in West Boylston, Massachusetts in or about September 2002. Id. at ¶ 6. From a distance, Davis observed that the AR-15 rifle was shooting in three round bursts and appeared as though it was firing in an "automatic" mode, functioning as a machine gun. Id. Davis observed Lewis and his two associates training with a high velocity weapon in a method he considered to be dangerous to the other people at the range; the individuals were shooting a high velocity weapon in very close proximity to a building and Davis was concerned about the possibility of ricochet. Id.

---

[7] An AR-15 rifle is very similar in appearance to a Bushmaster XM-15 rifle. Curran Aff. at ¶ 6.

14

Davis confronted Lewis about his dangerous firing practices. Davis explained to Lewis that by shooting an AR-15 into a stone wall, the rounds could ricochet and someone could get hurt.  <u>Id.</u> at ¶ 7.  Davis also asked why the AR-15 was shooting multiple round bursts and if it was properly registered with ATF.  <u>Id.</u>  In response, Lewis told Davis that he better watch his back, and that he (Davis) didn't know who he was "fucking" with.  <u>Id.</u> Davis also informed Special Agent Curran that he had heard that Lewis was a member of an "anti-government" group.  <u>Id.</u>

Angela Mangrum, Lewis' ex-wife, was interviewed in March and November 2004.  <u>Id.</u> at ¶ 8.  During these interviews, Mangrum told Special Agent Curran that: in approximately 1997, Lewis converted to the Muslim faith; that Lewis had traveled to the Middle East, Somalia or Syria, for one month in the Spring of 2003; Lewis had become more anti-American over the last three years and she had heard him speak on multiple occasions of engaging in jihad and that he will someday die in a jihad in order to go to heaven; and Lewis uses the name "Shaheed," which is a Muslim name meaning "martyr."  <u>Id.</u>  Individuals that die while engaging in jihad are referred to as "martyrs."  <u>Id.</u> During the course of other interviews conducted, associates of Lewis, including Clarence Plant, confirmed that Lewis does in fact use the name "Shaheed."  <u>Id.</u>

Additionally, in December 2004, a confidential informant

15

("CI") of ATF and the Drug Enforcement Administration told
Special Agent Curran that Lewis was moving to an overseas country
where there was presently a "war" or a "crisis". <u>Id.</u> at ¶ 11.
Shortly thereafter, in January 2005, the CI told Special Agent
Curran that Lewis' plans had changed slightly and that Lewis now
did not plan on taking his "trip" until sometime after January 1,
2005. <u>Id.</u> The CI presumed that the country to which Lewis was
moving was Afghanistan or another Middle Eastern country. <u>Id.</u>

The defense has attempted to portray the CI as not credible
as a result of a mistake he initially made about the location to
which Lewis and his family had moved in or about August 2004.
The CI had initially provided incorrect information regarding the
number of the house on Belmont Street to which Lewis moved. <u>Id.</u>
at ¶ 12. This simple mistake does not render this CI's
information unreliable. The CI has provided information to the
DEA that resulted in a large seizure of contraband and multiple
indictments. <u>Id.</u> Further, the CI was a close associate of Lewis
and his family at the relevant time period and thus, the
investigators reasonably he was in a position to have heard about
Lewis' plans. <u>Id.</u>

In light of the evidence of the Defendant's criminal conduct
in making false statements during the acquisition of 16 firearms,
the inability of the defendant to account for 3 of the firearms
he fraudulently obtained, evidence of the Defendant's anti-

American views and desire to commit jihad, the Anti-Terrorism and
National Security Unit sought and obtained an indictment against
the defendant.  At no time was Lewis' race or religion considered
as a reason to prosecute him.

ARGUMENT

I.  **DEFENDANT HAS FAILED TO MEET HEAVY BURDEN OF PRODUCING CLEAR
    EVIDENCE OF SELECTIVE PROSECUTION.**

The Attorney General and United States Attorneys retain
"broad discretion" as to whom to prosecute.  Wayte v. United
States, 470 U.S. 598, 607 (1985) (quoting United States v.
Goodwin, 457 U.S. 368, 380 n.11 (1982)).  "[S]o long as the
prosecutor has probable cause to believe that the accused
committed an offense defined by statute, the decision whether or
not to prosecute, and what charge to file or bring before a grand
jury, generally rests entirely in his discretion."  United States
v. Armstrong, 517 U.S. 456, 464 (1996) (quoting Bordenkircher v.
Hayes, 434 U.S. 357, 364 (1978)).  The United States Supreme
Court has granted this broad discretion to the government largely
in recognition of its conclusion that the "decision to prosecute
is ill-suited to judicial review."  Wayte, 470 U.S. at 607.  The
Supreme Court explained in Wayte v. United States its assessment
of the inability of the courts to review such prosecutorial
decisions:

> such factors as the strength of the case, the
> prosecution's general deterrence value, the
> Government's deterrence value, the Government's

17

enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

Id.

The Supreme Court has also voiced concern that judicial inquiry of prosecutorial decisions threatens the performance of a core executive constitutional function.  Armstrong, 517 U.S. at 465. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."  Id.  Thus, the Supreme Court has repeatedly announced that the standard of proving selective prosecution claims "is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully."  Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 489 (1999) (citing United States v. Armstrong, 517 U.S. 456, 463-65 (1996)).

To overcome the presumption of prosecutorial good faith, the defendant must prove by clear evidence that the decision to prosecute had (1) a discriminatory effect and (2) it was motivated by a discriminatory purpose.  Armstrong, 517 U.S. at 465; see United States v. Magana, 127 F.3d 1, 8 (1997) (to prove selective prosecution, defendant must demonstrate by clear

18

evidence "both that she has been singled out for prosecution when others similarly situated have not been prosecuted and that the prosecutor's reasons for doing so were impermissible.") (citations omitted).  Failure to prove both of these requirements is fatal to any selective prosecution claim.  The Defendant cannot meet this burden.  He has failed to prove by clear evidence both a discriminatory effect and a discriminatory purpose.  Furthermore, the Defendant has not presented any evidence of discriminatory purpose.  On that ground alone, this Motion should be dismissed.

