UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
        v.                      )        CRIMINAL NO. 05-40001-FDS
                                )
SAMUEL J. LEWIS                 )


DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO
MOTION TO DISMISS AND FOR FURTHER DISCOVERY

The government's opposition does little more than restate the allegations made in the indictment and justify the prosecution because "information was learned that reasonably led investigators and prosecutors to believe that the Defendant presented a risk to national security."  Government's Opposition to Motion to Dismiss (hereinafter "Gov't Opp.) at 13.  Close examination of that information, however, reveals that the "information" proves nothing more than post-hoc justification for a prosecution that would not otherwise have been undertaken if Lewis were not an African-American Muslim.  In any event, the government's concession that it selected Lewis for unique prosecution alone raises a reasonable doubt about the propriety of the government's purpose that requires resolution after further discovery and a hearing.  United States v. Graham, 146 F.3d 6, 9 (1st Cir. 1998).

I.   **The Government's Shifting Factual Rationale for Prosecuting Lewis Combined with Its Failure to Disclose the Marginal Reliability of Key Information Raises a Compelling Inference that the Government's Prosecution Was Made for an Impermissible Purpose**.

The government concedes, as it must, that prosecution of Lewis is unprecedented given the actual conduct that occurred in this case.  Gov't Opp. at 19-20; 26.  It nevertheless suggests a smorgasbord of inconsistent factual rationales that, it claims, justify prosecution.  Lewis's prosecution was independently justified, according to the government, primarily because Lewis was a "large firearms purchaser," Gov't Opp. at 27, and because the ATF cannot locate three of the firearms sold by Lewis to Federal Firearm Licensees, Gov't Opp. at 21, 27.  <u>See</u> Curran Affidavit (attached to Gov't Opp.) ¶¶ 29-33, 35.[1]

---

[1]As to these issues, SA Curran makes two key representations that require further development through precisely the discovery defendant has requested in his motion.  First, SA Curran states that pursuant to BATF policy "[w]here firearms have been fraudulently obtained, as is the case here, and some of those firearms cannot be located, the applicant/purchaser will likely be recommended for prosecution."  Curran Aff. ¶ 33.  Defendant has requested the guidelines by which referrals for violations of the two statutes are evaluated.  Defendant's Motion to Dismiss at 39.  Where the government has explicitly invoked those guidelines as a basis for its prosecution, fairness dictates that the defendant should be allowed access to those guidelines.

Second, SA Curran says that his experience and training leads him to the conclusion that only "a very small percentage of people buy firearms in the amounts similar to that of the defendant . . . even legitimate firearm collectors."  Curran Aff. at 35.  Defendant submits that the government's reliance on SA Curran's opinion triggers the disclosure requirements of Fed. R.

What the government ignores, of course, is that it knows that Lewis did not possess thirty or twenty or even ten weapons at a time. Records obtained by BATF demonstrated that the weapons at issue were traded for other weapons, and always done so through Federal Firearms Licensees. The government knew that information as early as January 2004, ten months before the complaint issued in this matter.

Similarly, BATF asked for and received detailed information from Lewis concerning all but one of the weapons, including where each had been sold or traded. Moreover, Lewis voluntarily provided this information within 48 hours of a request by SA Curran. Correspondence between Curran and attorneys representing Lewis in his civil suit to regain his license is attached hereto as Exhibit A. This level of cooperation, which included Lewis tracking firearms often sold years before and substantially assisting SA Curran in learning the disposition of the weapons, is remarkable for one now accused of fraudulently obtaining firearms because of an incorrect residence address.

Notwithstanding this cooperation, the government faults Lewis because, out of the many weapons it asked about, it was unable to recover three of the weapons based on the information

---

Crim. P. 16 and hereby requests that the government disclose the basis of the opinion including all materials (including training materials) reviewed by SA Curran in forming this opinion.

he provided.  See Curran Aff. at 32.  The government, however,
apparently made little or no effort to investigate the
disposition of the weapons itself, nor did it notify Lewis that
his failure to come up with more information concerning the
disposition would result in his indictment.  Indeed, the
government has not documented, other than in summary fashion, its
efforts to independently locate records of the disposition of the
three remaining weapons.[2]

In short, the government's characterization of Lewis as a
"large firearm purchaser" probably responsible for nefarious
firearm trafficking is factually baseless and does not support
its suggestion that prosecution of him is nothing more than
routine.  Quite the opposite: as SA Curran confirms, a BATF
policy concern is "locating guns fraudulently obtained and
possessed by prohibited persons."  Curran Aff. at ¶ 33 (emphasis
supplied).  The government presents little justification - nor
can it - for why it chose to bring this unprecedented prosecution
against an African-American Muslim who was not a prohibited
person and provided substantial and detailed records as to his
firearms transactions.

---

[2]Defendant intends, either for hearing or at trial, to
subpoena the records of the Federal Firearms Licensees with whom
Lewis did business in his own effort to obtain verification of
the disposition of the weapons characterized as "missing."

Indeed, the government concedes as much when it admits that prosecution of Lewis was actually the result of "re-evaluation [of] past practices in light of changing historical circumstances . . . [and] new enforcement priorities," Gov't Opp. at 20, and insinuates that prosecution of Lewis was undertaken because of a "possible terrorism connection" that "presented a risk to national security," Gov't Opp. at 13.  It based this rationale on interviews with four people: (1) Lewis's friend Clarence Plant, (2) Andrew Davis, who observed Lewis one day at a shooting range, (3) Lewis's ex-wife Angela Mangrum, and (4) a confidential informant.  Gov't Opp. at 13.  With the exception of the confidential informant, who provided information in late 2004 and for which the circumstances of the information are more fully discussed below, the supposedly damaging information implicating national security concerns were gleaned from interviews that were completed by March 2004, nine months before Lewis was indicted. This timing alone raises significant questions as to whether the government's assertions concerning its decision to prosecute are made in good faith.  Examination of the information, however, demonstrates conclusively that prosecution of Lewis is unique and counter to standard practices of the BATF and the USAO and not justified by the government's asserted rationales.

1.    **Clarence Plant**

The government places much store in the fact that "[e]ven [Lewis's] own friend, Clarence Plant, advised law enforcement that [Lewis] uses the name 'Shaheed,' a Muslim name meaning 'martyr'." As a preliminary matter, Plant did not "advise" law enforcement; rather, he disclosed that information in the course of, and as the result of, intense law enforcement pressure brought to bear on him, including five interrogations, a search of his home, and threatened prosecution. In any case, what Plant also disclosed, prior to the government's decision to indict Lewis, was that "he would not describe Lewis as extremist." A copy of ATF Report of Investigation documenting a proffer made by Clarence Plant is attached hereto as Exhibit B. The government also knew by January 2005 - eleven months before charging him - that Lewis was married, had recently graduated from Clark University, and was employed as a teacher.

