UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES of AMERICA | ) |
|  | ) |
| v. | ) |
|  | ) Criminal No. |
|  | ) 05-40001-FDS |
| SAMUEL J. LEWIS, | ) |
| a/k/a SHAHEED LEWIS, | ) |
|  | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO DISMISS AND FOR FURTHER DISCOVERY**

**SAYLOR, J.**

This is a prosecution of defendant Samuel J. Lewis for making false statements in connection with the purchase of firearms in violation of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A). Defendant is an African-American who has converted to the Muslim faith. Defendant has moved to dismiss the indictment on grounds of selective prosecution and, in the alternative, for discovery and an evidentiary hearing on the government's decision to prosecute. For the reasons set forth below, the motion will be denied.

**I.     Background**

    **A.     The Regulatory Scheme**

The National Firearms Act ("NFA") requires that firearms be properly registered with the federal government. 26 U.S.C. § 5861; 27 C.F.R. Ch. II, Subch. B, Pt. 478, Subpart H. An individual purchasing a firearm from a federally licensed dealer in an intrastate, over-the-counter transaction must complete ATF Form 4473 (Firearms Transactions Record). 27 C.F.R. § 478.124. Form 4473 requires the transferee to provide his or her name, sex, residence address,

date and place of birth, height, weight, race, country of citizenship, INS-issued alien number or admission number, and state of residence, and a certification that he is not prohibited from transferring or receiving a firearm in interstate or foreign commerce. *Id*. at § 478.124(c)(1). Form 4473 also requests optional information, including the transferee's social security number. *Id*. at § 478.124(c)(2).  The transferee must answer questions regarding his eligibility to possess firearms lawfully, including whether he is currently charged with a crime; has been convicted of a felony; is addicted to or unlawfully uses controlled substances; or has ever been adjudicated mentally defective.  Finally, the transferee must sign the form certifying that the information provided is true and correct and that he is the actual buyer of the firearm.

The NFA requires an additional step for firearms deemed inherently dangerous, such as machine guns and short-barreled rifles and shotguns.  A transferee of such a firearm must complete ATF Form 4, which is an application for a tax-paid transfer and registration of firearms.  With the application, the transferee must submit a full set of fingerprints and pay a tax. 26 U.S.C. §§ 5811, 5812.  Form 4 requires that the transferee provide similar information as that required by Form 4473, including identifying information, the transferee's eligibility to lawfully possess firearms, and the transferee's declaration under penalties of perjury that the information provided is true, correct, and complete.  The application is submitted for approval to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

Knowingly making a false written statement in connection with the acquisition of a firearm is a felony.  18 U.S.C. § 922(a)(6).  An individual convicted under this statute is subject to a term of imprisonment not to exceed ten years.  18 U.S.C. § 924(a)(2).  Knowingly making a false statement or representation with respect to information provided in ATF Form 4473 is also

a felony. 18 U.S.C. § 924(a)(1)(A). A conviction under this statute authorizes a term of imprisonment of up to five years. Finally, knowingly making a false entry on ATF Form 4 is a felony under 26 U.S.C. §§ 5861(l) and 5871.

### B. The Government's Investigation

#### 1. The Initiation of the Investigation

In August 2003, ATF, in conjunction with the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF"), commenced an investigation of Lewis. According to the government, the investigation revealed that Lewis had purchased 32 firearms between November 2000 and October 2003 and that he made false statements in connection with the acquisition of 16 of those firearms.

#### 2. The Firearms Purchases

According to the government, between November 2000 and October 2003—a period during which he was mostly unemployed and receiving public assistance—Lewis purchased 32 firearms. Three of the 32 firearms (a Beretta pistol, a Browning pistol, and a Glock pistol) have not been located or otherwise accounted for.

The government alleges that Lewis provided false residential addresses in connection with his acquisition of 16 of those firearms. On August 1 and 9, 2002, Lewis falsely reported his address on two Forms 4473 as 2 Fairlawn Drive, Worcester, MA 01602. This was the address of a house that he had rented from December 1999 to December 2001, but at which he no longer resided.