To establish a discriminatory effect in a racial discrimination case, the defendant must show that similarly situated individuals of a different race were not prosecuted. Id.  To meet this burden, Lewis puts forward two theories to prove disparate effect.  First, the Defendant asserts, that his degree of culpability is less than other defendants charged in this district under 18 U.S.C. § 922(a)(6) because he was not a convicted felon or purchasing firearms for a convicted felon.  To support this theory, the Defendant points out that no one in three years has been charged with both §922(a)(6) and §924(a)(1)(A).  As the Defendant concedes, however, Section 924(a)(1)(A) is simply an alternative method of charging someone with making false statements on the ATF Form 4473 in connection with the acquisition of firearms.  See Def. Mot. at 12 n.3.

19

This offense is also easier to prove in that the government is not required to prove that the false statement was material.

The Defendant claims that his prosecution is "prima facie a radical departure from existing practices warranting dismissal or, at a minimum, further discovery. . ." He asserts that no other person has been prosecuted under §922(a)(6) in any case remotely similar to this unique set of facts.[8] The fact that an office of limited resources has historically only chosen to prosecute certain false statements does not prohibit that same prosecutorial office from re-evaluating its past practices in light of changing historical circumstances, concerns for deterrence and incapacitation, new enforcement priorities, and the particular facts of particular cases. Furthermore, the Defendant fails to recognize the actual magnitude of his criminal misconduct and harms caused by his own conduct. The Defendant did not lie on one or two ATF Forms but lied on 15 separate ATF Forms 4473 in acquiring 16 firearms. The government can

---

[8] To overcome the evidentiary obstacles of proving selective prosecution, the Defendant recommends using the analysis applicable to venire-selection cases to evaluate his claim. The Supreme Court has rejected the application of <u>Batson</u> type analysis to selective prosecution claims. <u>See</u> <u>McCleskey v. Kemp</u>, 481 U.S. 279, 298 n.17 (1987) ("Requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts."). This Court should, therefore, refuse to infer discriminatory purpose solely upon the fact that in the last three years, the United States Attorney's Office has not prosecuted someone for making false statements on the ATF Form 4473 regarding their address.

legitimately place a higher priority on prosecuting someone who commits an offenses 5, 10, or 15 times, than a person who comments an offense once.  Even more troubling is the fact that ATF cannot locate three of the 16 firearms the defendant fraudulently purchased by making false statements as to where he resided.  As explained by Special Agent Curran, in cases where firearms are fraudulently obtained, as is the case here, and some of those firearms cannot be located, ATF often recommends that the purchaser be prosecuted.  Curran Aff. at ¶ 33.

Second, using raw statistical data, Lewis claims that similarly situated Caucasians have not been prosecuted.  The Defendant, however, fails to identify any specific individuals that are similarly situated and have not been prosecuted but rather attempts to use this statistical data to speculate about unknown false statements, made by individuals of unknown ethnicities and religious backgrounds, that have not been prosecuted.  The statistical information upon which the Defendant relies comes from three sources: (1) a U.S. Department of Justice, Office of Inspector General Report regarding the enforcement of Brady Act violations ("OIG"), (2) a National Survey of Private Ownership and Use of Firearms conducted by the National Institute of Justice using telephone surveys performed in 1994; and (3) Bureau of Justice Statistics Bulletin regarding Background Checks for Firearms Transfers.  The OIG Report

reviewed the extent to which ATF investigated various violations

of the Brady Act, whether ATF retrieved the firearms issued to

the prohibited persons, and the extent to which Brady Act

violations (false answers on the Form 4473 in response to the

questions asking the purchaser whether they fell within one of

the nine categories of persons prohibited from possessing

firearms) were referred to and prosecuted by the United States

Attorneys' Offices.  Defendant has culled through the OIG

Report's bare statistics regarding Brady Act denials,[9] which

contain no identifying information regarding ethnicity or

religious affiliation, and concluded that based upon this

information there was a potential pool of offenders of 370

persons that were referred to the Boston ATF office over the

period 2002-2003.  Using the racial breakdown for the population

of Massachusetts contained in the 2002 United States Census

Bureau, the Defendant then concluded that 84.5% of the population

is white and 5.5% is African-American.  From a ten year old

telephone survey regarding nationwide firearm possession habits,

the Defendant then concluded that "that Caucasians are 163% more

likely to own a firearm than an African American."  From this

_____

[9] The report analyzes the investigative and prosecution
trends related to two groups of people delayed denial cases and
standard denials cases.  In delayed denial cases, the person
fraudulently obtained the firearm and in the standard denial
cases, which constituted the majority of offenders, the person
did not obtain the firearm because the background check was
completed in time.

information and the statistics contained in the Bureau of Justice
Statistics Bulletin regarding rejection rates of firearm
applications, the Defendant further extrapolated that 285
Caucasian applicants lied on the ATF Form and were referred to
the ATF for investigation and for possible prosecution in the
period of 1999-2004.  This is mere speculation on the part of the
Defendant.  There is simply no evidence of the race of the
applicants who were rejected.  Nor is there a breakdown by
religion, the reason for the rejection (e.g., what type of false
statements were made), or any circumstantial or specific
information about the offender.  All the defendant has presented
is purely numbers; this is insufficient to meet his burden.

    A.    Statistical Data is Insufficient to Meet Defendant's
          Burden of Proof.

    Mere speculation and generalized assertions do not
constitute clear evidence of intentional and purposeful
discrimination.  To overcome the presumption of good faith, the
defendant must adduce facts, not assumptions.  The Defendant has
failed to do that here.