Plant also told agents exactly the nature of, and reason for, the multiple firearms purchases when he explained in detail the pair's activities at shooting ranges. Tellingly, Plant said nothing that remotely suggested a connection between firearms and Lewis's religious views at all, let alone any "possible terrorism connection."

Read in this context, the government's evocation of terrorism by noting that Shaheed is a Muslim name meaning

"martyr," defendant submits, is itself evidence of ulterior motive in prosecution. As the government should well know, Shaheed is a common Muslim name susceptible to multiple meanings including, for example, "witness." See About Islam, "Masculine Baby Names," http://islam.about.com (last visited March 16, 2006); The Quranic meaning of the word "Shaheed," http://www.auran-islam.org/148.html (last visited March 3, 2006)("Moreover, the word 'shaheed' in the Quran does not mean martyr at all. The word 'shaheed' in the Quran means witness.") To suggest that the selection of such a name evinces a national threat and thus a reason for the unique prosecution of Lewis is, defendant submits, absurd. The government should be required to document for the Court through discovery any guidelines for investigation and prosecution that include the meaning and inference of a selected Muslim name.

In sum, Clarence Plant's statements to the government, far from supporting a description of Lewis as someone who "is a member of a radical group with Anti-American views, someone who wished to commit jihad and die while committing jihad," (Gov't Opp. at 14), supports instead defendant's contention that the government engaged in racial and religious stereotyping where it sought to undertake this unique prosecution. Such a purpose is impermissible and dismissal is warranted.

-7-

### 2. Andrew Davis

The sum total of Andrew Davis's contribution to the government's assertion that "several witnesses that described [Lewis] as being a member of a radical group with Anti-American views" consists of Davis's statement, without attribution and eleven months after a single angry confrontation with Lewis that he initiated, that "he had heard that Lewis was a member of an 'anti-government' group." (Gov't Opp. at 15, Curran Aff. at ¶ 7). Not only is this hearsay evidence bereft of any reliability on its face, but Davis's reliability as a reporter, as the government knew during the investigation and at its decision to undertake the prosecution of Lewis, was quite dubious. For example, Davis's most serious allegation was that Lewis possessed an automatic rifle at Wayne's Weaponry, a gun dealer and shooting range in West Boylston, MA. The government fails to point out, however, that SA Curran interviewed two witnesses who both dispelled Davis's allegation. Wayne Alstrom, the owner of the dealership and shooting range, told Curran (1) Lewis was a regular customer in the store and at the range, (2) was knowledgeable about firearms, (3) took good care of his firearms, and (4) was a person he had never had any problems with. He did not confirm Davis's allegation but rather explained that Lewis liked to practice tactical shooting that included "double-taps" and "triple-taps" on the targets. Later, Clarence

-8-

Plant completely dispelled the suggestion that Davis was reliable when he confirmed that Lewis did not have an automatic rifle but rather sometimes shot with "double-taps" and "triple-taps" on the target that could sound like automatic fire.

In short, to the extent it relies in any part on statements made by Davis, the government's assertion that "several witnesses described [Lewis] has being a member of a radical group with Anti-American views, someone who wished to commit jihad and die" is simply not credible.

### 3. Angela Mangrum

The government cites Angela Mangrum, Lewis's ex-wife, for statements made in the course of a vitriolic interview where, inter alia, Mangrum attributes the beginning of their marital discord, which resulted in a 1998 divorce, to Lewis's conversion in 1997 to the Muslim faith. A copy of the Report of Investigation memorializing the interview is attached hereto as Exhibit C. Notwithstanding her admission that she had no contact with Lewis other than when she talks with him concerning the children they have together, Mangrum opined that Lewis's views concerning Islam were "becoming more radical and extremist as time goes on," is "insane" about his religion, and has "weird values."

Defendant submits that the statements of an ex-wife - with the obvious bias attendant in many dissolved marriages - are too

slender a reed upon which the government can justify its unique prosecution of Lewis.  That the statements were of limited value is borne out by the government's unwillingness to undertake prosecution of Lewis for another six months.

### 4.  Confidential Informant[3]

The lynchpin of the government's assertion that it is the "possible terrorism connection," Gov't Opp. at 13, that is responsible for its prosecution of Lewis rests chiefly on statements by a confidential informant ("CI") made in August and November 2004.[4]  (Gov't Opp. at 15-17; Curran Aff. at ¶¶ 11-12). The government did not initiate prosecution as a result of the information supplied by Clarence Plant (provided over eleven months before the decision to prosecute), the information provided by Andrew Davis (provided over one year before the decision to prosecute), or the information provided by Lewis's former wife, Angela Mangrum (nearly all of which was provided six months before the decision to prosecute).  According to the

---

[3]As explained more fully below, undersigned counsel is aware of the identity of the confidential informant.  At the request of the government, the undersigned has agreed for purposes of this Reply to refrain from naming the individual.

[4]The government's opposition and SA Curran's affidavit appear to be erroneous where each state that the information was supplied in December 2004 and January 2005.  As ATF Reports of Investigation provided to defendant confirm, however, the CI met with SA Curran in August 17, 2004 and then again on November 22, 2004.  The reports were previously provided under seal and thus are not reproduced here as an exhibit.

government and SA Curran, the CI informed Curran that Lewis was imminently moving to an unnamed overseas country where there was a "war" or a "crisis" that the CI "presumed" was Afghanistan or another Middle Eastern country.  (Gov't Opp. at 16; Curran Aff. at 12).  The government's assertion that this information was reliable and thus a legitimate basis on which to base the decision to prosecute is belied by the facts.

Counsel independently ascertained the identity of the informant and interviewed the CI, who is presently incarcerated as a result of criminal convictions unrelated to Lewis.  As the affidavit demonstrates, SA Curran knew that (1) the CI possessed no first-hand information concerning Lewis's activities and travel plans, and was in no position to personally learn of them; (2) the CI had a specific adversarial relationship with Lewis, who had married the CI's former wife, that was fraught with ulterior motives; and (3) the CI used as his purported source of any information a then thirteen year-old girl who only visited him pursuant to a visitation agreement.  The affidavit of Federal Defender Office Investigator Winfred Meadows-Marquez is attached hereto as Exhibit D.  Given this context, the government's assertion that the information was reliable because CI was a "close associate of Lewis and his family" is, at best, disingenuous.