Between October 2002 and September 2003, Lewis resided with his second wife and three children in Worcester public housing at 236 Constitution Avenue. On 14 occasions

between November 14, 2002, and September 17, 2003, Lewis falsely reported his address on Forms 4473 as 59 Evelyn Street, Worcester, MA. He provided three different zip codes (01602, 01607, 01609) in conjunction with the Evelyn Street address. The address is a large apartment building for the elderly and disabled in which Lewis's mother resides.[1]

In two of the transactions (one involving an H & K pistol on August 9, 2002, and one involving a Bushmaster rifle on January 21, 2003), Lewis also falsely represented that he was the actual buyer of the firearms, when he in fact purchased the firearms for Clarence Plant, a friend who did not possess a federal firearms license.[2]

### 3.   The Evidence of a Possible Terrorism Connection

As a result of interviews conducted between October 2003 and December 2004, ATF and JTTF learned the following information about Lewis.

First, Lewis's ex-wife, Angela Mangrum, stated that Lewis converted to Islam in 1997; that he had become more anti-American over the past three years; that he had expressed his intent to die in a jihad (or holy war) so that he could go to heaven; that he traveled to either Syria or Somalia for one month in the spring of 2003; and that he had expressed interest in moving to the Middle East. She also informed investigators that Lewis used the first name "Shaheed," a Muslim word meaning, among other things, "martyr."[3]

Second, a confidential informant, who was a close associate of Lewis and his family at

---

[1] According to the government, Lewis falsely claimed to law enforcement officers in a follow-up interview that he resided at 59 Evelyn Street.

[2] Plant is also an African-American who has converted to Islam. He has not been prosecuted in connection with the firearms purchases at issue.

[3] Lewis's use of "Shaheed" was confirmed by other interviewees, including Clarence Plant.

the time, reported that Lewis planned to move overseas to a country where there was a "war" or a "crisis."[4]

Third, ATF learned from the Diplomatic Security Service that Lewis was issued a new passport after reporting it lost in 2001. According to ATF, reporting one's passport as lost is one tactic for obtaining a "clean" passport after traveling to countries linked to terrorism-related activities.

Finally, Lewis was observed by a firearms instructor named Andrew Davis engaging in shooting exercises with a high velocity weapon at a facility in West Boylston, Massachusetts. Davis reported that he approached Lewis to warn him and his two associates of the danger of shooting a high velocity weapon in close proximity to a building, and to ask him if the rifle he was using was registered with ATF. Lewis responded with threats and warned Davis that he should "watch his back" and that Davis "didn't know who he was fucking with."[5]

### C. The Indictment

On January 5, 2005, the Grand Jury returned an indictment charging Lewis with five counts of making a false written statement in connection with the acquisition of a firearm from a licensed firearm dealer in violation of 18 U.S.C. § 922(a)(6) (Counts 1, 3, 6, 12, and 15), fifteen counts of making a false statement on ATF Form 4473 in violation of 18 U.S.C. § 924(a)(1)(A) (Counts 2, 4-5, 7-11, 13-14, and 16-20), and one count of making a false statement on ATF Form 4 in violation of 26 U.S.C. § 5861(1) (Count 21).

---

[4] According to the government, this informant has on other occasions provided credible information to the DEA that led to a large seizure of contraband and subsequent indictments.

[5] Davis also relayed his belief, apparently based on hearsay, that Lewis belonged to an "anti-government" group; the basis for that belief, if any, is not revealed in the record.