    Apart from raw statistical data, the Defendant has failed to
point to anyone that is similarly situated.  See United States v.
Bass, 536 U.S. 862, 864 (per curiam) (2002) ("raw statistics
regarding overall charges say nothing about charges brought
against similarly situated defendants.").  The Supreme Court has
rejected claims of selective prosecution based upon statistical

23

evidence.  For instance, in <u>McCleskey v. Kemp</u>, 481 U.S. 279, 286-89 (1987), in support of a claim of selective prosecution, the defendant submitted a sophisticated statistical report, entitled the Baldus Study, which showed a disparity in the imposition of the death penalty in Georgia based upon the murder victim's race the defendant's race.  The Supreme Court held that the defendant had failed to prove that the prosecutors in McCleskey's case acted with discriminatory purpose because the defendant offered no evidence specific to his own case that would prove that racial considerations played a role in the prosecutorial decision to seek the death penalty.  <u>Id.</u> at 292-93, 297.  In so doing, the Court concluded that the Baldus study, by itself, was not sufficient to support an inference of purposeful discrimination. <u>Id.</u> at 292-93.

Like <u>McCleskey</u>, the statistical analysis presented in this case fails to prove any discriminatory purpose or provide a specific, articulable basis for finding discriminatory effect. As discussed above, the OIG report merely discusses overall trends nationwide in the referral for investigation and prosecution, and United States Attorneys Offices acceptance for prosecution, of violations of 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A).  This report does not specify what types of false statements are reflected in the statistics, does not differentiate between ethnicities or religious backgrounds, or

identify how many of the individuals were repeat offenders.

The Defendant has failed to show that similarly situated persons of a different race or religion (e.g., Caucasian jew or a Hispanic catholic who (1) purchased in excess of 30 firearms in less than 36 months, (2) lied on 15 separate ATF forms, (3) was unable to locate firearms he had purchased illegally, and (4) expressed an interest in committing jihad) were not prosecuted. In fact, the Defendant has failed to identify any similarly situated persons.

"Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." Attorney General v. Irish People, Inc., 684 F.2d, 928, 946 (D.C. Cir. 1982). Thus, in determining whether persons are similarly situated, a court must examine all relevant factors: the type of charged conduct; the manner in which the conduct was committed; the deterrence value; the relationship of the charged crime and perpetrator to the Government's enforcement priorities and enforcement plan; and the strength of the evidence. See United States v. Ovis, 97 F.3d 739, 744 (4th Cir. 1996). When these factors are considered, Lewis has failed to identify anyone similar situated to which he can be compared.

Where a defendant cannot show anyone in a similar situation was not prosecuted, he cannot prove by clear evidence a claim of selective prosecution. Nor can he show a prima facie case of

25

selective prosecution warranting an evidentiary hearing or further discovery. See Armstrong, 517 at 470 (proffered study did not constitute "some evidence" to support claim of selective prosecution where study "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted."); United States v. Barham, 16 F.3d 844, 847 (8th Cir. 1994) (discovery properly denied because "[w]here a defendant cannot show anyone in a similar situation who was not prosecuted, he has not met the threshold point of showing that there has been selectivity in prosecution.").

Further, the mere fact that a statute has been used infrequently does not equate to per se discrimination. As one Circuit Court has recognized, "[t]he reality resulting from limited law enforcement and judicial resources is that not every criminal violation of the United States Code can be prosecuted." United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000). The government should not be penalized for selectively prosecuting those individuals who it deems constitute serious threats to security as long as the prosecution was not based upon an impermissible consideration such as race or religion.

B. Lewis Was Not Prosecuted Because of His Race or Religion.

Even if this Court were to find that the Defendant made a prima facie showing of discriminatory effect, the Defendant has

26

failed to present any evidence that his prosecution was motivated

by his race, religion, or any other impermissible reason.  As

the Supreme Court has noted,

> '[D]iscriminatory purpose' . . . implies more than . .
> . intent as awareness of consequences.  It implies that
> the decisionmaker . . . selected or reaffirmed a
> particular course of action at least in part 'because
> of,' not merely 'in spite of,' its adverse effects upon
> an identifiable group.

Wayte, 470 U.S. at 610 (quoting Personnel Administrator of

Massachusetts v. Feeney, 442 U.S. 256, 279 (1979)).

The Defendant, a large firearms purchaser, with little to no

financial resources, was prosecuted because he made false

statements during the acquisition of 16 firearms; he lied on

fifteen ATF Forms regarding his residential address.  In addition

to those false statements, in two of the 16 firearm purchases, he

also lied about the identity of the actual purchaser.  When the

Defendant was interviewed in September 2003 about these firearms

purchases, the Defendant was evasive and not forthcoming.

Subsequently, after the Defendant's license to carry was revoked

and he was made aware that ATF could not locate all the

disposition records for his firearms, the Defendant was unable to

account for the whereabouts of 3 of the firearms he fraudulently

obtained.  Those firearms still remain missing today.  Finally,

during the course of this joint investigation by ATF and JTTF,

evidence has been developed that the Defendant may be linked to

potential violent, terrorist activities.  Interviews of three
separate, unrelated individuals provided the following
information: the Defendant is violent, is or has been a member of
an anti-American group, and on multiple occasions, has espoused
his desire to commit jihad and die while engaging in jihad.
Immediately prior to his arrest, the government had received
information that the Defendant was leaving for a place in crisis
or at war, which was presumed to be Afghanistan.

Moreover, if as the Defendant contends, the government
brought this case against Lewis because he is an African-American
Muslim, it would have also brought charges against Clarence
Plant, a fellow  African-American Muslim, for making false
statements to law enforcement officers in violation of 18 U.S.C.
§ 1001 when he denied any knowledge of Lewis' purchases of the
H&K pistol and Bushmaster rifle and conspiring with Lewis to make
false statements on ATF Forms 4473 in violation of 18 U.S.C. §
922(a)(6).  As demonstrated in Special Agent Curran's affidavit
and this memorandum, the government chose to prosecute the
Defendant for legitimate purposes, most importantly, deterrence
and incapacitation.  Three of the 32 firearms purchased by the
Defendant cannot be located.  Similarly, the government has a
vested interest in ensuring that purchasers of firearms,
especially those who buy easily concealable short-barreled
shotguns, are truthful about where they are going to store their

28

dangerous weapons.  See United States v. Crandall, 453 F.2d 1216, 1217 (1st Cir. 1972) (concluding that purchase of firearm was illegal where defendant provided a false name, address, and date of birth in connection with his purchase even though defendant was not a prohibited buyer); accord United States v. Queen, 408 F.3d 337, 338-39 (7th Cir. 2005) (holding that providing a false street address on ATF Form 4473 is material to the lawfulness of the sale and constitutes a violation of 18 U.S.C. §922(a)(6)). Lastly, at this critical time in the nation's history, when the government has developed evidence of a crime, the government needs the discretion to prosecute those whom it believes may present a risk to the public or to the nation's security interests.