Moreover, use of this information itself suggests an unexplained deviation in practice apparently peculiar to the investigation of Lewis.  ATF Order No. 3210.7B, titled "Investigative Priorities, Procedures, and Techniques," provides instructions to field agents concerning, inter alia, informant development, use and control.  Paragraph 33, titled "Evaluation of Informants," (attached hereto as Exhibit E) directs field agents to make "[a]ll reasonable efforts . . . to ensure that information provided is reliable."  The Order goes on to caution that "[p]rior to committing substantial resources or taking significant enforcement action based upon information provided by an informant of unknown or untested reliability," the special agent should first consider, inter alia:

> . . .
>
> c.   [T]he informant's sources and means of securing
>      information, if possible.
>
> d.   Determine any possible motives the informant may have
>      for providing false or misleading information.
>
> e.   Consider any other factor the special agent thinks will
>      bear on the informant's credibility.

<u>Id.</u>[5]  While it may be true that the CI was reliable in a DEA
investigation in the past, the credibility determination here (as
SA Curran well knew) involved <u>both</u> the CI <u>and</u> the thirteen year-
old daughter.  Where the government knew that the informant
himself may have had a panoply of motives to provide false and
misleading information, and himself was simply passing on
information purportedly completely gleaned from an unknown and
untested thirteen year-old girl with her own motives to supply
false or misleading information, its assertion that it had
credible information of a terrorist connection is simply
untenable.

     In sum, the government's assertion that it prosecuted Lewis
because "[i]n several interviews conducted during this
investigation, witnesses described the Defendant as being a
member of a radical group with Anti-American view, someone who
wished to commit jihad and die while committing jihad, and travel
overseas [sic]" is disingenuous.  In reality, the government has

---

[5]The quoted ATF Order was obtained under the Freedom of
Information Act and, as Exhibit E shows, is heavily redacted.
For example, subsection "f" in paragraph 33, which appears to run
one and three-quarters pages and sets forth a significant and
detailed factor in assessing informant reliability, is completely
deleted.  The government's lynchpin assertion is that Lewis was
prosecuted not because of his religion or race but because of the
information provided by the confidential informant that it deemed
reliable.  Defendant submits that given these facts and
assertions, discovery of the remainder of this Order (as well as
any recent amendments to the Order, if any) is appropriate.

chosen to prosecute Lewis based on double hearsay originating with a thirteen year-old adolescent. Defendant submits that, at a minimum, the Court should schedule an evidentiary hearing to determine whether the government's proffered assertions that it possessed credible information supporting its unique prosecution of Lewis are made in good faith.

**II.  The Government's Concession that It Selectively Prosecuted Lewis Is A Strong if Not Conclusive Acknowledgment that He Has Met His Prima Facie Burden and Further Discovery and a Hearing are Required.**

The government has, as it must in light of the patently unique nature of this prosecution, conceded that it has selectively prosecuted Lewis. Gov't Opp. at 26. See also Gov't Opp. at 20 (arguing that prosecution flowed from "changing historical circumstances, concerns for deterrence and incapacitation, new enforcement priorities, and the particular facts of particular cases"). As the government forthrightly recognizes, the only real issue is whether it undertook prosecution of Lewis because he posed a "serious threat[] to security," or if he simply had the bad luck to be a Mosque-attending African-American Muslim who also enjoyed trading guns and practiced shooting. Gov't Opp. at 26. Consequently, the government's citations to cases like United States v. Ovis, 97 F.3d 739,(4th Cir. 1996)(white co-defendants charged with same crime but offering "different prosecutorial profiles" such as

-14-

cooperation with authorities or lack of evidence justified
disparate sentencing treatment), United States v. Barham, 16 F.3d
844, 847 (8th Cir. 1994)(defendants failed to show any
selectivity in prosecution at all) and United States v. Serafino,
281 F.3d 327, 331 (1st Cir. 2002)(permissible not to charge
others in kickback scheme where they reaped no benefit and
cooperated) are inapposite.  Rather, this is a case where
evidence specific to Lewis's case exists that suggest that racial
and religious considerations played a part in the decision to
prosecute.  McCleskey v. Kemp, 481 U.S. 279, 292-93 (1987).

     In defendant's view, the government's necessary concession
that the prosecution is unique to Lewis requires resolution by
further discovery and hearing.  To obtain a hearing, all a
defendant must do is "allege[] facts that tend to show that []he
has been selectively prosecuted and that raises a reasonable
doubt about the propriety of the government's purpose." United
States v. Graham, 146 F.3d 6, 9 (1st Cir. 1998)(internal
quotations, ellipses, and citations omitted).  Where, as here, no
other person other than an African-American Muslim defendant is
prosecuted for a violation of the statute given the underlying
factual circumstances and the government admits the prosecution
is unique, an inference of selective treatment because of race or
religion has been established and further discovery and a hearing
is required.  See id.  This is particularly true where, as

demonstrated above, the government's proffered non-race and non-religion criteria for prosecution are questionable factually and legally. Compare United States v. Queen, 408 F.3d 337, 338 (7th Cir. 2005)(conviction affirmed where defendant used prior residence address to buy 39 guns, at least eleven of which were recovered at crime scenes). The USAO should be called upon to demonstrate at hearing whether its non-race or non-religion criteria justifies this prosecution.

The government's reliance on Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999)("AAAC"), is at once baffling and disturbing. Gov't Opp. at 30-31. AAAC considered the narrow issue of statutory interpretation of an Immigration reform act. Specifically, the Court considered whether Congress intended to bar selective prosecution issues from being raised procedurally in the District Court where in one section of the reformed act Congress seemingly prohibited such review. Id. at 479-480. The Court's holding - that aliens undergoing deportation proceedings could be barred from raising a constitutional claim such as selective enforcement of civil deportation statutes - specifically focused on and was limited to the deportation context. Id. at 490-491. Justice Scalia, while affirming the compelling interest that a criminal prosecution target possessed in deterring selective prosecution, reasoned that illegal aliens raising such claims represented an ongoing

violation of the immigration laws; quick and final enforcement of
the civil statute the aliens had admittedly violated outweighed
the interest they had in vindicating a selective enforcement
claim.  Id.  Notwithstanding the holding, Justice Scalia noted
that even in the immigration context the government's discretion
is limited by principles of due process and equal protection; he
allowed that there might the possibility of a rare case in which
evidence of outrageous discrimination would overcome the
statutory disability of raising a constitutional claim.  Id.