## II. Analysis

### A. The Applicable Legal Standard

Under the United States Constitution, the executive power is vested in the President of the United States. U.S. Const. art. II, § 1. That executive power includes, among other things, the general power to determine which laws to enforce and against whom to enforce them. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Wayte v. United States*, 470 U.S. 598, 607 (1985). Specific prosecutorial authority is committed by law to the Attorney General and United States Attorneys. 28 U.S.C. §§ 503, 509, 547.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see United States v. Goodwin*, 457 U.S. 368, 380 n.11 (prosecutor has "broad discretion" to select the charges against an accused). Furthermore, the "decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. As the Supreme Court has explained:

> Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Id*. Judicial inquiry of prosecutorial decisions also threatens "the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id*. (quoting *Wayte*, 470 U.S.

at 607).

Although prosecutorial discretion is broad, "it is not 'unfettered.'" *Wayte*, 470 U.S. at 608 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). Prosecutorial selectivity in the enforcement of criminal laws is subject to constitutional restraints, and thus "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Nonetheless, the Supreme Court has repeatedly stated that the standard of proving selective prosecution claims "is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 489 (1999) (citing *Armstrong*, 517 U.S. at 463-65).

To overcome the presumption of prosecutorial good faith, the defendant must prove by "clear evidence" that the decision to prosecute (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose. *Armstrong*, 517 U.S. at 465; *Wayte*, 470 U.S. at 608; *see United States v. Magana*, 127 F.3d 1, 8 (1st Cir. 1997) (to prove selective prosecution, defendant must demonstrate by clear evidence "both that she has been singled out for prosecution when others similarly situated have not been prosecuted and that the prosecutor's reasons for doing so were impermissible.") (citations omitted). In order to prove discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted; in the words of the Supreme Court, the "required threshold" is "a credible showing of different treatment of similarly situated persons." *Armstrong*, 517 U.S. at 470.

Under some circumstances, a defendant may be entitled to discovery or an evidentiary

hearing on the issue of selective prosecution. If the defendant makes "a credible showing of different treatment of similarly situated persons," he may obtain discovery as to selective prosecution issues. *Id.*; *accord United States v. Bass*, 536 U.S. 862, 863 (2002). If the defendant "alleges facts that tend to show that [he] has been selectively prosecuted and that raise a reasonable doubt about the propriety of the government's purpose, then [he] is entitled to an evidentiary hearing unless the government 'puts forward adequate countervailing reasons to refute the charge and . . . the court is persuaded that the hearing will not be fruitful.'" *United States v. Graham*, 146 F.3d 6, 9 (1st Cir. 1998) (quoting *United States v. Goldberg*, 105 F.3d 770, 776 (1st Cir. 1997)).

The Court must be mindful, however, that discovery itself "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468.

### B.     Defendant's Claim of Selective Prosecution

Defendant here contends that he has been selectively prosecuted based on his race (African-American) and his religion (Muslim). His theory of selective prosecution has three principal components: he contends (1) that no other defendant has been prosecuted in the District in the last three years for similar conduct; (2) that large numbers of white, non-Muslim individuals have been similarly situated and have not been prosecuted; and (3) that "adherence to the U.S. Attorney's own guidelines and publicly stated policies would ordinarily result in declination" of the prosecution of Lewis.

In support of the first proposition, defendant has submitted an analysis of all defendants

who have been convicted of violations of 18 U.S.C. § 922(a)(6) and § 924(a)(1)(A) in the District of Massachusetts over the past three years.[6] Defendant contends that he is the only defendant in that group who has been charged with violations of both § 924(a)(1)(A) and § 922(a)(6); that in every other prosecution, the buyer was either a convicted felon or knew that the ultimate recipient of the weapon was a convicted felon, neither of which factors is present here; and that in most instances, the prohibited person "had a significant and serious criminal history that included crimes of violence or drug trafficking offenses."