Because the Defendant has failed to come forward with "evidence specific to his own case that racial consideration played a part" in the charging decision, the Court should deny the Defendant's Motion to Dismiss.  McCleskey v. Kemp, 481 U.S. 279, 292-93 (1987).

## II.  DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.

To obtain an evidentiary hearing, the defendant must allege some facts that (a) tend to show that he has been selectively prosecuted; and (b) raising a reasonable doubt about the propriety of the prosecution's purpose.  United States v. Serafino, 281 F.3d 327, 331 (1st Cir. 2002) (evidentiary hearing

on selective prosecution claim only required if defendant shows government did not prosecute others similarly situated and that the reasons for any such discrimination were illegitimate).  The Court, however, may refuse to grant an evidentiary hearing if the prosecutor presents "'countervailing reasons to refute the charge and . . . the court is persuaded that the hearing will not be fruitful.'"  United States v. Graham, 146 F.3d 6, 9 (1st Cir. 1998).

The defendant has failed to allege some facts that tend to show he is being selectively prosecuted and raise a reasonable doubt as to the propriety of the prosecution's purpose.  As described above, apart from speculative extrapolations based upon purely nonspecific nationwide statistical data, the Defendant has presented no evidence of discriminatory effect or discriminatory purpose.

Even assuming that the Defendant has met his threshold showing for an evidentiary hearing, as described above, the government has presented countervailing reasons that clearly refute any charge of intentional or purposeful discrimination in this case.  Accordingly, the Court should deny the Defendant's request for an evidentiary hearing.

In Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 473 (1999), resident aliens filed suit alleging selective prosecution claiming that they had been targeted for

deportation because of their affiliation with the Popular Front for the Liberation of Palestine, a politically unpopular group. The Court determined that the federal courts had no jurisdiction to hear this claim.  In analyzing their claim, the Supreme Court cited to analogous concerns present in this case and others brought by the United States Attorney's Office's Anti-Terrorism Unit that support this Court imposing a high standard of proof, refusing to hold an evidentiary hearing, and denying the Defendant's motion for further discovery.  See id. at 489-91. The Reno Court found that the "[E]xecutive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat. . . " Id. at 490-91. Nor should the Executive be required to disclose foreign policy objectives or foreign intelligence information.  Id. at 491.  Those same highly sensitive concerns are present in this case and necessitate a heavy burden of proof by the defendant before subjecting the prosecutor's motives to outside inquiry and requiring the government to open its files, which may contain classified information, to defense inspection; clearly, general statistical data is not sufficient to meet that burden.

III. **DEFENDANT HAS FAILED TO PRODUCE CREDIBLE EVIDENCE OF SELECTIVE PROSECUTION ENTITLING HIM TO FURTHER DISCOVERY**

In Armstrong, the Supreme Court "held that a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory

31

intent." <u>United States v. Bass</u>, 536 U.S. 862, 863 (per curiam) (2002).  Here again, the Defendant cannot meet this burden by merely suggesting the uniqueness of the Defendant's case and arguing that nonspecific nationwide statistical data support a finding of discriminatory effect.  The Defendant has also failed to present any evidence of discriminatory purpose.

Like the standard for ultimately proving a selective prosecution claim, the Defendant is held to a rigorous evidentiary standard for obtaining discovery from the government to support such a claim.  <u>Armstrong</u>, 517 U.S. at 468.  A significant barrier to discovery is necessary because discovery "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution.  It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy."  <u>Id.</u>  Because the defendant has failed to meet the rigorous evidentiary standard for obtaining further discovery on a claim of selective prosecution, the Court should also deny this request, which would only serve to waste scarce resources and delay trial in this case.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss should be denied without an evidentiary hearing and the Defendant's alternative request for further discovery should also be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ B. Stephanie Siegmann
B. STEPHANIE SIEGMANN
Assistant U.S. Attorney

Date: February 23, 2006

Certificate of Service

I do hereby certify that a copy of the foregoing opposition memorandum was served upon Mr. Watkins by electronic notice on this 23rd day of February 2006.

/s/ B. Stephanie Siegmann
B. Stephanie Siegmann
Assistant U.S. Attorney

33

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA           )
                                   )    CRIMINAL NO. 05-40001-FDS
        v.                         )
                                   )
                                   )
SAMUEL J. LEWIS,                   )
a/k/a SHAHEED LEWIS,               )
                                   )
        Defendant.                 )
                                   )
                                   )

## **Affidavit of Special Agent Michael P. Curran**

I, Michael P. Curran, Special Agent with the Bureau of
Alcohol, Tobacco, Firearms and Explosives of the United States
Department of Justice, state as follows:

1.    I am a Special Agent with the Bureau of Alcohol,
Tobacco, Firearms and Explosives of the United States Department
of Justice ("ATF") and have been so employed since September
1998.  Previously, I was employed as a Special Agent with the
U.S. Immigration and Naturalization Service for approximately two
years.  My responsibilities include investigating and enforcing
the federal firearms laws.  I attended the Criminal Investigator
Training Program, at the Federal Law Enforcement Training Center
("FLETC"), in Glynco, Georgia, from February 1998 to April 1998,
where I received training and instruction as a Special Agent,

1

including firearms training, the execution of search and arrest warrants, and investigative techniques. Subsequently, from March 1999 to July 1999, I attended specialized training known as New Professional Training ("NPT") through ATF, at FLETC, where I received instruction in firearms technology and identification, firearms trafficking, explosives, and arson.

2.    The information contained in this affidavit is based on my personal involvement in this investigation, my training and experience, my review of documents, and information provided to me by other law enforcement officers. This affidavit is submitted for the limited purpose of supporting the Government's Opposition to Defendant's Motion to Dismiss. Therefore, it does not set forth each and every fact that I have learned during the course of this investigation.