Thus, AAAC did not and does not change the essential core
holding of Armstrong that applies to this unique criminal
prosecution of an African-American Muslim:

> A defendant may demonstrate that the administration of
> a criminal law is 'directed so exclusively against a
> particular class of person . . . with a mind so unequal
> and oppressive' that the system of prosecution amounts
> to 'a practical denial' of equal protection of the law.

United States v. Armstrong, 517 U.S. 456, 464-465 (1996).

Beyond its patent inapplicability to the case at bar, the
government's citation to AAAC is disturbing because it suggests
that this Court impose a stricter standard of proof for selective
prosecution simply - and solely - because of the nature of cases
brought by the USAO's Anti-Terrorism Unit.  Gov't Opp. at 31.
This, according to the government, so it can be allowed to
prosecute notwithstanding its "real reasons" that may disclose
foreign policy objectives or foreign intelligence information.

-17-

Id., citing AAAC at 490-91.  Nothing in Armstrong, or AAAC for
that matter, supports the government's breathtaking premise that
it can hold itself above ordinary constitutional concerns by
simply invoking the term terrorism.  This Court should reject out
of hand any such attempt to impose a higher prima facie standard
in cases prosecuted by this or any other USAO terrorism unit.

CONCLUSION

        For the foregoing reasons, as well as the reasons set forth
in Defendant's Motion to Dismiss, defendant submits this unique
and unprecedented prosecution must be dismissed.  Even if
dismissal is not immediately warranted, defendant submits that he
has established a prima facie case of selective prosecution and
that the Court should order discovery as requested in Defendant's
Motion to Dismiss.  The Court should conduct a hearing at which
the government should be required to set forth its non-protected
class reasons underlying its decision to initiate this
prosecution, and for the Court to resolve factual issues
defendant has raised concerning that decision.

SAMUEL LEWIS
By His Attorney,


/s/ Timothy Watkins
Timothy G. Watkins
Federal Defender Office
408 Atlantic Ave. 3rd Floor
Boston, MA  02110
Tel: 617-223-8061


<u>CERTIFICATE OF SERVICE</u>

_____I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant, Assistant U.S. Attorney B. Stephanie Siegmann, as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 17, 2006


/s/
Timothy G.Watkins

# EXHIBIT
# A

| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 1 of 2 |
| --- | --- |

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 009 |
| --- | --- |

U. S. 035

**TITLE OF INVESTIGATION:**
Samuel Lewis

| CASE NUMBER:<br>762080-03-0016 | REPORT NUMBER:<br>9 |
| --- | --- |

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
| --- | --- | --- | --- |
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Michael P. Curran | SUBMITTED BY *(Title and Office)*<br>Special Agent, Worcester Field Office | SUBMITTED BY *(Date)*<br>02/09/2004 |
| --- | --- | --- |
| REVIEWED BY *(Name)*<br>Jane E. Heffner | REVIEWED BY *(Title and Office)*<br>Resident Agent in Charge, Worcester Field Office | REVIEWED BY *(Date)*<br>2-9-04 |
| APPROVED BY *(Name)*<br>William J. Hoover | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Boston Field Division | APPROVED BY *(Date)*<br>2-9-04 |

**DESCRIPTION OF ACTIVITY:**
Firearms purchased on sold by Samuel LEWIS

**SYNOPSIS:**
Special Agent Michael Curran has conducted further research on firearms purchased and sold by Samuel "Shaheed" LEWIS, date of birth April 18, 1973, social security number 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.

**NARRATIVE:**

1) S/A Curran has been in contact with attorney Keith Langer, who is representing Samuel LEWIS. Langer was provided with a list of firearms that LEWIS purchased and the disposition could not be determined. Langer provided disposition information and copies of some receipts. S/A Curran also researched the firearms and verified information with gun dealers.

2) LEWIS sold a **Sig Sauer pistol, .40 caliber, s/n SA4-84443** to Sparky's Gun Shop in Webster, MA on September 13, 2001. Attorney Langer provided a receipt from Sparky's, and S/A Curran verified this with Sparky's.

3) LEWIS sold a **Glock pistol, .40 caliber, s/n 8UB299US** to Match Shot in Gardner, MA on August 1, 2002. Attorney Langer provided a receipt, and S/A Curran verified this with Match Shot.

4) LEWIS sold a **Dan Wesson pistol, .45 caliber, s/n HC00119** to Match Shot in Gardner, MA on March 25, 2003. S/A Curran verified this with Match Shot.

ATF EF 3120.2 (5-98)

| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 2 of 2 |
|---|---|

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 009 |
|---|---|

| TITLE OF INVESTIGATION:<br>Samuel Lewis | |
|---|---|

| CASE NUMBER:<br>762080-03-0016 | REPORT NUMBER:<br>9 |
|---|---|

5) LEWIS sold a **Glock pistol, 9mm caliber, s/n MZ091US** to Sparky's Gun Shop in Webster, MA in April, 2002. S/A Curran verified this with Sparky's Gun Shop.

6) LEWIS sold a **Smith and Wesson revolver, .38 caliber, s/n BPH1681** to Match Shot in Gardner, MA on August 1, 2002. Attorney Langer provided a receipt, and S/A Curran verified it with Match Shot.

7) LEWIS sold a **Smith and Wesson revolver, .357 caliber, s/n 14K5390** to Wayne's Weaponry in West Boyston, MA on May 12, 2003. Attorney Langer provided a receipt for this firearm.

8) LEWIS sold a **Colt pistol, .45 caliber, s/n 2737038,** to Match Shot in Gardner in January 2004. This was verified with Match Shot.

9) LEWIS has submitted paperwork to the State of Massachusetts documenting the transfer of the following two firearms to Clarence PLANT of Worcester in October 2003:
   - **H&K pistol, .45 caliber, s/n 29-006531**
   - **Bushmaster rifle, model XR-15, serial number BFI402246.**
   Information developed by ATF in this investigation has shown that LEWIS purchased these firearms for PLANT using PLANT's money and making false statements to the firearms dealer. The paperwork transfer occurred after LEWIS was approached by ATF.

10) Attorney Langer provided information that a **Beretta pistol, .32 caliber, serial number DAA175590** was sold to Sparky's Gun Shop on September 4, 2000. However, this is not possible because LEWIS purchased this firearm at the Village Gun Shop in Northboro, MA on May 18, 2001, well after the date LEWIS claimed to sell it back to Sparky's.