In support of the second proposition, defendant has submitted an analysis that purports to estimate that in the calendar years 2002 and 2003, there were 335 investigative referrals to local ATF offices in the District of Massachusetts for misrepresentations on ATF Form 4473. Defendant contends that, according to statistical probabilities, 285 of those 335 were likely to be white and 276 were likely to be self-identified Christians; none of them were prosecuted.[7]

In support of the third, defendant has submitted a report from the Department of Justice Office of the Inspector General indicating that decisions by United States Attorneys not to prosecute Brady Act violations "generally" were based on lack of jury appeal, taking into account factors such as the age of the prior conviction and the lack of subsequent criminal activity; the fact that the prior conviction was a nonviolent crime; or the fact that the person was prohibited from purchasing a firearm for noncriminal reasons.

In addition, defendant argues at some length that the government's allegations of a "possible terrorism connection" is spurious, based largely on the timing of the indictment (the

---

[6] Defendant also included one pending prosecution for violations of § 922 (a)(6).

[7] Only 1.3 were likely to be self-identified Muslims.

indictment occurred nine months after the last witness interview, and thus the prosecution did not reflect any particular urgency) and the alleged lack of reliability of the witnesses (who included Lewis's ex-wife and a confidential informant with a "specific adversarial relationship with Lewis").  Finally, defendant argues that the government essentially admits that its prosecution of Lewis is "unique" and "unprecedented,"[8] and is based on "inconsistent" and "shifting" factual rationales.[9]

### C. Whether the Defendant Has Raised a Reasonable Doubt Concerning the Propriety of the Prosecution

Defendant contends that he has produced "clear evidence" sufficient to meet his burden of proving selective prosecution.  Defendant cannot, however, make the more limited showing necessary to establish a right to discovery and an evidentiary hearing, and therefore cannot meet the demanding burden necessary to prove selective prosecution outright.

As noted, for the defendant to obtain discovery, he must make a credible showing of different treatment of similarly situated persons.  To obtain an evidentiary hearing, he must set forth facts that tend to show that he has been selectively prosecuted and raise a reasonable doubt about the propriety of the government's purpose.  Here, the Court is not persuaded either (1) that

---

[8] Defendant's claim in this regard is based on the following passage in the government's opposition memorandum:

> The fact that an office of limited resources has historically only chosen to prosecute certain false statements does not prohibit that same prosecutorial office from re-evaluating its past practices in light of changing historical circumstances, concerns for deterrence and incapacitation, new enforcement priorities, and the particular facts of particular cases.

Gov. Mem. at 20.

[9] In essence, defendant contends that the government is aware that Lewis is not a "large firearms purchaser" because he never possessed large numbers of weapons at a single time, and that the government has offered no evidence of its efforts, if any, to locate the three unaccounted for firearms.

defendant has made the requisite "credible showing" or (2) that the facts tend to show selective prosecution and that the requisite reasonable doubt has been raised.

Defendant's argument is built principally, although not exclusively, on statistical evidence. He contends that his two statistical analyses demonstrate that there are similarly situated white, non-Muslim individuals who have not been prosecuted for the same offenses, which (together with the other evidence) is sufficient to establish a prima facie case.

As a general matter, statistical evidence to prove selective prosecution must be viewed with considerable caution. *See Bass*, 536 U.S. at 864 ("raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*") (emphasis in original). Among other things, it may be very difficult to make an apples-to-apples comparison, given the great variety of circumstances that may lead to criminal prosecutions and the difficulty of comparing a single prosecution decision to multiple decisions by multiple prosecutors. *See McCleskey v. Kemp*, 481 U.S. 279, 296 n.17 (1987) (rejecting *Batson*-type standard for selective prosecution; "[r]equiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut contemporaneous a challenge to his own acts."). While it is true that defendant's statistical analyses attempt to analyze prosecutions for false statements in connection with the purchase of a firearm by race and religion, those studies are not sufficient to meet the necessary showing. At a minimum, those studies do not address two critical factors.