**BACKGROUND OF INVESTIGATION**

3.    In August 2003, during another investigation involving stolen firearms, Samuel J. Lewis a/k/a Shaheed Lewis ("LEWIS"), was identified to ATF as possessing multiple firearms. Subsequently, ATF received information that LEWIS was allegedly in the possession of an unregistered machine gun.  ATF also received information that Lewis was a member of a radical group

2

with anti-American beliefs. As a result, ATF opened an investigation of LEWIS.

4.     This case was jointly investigated by ATF and the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF").

5.     During the course of this investigation, I learned that in less than a three year period, between November 2000 and October 2003, LEWIS (while for the most part unemployed and receiving public assistance) purchased approximately 32 firearms, three of which have still not been located and LEWIS was unable to account for prior to being indicted on the current charges. In obtaining 16 of these firearms, LEWIS provided false information about his home address and where the firearms would ultimately be stored and/or the identity of the actual buyer. These false statements are the subject of the pending indictment.

6.    In October 2003, I interviewed a person by the name of Andrew Davis, who is employed at a security agency and also works as a National Rifle Association firearms instructor. Davis told me that he had observed LEWIS with two other men performing tactical shooting exercises at Wayne's Weaponry in West Boylston, Massachusetts in or about September 2002. According to Davis, the three men were armed with pistols and an AR-15 rifle. An AR-

3

15 rifle is very similar in appearance to a Bushmaster XM-15 rifle. From a distance, Davis observed that the AR-15 rifle was shooting in three round bursts and appeared as though it was firing in an "automatic" mode, functioning as a machine gun. Davis told me that he observed LEWIS and his two associates training with a high velocity weapon in a method he considered to be dangerous to the other people at the range; the individuals were shooting a high velocity weapon in very close proximity to a building and Davis was concerned about the possibility of ricochet.

7.   According to Davis, he confronted LEWIS about his dangerous firing practices. Davis asked LEWIS if he had ever heard of ricochet. LEWIS responded that ricochet was a good movie. Davis told LEWIS that by shooting an AR-15 into a stone wall, the rounds could ricochet and someone could get hurt. Davis also asked why the AR-15 was shooting multiple round bursts and if it was properly registered with ATF. LEWIS and his two associates became quiet. LEWIS then told Davis that he better watch his back, and that he (Davis) didn't know who he was "fucking" with. Davis also told me that he has heard that LEWIS is a member of an "anti-government" group.

4

8.   During this investigation, I interviewed Angela Mangrum,
LEWIS' ex-wife in March and November 2004.  During these
interviews, Mangrum told me that: in approximately 1997, LEWIS
converted to the Muslim faith; LEWIS had become more anti-
American over the last three years and she has heard him speak on
multiple occasions of engaging in jihad and that he will someday
die in a jihad in order to go to heaven; and LEWIS also uses the
term "Shaheed," which is a Muslim word meaning "martyr", as his
first name.  I know from my own experience and from what members
of the JTTF have told me that individuals that die while engaging
in jihad are referred to as "martyrs."  During the course of
other interviews I conducted, associates of LEWIS, including
Clarence Plant, also told me that LEWIS uses the name "Shaheed."

9.   During my interviews of Mangrum, Mangrum indicated that
she would be surprised if LEWIS had purchased multiple firearms
because LEWIS never has money for child support.  Mangrum also
told me that LEWIS has traveled overseas and expressed interest
in living in the Middle East.  Mangrum told me that LEWIS had
traveled to the Middle East, either to Somalia or Syria, for
approximately one month in Spring 2003.  According to Mangrum,
LEWIS had also traveled to Canada approximately 1-2 years ago.

10.   The Diplomatic Security Service informed me that LEWIS
had reported that he had lost his passport in 2001. As a result,
LEWIS had been issued a new passport.  Based upon my own
experience working as an Special Agent of the Immigration
Naturalization Service and conversations I have had with members
of the JTTF, I know that individuals sometimes report that they
have lost their passport in order to obtain a new clean passport
so as to avoid having any government official see evidence of
international travel and travel to countries suspected of being
havens for terrorism-related activity (many of which have little
or no tourism appeal such as Afghanistan, Bosnia, Somalia,
Chechnya).

11.   Additionally, in December 2004, I learned from a
confidential informant ("CI") of ATF and the Drug Enforcement
Administration that LEWIS was moving to an overseas country where
there was presently a "war" or a "crisis".  Shortly thereafter,
in January 2005, the CI told me that LEWIS' plans had changed
slightly and that LEWIS now did not plan on taking his "trip"
until sometime after January 1, 2005.  The CI presumed that the
country to which LEWIS was moving was Afghanistan or another
Middle Eastern country.

12. I understand that the defense has attempted to portray the CI as not credible as a result of a mistake he initially made about the location where LEWIS and his family had moved. The CI had initially provided incorrect information regarding the number of the house on Belmont Street to which LEWIS moved. I do not believe that one mistake renders this CI's information not reliable. To the contrary, I consider the information provided by this CI to be reliable. The CI has provided information to the DEA that resulted in a large seizure of contraband and multiple indictments. Further, the CI was a close associate of LEWIS and his family at the relevant time period and thus, in a position to have heard about LEWIS' plans.

## ATF DEVELOPS EVIDENCE OF CRIMES

13. During the course of this investigation, I learned that between August 2002 and September 2003, LEWIS purchased 16 firearms for approximately $8,036. During that time, LEWIS was, for the most part, unemployed, taking classes at Clark University, living in free housing provided to LEWIS and his family because they were homeless, and in arrears in his monthly child support payments of $400. In connection with the purchases of the 16 firearms, including a Mossberg short-barreled shotgun, LEWIS knowingly made false written statements on ATF Form 4473

and an ATF Form 4 to federally licensed firearms dealers.   The
false statements concerned LEWIS' residential address (the place
where the purchased firearms would be stored) at the relevant
time periods and the identity of the actual purchaser for two of
the firearms (a H&K pistol and Bushmaster rifle).   On two of the
Forms 4473 he completed and signed in August 2002, he used a
prior address of a house he rented from December 1999 to December
2001 (2 Fairlawn Drive, Worcester) and on the other Forms 4473
and 4, he used his mother's address (59 Evelyn Street, Worcester)
at a subsidized property for the elderly and disabled.