11) Attorney Langer provided information that LEWIS sold a **Browning pistol, 9mm caliber, s/n 245NX51198** to Match Shot firearms in Gardner, and no date or receipt was provided. S/A Curran and Match Shot owner Charlie Norris could not locate any record of LEWIS selling this firearm to Match Shot. Norris told S/A Curran that he rarely deals with Browning pistols, and does not remember purchasing one from LEWIS.

12) Attorney Langer provided no response about the disposition of a **Glock pistol, .40 caliber, s/n NC448US** that was purchased by LEWIS.

13) S/A Curran researched the Massachusetts Firearms Records Bureau for **Beretta pistol, .32 caliber, serial number DAA175590, Browning pistol, 9mm caliber, s/n 245NX51198, and Glock pistol, .40 caliber, s/n NC448US,** and no new owner was found in their system.

Yahoo! My Yahoo! Mail

# YAHOO! Mail  Welcome, menshealthnt
[Sign Out, My Account]

powered by (hp)

Search the web

Mail Home - Help



✉Mail ▾ | 📖Addresses ▾ | 🗒Calendar ▾ | 📝Notepad ▾   menshealthnt@yahoo.com [Sign Out]

**Check Mail** | **Compose**    Mail Upgrades - Search Mail - **Mail Options**

Folders [Add]
 Inbox
 Draft
 Sent
📩 Bulk [Empty]
🗑 Trash [Empty]

## View Attachment

powered by
OUTSIDE IN°
HTML EXPORT

Back to Original Message - Printable View

**File name: BATFE.fax_1.wpd   File type: application/x-wordperfect6**

Save to my Yahoo! Briefcase - Download File - Need Help?

😊 **Check your Credit! It's Free.**

🎓 **100% Online Degrees**

📀 **Netflix DVD Rentals Delivered!**

### KEITH G. LANGER

*Attorney at Law*

Admitted in Massachusetts and Rhode Island

255 Harvard Lane, Wrentham, MA 02093-1069

Phone: (508) 384-8692 Fax (508) 384-3547

THIS FAX TRANSMISSION CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION FOR THE USE OF THE DESIGNATED RECIPIENT ONLY. IF YOU HAVE RECEIVED THIS MATERIAL IN ERROR, PLEASE CALL (508) 528-4200 OR FAX (508) 528-3919, COLLECT, IMMEDIATELY. THE USE, PUBLICATION, TRANSMISSION OR REVELATION OF THIS MATERIAL BY ANY OTHER THAN THE INTENDED PARTY IS A VIOLATION OF LAW. THANK YOU FOR YOUR COOPERATION.

**TO: Agent Curran**

Bureau of Alcohol, Tobacco, Firearms and Explosives

FR: Attorney Keith G. Langer

DA: January 7, 2004

RE: Samuel J. Lewis

FAX TO: (508) 793-0271

Dear Agent Curran:

Per your e-mail request of this afternoon, I attach the following:

1. Receipt # 51749 from Sparky*s Gun Shop, dated 9/13/01, showing SIG 239 # SA4-84443 traded in for a Glock Model.22;

2. FA-10 # F849503, dated 10/02/03, showing H&K USP # 29-006531 sold to Clarence Plant, Jr.;

3. Receipt # 57522 from Sparky*s Gun Shop, dated 4/3/02, showing Glock 19 # M2091US traded in for a Glock Model 23;

4. Purchase Form from Match Shot, showing three guns sold to it:

Thompson Auto-Ordnance Pit Bull, # TGM 930;

Glock 23, # BUB299US (NOT "8UB"); and

Smith & Wesson 640, # BPH1681

NOTE: This form is somewhat vague; it is more likely that the Auto- Ordnance was bought by Mr. Lewis, by trading in both the Glock and S&W, as he also received two hundred thirty-five dollars ($235.00) back from Match Shot.

5. Receipt # 52938 from Sparky*s Gun Shop, dated 9/4/00, showing Beretta Tomcat (3032) # DAA175590 traded in for a Bushmaster XR-15; and

6. Receipt from Wayne*s Weaponry, dated 5/12/03, paying Mr. Lewis two hundred dollars ($200.00) for Smith & Wesson 19 # 14K5390 (NOT "5340").

I trust this resolves the status of the above firearms. If you have

following firearms:

Sig Sauer pistol, model 239, .40 caliber, s/n SA4-84443.

      Sold to Sparky's Gun Shop in Webster on 9/13/01.

Glock pistol, .40 caliber, s/n 8UB299US.

      Check the serial number. I show this gun, # BUB (not "8U
      as being sold to Match Shot in Gardner; no date on pape1

H&K pistol, model USP Compact, .45 caliber, s/n 29-006531.

      Sold in a private transfer to Clarence Plant, Jr. on EA-
on
10/12/03.

Glock pistol, model 19, 9mm caliber, s/n MZC91US.

      Sold to Sparky's Gun Shop, Webster on 4/3/02.

Beretta pistol, model 3032 [Tomcat], .32 caliber, s/n DAA175590.

      Sold to Sparky's Gun Shop on 9/4/00.

Smith and Wesson revolver, model 640, .38 caliber, s/n BPH1681.

      Sold to Match Shot in Gardner; no date on paperwork
      (part of sale w/ .40 Glock).

Smith and Wesson revolver, model 19, .357 caliber, s/n 14K5340.

      Check the serial number. I show # 14K5390, not 5340, as
      to Wayne's Weaponry in West Boylston on 5/12/03. Note th
      number matches that on the purchase EA-10, #F605923.

While I have not received copies of the paperwork, my client inj
that the following firearms were sold to Match Shot in Gardner;

      Dan Wesson pistol, model Pointman, .45 caliber, s/n HC0(

      Browning pistol, model Hi-Power, 9mm caliber, s/n 245NX5

      Colt pistol, model 1991A1, .45 caliber, s/n 2737038.

Please note that the Bushmaster XR-15 was NOT on the list you se
Attorney Arbabi; it was added to your list later. My client usec
earlier list, and did not provide me with the disposition of thi
rifle.
As it is not a .38, a .40, or even a handgun, it is not a firea1
inquired about during your September 26, 2003 interrogation of r
client.


I will follow up on this gun and provide you with an update wher
the details. Should you require anything further, please feel f1
call.