First, and most significantly, there is considerable evidence that the defendant poses a substantial danger of violence and a possible connection to terrorist activities. As noted, Lewis's ex-wife stated that he is physically confrontational; that he has become more radical and

11

extremist, and more anti-American, in the past several years; that he has stated that he wants to die in a jihad in order to get to heaven; that he traveled to Somalia or Syria for a month; and that he had begun to use the name "Shaheed," which means "martyr" in Arabic.  That information was corroborated by multiple sources, including a confidential informant (who reported that Lewis wanted to move to a country where there was a "war" or a "crisis"), Clarence Plant (who confirmed the use of the name "Shaheed"), and the Diplomatic Security Service (which indicated that Lewis reported a lost passport, which is a method of hiding suspicious travel).  Moreover, according to the government, the whereabouts of three of the firearms has not been determined.[10]

Defendant has not, of course, been charged with any terrorism-related offense. Nonetheless, the government contends that he is more dangerous than the usual caliber of defendant who has made a false statement to purchase firearms—conceivably, several degrees of magnitude more dangerous.  That fact, according to the government, caused law enforcement to take an interest in his activities, and ultimately contributed to the prosecution decision.

Second, there is evidence—indeed, probable cause to believe, given his indictment—that the defendant has committed 16 firearms offenses in a period of less than three years.  Again, the government contends that the large number of the offenses is not typical and contributed to the prosecution decision.

Thus, while defendant uses statistical analysis to attempt to establish that other, similarly situated non-African-Americans and non-Muslims were not prosecuted, he does not account for

---

[10] Lewis's conversion to Islam and his choice of an Arabic name are not irrelevant to that analysis.  While the government is not permitted to prosecute him because he has converted to Islam, it is not required to ignore that fact when considering his possible connections to terrorist or anti-American activities—particularly in light of the evidence that he has traveled to Middle Eastern countries with terrorist activities and expressed a desire to die in a jihad.  Likewise, his deliberate choice of name—which he, not his parents, selected—is a relevant fact that law enforcement may take into account in assessing the evidence against him.

two significant variables: defendants with possible terrorism connections and defendants who committed multiple offenses. There is not the slightest suggestion that (for example) white persons who were suspected of having a possible connection to terrorism, and who committed false statements in connection with a firearms purchase, have not been prosecuted; or that white persons who committed ten, fifteen, or twenty such false statements have not been prosecuted. For the statistics to bear any significance in this context, the persons to whom defendant compares himself must be "similarly situated." A white person who raises no concerns of links to possible terrorism, or who makes a single false statement, is simply not "similarly situated" to the defendant for purposes of determining selective prosecution. Or to put it another way, defendant appears to be uniquely situated, rather than similarly situated, to other violators of the firearms laws.[11]

    Defendant's other arguments add little weight to the statistical analysis. First, defendant's attacks on the motives and credibility of the government's witnesses cannot be given substantial credence at this stage of the proceedings, particularly given that the claims are corroborated by other evidence. Second, the OIG study simply concludes that "generally" cases without perceived jury appeal have not been prosecuted; at a bare minimum, that conclusion suggests that the government may bring prosecutions lacking such appeal in exceptional circumstances. Finally, the fact that the indictment was not returned for nine months after the last witness interview does not substantially undercut the government's asserted motives for prosecution.

---

[11] It should be emphasized that there is nothing inherently wrong or suspicious in a prosecution that is legally and factually unique. While the government may not, of course, single out a defendant for prosecution on race, religion, or other improper basis, it is not confined solely to routine prosecutions or well-worn statutory theories. Moreover, it is entitled to re-evaluate its priorities and adapt to new threats.

Accordingly, the Court concludes that defendant has not made a credible showing of different treatment of similarly situated persons, and that the evidence put forth by defendant does not tend to show selective prosecution and does not raise a reasonable doubt about the propriety of the government's purpose.  Defendant is therefore not entitled to discovery or an evidentiary hearing on the issue of selective prosecution.  Furthermore, defendant has not set forth "clear evidence" that any improper selective prosecution has occurred in this case entitling him to dismissal of the indictment.

**III.    Conclusion**

For the foregoing reasons, defendant's Motion to Dismiss and for Further Discovery is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: May 11, 2006