        14.   From October 2002 until September 2003, LEWIS
participated in Worcester Housing Authority's Transitional
Housing Program (a homeless shelter program) and resided with his
second wife, Pamela Cortez, and three children in U.S. Housing
and Urban Development ("HUD") public housing at 236 Constitution
Avenue in Worcester (a property known as Great Brook Valley).
However, when LEWIS purchased 14 firearms during this time
period, he provided a false residential address of 59 Evelyn
Street, Worcester on ATF forms and a NFA application.   The Evelyn
Street location is a HUD elderly/disabled housing complex where

8

LEWIS' mother resides.[1]  LEWIS did not and could not (because he was neither elderly nor disabled) reside at 59 Evelyn Street.

15.  Additionally, on two of the ATF forms relating to the purchase of a H&K pistol and Bushmaster rifle, LEWIS falsely indicated that he was the actual buyer of these firearms when in fact LEWIS bought the pistol and rifle for Clarence Plant, a person who did not have a license to carry firearms at that time. LEWIS offered to buy Plant, a longtime friend of LEWIS, these firearms so Plant would have his own weapons to shoot at the gun range.  Plant accepted LEWIS' offer and provided LEWIS the money to buy these firearms.

16.  Prior to all of these firearm purchases, LEWIS completed an ATF Form 4473.  Every individual that purchases a firearm from a federally licensed dealer must fill out this form. The form requires the buyer to identify himself, provide a valid "residence address", date and place of birth, social security number or other identifying number, and state of residency.

_____

[1] 59 Evelyn Street is actually an apartment building and LEWIS' mother lives at 59 Evelyn Street, Apt. 503.  LEWIS, however, only used his mother's street address when filling out the Forms 4473.  He omitted any apartment number and also used three different zip codes.  These omissions and slight modifications of his residential address present further evidence of LEWIS' desire to conceal where the firearms would be stored.

9

Additionally, the buyer must also certify on this form that he is the actual buyer of the firearm. ATF Form 4473 also contains a certification that the purchaser must sign and date stating that his/her answers are true and correct and acknowledging that he/she understands that

> making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony.

17. ATF records that I have reviewed demonstrate that LEWIS falsified 15 separate ATF Forms 4473 during the purchase of the firearms from federally licensed firearms dealers located in various towns throughout Worcester County, by (1) using an address of a house he previously rented and (2) listing the address of his mother's residence as his own. In addition to falsifying his home address, LEWIS twice falsified an ATF Form 4473, by stating that he was the actual purchaser of two firearms (a H&K pistol and Bushmaster rifle) when in fact the actual buyer was another person, Clarence Plant. At the time of those purchases (August 2002 and January 2003), Plant was not licensed to carry firearms and consequently, was unable to legally obtain and possess them. Plant, however, was not an alien or felon who was prohibited from carrying firearms.

10

18. With regard to the purchase of the Mossberg short-barreled shotgun, LEWIS also completed an ATF Form 4 on November 14, 2002. Like the ATF Form 4473, LEWIS falsified this ATF Form 4 by providing his mother's residential address of "59 Evelyn Street, Apt 503" as his own address rather than 236 Constitution Avenue. Certain weapons, like the Mossberg, are subject to more restrictive ATF regulations due to their inherently dangerous nature.[2] Because the Mossberg is short-barreled, it is more concealable than other shotguns. ATF requires buyers of such firearms to fill out an additional NFA form registering the gun with ATF. Form 4 is an application for a tax paid transfer and registration of firearms regulated under the National Firearms Act.

19. LEWIS signed the Form 4 certification which states that

I, Samuel Jermaine LEWIS, have a reasonable necessity to possess the machine gun, short-barreled shotgun, short-barreled rifle, or destructive device described on this application for the following reason(s): firearms collector, and my possession of the device or weapon would be consistent with public safety (18 USC 922(b)(4) and 27 CFR 178.98). UNDER PENALTIES OF PERJURY, I declare that I have examined this application and the documents submitted in support thereof, and to the best of my knowledge and belief it is true, correct and complete.

_____

[2] Under the NFA, a Mossberg firearm is defined as "any other Weapon," and consequently, is a firearm subject to regulation. See 26 U.S.C. §5845(e).

11

20. Based upon the evidence of LEWIS' false statements to licensed firearms dealers, LEWIS was charged in an indictment with violating 18 U.S.C. §§ 922(a)(6) and 924(a)(1) in relation to 16 firearm purchases. Both Sections 922(a)(6) and 924(a)(1) criminalize the making of false statements in connection with the acquisition of firearms but the proof requirements and penalties are different.

21. The following list identities the fifteen firearm transactions charged in the indictment by count and specifies what false information was provided by LEWIS on ATF Forms 4473 and ATF Form 4 in relation to each purchase:

1) **Counts One and Two: August 1, 2002** - a Glock pistol, model 27, .40 caliber, serial number BXD510US, purchased from Village Gun Shop, located in Northboro, MA, stated residential address "2 Fairlawn Dr., Worc., MA 01602";

2) **Counts Three and Four: August 9, 2002** - a H&K pistol, model USP Compact, .45 ACP caliber, serial number 29-006531, purchased from Sparky's Gun Shop, located in Webster, MA, in LEWIS' name for Clarence Plant and stated residential address "2 Fairlawn Dr., Worcester, MA 01602";

3) **Count Five: January 21, 2003** - a Bushmaster rifle, model XM15, .223 caliber, serial number BFI402246, purchased from Sparky's Gun Shop in LEWIS' name for Clarence Plant and also stated residential address "59 Evelyn St Worcester MA 01609";

4) **Counts Six and Seven: November 30, 2002** - a Glock pistol, model 17, 9mm caliber, serial number ADD061, purchased from Sparky's Gun Shop, stated residential address "59 Evelyn St Worc. MA 01607";