Very truly yours,

Keith G. Langer

# EXHIBIT B

DEP    MENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
**REPORT OF INVESTIGATION**

Page 1 of 2

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-05<br>Report 024 |
|---|---|

| TITLE OF INVESTIGATION:<br>Samuel Lewis | |
|---|---|

| CASE NUMBER:<br>762080-03-0016 | REPORT NUMBER:<br>24 |
|---|---|

TYPE OF REPORT: *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | | COLLATERAL REPLY |
|---|---|---|---|---|
| | REPORT OF INTELLIGENCE | | | |

| SUBMITTED BY *(Name)*<br>Debora A. Seifert | SUBMITTED BY *(Title and Office)*<br>Special Agent, Worcester Field Office | SUBMITTED BY *(Date)*<br>12/21/2004 |
|---|---|---|
| REVIEWED BY *(Name)*<br>Michael P. Curran | REVIEWED BY *(Title and Office)*<br>Acting Resident Agent in Charge, Worcester Field Office | REVIEWED BY *(Date)*<br>12/21/04 |
| APPROVED BY *(Name)*<br>William J. Hoover | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Boston Field Division | APPROVED BY *(Date)*<br>1/3/05 |

**DESCRIPTION OF ACTIVITY:**
Proffer with Clarence PLANT.

**SYNOPSIS:**
On Wednesday, December 15, 2004, ATF Special Agent Debora Seifert, FBI Special Agent John Van Kleef and Assistant United States Attorney Stephanie Siegmann attended a proffer session for Clarence PLANT, who was present with his attorney Peter Ettenberg. PLANT'S wife, Angela PLANT was also present for the proffer session, which took place in a conference room in the United States Attorney's Office in Worcester.

**NARRATIVE:**

1). On Wednesday, December 15, 2004, ATF Special Agent Debora Seifert, FBI Special Agent John Van Kleef and Assistant United States Attorney Stephanie Siegmann attended a proffer session for Clarence PLANT, who was present with his attorney Peter Ettenberg. PLANT'S wife, Angela PLANT was also present for the proffer session, which took place in a conference room in the United States Attorney's Office in Worcester.

In addition to information already provided to law enforcement, PLANT offered the following information during the course of the proffer session to the Agents and AUSA Siegmann:

Plant met Samuel LEWIS in high school, but knew LEWIS'S brother, Sean LEWIS, before he knew Sam. Beginning in 2002, PLANT would often go to shooting ranges with LEWIS approximately two to three times a month, but after the "problems with ATF" started and LEWIS'S firearms license was revoked,

01/21/05   15:47 FAX 1 508 793 0271     BUREAU OF ATF                                    @003/003

DEF    'MENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
**REPORT OF INVESTIGATION**

| | | |
|---|---|---|
| | | Page 2 of 2 |

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge | Boston Field Division |
| Boston Field Division | FY-05 |
| | Report 024 |

| TITLE OF INVESTIGATION: |
|---|
| Samuel Lewis |

| CASE NUMBER: | REPORT NUMBER: |
|---|---|
| 762080-03-0016 | 24 |

PLANT could not recall if he continued to shoot with LEWIS. At the time LEWIS lost his firearms license PLANT recalled LEWIS had approximately four to five firearms still in his possession. PLANT recalled most of the weapons went to LEWIS'S brother's house. LEWIS eventually sold the firearms to an FFL in Gardner, but PLANT recalled in possibly October of this year, LEWIS brought one more firearm, a shotgun, to Wayne's Weaponry in West Boylston. PLANT stated he was with LEWIS when LEWIS brought the gun to Wayne's were it was traded for a .22 pistol. PLANT stated the .22 was for his use and was to belong to him. PLANT stated the .22 pistol is still at Wayne's, because approximately $100.00 is still owed to Wayne's for the trade before PLANT can bring the weapon home. PLANT stated LEWIS wanted a receipt for the trade from Wayne's.

PLANT recalled when he went to shooting ranges with LEWIS they would both put in money to split the cost of the ammunition. PLANT also recalled when it came time for LEWIS to purchase the guns for PLANT, LEWIS chose Sparky's Gun Shop, because they had good prices. PLANT stated he always paid LEWIS in cash for the guns. PLANT stated he used ATM's in either Worcester or Webster when he would retrieve money to pay LEWIS for the guns. PLANT recalled he and LEWIS attempted to be inconspicuous when LEWIS filled out the paperwork in Sparky's. PLANT recalled the Bushmaster was purchased on a lay-a-way plan at Sparky's and PLANT made approximately four payments over time to LEWIS for the Bushmaster Rifle. PLANT was always with LEWIS when a payment was made on the rifle. Plant believed on October 30, 2002 he made a first withdrawal from an ATM for the Bushmaster, which he recalled was approximately $200.00.

PLANT recalled LEWIS lived at Great Brook Valley with his family during the period LEWIS purchased the guns for PLANT. PLANT recalled LEWIS kept a gun safe at his Great Brook Valley residence. PLANT recalled LEWIS would often wear a bullet proof vest when they went shooting.

PLANT stated LEWIS is dedicated to his Muslim religion, however, he would not describe him as an extremist. PLANT stated he knows a man named "AMIR", who sold scented incense in Worcester, hung out at the Mosque and who he further described as "joyful".

Lewis Discovery
U.S. 111

ATF EF 3120.2 (5-98)

# EXHIBIT
# C

11/22/04  15:45 FAX 1 508 793 0271      BUREAU OF ATF                                      ☒003

DEPART    T OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**REPORT OF INVESTIGATION**

Page 1 of 4

U. S. 040

DDRESSED TO:
Special Agent in Charge
Boston Field Division

MONITORED INVESTIGATION INFORMATION:
Boston Field Division
FY-04
Report 012

TTLE OF INVESTIGATION:
Samuel Lewis

CASE NUMBER:
762080-03-0016

REPORT NUMBER:
12

TYPE OF REPORT: *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | | COLLATERAL REPLY |
|---|---|---|---|---|
| | REPORT OF INTELLIGENCE | | | |

| SUBMITTED BY *(Name)* | SUBMITTED BY *(Title and Office)* | SUBMITTED BY *(Date)* |
|---|---|---|
| Michael P. Curran  *Michael P. Curran* | Special Agent, Worcester Field Office | 03/10/2004 |
| REVIEWED BY *(Name)* | REVIEWED BY *(Title and Office)* | REVIEWED BY *(Date)* |
| Jane E. Heffner  *Janetteffe* | Resident Agent in Charge, Worcester Field Office | 3-11-04 |
| APPROVED BY *(Name)* | APPROVED BY *(Title and Office)* | APPROVED BY *(Date)* |
| William J. Hoover  *Janetteffe* | Special Agent in Charge, Boston Field Division | 3-11-04 |

**DESCRIPTION OF ACTIVITY:**
Interview of Angela Mangrum

**SYNOPSIS:**
On March 9, 2004, Special Agents Michael Curran and Eric Kotchian interviewed Angela Mangrum, date of birth May 11, 1974, social security number 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, at her residence located at 36 John Street, apartment 3, in Worcester, MA.