12

5)      **Count Eight: February 14, 2003** - a Dan Wesson pistol,
        model Point Man, .45 caliber, serial number HC00119,
        purchased from Sparky's Gun Shop, stated residential
        address "59 Evelyn St Worcester MA 01607";

6)      **Count Nine: March 5, 2003** - an IZH rifle, model Tiger,
        7.62 x 54 caliber, serial number 36621, purchase from
        Village Gun Shop, located in Northboro, MA, stated
        residential address "59 Evelyn St Worcester MA 01607";

7)      **Count Ten: March 31, 2003** - a Smith and Wesson revolver,
        model 19, .357 caliber, serial number 14K5390, purchased
        from Match Shot, located in Gardner, MA, stated
        residential address "59 Evelyn St Worcester MA 01607";

8)      **Count Eleven: April 22, 2003** -  a Glock pistol, model 23,
        .40 caliber, serial number AMF968US, purchased from Match
        Shot, stated residential address "59 Evelyn St Worcester
        MA 01602 Worcester County";

9)      **Count Twelve and Thirteen: May 13, 2003** - a Mossberg
        short-barreled shotgun, "Any Other Weapon," model 51683,
        12 gauge caliber, serial number P997733, purchased from
        Clarence Edgar Floyd, located in Lunenburg, MA, stated
        residential address "59 Evelyn Street Worcester MA 01607
        Worcester County" (and charged in **Count Twenty-One**, on
        November 14, 2002, LEWIS also falsified the NFA ATF Form
        4 application with respect to this weapon);

10)     **Count Fourteen: July 1, 2003** - a Sig Sauer pistol, model
        226, .40 caliber, serial number U638414, purchased from
        Sparky's Gun Shop, stated residential address "59 Evelyn
        St. Worcester, MA 01607 Worcester County";

11)     **Counts Fifteen and Sixteen: July 8, 2003** - a Sig Sauer
        pistol, model P228, 9mm caliber, serial number B118556,
        and a Norinco rifle, model MAK 90, caliber 7.62 x 39,
        serial number 94115827, purchased from Match Shot, stated
        residential address "59 Evelyn St. Worcester MA 01607
        Worcester County";

12)     **Count Seventeen: August 19, 2003** - a Colt pistol, model
        1911A1, .45 caliber, serial number 2737038, purchased

13

from Match Shot, stated residential address "59 Evelyn St Worcester MA 01607 Worcester County";

13)     **Count Eighteen: August 28, 2003** - a Smith and Wesson pistol, model 4013TSW, .40 S & W caliber, serial number VJE8708, purchased from Wayne's Weaponry, located in West Boylston, MA, stated residential address "59 Evelyn St Worcester MA 01607 Worcester County";

14)     **Count Nineteen: September 9, 2003** - a Romarm rifle, model SAR-1, 7.62 x 39 caliber, serial number S18372203, from Wayne's Weaponry, stated residential address "59 Evelyn St Worc MA 01607 Worcester County"; and

15)     **Count Twenty: September 17, 2003** - a Beretta pistol, model 96, .40 S & W caliber, serial number BER079921, from The Gun Room of Shrewsbury Inc., located in Shrewsbury, MA, stated residential address "59 Evelyn St Worc. MA 01607 Worcester County."

14

**CLARENCE PLANT**

22.  I interviewed Clarence Plant several times, usually in the presence of other federal law enforcement agents.  Plant, like LEWIS, is an African American convert to the Muslim faith. Initially, Plant denied knowing anything about the whereabouts of the Bushmaster rifle purchased by LEWIS.  As a result of concerns that the Bushmaster rifle may be unlawfully converted to an automatic machinegun and evidence of a crime, on January 20, 2004, I, with the assistance of the FBI and Worcester Police Department, executed a search warrant at Plant's home and recovered the Bushmaster rifle.  Shortly after the search was conducted, Plant admitted to knowing about LEWIS' purchases of the Bushmaster rifle and H&K pistol on his behalf.  This course of conduct was far from extraordinary.  ATF agents are authorized to seek and obtain search warrants to search residences and other locations for evidence of violations of 18 U.S.C. §922(a)(6).

23.  On January 21, 2004, Plant agreed to meet with me.  At that time, he voluntarily provided a detailed statement describing how and why LEWIS purchased firearms for him.  Plant stated that beginning in August 2002, LEWIS offered to purchase firearms for Plant.  According to Plant, in August 2002, LEWIS told Plant that since he (LEWIS) had a license to carry firearms

15

in Massachusetts and Plant did not, LEWIS could purchase firearms

at gun shops for him.  At that time, both men understood that

since Plant was not licensed to carry firearms, he was unable to

legally obtain and possess them.  According to Plant, LEWIS

suggested that if Plant were to give him money, LEWIS could

purchase firearms for Plant in LEWIS' name.  Plant accepted

LEWIS' offer to purchase firearms for him.

24.  Plant stated that on August 9, 2002, LEWIS purchased a

H&K pistol, model USP Compact, .45 caliber, serial number 29-

006531, at Sparky's Gun Shop, a federally licensed firearms

dealer located in Webster, Massachusetts, for Plant.  LEWIS used

money provided by Plant to purchase this firearm.

25.  According to Plant, LEWIS purchased a second firearm

for him in January 2003.  In approximately December 2002, LEWIS

offered to purchase Plant a Bushmaster rifle knowing that Plant

still did not have a license to carry firearms.  Plant again

provided LEWIS the money, approximately $800, to purchase the

Bushmaster rifle.  Plant stated that LEWIS purchased the

Bushmaster rifle for him on January 21, 2003 from Sparky's Gun

Shop.

26.  According to Plant, after LEWIS was interviewed by ATF

in late September 2003 (described below), LEWIS transferred, on

16

paper, the H&K pistol and Bushmaster rifle to Plant. The transfer documents were dated October 2, 2003. Plant had obtained his license to carry in August 2003. Plant told me that in October 2003, at approximately the time LEWIS was approached by ATF, LEWIS gave Plant's H&K pistol and Bushmaster rifle to Plant to store at his residence, and filled out state paperwork to accompany this transfer. According to Plant, no additional money was exchanged between him and LEWIS. Plant has no receipts for these two firearms because they were purchased in LEWIS' name.