**NARRATIVE:**

1) On March 9, 2004, Special Agents (S/As) Michael Curran and Eric Kotchian interviewed Angela Mangrum at her residence in Worcester, MA regarding her knowledge of Samuel LEWIS and his possession and purchasing of firearms. Mangrum is the former wife of Samuel LEWIS. During the interview, Mangrum provided the following information to investigators:

2) Mangrum is employed as an emergency room nurse and nurse manager.

3) Mangrum and Samuel LEWIS met while they were growing up in Worcester and they attended South High School in Worcester together. In 1996, LEWIS and Mangrum married, and permanently separated in approximately 1998. Shortly after their separation, a divorce was finalized. Mangrum has maintained primary custody of their two children, and LEWIS has visitation with them on weekends. LEWIS and Mangrum have an agreement in which LEWIS pay $400 a month child support, but Mangrum stated that he is often late with child support payments. Mangrum also stated that there was a period of time that LEWIS

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF INVESTIGATION

Page 2 of 4

U.S. 041

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge | Boston Field Division |
| Boston Field Division | FY-04 |
| | Report 012 |

TITLE OF INVESTIGATION:
Samuel Lewis

| CASE NUMBER: | REPORT NUMBER: |
|---|---|
| 762080-03-0016 | 12 |

did not make child support payments when he had financial difficulty. Mangrum has since remarried, and lives with her new husband. Mangrum has to work extra hours because LEWIS is not consistent with his child support payments.

4) Before LEWIS and Mangrum became separated, LEWIS talked about getting a firearms permit, and Mangrum believes he ultimately received a license in 1998 or 1999. Mangrum does not know how many firearms that LEWIS has purchased, but would be surprised if it were many at all because LEWIS never has money for child support. LEWIS recently told Mangrum on one occasion that he was carrying a firearm on his person while he was in her house, and she asked him not to bring firearms into her house. Mangrum also stated that LEWIS is interested in weapons such as swords.

5) Until recently, LEWIS was living at the Great Brook Valley Housing Development in Worcester with his "wife" Pamela Cortez. Mangrum does not think LEWIS and Cortez are legally married. LEWIS, Cortez, and their children moved to another location several months ago, where they live in a basement. Mangrum knows that LEWIS' mother lives in an old age home on Evelyn Street in Worcester. LEWIS will sometimes use his mother's address as his residence, but he does not live with her. Mangrum believes that LEWIS does this because Cortez is on welfare.

6) Mangrum said that LEWIS would sometimes become physically confrontational with her, and would push and shove her. This abuse is one of the reasons Mangrum left LEWIS. After their separation, LEWIS would stand outside of Mangrum's residence and watch who came in and out of her apartment. Mangrum stated that she was very close to getting a restraining order, but never did.

7) Mangrum still has contact with LEWIS, but only talks with him because of the children they have together.

8) In approximately 1997, LEWIS became converted to the Muslim faith. LEWIS converted to Muslim at a time when LEWIS and Mangrum were separated. LEWIS attends services at the Mosque on Laurel Street in Worcester, near Plumley Village. LEWIS also has attended service at a Mosque in Rhode Island, off of route 146. Mangrum stated that LEWIS would often go with other Muslims to other states to spread the word of Islam. One of the Muslims LEWIS would travel with was an older male from Somalia, who had a wife from Venezuela.

9) Mangrum attended services at the Mosque in Worcester several times with her husband. When she attended services, Mangrum was required to shroud her face. Mangrum described some of the other people attending the Mosque as normal people and others as "weird". Mangrum also stated that she saw some younger people at the Mosque who she described as "hoodlum types". Mangrum said that she was surprised that the people of the Mosque would allow people dressed like that to attend.

10) Mangrum began having marital problems with LEWIS when he converted to the Muslim faith. Mangrum feels that LEWIS' views are becoming more and more radical and extremist as time goes on.

|  | DEPARTMENT OF THE TREASURY BUREAU OF ALCOHOL, TOBACCO AND FIREARMS REPORT OF INVESTIGATION |  | Page 3 of 4 |
|---|---|---|---|

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 012 |
|---|---|

| TITLE OF INVESTIGATION:<br>Samuel Lewis |
|---|

| CASE NUMBER:<br>762080-03-0016 | REPORT NUMBER:<br>12 |
|---|---|

11) Mangrum stated that she works with Muslims in the medical profession who act like ordinary people. Mangrum stated that she believes that LEWIS is very radical and extremist in his views, which is different than the other Muslims that Mangrum knows from work. Mangrum stated that LEWIS is "insane" about his religion and has weird values. Mangrum added that she felt that LEWIS has become more anti-government over the last three years Mangrum believes this about LEWIS because of the things he has said. LEWIS has told Mangrum about a "Jihad" and that he will someday die in. LEWIS told Mangrum that he would like to die in a Jihad because it would get him to heaven. LEWIS has told Mangrum that the United States government likes to pick on Muslims and harass them because of their beliefs. LEWIS has also told Mangrum that one-day all Muslims will be called back to Mecca. Mangrum does not think that LEWIS would ever hurt any innocent people. Mangrum also added that LEWIS might not consider a "caffer", which is a non-believer, to be an innocent person. LEWIS also uses the name "Shaheed", which is a Muslim name meaning "Martyr". LEWIS' views have made Mangrum very uneasy. Mangrum also feels it would be very easy for someone to influence LEWIS. LEWIS would often go to the Mosque early and said he was doing so to "learn Arabic".

12) In approximately Spring 2003, LEWIS traveled to the Middle East, either to Somalia or Syria, for approximately 1 month. LEWIS went to visit a friend of his in the Middle East, but Mangrum does not remember his name. Upon returning, LEWIS told Mangrum that he had an "awakening" while overseas and that the people in the Middle East hate America. Mangrum does not know how LEWIS paid for his trip. LEWIS often talks of wanting to travel to the Middle East and living there. Mangrum is concerned about LEWIS taking her two children out of the country. LEWIS has said that if he moves to the Middle East, he would like to take the children with her.