## Interview of LEWIS

27. On September 26, 2003, myself and other law enforcement officers went to 59 Evelyn Street, apartment 503, to interview LEWIS. One of the purposes of this interview was to obtain and/or examine an AR-15 rifle that was suspected of being converted to an automatic machinegun. LEWIS was not at 59 Evelyn Street. Massachusetts State Trooper Michael Sampson called (508) 853-4968 and left a message for LEWIS. LEWIS called Trooper Sampson back. Trooper Sampson told LEWIS that he was in the parking lot at Evelyn Street and wished to speak to him about a motor vehicle matter. Shortly thereafter, LEWIS met us in the parking lot of 59 Evelyn Street. When he arrived at the parking

17

lot, we told LEWIS that we would like to speak with him regarding firearms. LEWIS claimed to reside at the Evelyn Street address as well as another location, which he refused to disclose at that time. When asked about the firearms that he had recently purchased, LEWIS stated that these firearms and his paperwork were at another location, with the exception of two firearms he was carrying with him, a Beretta .40 caliber pistol and Smith and Wesson . 40 caliber pistol. LEWIS stated that he had an AR-15 rifle, a short-barreled Mossberg, and a Romanian rifle at an another location. When asked why he did not have the Mossberg short-barreled shotgun with him or at the address listed on the ATF registration form (59 Evelyn Street, Apt. 503), LEWIS then stated that he had actually moved out of Evelyn Street recently and was in the process of updating his address with ATF.

28. During this interview, LEWIS was shown copies of records of his firearm transactions and LEWIS stated that the list was wrong because he had sold all of the firearms that he no longer possessed back to gun dealers. I asked LEWIS to produce his proof of National Firearms Act Registration for the Mossberg but Lewis was unable to do so. LEWIS stated that he had his Mossberg short-barreled shotgun at another location and he would retrieve it for investigators. We followed LEWIS to 236

18

Constitution Avenue, where he refused to allow us entry into his apartment. LEWIS came out of his apartment and turned over a Mossberg "Any other Weapon", model 51683 12 gauge caliber, serial number P997733 to me.

29. After interviewing LEWIS, I compiled a list of the 32 firearms he purchased from November 2000 to October 2003. In 2004, I was unable to locate disposition records for eleven of those firearms. By that time, LEWIS' license to carry had been revoked and he could no longer legally possess or acquire any firearms.

30. On October 7, 2003, Worcester Police Department revoked LEWIS' license to carry firearms. On October 9, 2003, LEWIS was served with notice of this revocation. LEWIS has made representations in his Motion to Dismiss that he was granted an extension of time to dispose of his firearms after being notified of the revocation of his license to carry. I have learned that these representations are false. I spoke with the licensing department of the Worcester Police Department and I was informed that in fact no such permission or extension was granted.

31. As a result of identifying possible missing firearms, I contacted LEWIS' attorney, Keith Langer. LEWIS, through his attorney, did provide me some additional information and

19

disposition records but was unable to account for all of the firearms.

32.  Despite LEWIS' representations to the contrary, I was not provided information about the disposition of all the firearms purchased by LEWIS.  Three of the firearms LEWIS purchased were missing in January 2005, when he was indicted, and still remain missing today.  In other words, I have been unable to locate any disposition records for three of LEWIS' firearms. Nor has LEWIS or any attorney on his behalf provided me any such records for disposition/location of the following: (1) Beretta pistol, .32 caliber, serial number DAA175590; (2) Browning pistol, .9 mm caliber, serial number 245NX51198; and (3) Glock pistol, .40 caliber, serial number NC448US.

### RELEVANT ATF PRACTICES

33.  I have reviewed the Defendant's Motion to Dismiss and exhibits attached thereto.  I noticed several discrepancies between what the Defendant argues in this motion and how ATF enforces the laws regarding the purchase of firearms.  First, when a person purchases a firearm from a federally licensed firearms dealer and fills out ATF Form 4473, and is rejected outright as a result of the National Instant Criminal Background Check System ("NICS"), established by the Brady Act, the

20

applicant never gets the firearm. Accordingly, ATF rarely recommends to the United States Attorneys that such persons be prosecuted. This stems from ATF's policy concerns with locating guns fraudulently obtained and possessed by prohibited persons. Where firearms have been fraudulently obtained, as is the case here, and some of those firearms cannot be located, the applicant/purchaser will likely be recommended for prosecution.

34. Second, none of the firearms purchased by LEWIS qualify as curios or relics, firearms which are of special interest to collectors. LEWIS purchased a short-barreled shotgun, an assault rifle as well as three other rifles, and handguns such as Glock pistols of various calibers for use in tactical shooting practice. None of those firearms could be purchased using a Curio and Relics License. To qualify as curios or relics, firearms must fall within one of the following categories:

(a) Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

(b) Firearms which are certified by the curator of a municipal, State or Federal museum which exhibits firearms to be curios or relics of museum interest; and

(c) Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event.

27 C.F.R. § 478.11.

21

Curio and Relics Licenses do not allow collectors to purchase guns in transactions that may otherwise be prohibited by the National Firearms Act. Although I did learn, during this investigation, that LEWIS had obtained a Curio and Relics License, this license was not used by LEWIS in any of the charged firearm transactions. As explained above, LEWIS could not use the Curio and Relic license to purchase the Mossberg short-barreled shotgun; such a purchase in Massachusetts requires: a valid license to carry firearms; completion of ATF Form 4 – Application for Tax Paid Transfer and Registration of Firearm Subjected to the National Firearms Act; and approval by both ATF and the Chief Law Enforcement Officer of the town or city in which he resided of the requested purchase.

35. Additionally, based upon my experience and training, I believe that a very small percentage of people buy firearms in the amounts similar to that of the defendant, more than 30 firearms in less than 36 months, even legitimate firearm

collectors.

On this 9th day of February 2006, I declare under penalty of

perjury that the foregoing is true and correct.

*Michael P. Curran*

Michael P. Curran, Special Agent
U.S. Bureau of Alcohol, Tobacco,
Firearms and Explosives