13) LEWIS is a friend with Clarence PLANT, who is working at Stop and Shop Supermarket in Worcester. LEWIS introduced PLANT to the Muslim faith. Mangrum does not know if PLANT and LEWIS are still close.

14) Mangrum stated that the name "Malik" was familiar to her but that she did know from where. Mangrum believes it may be the name of one of LEWIS' Muslim friends.

15) Mangrum has heard that LEWIS obtained a degree from Clark University and is working as a type of a teacher.

16) Pamela Cortez, the woman LEWIS lives with, is now pregnant.

17) After the interview was concluded, Mangrum called S/A Curran at the Worcester ATF Office and provided the following:

18) LEWIS' cellular telephone number is (774) 232-1400.

11/22/04  15:46 FAX 1 508 793 0271    BUREAU OF ATF    ☒008

|  | DEPART      NT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>**REPORT OF INVESTIGATION** | Page 4 of 4 |
|---|---|---|

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 012 |
|---|---|
| TITLE OF INVESTIGATION:<br>Samuel Lewis | |
| CASE NUMBER:<br>762080-03-0016 | REPORT NUMBER:<br>12 |

U. S. 043

19) Approximately 1-2 years ago, LEWIS and Pamela Cortez took Mangrum's two children to Canada to visit other Muslims. LEWIS did not ask Mangrum for prior permission to do this.

20) LEWIS' mother will lie for LEWIS.

21) LEWIS has taken Mangrum's young son Nathan shooting with him without asking Mangrum for permission.

22) Mangrum stated that when she was married, LEWIS and her socialized with other Muslims in Leominster, Massachusetts. These people are named Andrew Frederick and "Kadisha" Mangrum learned that Frederick drifted away from LEWIS because he did not approve of LEWIS' radical views. When Frederick heard that Mangrum was separating from LEWIS, he told Mangrum that he was upset she was leaving the faith because people like LEWIS give Muslim a bad name. Mangrum thought that Frederick had moved out of state, but recently saw him in the Worcester area.

# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          CRIMINAL NO. 05-40001-FDS
                                  )
SAMUEL J. LEWIS                   )

AFFIDAVIT OF WINFRED MEADOWS-MARQUEZ IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

I, Winfred Meadows-Marquez, do hereby depose and state the

following:

1.   I am an investigator employed by the Federal Defender
     Office for the District of Massachusetts.  I have been
     so employed since 1999.  I am admitted to the practice
     of law in Massachusetts and Puerto Rico.

2.   I assisted in locating and interviewing an individual
     referred to in discovery in this case as the
     confidential informant ("CI").  This interview took
     place at the Worcester County House of Correction where
     the CI was serving a sentence.  I am aware that the CI
     also has a criminal record in Connecticut.

3.   During the interview, the CI admitted that he worked as
     a CI for the Drug Enforcement Administration and the
     Bureau of Alcohol, Tobacco, and Firearms.  He
     identified ATF Special Agent Michael Curran as the
     agent to whom he had supplied information about Samuel
     Lewis.

4.   The CI revealed that his former wife is the present
     wife of Samuel Lewis.  He confirmed that he had a
     daughter who was in the custody of his former wife and
     Samuel Lewis.  He stated that in the later part of
     2004, he would occasionally pick up his daughter for
     parental visits with him.

5.   When confronted with the information contained in ATF
     Reports of Investigation, the CI revealed that he had
     met Samuel Lewis on a few occasions while picking up
     his daughter for parental visits.

6.   The CI stated that all of the information contained within the ATF Reports of Investigation was information obtained from his daughter.

7.   He further stated that he had no information that Samuel Lewis was involved in terrorism, nor did his daughter ever disclose that Samuel Lewis intended to engage in terrorist acts.

Signed under pains and penalties of perjury this _17th_ day of March, 2006.

Winfred Meadows-Marquez

-2-

# EXHIBIT
# E



Department
of the Treasury



Bureau of
Alcohol, Tobacco
and Firearms

# ORDER

O 3210.7B

June 28, 1989

(Includes chgs. 1 —

---

INVESTIGATIVE PRIORITIES, PROCEDURES, AND TECHNIQUES



---

Distribution: ML-4                                          OPI: LE:P:PP

## CHAPTER D.  INFORMANT DEVELOPMENT, USE, AND CONTROL

31. <u>POLICY ON THE USE OF INFORMANTS</u>.  It is the policy of the Bureau to use
informants to assist in the investigation of criminal activity.  Since the
use of informants is a sensitive matter and will require the association of
our special agents with persons whose motivations may be suspect or
ultimately challenged by courts, this investigative technique should be
carefully controlled and closely monitored.  The proper use of informants
requires that individual rights not be infringed and that the Bureau conduct
itself within the parameters of ethical and legal law enforcement behavior.

32. <u>INFORMANT DEFINED</u>.

   a.  Informants are defined as persons who assist enforcement efforts by
   providing information and/or lawful services which otherwise might not be
   available in return for money or some other specific consideration.  The
   information or services provided must have specific investigative or
   general intelligence value in enforcing laws and regulations within Bureau
   responsibility.

   b.  Informants, in addition to providing information, may be expected to
   participate in investigations or testify in open court, if required.
   They may also expect that their identity will not be disclosed, except
   with their approval.

   c.

33. <u>EVALUATION OF INFORMANTS</u>.  All reasonable efforts should be made to ensure
that information provided is reliable and that the informant will not
jeopardize the success of the enforcement mission.  Prior to committing
substantial resources or taking significant enforcement action based upon
information provided by an informant of unknown or untested reliability,
the special agent should first:

   a.  Gather all available background records, names of associates, employment
   history, family ties, names of friends, etc.

   b.  Verify the reliability of any information provided to other law
   enforcement agencies if doing so would not compromise the informant
   or the investigation.

   c.  Consider the informant's sources and means of securing information,
   if possible.

   d.  Determine any possible motives the informant may have for providing
   false or misleading information.

   e.  Consider any other factor the special agent thinks will bear on the
   informant's credibility.

   f.

ATF O 3210.7B
JUN 2 8 1990

(12

(13

(14

(15

g.  The SAC must query TECS and NCIC, and request an FBI criminal record check
through the computerized criminal history facilities prior to approving a
request for use of a prospective informant.  (See ATF H 3520.1A, TECS
Operator Handbook, pages 26-27.)  If the computerized criminal history
query is negative, the SAC will then request an FBI record check by mail.

Page 19