UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          CRIMINAL NO. 05-40001-FDS
                                  )
SAMUEL J. LEWIS                   )

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Defendant, Samuel Lewis, submits this memorandum to assist the Court in sentencing.  For the reasons that follow, defendant submits that the guideline sentencing range for the offenses of which he stands convicted is 0-6 months and the Court should sentence Lewis to time served and a three-year period of supervised release.  Alternatively, should the Court determine that the advisory guideline sentencing range is 41-51 months, departure from that range to a sentence of time served with supervised release to follow is warranted.  Finally, even if the Court finds that recognized grounds of departure do not support a sentence of time served, the Court should consider the sentencing factors contained in 18 U.S.C. § 3553(a) and find that a sentence of time served with a period of supervised release to follow is sufficient and not greater than necessary to satisfy the sentencing goals set forth in the statute.

**<u>INTRODUCTION</u>**

The facts underlying the Court's sentencing of Samuel Lewis have been extensively litigated throughout the pretrial and trial

phases of this case.  As has been the case throughout the
government's prosecution of Lewis, very little of the factual
basis is disputed.  Indeed, some common themes based on
undisputed facts run through this unique prosecution brought by
the United States Attorney's Office for the District of
Massachusetts:

- Throughout all of the firearms purchases, Lewis had no
  prior record, possessed a valid Massachusetts-issued
  license to carry firearms, and was legally permitted to
  purchase and possess firearms.

- Lewis purchased each of the firearms from Federally
  Licensed Firearms dealers and, with the exception of
  his residence address, accurately, completely, and
  truthfully completed ATF Form 4473.  These accurate and
  truthful answers included his full name, date of birth,
  social security number, citizenship, height, weight,
  and race, as well as questions designed to elicit any
  disabilities to firearms possession.

- The United States Attorney's Office for the District of
  Massachusetts has never before brought a prosecution
  based on the kind of de minimis conduct Lewis engaged
  in here.  In every other prosecution concerning false
  statements concerning gun transactions brought to
  conclusion by this USAO, the buyer was either himself a
  convicted felon with a substantial record or knew that
  the person on whose behalf s/he was purchasing the
  weapon had a substantial prior criminal record that
  prohibited him from purchasing weapons.  Indeed, the
  dearth of reported cases (and the government's
  inability to identify any cases) suggests that such a
  prosecution - a stand-alone charge alleging a false
  statement not having to do with a gun possession
  disability - has rarely if ever been brought in any
  district in the entire country.

- The United States Attorney's Office for the District of
  Massachusetts has never before brought a prosecution
  where it alleged the false statements under 18 U.S.C. §
  924(a)(1)(A).  Rather, it has always brought such
  prosecutions under 18 U.S.C. § 922(a)(6), which

requires an intent to deceive.  Again, the dearth of reported cases (and the government's inability to identify any cases) suggests that such a prosecution - a stand alone charge alleging a false statement not having to do with a gun possession disability - has rarely if ever been brought in any district in the entire country.

Through trial and the Presentence Report, the Court has learned that these offenses were committed by a responsible, committed family man whose life has been and will be irrevocably altered by virtue of this unprecedented prosecution by the United States Attorney's Office Anti-Terrorism Unit.

## ARGUMENT

**I.    THE SENTENCING COMMISSION DID NOT ENVISION THAT THE HIGH OFFENSE LEVEL DETERMINED BY THE PROBATION DEPARTMENT WOULD APPLY TO THIS OFFENSE AND INSTEAD CLEARLY INTENDED TO SET A BASE OFFENSE LEVEL OF SIX FOR THE TYPE OF CONDUCT ENGAGED IN BY LEWIS.**

The government, on the eve of trial, dismissed all of the counts that would have required it to prove an intent to deceive in connection with the residence address, effectively rendering the counts of conviction strict liability offenses as to the residence question.[1]  Thus, Lewis stands convicted under a statute that, until the government's prosecution of Lewis, was designed and generally reserved for record-keeping offenses committed by gun dealers.  Trial arguments aside, implicit in the

---

[1]The government proceeded to trial on two counts that required it to prove an intent to deceive in connection with transactions alleging straw purchase for Clarence Plant; Lewis was acquitted on both.

-3-

government's decision is the recognition that Lewis was not
seeking to hide his ownership of any of the firearms; nor has it
averred any evidence that the misrepresentations on the ATF 4473
forms were made for purposes of some underlying illegality.
Indeed, the undisputed evidence at trial is that Lewis was a gun
enthusiast who collected and responsibly handled his firearms as
a hobbyist.  Defendant submits that in the unusual facts
underlying the prosecution of this matter, the sentencing
commission intended the base offense level to be six (6).

U.S.S.G. § 2K2.1(b)(2) directs a base offense level of six
(6) if a defendant "possessed all ammunition and firearms solely
for lawful sporting purposes or collection, and did not
unlawfully discharge or otherwise unlawfully use such firearms."
The undisputed testimony at trial established that Lewis
purchased, traded, and kept all of the firearms at issue for
lawful sporting and collection purposes; the firearms were used
exclusively at target ranges following accepted and rigorous
safety practices.  Consequently, § 2K2.1(b)(2) directly applies
to Lewis's conduct in this offense.  See U.S.S.G. § 2K2.1,
comment. (n.7) (discussing factors relevant to the determination
of the so-called "sporting exception").

Section 2K2.1(b)(2), however, purports to make the sporting
exception unavailable if the offense involves a National Firearms
Act weapon.  While this provision nominally appears to apply to

this case in that one transaction, the purchase of the Mossberg, involved a National Firearms Act weapon, it is clear that the Sentencing Commission did not intend the result that the unavailability of the sporting exception creates in this case

The guideline amendment establishing both the base offense level and sporting exception prohibition for a National Firearms Act weapon was added in the 1991 amendment cycle to the Sentencing Guidelines.  The relevant portion of the amendment, which was eventually adopted as Amendment 374 to the guidelines, arose from a proposal by the Sentencing Commission Firearms and Explosives Materials Working Group (hereinafter "Working Group"). In developing the base offense level and sporting exception prohibition, the Working Group attempted to reconcile perceived disparate sentencing of defendants whose offenses involved more serious types of firearms but who were actually convicted under statutes not directly addressing N.F.A. weapons.  The Working Group wrote:

> Such a system poses an obvious potential for sentencing disparity.  Such disparity might be justified if N.F.A. included both serious and minor record-keeping violations, such that the exercise of prosecutorial discretion to distinguish between the two would be appropriate.  ATF, informs us, however, that with regard to possession of N.F.A. firearms . . . there are virtually no minor violations.

U.S. Sentencing Commission, Firearms and Explosive Materials Working Group Report, December 11, 1990 ("Working Group Report")

at 16 (emphasis supplied).  A copy of the Working Group Report as attached hereto as Exhibit A.

The case at bar is a case that is directly counter to the premise offered to the Working Group.  Lewis's purchase of the Mossberg, as was the case with every other firearm purchased by him, was accomplished through legally proper channels.  As Clarence Floyd's testimony demonstrated, it was Floyd - who specializes in the sale of National Firearms Act weapons - who walked Lewis through each and every step of the sale approval process, which included the requirement of a special background check, a waiting period, and specific dispensation from ATF.  As with all of the other firearms, the offense here does not concern a prohibition to owning the firearm; rather, the offense is quintessentially a minor violation of the record-keeping statute. Because the premise upon which the Working Group recommended categorical prohibition was based is false in Lewis's case, the resulting offense guideline and sporting exception prohibition cannot apply to him.

An application note to § 2K2.1 further reinforces the conclusion that the draconian base offense level nominally suggested by the guideline does not apply.  Application note five addresses §2K2.1(b)(7), the provision of the guideline that would apply to Lewis but for the Mossberg purchase even if the sporting

exception did not apply.  The application note recognizes and
addresses an anomaly in the guideline:

> Subsection (a)(7) includes the interstate
> transportation or interstate distribution of firearms,
> which is frequently committed in violation of state,
> local, or other federal law restricting the possession
> of firearms, or for some other underlying unlawful
> purpose.  <u>In the unusual case in which it is
> established that neither avoidance of state, local, or
> other federal firearms law, nor any other underlying
> unlawful purpose was involved, a reduction in the base
> offense level to no lower than level 6 may be warranted
> to reflect the less serious nature of the violation</u>.

U.S.S.G. §2K2.1, <u>comment.</u> (n.5).  Lewis's conduct here is exactly
the type of "unusual case" the Sentencing Commission sought to
address by this ameliorative application note.  Not only did
Lewis not try to avoid state, local or other firearms law, the
undisputed evidence at trial established that Lewis took
significant steps to seek and maintain proper licenses and
adhered to exemplary safety practices.

Defendant recognizes that the example given in the
application note specifically cites "interstate transportation or
interstate distribution of firearms," features not present in
Lewis's case.  Defendant submits however, that the principle is
identical and it would be anomalous to award the reduction
directed by the Sentencing Commission to an individual who
distributes weapons after taking the further step of crossing
state lines while denying the reduction to another who bought for
only personal, legitimate use.

In sum, defendant submits that the Sentencing Commission intended an offense level of six (6) to apply to the unusual circumstances of defendant's conduct and the Presentence Report should reflect that clear intention.

Given Lewis's complete lack of prior criminal record, an offense level of six (6) produces a guideline sentencing range of 0-6 months.  Defendant would therefore be eligible for probation without any incarcerative component.  Lewis, however, spent thirteen (13) days in custody before his release on conditions. Defendant therefore submits that a sentence of time served, with a period of supervised release, is appropriate.

**II.  REGARDLESS OF THE CALCULATED GUIDELINE SENTENCING RANGE, LONG-STANDING DEPARTURE PRINCIPLES WARRANT A SENTENCE OF TIME SERVED.**

    **A.  The Conduct Underlying Lewis's Conviction In This Case Is Atypical of the Heartland of Misconduct Covered by U.S.S.G. § 2K2.1.**

Even if the Court determines that the base offense level - and the draconian guideline sentencing range it brings with it - is nominally driven by the fact that a National Firearms Act weapon (the Mossberg) was involved in one of the transactions, defendant submits that the misconduct of misrepresenting his residence address is so far out of the heartland of misconduct covered by § 2K2.1 as to require departure to time-served.

The Sentencing Commission specifically envisioned that the district court would have departure authority to properly

-8-

sentence an individual in an "atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm." U.S.S.G. § 1A1.1, comment. Editorial Note 4(b). The Commission saw this departure provision as necessary, because inevitably there would be "unusual cases outside the range of the more typical offenses for which the guidelines were designed." Id. In the pre-Booker watershed decision, United States v. Koon, 518 U.S. 81 (1996), the Supreme Court cited § 1A1.1 to hold that district courts could consider the fact-bound circumstances of the misconduct at issue to determine whether that misconduct was atypical and thus out of the "heartland" covered by the specific guideline at issue. Id. at 100. In this case, Lewis's conduct, like the Koon defendants' conduct, constitutes an entirely different class of case from the wide range covered by the guideline.

> 1. **The De Minimis Conduct of Misstating the Residence Address Where An Individual Was Otherwise Lawfully Entitled to Purchase and Possess Weapons Is Not The Offense for Which § 2K2.1 Was Designed.**

Koon provides a highly useful analytic framework for Lewis's case. The high base offense level calculated by the Probation Department pursuant to § 2K2.1 clearly contemplates knowing illegal possession of a National Firearms Act weapon by an individual prohibited from possession of that weapon; the base offense level is a marked step up from possession of a firearm by

a prohibited person (which Lewis was not) including a convicted felon (which Lewis was not).  The base offense levels thus presume a knowledge element (being prohibited) with a willfulness aspect (nevertheless possessing a firearm) that is simply absent from Lewis's case.

Moreover, as described more fully in Section I, <u>supra</u>, the high guideline sentencing range nominally applicable to Lewis is driven by the operation of just one of the several transactions of which he stands convicted - the purchase of the Mossberg, a National Firearms Act weapon.  Lewis would otherwise face a base offense level of six after operation of the sporting exception and a guideline sentencing range of 0-6 months.  As the Working Group report conclusively shows, the Sentencing Commission did not contemplate that the guideline would operate on someone who attempted to purchase the weapon through legal channels as Lewis did.  Indeed, it appears that the Sentencing Commission did not believe, based on representations by the Bureau of Alcohol, Tobacco, and Firearms, that such a weapon could be legally possessed at all.  Additionally, as described above in Section I, the Sentencing Commission, apparently recognizing the potential broad reach of the guideline, clearly intended to carve out the minor kind of record-keeping violations that occurred here from the heartland of the guideline.  <u>See</u> U.S.S.G. §2K2.1, <u>comment.</u> (n.5)(referring to interstate transportation of weapons and

directing that [i]n the unusual case in which it is established
that neither avoidance of state, local, or other federal firearms
law, nor any other underlying unlawful purpose was involved, a
reduction in the base offense level to no lower than level 6 may
be warranted to reflect the less serious nature of the
violation."). See also United States v. Jones, 158 F.3d 492
(10th Cir. 1998)(noting that § 2K2.1 "clearly intended to punish
innocent possession and use of a firearm less severely, and
improper use more severely").

Consideration of the guideline history and application notes
compels the conclusion that Lewis's conduct in misstating his
residence address was an "atypical case, one to which a
particular guideline linguistically applies but where conduct
significantly differs from the norm." U.S.S.G. § 1A1.1, comment.
Editorial Note 4(b). Rather, Lewis's conduct here more closely
resembles conduct underlying application of the sporting
exception and a resulting sentence of probation. See United
States v. Robert Bourgeois, No. 01-40007-NMG (defendant sentenced
to a guideline sentence of probation after application - with
apparent agreement of the government - of the sporting exception
where defendant had lied about felon status and had accumulated
twenty-five (25) illegally possessed firearms). Indeed, Lewis's
conduct is less culpable - the sporting exception is available to
those who illegally purchased weapons knowing that their lengthy

criminal histories prohibited that ownership.  Departure to the

otherwise applicable base offense level of six (6) is therefore

warranted and the Court should sentence Lewis to time served.

>    **2.    Lewis's Actual Conduct Is Vastly Different From
>            the Typical of Conduct for Which Defendants Are
>            Ordinarily Sentenced Under § 2K2.1.**

In <u>Koon</u>, the Court noted with approval the district court's

analysis of the "heartland" of assaultive crimes and its

determination that the police officers' conduct, while unlawful,

did not neatly fit within that heartland.  <u>Id.</u> at 102-105.  The

Court ruled that it was entirely appropriate to consider the wide

range of conduct and offenders ostensibly covered by a nominally

applicable guideline:

> [U.S.S.G. § 2H1.4] incorporates the Guideline for the
> underlying offense, here § 2A2.2 for aggravated
> assault, and thus creates a Guideline range and a
> heartland for aggravated assault committed under color
> of law.  As the District Court was correct to point
> out, the same Guideline range applies both to a
> Government official who assaults a citizen without
> provocation as well as instances like this where what
> begins as legitimate force becomes excessive.  The
> District Court did not abuse its discretion in
> differentiating between the classes of cases, nor did
> it do so in concluding that unprovoked assaults
> constitute the relevant heartland.
>
> . . .
>
> The punishment prescribed by § 2A2.2 contemplates
> unprovoked assaults, and as a consequence, the District
> Court did not abuse its discretion in departing
> downward for King's misconduct in provoking the wrong.

<u>Id.</u> at 105.  That Lewis's conduct was of a completely different

class than that of typical defendants is demonstrated by the

prosecution and sentencing of ATF 4473 false statement defendants within the District of Massachusetts.  A summary of those prosecutions and their outcomes is attached hereto as Exhibit B.[2]

A common thread runs through all of the conduct of defendants subject to § 2K2.1 as a result of making false statements: in <u>every</u> <u>sentencing</u>, the buyer was either himself a convicted felon or knew that the person on whose behalf s/he was purchasing the weapon had a prior criminal record that prohibited him from purchasing weapons.  Moreover, the simple existence of a prior conviction alone was rarely, if ever, enough to result in prosecution and sentencing under § 2K2.1.  Rather, the convicted felon - either the purchaser or, in the straw purchase context, the receiver - had a significant and serious criminal history that included crimes of violence or drug trafficking offenses. Many times the transactions made by straw purchasers were done for cash or other tangible consideration.

Here, by way of contrast, Lewis has <u>no</u> criminal record whatsoever and the misstatement made was not made with the intent or the result of the release of any firearm into the hands of a

---

[2]The list of prosecutions used to compile the summary was provided by the United States Probation Office in response to defendant's request for all defendants prosecuted and sentenced pursuant to 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 924(a)(1)(A). <u>See</u> May 15, 2005 and December 4, 2006 Letters of S.U.S.P.O. Jennifer Sinclair, attached hereto as Exhibit C.  According to Ms. Sinclair, there is no record of any defendant having been prosecuted or sentenced for a violation of 18 U.S.C. § 924(a)(1)(A). <u>Id.</u>

prohibited person.  Indeed, Lewis's conduct in using his mother's
address is – by the government's implicit admission in dropping
all counts that required an intent to deceive - several
magnitudes of seriousness below the conduct underlying any of the
individuals sentenced.  Lewis's conduct is therefore completely
out of the heartland of defendants sentenced under § 2K2.1 for
making false statements.  See Koon, supra, 518 U.S. at 105
(approving district court's procedure of differentiating classes
of cases covered by a particular guideline).

Review of the cases sentenced where defendants were
convicted of § 922(a)(6) offenses reveals an additional dichotomy
within the heartland.  Defendants who were themselves felons and
convicted of false statements were subject to a harsh guideline
sentencing range and generally received high sentences on a par
with the advisory sentencing range suggested by the Probation
Department in this case.  See, e.g., United States v. Barbosa,
et. al., No. 03-4009-NMG (sentences of 70 and 37 months for each
of two brothers);  United States v. James Carey, No. 05-40040-FDS
(46 months);  United States v. Anthony Hodges, No. 03-40010-FDS
(90 months);  United States v. Rafael Perez, No. 02-30025-MAP (30
months);  United States v. Harold Wilson, et. al., No. 98-30013-
FHF (60 months after departure from 100-125 month range).  By
contrast, defendants who themselves did not have substantial or
any criminal record but lied in order to buy on behalf of those

-14-

whom they knew did received far lower - most often probationary - sentences.  <u>See</u>, <u>e.g.</u>, <u>United States v. Kevin Brodeur</u>, No. 01-30040-MAP (13 months);  <u>United States v. Domingos DePina</u>, No. 99-10252-PBS (probation); <u>United States v. Sarah Hanrahan</u>, No. 00-10329-WGY (probation); <u>United States v. Tammy L. Johnson</u>, No. 02-10327-PBS (probation); <u>United States v. Michael P. Lehtonen</u>, No. 00-10308-REK (six-month commitment to halfway house); <u>United States v. Eric D. Offley</u>, No. 01-10246-JLT (time served); <u>United States v. Lindell Smith</u>, No. 03-30019-MAP (18 months).  The conclusion is clear: the further a defendant is from actually being a prohibited person in possession of a weapon, the further the individual is from being in the "heartland" of § 2K2.1. Lewis, who was not prohibited in any way and did not transfer a weapon to any prohibited person, is therefore completely out of the heartland.  Departure is therefore warranted and appropriate.

> **3.   Courts in the District of Massachusetts Have Downwardly Departed to Reflect Overstatement of Seriousness Where the Actual Conduct Was More Egregious than Lewis's Misstatement of Residence Address.**

Review of cases where judges in the District of Massachusetts chose to depart in false statement cases illustrate the appropriateness of substantial departure in Lewis's case.

- In <u>United States v. Sarah Hanrahan</u>, No. 00-10329-WGY, Hanrahan admitted that she had purchased seven firearms that she in turn sold to a convicted felon whom she knew to be a drug dealer.  Hanrahan herself had multiple arrests for assault and battery, possession of cocaine, possession with

intent to distribute cocaine, and possession of marijuana; she knew that the weapons were going to a known drug dealer. Judge Young, with little explanation and apparently with the agreement of the government, departed downward from an 18-24 month guideline sentencing range to sentence Hanrahan to three years' probation with the first six months in home detention.

- In <u>United States v. Domingos DePina</u>, No. 99-10252-PBS, DePina purchased guns from federally licensed dealers and resold them to persons he knew to be prohibited. On each occasion, DePina falsely stated on the AFT Form 4473 that he was the actual buyer of the firearms when in fact he was not. Judge Saris departed from a 10-16 month guideline sentencing range to sentence DePina to three years' probation with the first six months in home detention.

- In <u>United States v. Vito Resto</u>, No. 05-30016-MAP, Resto had a significant criminal history including convictions for drug trafficking, armed robbery, and prior firearms possession and at the time of the offense was under state court indictment for offenses arising out of a shooting incident. He nevertheless rented weapons and ammunition on two different occasions, falsely stating that he had not been convicted of a felony. In a post <u>Booker</u> sentencing, Judge Ponsor sentenced Resto to 24 months imprisonment, substantially below the advisory range of 57-71 months, in part because the nature and circumstances of Resto's conduct warranted consideration not given by the Sentencing Commission.

Each of these cases involved conduct far more egregious than Lewis's misstatement of his residence address and constituted acts far more clearly targeted by § 2K2.1 than the offenses committed by Lewis.[3] In all cases, however, the sentencing courts recognized that the nominally broad reach of the guideline did not take into account the nuances of a defendant's actual conduct. Lewis's actual conduct is far less serious - both in

_____

[3]The government did not appeal any of the three downward departures and indeed, as noted, apparently joined in one.

terms of culpability and in resulting harm - than any of the three cases, including two where the sentencing courts determined that no incarceration was warranted.  The outcome of these cases compels the conclusion that departure to a sentence of time served for Lewis is warranted and appropriate.

**B.    The Unanswered Questions Underlying the Government's Extraordinary and Unprecedented Prosecution of Lewis Is a Further Justification for Departure.**

In litigating defendant's Motion to Dismiss and for Further Discovery, the government conceded, as it had to, that prosecution of Lewis is unprecedented given the actual conduct that occurred in this case.[4]  In a filing to this Court, the government suggested that the prosecution of Lewis was actually the result of its re-evaluation of past practices in light of changing historical circumstances and new enforcement priorities. The historical record makes clear that the government's reevaluation of its priorities in the firearms context has been singularly applied to Lewis, and it cannot be ignored that this

---

[4]The litigation over defendant's Motion to Dismiss involved substantial filings and a hearing.  The filings may be found at Docket Entry # 53 (Defendant's Motion to Dismiss), Docket Entry # 61 (Opposition by the Government), and Docket # 63 (Defendant's Reply Memorandum).  For the sake of brevity defendant only briefly summarizes the position taken by the parties in the pleadings.  The Court denied the Motion by Memorandum and Order entered on May 11, 2006.  See Docket # 66.

singularity is directed towards Lewis, a Muslim man, by the Anti-Terrorism Unit of the United States Attorney's Office.[5]

Broad federal jurisdiction to pursue <u>de</u> <u>minimis</u> record-keeping infractions as well as more substantive violations of criminal law presents the opportunity for selective federal prosecution, which may result in a disparity between similarly-situated persons for reasons other than the nature of the conduct or other legitimate law enforcement needs.  <u>See</u> Task Force on the Federalization of Criminal Law, Am. Bar Ass'n, <u>The Federalization of Criminal Law</u> 28-32 (1998); Paul Rosenzweig, <u>The Gang Act Needs Modification</u>, Web Memo published by the Heritage Foundation (May 3, 2004), <u>www.heritage.org</u>; Steven D. Clymer, <u>Unequal Justice: The Federalization of Criminal Law</u>, 70 S. Cal. L. Rev. 643 (March 1997); Jay M. Cohen & David J. Fried, <u>United States v. Lopez and the Federalization of Criminal Law</u>, 29-DEC Prosecutor 23, 27 (Nov./Dec. 1995); Sara Sun Beale, <u>Reporter's Draft for the Working Group on Principles to Use When Considering the Federalization of Criminal Law</u>, 46 Hastings L.J. 1277, 1300 (April 1995).

Selection of a person for federal prosecution for an improper reason, even where that reason does not rise to a level where dismissal might have been warranted, is an appropriate

---

[5]Firearms violations are ordinarily prosecuted under the aegis of the United States Attorney's Major Crimes Unit.

basis for a sentence below the guidelines range by departure.[6]
United States v. Jones, 399 F.3d 640, 649-50 (6th Cir.
2005)(permissible for district court to consider, both for
departure and § 3553(a), outrageousness of local police
department practice that featured race-based discrimination
purposes); United States v. Coleman, 188 F.3d 354 (6th Cir.
1999)(district court erred in refusing to consider improper
investigative techniques selectively aimed only at African
Americans as ground for downward departure); United States v.
Parham, 16 F.3d 844, 848 (8th Cir. 1994) (district court could
consider government's "bizarre" selection of black voting
registrars for prosecution for voter fraud in county where blacks
had long been disenfranchised as basis for downward departure).

    The government, in justifying its initial and continuing
prosecution of Lewis, has previously insinuated to this Court
that its decision to prosecute Lewis was based on a possible
terrorism connection and because he presented a risk to national
security.  The Court, in denying defendant's Motion to Dismiss
and for Further Discovery, specifically relied in part on the
government's representation that this was so.  Now, however, the
government quite sensibly appears to have abandoned these

_____

    [6]As noted below, defendant also submits that consideration
of the government's questionable motives are cognizable under 18
U.S.C. § 3553(a) because that motive sheds light on both "the
nature of the offense," 18 U.S.C. § 3553(a)(1) and the "history
and characteristics of the offender," 18 U.S.C. § 3553(a)(3).

contentions - the Presentence Report is bereft of any whisper of a hint that Lewis is involved in terrorism or a national security threat.[7]  In any event, the trial and the Presentence Investigation have revealed that far from being a terrorist and national security risk, Lewis is a working family man with lifetime ties to the Worcester community who, until his arrest, had a hobby collecting and trading guns.

Even if initially begun in good faith, the utter lack of support to justify the government's continued targeting of Lewis and prosecution through a never-before-used statute for conduct not previously deemed worthy of prosecution justifies departure to a probationary sentence.[8]

---

[7]What little evidence possessed by the government that Lewis had terrorism ties or was a national security risk came from Lewis's estranged wife and a confidential informant who (1) was the ex-husband of Lewis's wife, (2) possessed no first-hand information concerning Lewis's activities, and (3) used as his purported source of information a then-thirteen year-old girl who only visited the ex-husband informant pursuant to a visitation agreement.

[8]Indeed, in the course of litigating defendant's Motion to Dismiss the government made little effort to dispel defendant's contention that a misstatement of residence address on an ATF 4473 is never investigated, let alone ever prosecuted as a stand-alone federal felony.  In this sense, defendant through the very fact of conviction has already been punished far more severely than the vast universe of potential defendants who make misstatements without the intent to deceive.

**C.    Lewis's Extraordinary Family Responsibilities Warrant Substantial Departure.**

Even prior to the Supreme Court's <u>Booker</u> decision, sentencing courts in the First Circuit had the discretion and authority to downwardly depart to take into account extraordinary family circumstances present to a degree not contemplated by the Sentencing Commission.  <u>See</u> U.S.S.G. § 5H1.6, <u>United States v. Sclamo</u>, 997 F.2d 970, 971-972 (1st Cir. 1993); <u>United States v. Rivera</u>, 994 F.2d 942, 948, 953-54 (1st Cir. 1993).  The Presentence Report presents a compelling picture for departure in this case: the defendant is a dedicated father who, despite substantial obstacles throughout his entire life, financially supports and enjoys a close and nurturing relationship with his wife and four young children.  <u>Rivera</u>, 994 F.2d at 949 (guidelines recognize that "special, unusual or other-than-ordinary circumstances," may be considered as a basis for a departure even though family circumstances do not ordinarily warrant a departure); <u>Sclamo</u>, 997 F.2d at 971-972 (affirming downward departure from a range of 24-30 months to probation because of the importance to the defendant's stepson of the defendant).

In <u>Rivera</u>, then-Chief Judge Breyer noted that, while family responsibilities are not "ordinarily" relevant in sentencing, the issue is one of degree.  "At some point, the nature and magnitude of family responsibilities (many children? with handicaps? no

-21-

money? no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary."  <u>Id.</u> at 948.

"[T]he crucial question is whether the unique set of facts, taken together, rise to the level of extraordinariness[.]" <u>United States v. Perreira</u>, 272 F.3d 76, 83 (1st Cir. 2001).  In <u>Perreira</u>, the First Circuit reversed a departure where it found that the defendant's circumstances would make his imprisonment merely an "inconvenience" for his family, an insufficient showing to justify a departure.  <u>Id</u>.

As the Presentence Report makes clear, the circumstances of Lewis's role in his family are truly extraordinary, and present a far more dire situation than a mere "inconvenience" to others and, indeed, more dire than those presented in other cases.

The issue in this case is both one of providing an irreplaceable care-taking function, as suggested by <u>Perreira</u>, <u>see id</u>. at 81-82, and analogous to that presented in <u>United States v. Sclamo</u>, 997 F.2d 970, 972-74 (1st Cir. 2001) (affirming departure where, over a three-year period, defendant had developed "a special and crucially important relationship" with the emotionally troubled son of his live-in girlfriend).

As the Court has heard during trial and has become clear as a result of the Presentence Investigation, the Lewis-Rivera family has been an example of teamwork for survival.  The couple

has worked together and sacrificed in order that Lewis could complete his degree at Clark University while the couple raised their children. At the same time Lewis struggled to financially support a rapidly growing family by taking a series of jobs while at the same time completing his studies with above-average grades. In addition to helping to raise their own children, Lewis provided support to Pamela Rivera in caring for her children from her previous marriage.

That teamwork has finally shown signs of paying dividends. The family, for the first time in years, has become financially solvent; Lewis, since obtaining his degree, has enjoyed a number of promotions and seen his earning power grow. This solvency has come despite the fact that Lewis's arrest and conviction in this matter has prohibited Pamela Lewis from operating a family daycare center at the couple's home - a business that, prior to Lewis's arrest in this matter, provided the family with sorely needed income.

The impact of losing -- even temporarily -- the presence of the only breadwinner in the lives of these children cannot be compared to the usual situation of children whose parent faces incarceration. Here, as was the subject of much testimony at trial, the Lewis-Rivera children suffered from the consequences of the couple's precarious financial situation during Lewis's college years. The family is now close to getting on its

financial feet but is still a loss of one paycheck away from
homelessness.  As the Presentence Report relates, just the two-
week period of detention at the inception of this case was nearly
catastrophic to the family.  Removing Lewis from the home for any
extended period of time would simply be too great a loss to bear.
While Pamela Rivera certainly would remain in their lives, her
relationship with the children is only one-half of the equation
and would provide none of the stability the family now enjoys;
the ability of Pamela to support the children at all is extremely
uncertain.  See United States v. Galante, 111 F.3d 1029 (2nd Cir.
1997)(affirming departure in drug case from 46-57 months to 8
days where defendant showed he was conscientious and caring
father of two young sons who would have faced severe financial
hardships).

     It is also worth noting that Lewis's decision to commit to
Pamela and start a family occurred long before Lewis's arrest in
this case and that his devotion to the children has not wavered
from the time his arrest occurred.  All of these aspects render
Lewis's situation extraordinary.  Thus, this case presents "a
critical mass of hardships [that] could accrue to the defendant's
family."  United States v. Louis, 300 F.3d 78, 83 (1st Cir.
2002)(describing circumstances presented in Rivera).  See United
States v. Johnson, 964 F.2d 124, 128-30 (2nd Cir. 1992)("We are

-24-

reluctant to wreak extraordinary destruction on dependants who rely solely on the defendant for their upbringing.")

Lewis's presence in the children's lives is one that cannot be replaced by anyone else.  It is difficult to envision more compelling circumstances than those presented here and it is clear that this case is one in which the impact on the children from the removal of this particular person in their lives is truly extraordinary.  Lewis's imprisonment will have far greater consequences than the difficult, but nevertheless common, loss of the presence of a parent and spouse as the result of a sentence of imprisonment.  These circumstances, in conjunction with the limited seriousness of the offense, militate that a sentence of probation would accomplish the appropriate punishment for Lewis without needlessly traumatizing his wife and small children. See United States v. One Star, 9 F.3d 60, 61 (8th Cir. 1993)(in felon-in-possession case, departure warranted where sentencing court determined defendant was no danger to community, possessed weapon wrongfully but in self-defense, and had demonstrated strong family ties and responsibilities with a good employment record); United States v. Gaskill, 991 F.2d 82, 85-86 (3rd Cir. 1993)(in Social Security false statement case, remand for departure to probation warranted where defendant demonstrably not dangerous and cared for mentally-ill wife); United States v. Alba, 933 F.2d 1117, 112 (2nd Cir. 1991)(departure warranted

-25-

where imprisonment would result in destruction of an otherwise strong family unit).[9]

**D. The Combination of Factors Warrants a Substantial Departure.**

A sentencing court may depart downward where a combination of factors warrants it. See U.S.S.G. § 5K2.0 Commentary (combination of characteristics and circumstances, none of which alone take the case out of heartland, may warrant departure). See also United States v. Sklar, 920 F.2d 107, 1117 (1st Cir. 1990) ("We do not mean to imply that factors, inadequate to warrant departure when taken in isolation, may not in combination suffice to remove a case from the heartland") (citation omitted); United States v. Broderson, 67 F.3d 452, 458-59 (2d Cir. 1995) (departure where "confluence of circumstances was not taken into account by the guidelines); United States v. Bowser, 941 F.2d 1019, 1024-25 (10th Cir. 1991) ("unique combination of factors" warranted departure). Defendant submits that the overstatement of the seriousness of the offense by the guideline range, along with the government's questionable conduct in prosecuting the

---

[9]As set forth more fully below, defendant submits that even if the Court determines that ordinary departure is not supported by the extraordinary circumstances present here, the Court must consider whether this factor supports a sentence that is below the guideline range but is nevertheless reasonable. See United States v. Antonakopulos, 399 F.3d 68, 81 (1st Cir. 2005)(remand required consideration of whether below-guideline sentence appropriate notwithstanding fact that traditional departure for extraordinary family responsibilities precluded).

case and Lewis's demonstrated extraordinary family
responsibilities and circumstances, warrant a departure to
probation.  See United States v. Jones, 158 F.3d 492, 505-06
(10ᵗʰ Cir. 1998)(in felon-in-possession of a firearm case,
departure to probation warranted after consideration of multiple
factors).

**III. EVEN IF LONG-STANDING DEPARTURE GROUNDS DO NOT COMPLETELY SUPPORT A SENTENCE OF TIME SERVED, A SENTENCE OF TIME SERVED COMPORTS WITH THE SENTENCING GOALS OF 18 U.S.C. § 3553(a).**

Tensions in the guideline promulgation process have resulted
in sentencing guidelines that are generalized and can produce
outcomes that may appear unreasonable to sentencing judges in
particular cases.  United States v. Jimenez-Beltre, 440 F.3d 514,
518 (1ˢᵗ Cir. 2006).  Thus, under United States v. Booker, 125
U.S. 738, 757 (2005), sentencing courts are to treat the
guidelines as just one of a number of sentencing factors set
forth in 18 U.S.C. § 3553(a), keeping in mind the primary
directive that sentencing courts "impose a sentence sufficient,
but not greater than necessary, to comply with the purposes set
forth in paragraph 2."  Id.  See Jimenz-Beltre, supra, at
518("Booker's remedial solution makes it possible for courts to
impose non-guideline sentences that override the guidelines,
subject only to the ultimate requirement of reasonableness.")
This obligation includes consideration of factors that, under the
former mandatory guidelines regime, might not or could not

-27-

support deviation from the guideline sentencing range.  See
United States v. Jones, 445 F.3d 1 (1st Cir. 2006)(no legal error
in considering factors discouraged or forbidden under
guidelines); United States v. McBride, 434 F.3d 470, 476 (6th
Cir. 2006)("the decision to deny a Guidelines-based downward
departure is a smaller factor in the sentencing calculus . . .
many of the very factors that used to be grounds for a departure
under the Guidelines are now considered by the district court --
with greater latitude -- under section 3553(a)").

1.   **The Nature and Circumstances of the Offense and the History
     and Characteristics of the Offender**

     •    **Nature and Circumstances of Offense**

     There is no disputing that the conduct Lewis engaged in was
serious; Congress has given the Bureau of Alcohol, Tobacco, and
Firearms the discretion to require that certain information be
truthful and accurate and the government has an interest in
insuring that individuals filling out its forms completely comply
with those dictates.  Notwithstanding the seriousness of his
behavior, Lewis's conduct here - as set forth more fully in
Sections I & II(a), supra - was ultimately benign and clearly
would not have been prosecuted absent the government's singular
exercise of discretion to prosecute Lewis under a strict-
liability statute in response to Lewis's supposed connections to
terrorism and a perceived (but baseless) national security

-28-

threat.  Defendant submits that this fact alone warrants a
sentence substantially below the advisory guideline range.
United States v. Jones, 399 F.3d 640, 649-50 (6th Cir.
2005)(after Booker, district court may consider selective
prosecution as basis for sentence below the guideline range).

In any event, the extent of the actual seriousness of the
conduct is limited to the government's oft-repeated rationale
behind requiring a residence address on ATF Form 4473; according
to the government, the residence address is beneficial to help
law enforcement to trace and identify gun owners if at some later
point such a trace were required.[10]  As the evidence at trial
demonstrated, however, Lewis accurately and truthfully filled out
identifying information - including date of birth and social
security number - that was far more effective in conclusively
identifying and locating an individual than is a static residence
address indelibly and unchangeably filled out on a government

---

[10]Of course, this rationale requires overcoming cognitive
dissonance.  This is because an informal private party sale does
not require use of the ATF 4473 form; as a result, gaps in the
tracing of firearms are routine and it is commonplace that law
enforcement is completely unable to effectively trace a
particular gun.  Stated more simply, Lewis's decision to buy his
weapons through federal licensed dealers rather than privately
gave BATF a tool for a later trace that it would not otherwise
have; Lewis's conduct in misstating his residence address
somewhat diminished the usefulness of that tool if at some later
date BATF desired to conduct a trace.  As explained infra,
however, the accurate and complete identifying information
supplied by Lewis largely if not completely obviated that
difficulty.

form.  See Affidavit of Winfred Meadows-Marquez, attached hereto
as Exhibit D (setting forth the utility of Choicepoint open-
source databases in locating current addresses).  Moreover, the
evidence at trial showed that Lewis had substantial ties to the
residence address he supplied on the forms - there was undisputed
evidence that he was physically present there for substantial
periods of time and that his mother lived there - and that when
summonsed by law enforcement he arrived there within a short
period of time.

    Balanced against the limited severity of the offense at
issue is substantial indicia that Lewis was highly responsible
with firearms.  Worcester Police Officer Michael Sacco testified
that Lewis took safety courses and obtained a license to carry
firearms.  Firearms dealers testified that Lewis was
knowledgeable about and appropriate with firearms.  Firearms
dealer Clarence Floyd testified that Lewis was compliant and
responsive to his directions as to the additional background
checks and other paperwork required to obtain the Mossberg
shotgun.  Lewis's brother Derek Lewis, an Essex County Deputy
Sheriff, testified to Lewis's meticulous practice of gun safety
procedures.  Lewis's open, transparent, and responsible conduct
in dealing with firearms further diminishes the severity of the
strict-liability violations for which he stands convicted.  See
United States v. Bariek, 2005 WL 2334682 (E.D. Va. 2005)

-30-

(unpublished)(variance from guideline in part justified because defendant lacked knowledge of the regulation he was accused of violating - an element Congress expressly omitted from the statute - and showed no effort to hide his non-compliance).

In the unique circumstances of this case, the limited severity of the actual conduct for which Lewis stands convicted in the context of his overall dealings with firearms compels the conclusion that a sentence of probation is appropriate.

- **Lewis's History and Family Circumstances**

The Presentence Report thoroughly documents Lewis's life and supplements testimony heard by the Court at trial.  In sum, Lewis is a 33 year-old African-American man who overcame a difficult upbringing in the projects of, and later the inner-city of, Worcester.  He married and fathered a child when just out of high school. Attempts to go to college were frustrated by the attention required to provide financial support for a young family.  Lewis nevertheless sought and obtained reasonably well-paying jobs despite his lack of college education.

His first marriage, to Angela Mangrum, was rocky; a decision to have a second child in order to save the marriage proved ill-considered.  The couple separated and later divorced.  Lewis provided child support while trying to improve his fortunes by again attending college, first in the health field in Boston and later at Clark University.

-31-

By 1997, when he was 24 years old, Lewis became interested in and later converted to the Islamic faith.  Two years later he met Pamela Rivera, who later became his wife.  Pamela converted to the Islamic faith shortly thereafter and the couple have been devout ever since.

The birth of Lewis's children, his dedication to his wife Pamela and their family, and his commitment to the Muslim faith, has had a significant impact on Lewis's behavior and his long-term view of his life.  As his many supporters attest, Lewis has become a responsible man whose good works are a testament to his hard-working commitment to better his community.  Letters of Support are attached hereto as Exhibit E; a newspaper article describing Lewis's employment as a Youth Counselor in the community is attached as Exhibit F.

Defendant submits that, even if departure is not warranted by his extraordinary family circumstances and responsibilities, a below-guideline sentence of time-served is appropriate pursuant to 18 U.S.C. § 3553(a).  United States v. Antonakopulos, 399 F.3d 68, 81 (1st Cir. 2005)(remand required consideration of whether below-guideline sentence appropriate notwithstanding fact that traditional departure for extraordinary family responsibilities precluded).

2.    **The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

*   **to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

The seriousness of the offense has been described at length in Sections I, II(A), and above.  In light of the de minimis nature of the conduct, probation is just punishment for the offenses of which he stands convicted.

The simple fact of conviction has grave consequences for Lewis.  As the PSR sets forth, Lewis has dedicated his life to a career in the social services field, a field necessarily sensitive to public pressure to prohibit convicted felons from employment.  Thus, this federal conviction will have substantial effect on his current and future ability to work in his field, sharply limiting the types of jobs he will be able to take and his earning capacity for the rest of his life.

Moreover, Lewis's trial attracted much media attention. Instead of focusing on the relatively benign conduct actually at issue, however, published news reports prominently featured the government's allegations that Lewis had terrorist ties because of his travel to Africa.  Copies of articles from the Worcester Telegram and Gazette are attached hereto as Exhibit G. After jury selection for Lewis's trial, the lead story in the local section featured the headline "Holy War Weapons Case" and

the story was led with the introduction that "[a] jury was selected yesterday in U.S. District Court for the weapons trial of a Worcester man who allegedly expressed his intention to die in a holy war."  Similarly, a story reporting Lewis's conviction ran under the headline "Gun Buyer Convicted of Giving False Info to Weapons Dealers; Prosecutors Alleged Anti-American Bent" and led with the sentence "A Worcester man whose alleged anti-American sentiments came to the attention of the government has been convicted in U.S. District Court on charges of making false statements when buying 16 firearms."

There can be little question that very public allegations of anti-Americanism and support for "Holy War" are, in the climate of a nation at war, amongst the most emotionally charged accusations that can be made.  As the Presentence Report recounts, Lewis is extremely active in the community both in his work as a counselor and his volunteer work mentoring and counseling; the ramifications of these public allegations - unsupported but difficult to disprove in the court of public opinion - are serious and will be long-lasting.

Doubtless there will be local media coverage of Lewis's sentencing, coverage that will once again train unwanted attention on Lewis in his community activities.  Many on all sides of the war on terrorism issue will watch and analyze the sentence the Court chooses to impose on Lewis.  In all of the

-34-

circumstances of this case, a sentence of time served will promote respect for the law because it is a just sentence.

- **to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant**

Similarly, there can be little doubt that Lewis's very public humiliation as a result of his arrest and conviction of this charge provides overwhelming deterrence to any thought of a similar lapse in the future.

Judge Pratt of the Southern District of Iowa, in an analogous case involving a first-time offender convicted a firearms violation, cogently analyzed the public protection factor and recognized the diminishing deterrent value of imprisonment on an offender similar to Lewis. In United States v. Myers, 353 F.Supp.2d 1026 (S.D. Iowa 2005), the defendant, a forty year-old man, was convicted of possessing a sawed-off shotgun. Id. at 1030. The shotgun had originally been given to the defendant as a gift. Id. He later sawed off the barrel of the shotgun to remove a rusted end, making it safer to use. Id. Unbeknownst to him, by sawing the barrel he had made the firearm subject to the National Firearms Act, hence illegal to possess without registration. Id. In departing from a 20-30 months guideline sentencing range to impose a sentence of three months probation, Judge Pratt specifically addressed the impact of deterrence in the case:

> [A]s a matter of general deterrence, the conduct
> involved should be punished in some fashion.  While the
> plea of guilty to a federal felony may be a small
> irritation to some defendants, the federal felony
> conviction admitted to by this Defendant carries great
> weight.  The Defendant has defined himself as a strong
> role model for personal accountability and
> responsibility to his children.  He has been known for
> his high moral standards and proven character.  The
> experience of the present prosecution has had a
> terrible impact on the Defendant and his family.
> Regardless of sentence, the Defendant will always be
> described, in part, as a felon - no small punishment
> for this Defendant.  Moreover, there is no danger that
> this Defendant will commit another crime in the future.
> He is of no harm to his community and poses no future
> threat.  In fact, any community would be proud to have
> him as a member and neighbor.   In this rare instance,
> the Court also finds the defendant in no need of
> rehabilitation through "educational or vocational
> training ··· or other correctional treatment." . . .
> The sentence in this case will, as mandated by law, "be
> sufficient, but not greater than necessary, to comply
> with the purposes" with the need for sentence imposed.

Id. at 1031.  Like the defendant in Myers, Lewis, as demonstrated

by the Presentence Report, has sought to live an exemplary life

and provide a model for others, including his children.  In a

crucial respect, the public protection and deterrence value of

imprisonment are of far less concern in Lewis's case than the

defendant in Myers.  After appearing in court on the charge,

Myers was arrested for operating under the influence; Judge Pratt

nevertheless determined that the new arrest did not significantly

alter the deterrence or public protection factors because Myers

had gained insight into his alcoholism.  Id. at 1030-31.  Lewis,

by contrast, has been completely incident-free and indeed

exemplary while under Pretrial Services supervision.

As in <u>Myers</u>, Lewis's history and characteristics guarantee that there is no danger that he will commit another crime in the future.  He is of no harm to his community - indeed, he is an asset to it - and poses no future threat.  A sentence of probation is therefore "sufficient, but not greater than necessary to comply" with the sentencing goals in 18 U.S.C. § 3553(a).

## 3.    The Sentencing Range Established by the Sentencing Commission

The interplay of the guideline sentencing range with Lewis's actual conduct is described at length in Sections I and II(a), <u>supra</u>.  Defendant submits that <u>Booker</u> necessarily widened sentencing courts' discretion to take into account the nature and circumstances of the offense.  Even if the Court finds that Lewis's conduct in misstating his residence address was within the heartland of false statement cases, the Court should ameliorate the sentence by taking into account the <u>de minimis</u> nature of the conduct pursuant to 18 U.S.C. § 3553(a).

## 4.    Unwarranted Sentencing Disparity

Defendant submits that a sentence of time served avoids unwarranted sentencing disparity.  As noted in Section II, <u>supra</u>, analysis of all other cases sentenced within the District of Massachusetts shows that probationary or minimal sentences have been imposed upon defendants whose actual conduct was far more

egregious than Lewis's misstatement of his residence address.  In

addition to the cases cited above, Lewis's conduct invites

favorable comparison to at least four specific dispositions:

- In <u>United States v. Robert Bourgeois</u>, No. 01-40007-NMG,
  the defendant had an extensive criminal history
  including a prior felony conviction for carrying a
  firearm without a permit and lied about that status
  while buying three guns, one of which was a shotgun,
  and was later found in possession of twenty-five (25)
  firearms and five boxes of ammunition.  Judge Gorton
  sentenced Bourgeois to probation.

- In <u>United States v. Frederick M. Lebert</u>, No. 99-10327-
  RWZ, Lebert, a former police officer, was convicted in
  federal court of firearms felonies in 1985.
  Notwithstanding his conviction, he purchased a shotgun
  from a federally licensed firearms dealer on April 24,
  1999.  At the purchase Lebert completed the ATF Form
  4473 and in it denied that he had been convicted of a
  felony.  Judge Zobel sentenced former police officer
  Lebert to probation.

- In <u>United States v. Michael P. Lehtonen</u>, No. 00-10308-
  REK, Lehtonen bought firearms for a friend who was
  himself prohibited from buying weapons; four of the
  weapons were recovered at the scene of three separate
  shootings.  Judge Keeton, after government motion,
  sentenced Lehtonen to six months in a halfway house.

- In <u>United States v. William Pleasants</u>, No.
  99-10248-MLW, Pleasants applied five times to purchase
  firearms from federally licensed dealers; he was denied
  twice but was successful three times because he had
  been convicted of arson, illegal firearms possession
  twice, and rape.  Judge Wolf sentenced Pleasants to
  three years probation with the first six months in home
  detention.

In each of these cases, the defendant's conduct was willful,

knowing, and of several magnitudes greater than Lewis's

misstatement of his residence address.  In each case, however,

the sentencing judge found that a probationary or minimal

sentence was warranted.  The de minimis nature of his conduct in comparison to these defendants alone nearly mandates a similar sentence to avoid unwarranted disparity.  See United States v. Bariek, 2005 WL 2334682 (E.D. Va., 2005)(unpublished)(variance from guideline in part justified because of disparity where defendant complied with federal law, basis for federal prosecution was non-compliance with state law, and state law considered non-compliance a misdemeanor).  Lewis's compelling history and characteristics - of a degree, defendant submits, much greater than those relied upon in the above cases - requires such a sentence.

The Court should therefore sentence Lewis to time served with a three-year period of supervised release to follow.

## CONCLUSION

For the foregoing reasons, this Court should impose a sentence of time served - thirteen (13) days - with a three-year period of supervised release to follow.  The Court should impose no fine.

```
                         SAMUEL J. LEWIS
                         By his attorney,


                         /s/ Timothy Watkins
                         Timothy Watkins
                          B.B.O. #567992
                         Federal Defender Office
                         408 Atlantic Ave., Third Floor
                         Boston, MA  02110
                         (617) 223-8061
```

<u>CERTIFICATE OF SERVICE</u>

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), as well as to United States Probation Officer Jennifer Sinclair by electronic mail, on December 7, 2006.

/s/ Timothy G. Watkins
Timothy G. Watkins

UNITED STATES SENTENCING COMMISSION
ONE COLUMBUS CIRCLE, NE
SUITE 2-500, SOUTH LOBBY
WASHINGTON, DC 20002-8002
(202) 273-4500
FAX (202) 273-4529



# M E M O R A N D U M

**TO:**      Commissioners
Senior Staff
Phyllis Newton

**FROM:**    Rich Murphy, Coordinator
Firearms and Explosive Materials Working Group

**DATE:**    December 11, 1990

**SUBJECT:**  Firearms and Explosive Materials Working Group Report

Attached is the report of the Firearms and Explosive Materials Working Group.

OCT 1 3 2006

# TABLE OF CONTENTS[1]

Page

I.    INTRODUCTION AND GENERAL PRINCIPLES . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF FIREARMS STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  BACKGROUND DATA ON FIREARMS AND EXPLOSIVES . . . . . . . . . . . . . 6

IV.   REVIEW OF APPELLATE CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.    HISTORICAL SENTENCING PATTERNS . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.   REVIEW OF MONITORING DATA AND CASE FILES . . . . . . . . . . . . . . . . 7

VII.  DISCUSSION OF PROPOSED FIREARMS GUIDELINE

      2K2.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      2K2.1(a)(2) and (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      2K2.1(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      2K2.1(a)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      2K2.1(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      2K2.1(a)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      2K2.1(a)(5)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      2K2.1(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      2K2.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

      2K2.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      2K2.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

---

[1]  This table of contents has been revised to reflect the addition to the December 11, 1990, report of supplemental appendices prepared in April 1991. Appendices to the original report are found in Volume I; appendices to the supplemental report are found in Volume II.

2K2.1(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

2K2.1(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2K2.1(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2K2.1(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

2K2.1(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2K2.1(b)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2K2.1(b)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2K2.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## VII.    DISCUSSION OF EXPLOSIVE MATERIALS GUIDELINE

2K1.1(a)(1) and (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2K1.1(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2K1.1(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

2K1.1(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

2K1.1(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

2K1.1(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2K1.1(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

2K1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

2K1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

2K1.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

2K1.1(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

2K1.1(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2K1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

## I.    INTRODUCTION AND GENERAL PRINCIPLES

The Commission has requested that the Firearms and Explosives Working Group thoroughly examine the firearms guidelines (§§2K2.1 - 2K2.5) and explosives guidelines (§§2K1.1 - 2K1.7), and make appropriate revisions.    This report analyzes the working group's two proposed guidelines.

Firearms and explosives legislation is notoriously burdened with the complexity and confusion bred by political compromise.  As a consequence, the fashioning of a comprehensive, yet workable, guideline is handicapped from the start.

In an effort to be as informed as possible, the working group reviewed firearms and explosives monitoring data, case files, and appellate decisions, and received comments from the field and from the Bureau of Alcohol, Tobacco, and Firearms (ATF).[1] Based on this input, the working group has drafted initial proposed firearms and explosives guidelines that would combine four of the firearms guidelines, §§2K2.1, 2K2.2, 2K2.3, and 2K2.5, into a single firearms guideline for publication at U.S.S.G. §2K2.1; and would combine four explosives guidelines, §§2K1.1, 2K1.2, 2K1.3, and 2K1.6, into a single explosives guideline for publication at U.S.S.G. §2K1.1.

---

[1] Comments and critiques from the field calling for changes to the firearms guidelines are numerous (e.g., letter to Commission from federal district judge who states that the § 2K2 guidelines are "manifestly low in relation to other offenses ... increase significantly"), and are referred to briefly throughout the report.

1

The working group intends this consolidation of guidelines into a single guideline to achieve the following objectives:

(1) eliminate duplication and confusion in the application of the current guidelines, particularly with respect to multiple cross references, and the apparent application of more than one guideline to the same statute;

(2) reflect the concerns and sentencing practice discerned from monitoring data, appellate decisions, and hotline logs; and

(3) reduce the number of departures and consequent disparity by relying more heavily on specific offense characteristics.

## II. SUMMARY OF FIREARMS STATUTES

Until the 1920's and early 1930's, firearms restrictions were largely the province of State and local authorities. However, criminals, particularly those in organized crime, increasingly used more dangerous firearms such as machineguns, automatic weapons, guns equipped with silencers, and sawed-off firearms.[2] Local governments were perceived as unable to stem the national use of these dangerous firearms, and pressure soon developed to enact federal firearms restrictions.

---

[2] These firearms are known as National Firearms Act (N.F.A.) firearms. They can be distinguished from less destructive and volatile firearms, such as handguns, unaltered, regulation-length longarms (rifles and shotguns), and various semi-automatic weapons. Destructive devices, such as pipebombs and grenades were later added to the list of N.F.A. firearms.

2

In 1934, the National Firearms Act (N.F.A.), 26 U.S.C. § 5801, et seq., was enacted. The Act restricts the use of various serious firearms (N.F.A. firearms) by requiring manufacturers, importers and dealers to register annually with the federal government, to pay occupational, manufacture, and transfer taxes, to identify firearms with serial numbers or other methods of identification, and to maintain such records and returns as prescribed by the Secretary.[3] All "makings"[4] and transfers are required to be approved by the Secretary.[5] Every firearm is to be registered, and the information compiled in a central registry maintained by the Secretary.[6] The importing of N.F.A. firearms, except for certain lawful purposes (research, government use, etc.), is prohibited.[7] The receipt or possession of any unlawfully transferred, manufactured, transported, or imported firearm, or the possession of any unregistered or unidentified firearm, is punishable by a term of imprisonment not to exceed ten years.[8]

_____

[3] 26 U.S.C. §§ 5801, 5802, 5811, 5821, 5842, 5843.

[4] Under the Act, "making" a firearm involved the manufacture of a weapon by one not qualified to engage in the business of manufacturing firearms; "manufacturing" involved the manufacture by one engaged in the business. See 26 U.S.C. § 5845(i).

[5] 26 U.S.C. §§ 5812, 5822.

[6] 26 U.S.C. § 5841.

[7] 26 U.S.C. § 5844.

[8] 26 U.S.C. § 5871.

3

Additional federal firearms legislation was enacted in 1968, as part of the Gun Control Act of 1968, 18 U.S.C. § 921, et seq.[9] This Act extends considerable additional restrictions over N.F.A. firearms, and introduces some of the first federal firearms restrictions to non-N.F.A. firearms, such as shotguns, rifles, handguns, and other semi-automatic and manual firearms, and ammunition.

The Gun Control Act requires all importers, manufacturers, and dealers, including pawn brokers, to procure a license from the federal government before engaging in the business of importing, manufacturing, dealing, shipping, transporting, receiving firearms or ammunition.[10] Dealers are restricted from selling or delivering to underage persons or non-State residents, from violating State law, and from selling N.F.A. firearms or armor-piercing ammunition.[11] The manufacture and domestic sale of certain types of ammunition, particularly armor-piercing ammunition, is prohibited.[12]

Unlicensed persons are prohibited from delivering, or selling firearms in many cases.[13] Any person acquiring a firearm is

---

[9] The Act underwent a subsequent, substantial revision in 1986 as part of the Firearms Owners' Protection Act (FOPA).

[10] 18 U.S.C. § 922(a)(1).

[11] 18 U.S.C. § 922(b).

[12] 18 U.S.C. § 922(a)(7), (a)(8).

[13] 18 U.S.C. § 922(a)(3)-(5).

required to provide certain information to the dealer.[14]  No person
can transport stolen firearms, firearms not properly identified
with serial numbers, or, in most cases, machineguns.[15]  The
possession of firearms and other weapons in federal facilities or
school zones is generally prohibited.[16]  Certain unauthorized
persons (felons, fugitives, illegal aliens, indicted persons, drug
users, incompetents, and dishonorably discharged military
personnel) are prohibited from possessing or dealing in weapons.[17]
Most of the offenses under the Act are subject to five-year
statutory maximums,[18] but certain relatively serious offenses might
receive ten-year terms of imprisonment.[19]

    Two predominant threads underlie the approach and penalty
structure of the firearms statutes.  First, law-abiding citizens
generally have the right to own firearms, and this ownership should
be subject to minimal federal regulation.  Amendments to the Gun
Control Act, made under the Firearms Owner Protection Act,

---

[14]  18 U.S.C. § 922(a)(6).

[15]  18 U.S.C. § 922(i)-(k).

[16]  18 U.S.C. §§ 922(q), 930.

[17]  18 U.S.C. § 922(g).

[18]  But cf., 18 U.S.C. § 922(m) (one year statutory maximum
where dealer makes false entries or records, or fails to make
required records).

[19]  See e.g., 18 U.S.C. § 922(g) (prohibiting felons, and
others, from possessing firearms); 18 U.S.C. § 922(h) (prohibiting
employees of felons, and others, from purchasing firearms in the
course of their employment); 18 U.S.C. § 922(i) (prohibiting
shipping of stolen firearms); 18 U.S.C. § 922(j) (prohibiting
receipt or sale of stolen firearms); 18 U.S.C. § 922(o)
(prohibiting transfer or possession of machinegun).

5

underscore this theme.[20]   A second consideration is the intent of Congress that the statutes and their penalty provisions provide for harsh punishment where the offender is not a law-abiding citizen,[21] or where particularly serious weapons are involved, such as those regulated by the National Firearms Act.[22]

Numerous additional proposals for restricting certain handguns and military-style, semi-automatic assault rifles have been proposed since the early 1970's, but none have passed into law.[23]

## III. BACKGROUND DATA ON FIREARMS AND EXPLOSIVES

Firearms have had considerable negative impact on society when put to unlawful uses.   Vital Statistics data show that in 1987 handguns were used in almost 3,300 suicides, and other firearms or

---

[20]  See Hardy, The Firearms Owners' Protection Act:   A Historical and Legal Perspective, 17 Cumberland L. Rev. 585-682 (1987) for a detailed summary of the Act and the negotiations on which the Act was predicated.   See also discussion in Research Project, Federal Firearms Legislation, 6 Hamline Law Review 409, 412-415.   The author cites as the predominant provisions furthering this philosophy the restrictive definition of "engaged in the business of selling firearms," the tightened scienter requirements, and liberalized record keeping requirements for dealers.

[21]  See 18 U.S.C. § 924(a)(2), providing for ten year statutory maximums for offenses involving prohibited persons under 18 U.S.C. § 922(d), (g) and (h), and providing for a lower standard of scienter ("knowing") in contrast with the higher "willing" standard provided for violations of other provisions under the statute.

[22]  See 18 U.S.C. § 924(a)(2) which provides a ten year statutory maximum for "knowing" as opposed to "willing" violations of 18 U.S.C. § 922(o); see also 26 U.S.C. § 5871 (penalties for violations of the National Firearms Act).

[23]  See summary of legislation pending in the 101st Congress, printed in Hogan, Gun Control, Congressional Research Service Issue Brief (September 4, 1990).

6

unspecified firearms used in an additional 14,800 suicides -- well over half of all such deaths.  Firearms were similarly used in over half of the homicide deaths in 1987, with at least 1,000 involving a handgun, and 11,600 involving other or unspecified firearms.[24]

The FBI reports through its Uniform Crime Reporting Program (UCR) that almost 12,000 of the nearly 19,000 1989 murders were accomplished with a firearm, usually a handgun, but frequently a long gun.  The FBI also reports that firearms were used in over a third of all robberies, and a fifth of all aggravated assaults.[25]

## IV.    REVIEW OF APPELLATE CASES

See Appendix F for a review of decisional law concerning application of the firearms guidelines.

## V.    PAST PRACTICE -- HISTORICAL SENTENCING PATTERNS

Historical sentencing patterns for 18 U.S.C. § 922 have varied considerably.  Section 922 cases not sentenced under the guidelines have received average sentences ranging from 32 months to 62 months, with an approximate average annual total of 42 months.  Sentencing patterns for 26 U.S.C. § 5861 were considerably higher, with the average sentence over a period of July 1982 to June 1986 reaching 61 months.

---

[24] Vital Statistics of the United States, 1987, Volume II-Mortality, Part A, Division of Vital Statistics of the National Center for Health Statistics.

[25] Crime in the United States:   1989, U.S. Department of Justice, Federal Bureau of Investigation.

## VI.   REVIEW OF MONITORING DATA AND CASE FILES

Monitoring's 1989 data file, Mon1289, shows that 945 firearms cases averaged sentences of 43 months.[26]  This Monitoring data shows 1,153 firearms cases, 6.0% of all cases.[27]  The 1990 data file, Mon690, shows similar numbers of cases, with 1,351 firearms cases (5.7% of all cases), and 71 explosive materials cases (.3% of all cases).

The 1989 data file also shows upward departures occurred in 8.4% of the cases (compared with an overall guideline average of 3.5%), and downward departures occurred in 6.0% (compared with an overall guideline figure of 8.9%).[28]

The race of defendants was 56% white, 31% black, and 11% Hispanic, compared with an overall guideline figure of 47% white, 28% black, and 25% hispanic.  The gender of defendants was 97% male, 3% female, compared with an overall guideline figure of 84% male and 15% female.  Two-thirds of defendants received level 10 or less (compared with overall guideline figures of 40%).

The working group undertook extensive review of case files in order to ascertain the aspects of the firearms and explosives guidelines that worked well, and to determine the issues that appeared to raise the greatest concerns in the field.  The working

---

[26] Annual Report 1989, U.S. Sentencing Commission (Table VI).

[27] Id. Appendix B, Table B-4.

[28] Id., Table XII.  See Appendices D, G, I, K, L, M, N, O, and P

group reviewed and summarized all case files in which the court applied the current version of the firearms and explosives guidelines.[29]  In reviewing this set of files, the working group sought to identify issues arising from the current firearms and explosives guidelines that might need to be addressed in the current amendment cycle.

In addition, the working group separately reviewed and summarized case files in which the court applied the 1987/1988 version of the guidelines.[30]  The working group reviewed these cases primarily to determine issues that endured throughout the application of the guidelines, regardless of the version of guidelines applied.[31]

The working group has carefully relied on these case files to justify various aspects of the proposed guideline.  For example, the review of case files alerted the working group to offense characteristics that correlated with higher average sentences or

_____

[29] Twenty-two cases applied §2K1.3 (1987); seven applied §2K1.6 (1987); sixty-four applied §2K2.1 (1989); seventeen applied §2K2.2 (1989); three applied §2K2.3 (1989); and fifteen applied §2K2.5 (1989).

[30] The working group reviewed thirty-four cases which applied §2K2.2 (1987); and seventeen cases which applied §2K2.3 (1987).  No 1987 version of §2K2.5 existed, so no cases could be reviewed.  The large number of §2K2.1 (1987) cases (up to 1500) has prevented the working group from conducting any meaningful and complete review of §2K2.1 (1987) cases at this point.

[31] Case file summaries are attached in the appendix to this report (Appendices D, G, and H), as are in depth reviews of the findings (Appendices E, I, K and L).  In addition, sets of tables summarize the findings for §2K2.1 (1989) (see Appendix D, Tables I-A through I-D), and for §2K2.2 (1989) (see Appendix G, Tables I-A through I-B).

9

sentences at the upper end of the guideline range, including actual or intended unlawful or criminal use of the firearm,[32] possession of the firearm for personal protection, sporting or collection purposes,[33] drug-related conduct,[34] N.F.A. firearms,[35] destructive devices.[36]

The review also shows that 33% of all §2K2.1(a)(1) (1989) cases (applying to the most serious offenses) were sentenced at or above the upper end of the guideline range, and that 34% of §2K2.1(a)(2) (1989) cases (typically felon in possession) were so sentenced.[37]    This suggests a general insufficiency of these guidelines -- in contrast with the sentencing practices for §2K2.1(a)(3) (1989) (typically less serious possession and record

---

[32] Of §2K2.1 (1989) cases with this factor, 39% appeared at or above the guideline range; the average sentence was seventeen months, compared with an average sentence of fifteen months for all §2K2.1 (1989) cases.

[33] 72% of §2K2.1 (1989) cases with this factor were sentenced at or below the lower end of the guideline range; the average sentence was 11 months.

[34] 44% of §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the range; the average sentence was eighteen months.

[35] 35% of the §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the guideline range; the average sentence was nineteen months.

[36] All §2K2.1 (1989) cases with this factor were sentenced at or above the upper end of the guideline range; the average sentence was thirty months.

[37] A rough estimate of the number of all guidelines cases sentenced to the upper end of the guideline range is 15-20%, including upward departures.

10

keeping offenses) where only 11% were sentenced at the upper end of the range.

## VII.  DISCUSSION OF PROPOSED FIREARMS GUIDELINE

### PART I.  BASE OFFENSE LEVELS

1.    Proposed Section 2K2.1(a)(1):

> (1)  [18-20], if the offense conduct involved one or
> more firearms defined in 26 U.S.C. § 5845(a); [but
> if the offense conduct involved one or more
> destructive devices, as defined in 26 U.S.C. §
> 5845(f), then level [20-22]]

*Present Guideline*

§2K2.1(a)(1) provides a base offense level of 18 for unlawful
receipt, possession, or transportation of National Firearms Act
(N.F.A.) firearms (firearms defined in 26 U.S.C. § 5845(a)).
§2K2.2(a)(1) applies to unlawful trafficking of N.F.A. firearms.
Application of the present guideline requires a conviction under 26
U.S.C. § 5861.

*Proposed Guideline*

Proposes level 18-20 if the offense conduct involved one or more
National Firearms Act (N.F.A.) firearms defined in 26 U.S.C. §
5845(a), whether or not the statute of conviction was 26 U.S.C. §
5861.   Proposes a bracketed option that where the offense conduct
involved "destructive devices," defined in 26 U.S.C. § 5845(f), the
conduct receives level 20-22.  Application Note 1 defines the term
"firearms" by referencing 18 U.S.C. § 921(a)(3)-(8).    An
application note defines the term "defined in 26 U.S.C. § 5845(a)"
by referencing that statute.

*Statutory Provisions*

26 U.S.C. § 5861(a)-(l) (prohibiting various conduct, including
failure to properly register or secure a license, and possession of
unregistered firearms, and firearms without serial numbers).
Statutory maximum is ten years.

18 U.S.C. § 922(a)(4) (prohibits any unlicensed person from
transporting any N.F.A. firearm).  Statutory maximum is five years.

18 U.S.C. § 922(b)(4) (prohibits any dealer from selling or
delivering N.F.A. firearm).  Statutory maximum is five years.

18 U.S.C. § 922(o) (prohibition on any person transferring or
possessing a machinegun).  Statutory maximum is ten years.

*Issues*

a.  Should the current offense level (18) for conduct involving National Firearms Act firearms be raised to a level 19 or 20?

b.  Should the offense level for conduct involving destructive devices be raised from the same level as conduct involving other National Firearms Act firearms (a level 18) to a separate, higher level (20-22)?

*Discussion*

Offense conduct involving National Firearms Act (N.F.A.) firearms (including machineguns, destructive devices, such as pipebombs and grenades, silencers, and sawed off or short-barrel rifles and shotguns)[38] is generally considered more serious because such weapons are viewed as more dangerous than other firearms.[39] In recognition of this fact, Congress imposed relatively high statutory maximums where such firearms are involved. See 26 U.S.C. § 5871. ATF has recommended a base offense level of 20 for these offenses.[40]

---

[38] Firearms not considered "N.F.A. firearms" include regulation or legal length long guns (rifles and shotguns), handguns, starter guns, and the frame or receiver of any such weapon. See 18 U.S.C. § 922(a)(3) and 26 U.S.C. § 5845(a).

[39] Certain Members of Congress and advocacy groups have proposed in the last two decades that offenses involving additional firearms, such as handguns and assault rifles, be considered deserving additional regulation and penalties. The working group has not chosen to separate these firearms for special treatment under the guidelines in light of the failure of Congress to separate these firearms for special regulatory or punitive treatment. Further, ATF notes that military-style assault weapons can not be distinguished from other semi-automatic firearms, and so should not be treated differently. Meeting with ATF officials, October 12, 1990.

[40] See Appendix C, ATF letter to the Commission (December 14, 1989). See Attachment for text of this letter.

**13**

Past sentencing practice confirms the heightened concern with these weapons. Monitoring data for guidelines cases applying the 1989 version of §2K2.1 reveals that courts impose sentences in cases involving N.F.A. firearms at the upper end of the range more frequently than the norm for all non-firearms guidelines (35% of cases sentenced at upper end or above the range, compared with a norm of approximately 15%)[41]. Monitoring data also reveal that courts in these cases impose higher average sentences when N.F.A. firearms are involved (average 19 months compared with a norm in §2K2.1 cases of 15 months).

The proposed guideline would apply not only to charged conduct, as is the case with the present guideline, but to the offense conduct, itself. The intended result is that the felon, or other offender, in possession of an N.F.A. firearm should receive a base offense level that adequately reflects the danger of these firearms, notwithstanding the particular count of conviction, thereby eliminating or restricting plea bargaining designed to circumvent the guidelines. (Note: three of fifteen §2K2.1 (1989) cases involved offenders who unlawfully possessed an N.F.A. firearm, but were not charged under the N.F.A. statute).

The working group also proposes for the Commission's consideration and for public comment the making of a distinction between destructive devices and other N.F.A. firearms, on the ground that destructive devices are inherently more volatile and

---

[41] Monitoring data provided throughout this report has been culled from a review of cases applying 1987 and 1989 firearms guidelines.

14

more prone to unlawful uses than other N.F.A. firearms that can be better controlled and arguably have more limited ability to damage.[42]  Past sentencing data is sparse:  the two §2K2.1 (1989) cases involving destructive devices received average sentences of 30 months (compared with an overall §2K2.1 average of 15 months, and an N.F.A. firearms average of 19 months), and both were sentenced at the top or above the guideline range.  But the single §2K2.2 (1989) case was a downward departure for substantial assistance to a four-month sentence.  Of four §2K2.2 (1987) cases, the average sentence was also nineteen months.

*Possible Concerns* [43]

 1. <u>Making N.F.A. Violations Subject to A Real Offense</u> <u>Approach</u>

---

[42] The case files are replete with egregious examples of the unlawful use to which destructive devices are put.  [Note: Case file numbers are available.]  Bomb intended to be used as diversion during bank robbery; defendant threw pipebomb at his wife's car, and later threw molotov cocktail through the window of her house, after beating the wife and kidnapping their child; defendant sold grenades for cocaine and crack; defendant gave pipebomb to codefendant who exploded the bomb in the faces of police officers; defendant built pipebombs and hired friends to use the devices against his enemies who owed him money; similar conduct; defendant placed pipebomb under co-worker's car--it exploded, killing one child; defendant arrested before he was able to use two pipebombs on certain public officials. <u>U.S. v. Foster</u>, 898 F.2d 25 (4th Cir. 1990) (jilted defendant placed bomb in new boyfriend's car, but it failed to explode).

[43] The "Possible Concerns" sections throughout this report note concerns not necessarily raised in the "Discussion" sections.  An occasional absence of a "Possible Concerns" section at a particular point in the report may occur as a result of considerations of brevity and space, or where the "Discussion" section referred to relevant concerns.

The present guidelines provide for an enhanced level for N.F.A. violations only when convictions occur pursuant to statutory provisions that specifically address such firearms. Thus, if a defendant in possession of an N.F.A. weapon, such as a machine gun, a silencer, or a sawed off shotgun is convicted under one of the "N.F.A. statutes" that specifically prohibit possession of such weapons, he presently receives an offense level of 18. If, however, his offense conduct is the same, but he instead is convicted under a different statute not directly addressing N.F.A. weapons, he presently receives an offense level of 6 or 12, depending on the statute used.

Such a system poses an obvious potential for sentencing disparity. Such disparity might be justified if N.F.A. prosecutions included both serious and minor record-keeping violations, such that the exercise of prosecutorial discretion to distinguish between the two would be appropriate. ATF informs us, however, that with regard to possession of N.F.A. firearms--to wit, machineguns, silencers, sawed off shotguns, and destructive devices, such as pipebombs -- there are virtually no minor violations.

2. <u>Raising the Offense Level for N.F.A. Weapons and Carving Out An Additional Enhancement for Destructive Devices</u>

The working group has recommended for the Commission's consideration bracketed language setting N.F.A. offenses at an offense level of 18-20. The present level is 18; 20 would represent a two level increase.

There has obviously been little experience with N.F.A.
offenses since the 1990 amendment raising such offense from a level
16 to a level 18.  If the Commission examined this guideline by
itself, that absence of experience might disfavor changing the
guideline one year later.  Because the Commission is considering a
reworking of the entire firearm guideline scheme, however, it makes
sense for the Commission to decide, with some finality, what it
believes to be the appropriate offense level for N.F.A. offenses.
Given the consistent dissatisfaction with the firearms guidelines,
as reflected by the frequency with which these guidelines have been
amended, the working group feels that it is important that the
appropriate levels be settled in one amendment process in order to
avoid the need to revisit the area in future amendment cycles.

Accordingly, the Group has proposed for the Commission's
consideration an amendment that would raise by two levels the
offense level for N.F.A. violators.  The justification for the
increase, if the Commission chooses to make such an increase is
that in the past, the Commission, through its guidelines, has
indicated its belief that N.F.A. violations are among the most
serious firearms offenses.  If the Commission decides to raise the
offense levels for other firearms' violations, as suggested _infra_
by the working group, it also may wish to increase the N.F.A.
offense levels to retain the proportionally higher levels
traditionally given to those offenses.

Second, the Group has offered for the Commission's
consideration the question whether destructive devices, which are

**17**

included as N.F.A. firearms, should themselves receive an enhanced offense level over other N.F.A. weapons. The statute's failure to distinguish such devices from other N.F.A. weapons arguably disfavor a distinction made by the guidelines. Favoring an enhancement, however, is the inherent dangerousness, the unlikelihood of any legitimate use, and the risk posed to greater numbers of people by devices such as pipebombs or hand grenades. Alternatively, the possession of a destructive device could be the basis for an upward departure. The Commission may wish to seek public comment on this question.

2.  Proposed Sections 2K2.1(a)(2) and (3):

> (2)  [24], if the defendant is a prohibited person and had at least two prior [convictions for a violent felony or serious drug offense] [felony convictions for a crime of violence or controlled substance offense] [, or firearms offense]; but if the offense conduct involved one or more firearms defined in 26 U.S.C. § 5845(a), then level [26];

> (3)  [20], if the defendant is a prohibited person and had one prior [conviction for a violent felony or serious drug offense] [felony conviction for a crime of violence or controlled substance offense] [, or firearms offense]; but if the offense conduct involved one or more firearms defined in 26 U.S.C. § 5845(a), then level [22]

*Present Guideline*

§2K2.1(a)(2) provides a base offense level 12 for a prohibited person, regardless of the number or nature of prior convictions.

*Proposed Guideline*

Proposes level 24 if the defendant is a prohibited person and had two prior felony convictions for a crime of violence, controlled substance offense, or, optionally, a firearms offense.

18

**EXHIBIT B**

## SUMMARY OF COMPLETED PROSECUTIONS FOR
## <u>VIOLATIONS OF 18 U.S.C. § 922(a)(6)</u>

1.  **<u>United States v. Juan Barbosa</u>**
2.  **<u>United States v. William Barbosa</u>**,
    **No. 03-4009-NMG**

The Barbosas are brothers who were observed renting firearms, buying ammunition, and taking target practice at local shooting range. The range policy was to have individuals provide photo identification and to fill out and sign release forms affirming that guests had not been convicted of a crime punishable by law for more than one year. Each Barbosa denied that he was a felon. In fact, each had been convicted of serious drug felonies in the past.

> **SOURCE:**   Indictment, Presentence Report Offense Conduct

> **SENTENCE:** Juan Barbosa    -   70 months imprisonment.
>           William Barbosa -   37 months imprisonment.

3.  **<u>United States v. Robert Bourgeois</u>**,
    **No. 01-40007-NMG**

Bourgeois, who had an extensive criminal history including a prior felony conviction for carrying a firearm without a permit, lied about that status when he completed an ATF 4473 to buy three guns, including a shotgun. The lies were made after he had previously been denied transfer of a firearm because he was prohibited by his criminal record from possessing firearms. He also attempted to possess what agents initially believed to be a fully-automatic assault rifle. He was later found to be in possession of twenty-five (25) firearms and five boxes of ammunition.

> **SOURCE:**   Affidavit of BATF Special Agent Michael Curran.

> **SENTENCE:** Three years probation after the court's application, pursuant to agreement of the government, of the sporting exception.

EXHIBIT B

**4.    <u>United States v. Kevin Brodeur</u>,**
**No. 01-30040-MAP**

Brodeur and another individual received money from a person Brodeur knew to be a convicted felon and with that money bought guns and associated items for him.  Brodeur admitted that he lied when buying the guns and associated items by stating that he was not buying the guns for someone else.

**SOURCE:**    Indictment.

**SENTENCE:** 13 months imprisonment, a non-guideline sentence
            pursuant to a government motion.

**5.    <u>United States v. James Carey</u>**
**No. 05-40040-FDS**

Carey was a convicted felon who was known to carry handguns and was suspected of having engaged in witness tampering.  He was also the subject of an unsuccessful state-court prosecution for a violent home invasion that had to be dismissed after evidence was suppressed.  Carey lied about his felon status when he completed gun range forms allowing him to rent guns.  Carey admitted to agents that he well knew he could not possess guns and that he had intentionally lied when he completed the required range forms.

**SOURCE:**    Affidavit of BATF Special Agent Michael P. Curran

**SENTENCE:** 46 months imprisonment.

**6.    <u>United States v. Aldris Castillo</u>,**
**No. 90-30013-FEF**

Information could not be obtained about this case due to its age at inception.

**SOURCE:**

**SENTENCE:** After downward departure, a $5,000 fine and no
            imprisonment.

-2-

**EXHIBIT B**

7.    <u>**United States v. Domingos DePina**</u>,
      No. 99-10252-PBS

Domingos DePina purchased guns from federally licensed dealers three times between 1994 and 1997.  On each occasion, DePina falsely stated on the AFT Form 4473 that he was the actual buyer of the firearms when in fact he was not.  An investigation revealed that DePina had purchased three firearms from another federally licensed dealer between 1994 and 1996 and another firearm in 1997.  DePina admitted to selling the firearms to support a drug habit.  Individuals who DePina knew to have felony criminal records picked out the guns for DePina to buy and gave him money to do so.  Once purchased, DePina would immediately exchange the weapon outside of the store for the promised money.

**SOURCE:**    Indictment, Presentence Report Offense Conduct

**SENTENCE:** After downward departure from 10-16 month guideline sentencing range for extraordinary rehabilitation, 36 months probation with the first six months in home detention.

EXHIBIT B

8.  **United States v. Sarah Hanrahan**,
    **No. 00-10329-WGY**

    Hanrahan admitted that she had purchased seven firearms at
New England Sportsman, Inc.  At each purchase Hanrahan completed
the ATF Form 4473 and each time she claimed she was the actual
purchaser of the firearm.  She sold all the firearms to Robb
Rose, a convicted felon, who was friends with her boyfriend,
Shane Farr.  Farr was subsequently arrested with one of the
weapons, an Intratec, model CAT 9, 9mm pistol.  Hanrahan herself
had multiple arrests for assault and battery, possession of
cocaine, possession with intent to distribute cocaine, and
possession of marijuana; she knew that the weapons were going to
a known drug dealer.

> **SOURCE:**    Indictment, Presentence Report Offense Conduct,
>                Judgment.

> **SENTENCE:** After downward departure from 18-24 month
>               guideline sentencing range, 36 months probation
>               with the first six months in home detention.

9.  **United States v. Anthony Hodges**
    **No. 03-40010-FDS**

    Hodges had multiple convictions for violent crimes,
including assault with intent to murder, armed robbery, assault
on a police officer, and witness intimidation.  Hodges lied about
his felon status on multiple occasions when he rented assault
weapons.  When Hodges was questioned by police, he admitted that
he had lied on the form to be provided to the federally-licensed
range owner because he knew his felon status precluded him from
possessing firearms.

> **SOURCE:**    Government's Trial Brief.

> **SENTENCE:** 90 months imprisonment.

**EXHIBIT B**

10.  **United States v. John Patrick Hughes**,
     No. 99-10405-REK

A sporting goods store reported that Hughes had purchased eleven guns over the course of three purchases in one week, and had done so on one occasion when accompanied by two other men. Investigation disclosed that one of the guns was recovered in the possession of a convicted felon, an acquaintance of Hughes', in connection with an armed assault and car jacking.  Hughes was indicted for falsely stating on the ATF Form 4473 that he was the actual purchaser of the weapon and was later convicted for also denying that he was a drug-addicted person.

> **SOURCE:**  United States v. Hughes, 95 F.Supp.2d 49 (D.Mass. 2000).

> **SENTENCE:** After downward departure from a 27-33 guideline sentencing range to reflect extraordinary rehabilitation even in light of defendant's decision to go to trial, 18 months imprisonment.

11.  **United States v. Tammy L. Johnson**,
     No. 02-10327-PBS

Tammy L. Johnson admitted that she bought six firearms for her brother, Mack Fludd, in South Carolina on three separate occasions.  At each purchase Johnson completed the ATF Form 4473 and each time she claimed she was the actual purchaser of the firearms.  She knew that her brother was unable to purchase the weapons on his own because he had a criminal record.  Fludd would pick out the weapons he wanted her to purchase and she immediately gave all the firearms to him; he transported the weapons to and sold them in the Boston area.  (Fludd was later sentenced in South Carolina to a term of 292 months for participating in a series of such transactions.)

> **SOURCE:**  Indictment, Presentence Report Offense Conduct.

> **SENTENCE:** Two years probation with the first six months in home detention.

EXHIBIT B

12. **United States v. Frederick M. Lebert**,
       **No. 99-10327-RWZ**

Lebert, a former police officer, was convicted in federal court of firearms felonies in 1985. Notwithstanding his conviction, he purchased a shotgun from a federally licensed firearms dealer on April 24, 1999. At the purchase Lebert completed the ATF Form 4473 and in it denied that he had been convicted of a felony.

     **SOURCE:**   Indictment, March 21, 2000 Order (Dkt. Entry #21), Attorney Report

     **SENTENCE:** Three years probation.

13. **United States v. Michael P. Lehtonen**,
       **No. 00-10308-REK**

Between March and May of 1999, police recovered four firearms following three separate shootings in Brockton. Upon further investigation, law enforcement traced the firearms back to Lehtonen, who had purchased the firearms from legitimate licensed dealers. Lehtonen who admitted to purchasing the above firearms in addition to a Smith and Wesson 9mm pistol and a Smith and Wesson .380 caliber pistol, and ammunition for a convicted felon. Parker had provided the funds for weapons and paid Lehtonen for making the transactions.

     **SOURCE:**   Indictment, Presentence Report Offense Conduct.

     **SENTENCE:** Six months imprisonment in an halfway house after departure on government motion from a guideline sentencing range of 24-30 months.

EXHIBIT B

14. **United States v. Eric D. Offley**,
    **No. 01-10246-JLT**

On three separate occasions Offley purchased a total of six firearms from a federally licenced dealer in Westport, Massachusetts.  Each time he completed the ATF Form 4473 and indicated that he was the actual purchaser of the firearm when in fact he was purchasing the weapons for three other individuals with criminal records.  Moreover, he was subject to a restraining order taken out by his girlfriend when he possessed two of the firearms.

  **SOURCE:**    Indictment, Presentence Report Offense Conduct.

  **SENTENCE:** Time served (seven months) imprisonment after departure on the government's motion from a guideline sentencing range of 12-18 months.

15. **United States v. Rafael Perez**,
    **No. 02-30025-MAP**

Perez came to the attention of ATF agents because of reports of a number of suspicious firearms purchases.  Resulting surveillance and subsequent statements revealed that Perez purchased over 15 weapons from federally licensed firearms dealers, including at least one semiautomatic assault weapon, which he immediately distributed to at least two others.  In making the purchases, Perez falsely stated in ATF 4473 forms that he was the actual buyer of the firearms.

  **SOURCE:**    Presentence Report Offense Conduct

  **SENTENCE:** 30 months imprisonment.

16.  **United States v. William Pleasants**,
     No. 99-10248-MLW

Pleasants applied five times to purchase firearms from federally licensed dealers; he was denied twice but was successful three times.  Each time he completed the ATF Form 4473 and responded "No" to the question which asked if he had ever been convicted in any court of a crime for which the judge could have imprisoned him for more than one year.  In fact, however, Pleasants had been convicted of arson, illegal firearms possession twice, and rape.  The unsuccessful attempts were thwarted when the instant background check revealed the prior convictions.

> **SOURCE:**    Indictment, Presentence Report Offense Conduct.

> **SENTENCE:** Three years probation with the first six months in home detention after downward departure from a 46-57 month guideline sentencing range to reflect extraordinary physical impairment (defendant was a paraplegic).

17.  **United States v. Vito Resto**,
     No. 05-30016-MAP

Resto, while under state court indictment for offenses arising out of a shooting incident, rented weapons and ammunition on two different occasions.  At the time of each of the purchases, Resto also had a significant criminal history including convictions for drug trafficking, armed robbery, and prior firearms possession.  On each occasion he falsely stated that he had not been convicted of a felony, a fact which if disclosed would have prohibited sale of the weapons to him.

> **SOURCE:**    Government memorandum.

> **SENTENCE:** 24 months imprisonment, a sentence below the advisory range of 57-71 months imprisonment because to the nature and circumstances of the offense and overstatement of criminal offense by criminal history category IV.

**EXHIBIT B**

18.   **United States v. Lindell Smith**,
      **No. 03-30019-MAP**

    Smith, who possessed a valid firearms license, purchased a total of five handguns for two individuals who themselves were prohibited from purchasing because of their respective criminal histories, a fact of which Smith was aware.  On each occasion Smith falsely represented on the ATF 4473 form that he was the actual purchaser of the weapon at issue.  Smith received $150 for each gun he purchased.

    **SOURCE:**   Indictment.

    **SENTENCE:** 18 months imprisonment.

19.   **United States v. Kris St. Onge**,
      **No. 03-10395-WGY**

    St. Onge purchased weapons from federally licensed firearms dealers on six different occasions.  Each time he completed an ATF 4473 in which in falsely claimed to be the actual buyer; in fact, he was purchasing the weapons for delivery to others prohibited from purchasing the weapons.  Moreover, St. Onge lied in the forms when he stated that he was not addicted to a controlled substance when in fact he was.

    **SOURCE:**   Indictment.

    **SENTENCE:** 30 months imprisonment.

**EXHIBIT B**

20.   **United States v. Harold Wilson, et. al.**,
      **No. 98-30013-FHF**

Wilson, himself unable to purchase firearms due to his extensive criminal history, elicited the assistance of Henry Troy, a legally blind individual with an ATF card, to obtain 31 firearms.  On each occasion Troy falsely stated that he was buying the weapons for himself when in fact he was buying them on behalf of and at the direction of Wilson, who then obliterated the serial numbers and sold the weapons on the streets knowing they were to be used for illegal purposes in committing other crimes.  Very few of the weapons were ever recovered.

**SOURCE:** Sentencing hearing transcript.

**SENTENCE:** 60 Months imprisonment, a downward departure from the guideline sentencing range of 100-125 months imprisonment after departure on the government's motion.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### PROBATION OFFICE

**John M. Bocon**
Chief U.S. Probation Officer

1 Courthouse Way
Suite 1200
Boston, MA 02210
(617) 748-4200
Fax -(617) 748-9185

June 17, 2005

Ms. Courtney Roberts
Federal Defender Officer
408 Atlantic Avenue
Third Floor, Suite 328
Boston, MA 02210

Dear Ms. Roberts:

Below is a list of the defendant names and their docket numbers for those who were convicted of 18:922(a)(6). We found no records for 18:924(a)(1)(A).

| | |
|---|---|
| Barbosa, Juan | Dkt#03-40009 |
| Barboza, William | Dkt#03-40009 |
| Bourgeois, Robert | Dkt#01-40027 |
| Brodeur, Kevin | Dkt#01-30040 |
| Castillo, Aldris | Dkt#90-30013 |
| Depina, Domingos | Dkt#99-10252 |
| Hanrahan, Sara | Dkt#00-10329 |
| Hughes, John Patrick | Dkt#99-10405 |
| Johnson, Tammy L. | Dkt#02-10411 |
| Lebert, Frederick | Dkt#99-10327 |
| Lehtonen, Michael | Dkt#00-10308 |
| Offley, Eric D. | Dkt#01-10246 |
| Perez, Rafael | Dkt#02-30025 |
| Pleasants, William | Dkt#99-10248 |
| Smith Lindell | Dkt#03-30019 |
| St. Onge, Kris | Dkt#03-10395 |
| Wilson, Harold | Dkt#98-30013 |

Please call me at 617-748-9209 if you require further assistance.

Sincerely,

Jennifer D. Sinclair
Senior U.S. Probation Officer

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### Probation Office

**JOHN M. BOCON**
Chief U.S. Probation Officer

1 Courthouse Way, Suite 1200
Boston, MA 02210
(617) 748-4200
Fax - (617) 748-9185

Sent Via E-mail

December 4, 2006

Attorney Timothy Watkins
Federal Defendant Office
408 Atlantic Avenue
Third Floor, Suite 328
Boston, MA 02210

Dear Attorney Watkins:

Below is the information that you requested regarding the individuals convicted of 18:922(a)(6) since 2000. Please note that we have no record of anyone being sentenced under 18:924(a)(1)(A).

| | |
|---|---|
| BARBOSA, JUAN | 03-40009 |
| BARBOZA, WILLIAM | 03-40009 |
| BOURGEOIS, ROBERT | 01-40027 |
| BRODEUR, KEVIN | 01-30040 |
| CAREY, JAMES | 05-40040 |
| CASTILLO, ALDRIS | 90-30013 |
| DEPINA, DOMINGOS | 99-10252 |
| HANRAHAN, SARA | 00-10329 |
| HODGES, ANTHONY | 03-40010 |
| HUGHES, JOHN PATRICK | 99-10405 |
| JOHNSON, TAMMY L. | 02-10411 |
| LEBERT, FREDERICK | 99-10327 |
| LEHTONEN, MICHAEL | 01-10308 |
| OFFLEY, ERIC D. | 01-10246 |
| PEREZ, RAFAEL | 02-30025 |
| PLEASANTS, WILLIAM | 99-10248 |
| RESTO, VITO | 05-30016 |
| SMITH, LINDELL | 03-30019 |
| ST. ONGE, KRIS | 03-10395 |
| WILSON, HAROLD | 98-30013 |

If you have any questions or need further information, please contact me at (617) 748-9209. Please note that I will be out of the office until Tuesday afternoon. If you need anything else, please e-mail me.

Sincerely,

Jennifer D. Sinclair
Senior U.S. Probation Officer

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
          v.                )    CRIMINAL NO. 05-40001-FDS
                            )
SAMUEL J. LEWIS             )

AFFIDAVIT OF WINFRED MEADOWS-MARQUEZ

I, Winfred Meadows-Marquez, do hereby depose and state the
following:

1.    My name is Winfred Meadows-Marquez.  I am currently employed
      as an investigator for the Federal Defender Office for the
      District of Massachusetts.  I have been so employed for
      seven years.

2.    A major part of my duties as an investigator in the office
      is to locate and interview witnesses.  I am also asked to
      obtain background information on potential witnesses.

3.    When trying to locate witnesses, I am often given inaccurate
      or incomplete information, particularly concerning residence
      and work addresses.

4.    In order to locate a witness I often resort to using an
      internet-based open-source database service called
      Choicepoint.  I have been trained in how Choicepoint works
      and the services it provides.  I have also learned that
      Choicepoint (and services similar to it) is available to and
      routinely used by law enforcement.

5.  According to promotional materials provided by Choicepoint,
    its product provides access to more than 17 billion current
    and historical records on individuals and businesses, and
    allows users to browse through those records instantly.
    With as little information as a name or Social Security
    number, users can cross-reference public and proprietary
    records including identity verification information,
    relatives and associates, corporate information, real
    property records, deed transfers and much more.

6.  Choicepoint claims that its product gives users the "ability
    to locate people and assets faster, identify and manage
    risk, detect and prevent fraud, and solve more crimes."

7.  My own experience with Choicepoint verifies many of these
    claims.  For example, if provided with a name, date of
    birth, and social security number, I can within minutes
    determine residential history for at least the last several
    years.  The residential history usually provides dates when
    a subject lived there or used that address.  As to each
    address given in the history, I can also find the owner of
    the property and neighbors as well as a variety of other
    information.

8.  I have found Choicepoint to be more accurate and up-to-date
    than many other public records, including drivers license
    and car registration information.

Signed under pains and penalties of perjury this 7th day of December 2006.

Winfred Meadows-Marquez



*Wing Memorial*
Hospital and Medical Centers
A Member of UMass Memorial Health Care

40 Wright Street
Palmer, MA 01069
Tel: 413-283-7651

To whom it may concern:

Re: Mr. Samuel Lewis                    Oct, 4th 2006

Dear Sir;

I came to know Mr. Lewis through his work with us at the Inpatient Psychiatric Unit at Umass/ Wing Memorial Hospital.   Mr. enjoys a pleasant cooperative and positive attitude. He was always perceived as a caring, genuine, conscientious and helpful person. He got along very well with colleagues and patients alike.  He was liked and respected by all. He is still remembered  as a dependable thoughtful caring person.

 I have also known Mr. Lewis through the community where he is an active volunteer. He enjoys a good reputation as a good, helpful and kindhearted person.  He appears to me as a committed family person.

I am sure that Mr. Lewis will meet expectations and fulfill responsibilities assigned to him. I would not hesitate to recommend him for a job.

If you have any questions, please don't hesitate to contact me.

Sincerely,

Imad Khreim, MD

*Leah D. Hazard*
*85 Birch Street*
*Worcester, MA 01603*

*To Whom It May Concern:*

*My name is Leah D. Hazard, and I am a Protective Service Worker for Elder Services of Worcester County Inc., Worcester, MA. I have been working at this agency for the past 21 years and a resident of Worcester, MA all my life. I write you in hopes that my opinion, views and feelings might express my thoughts regarding Samuel (Sam) Lewis.*

*I have known Sam Lewis; since he was born and have watch him grow into a loving caring man/father and a man who loves his family very dearly. I have continuously grown very fond of Sam as he grew and matured into a man. I feel he is sensitive and has worked very hard in exhibiting his growth spiritually and emotionally toward others that have come into his life.*

*Sam is a gentle person and very sensitive to other's needs. He is a good father to his children and shows outwardly love, for them and want nothing but the best for them as they grow into responsible young people.*

*I know I have a personal bias toward this young man because of the connection my family has with his family, which has been true and active over several years in our closely knit community.*

*I offer my support and love to Sam and his family and wish you can look into his heart and see what I see and feel when I interact with him.*

*I am; of course, most grateful for your time and attention in taking the opportunity to read what I have to share, from my heart, the impact Sam Lewis has had on me and my family.*

*Sincerely*

*Leah D. Hazard*



**JOHN STREET BAPTIST CHURCH**
**43 John Street**
**Worcester, MA 01609**
**(508) 753-4991**

**Rev. Dr. Roosevelt Hughes Jr., Pastor**

Dear Sirs,

    I have had the privilege of knowing Mr. Sam Lewis for some ten years. During this time I have been blessed to see him mature into a most caring farther and member of our community. In past times Sam has shown a willingness to do volunteer work for both church and community services. Such examples noted were his work at the YMCA in which he worked in sponsoring a men's health seminar. In regards to community work, he continues to do volunteer work feeding the homeless at the John St. Baptist Church Soup kitchen on Saturdays.

    This type of service is an example of Mr. Lewis' character and love for doing for us in the community.

Yours truly,

*Dea. Walter Davenport*

Deacon Walter Davenport

10/29/06

To Whom it may Concern:

This letter is a character reference for Sam Lewis. I have known him since 1995. I have watched him with his children. I find him strong hard working and trust worthy.

He has always encouraged my daughter academically and has been a very strong help to all of the kids. I can't say anything negative about this young man I can truly say I Love him and admire him very much

Evang. Jocelyn Ekeh
31 Orne St # 2
Worcester Ma 01605

173 Ash Street
Spencer, Ma 01562
November 3, 2006


To whom it may concern,

I have known Samuel Lewis for six years. As a friend and as a co-worker. Samuel and I worked together as Instructional Assistance in West Boylston for the Worcester public school. For the two years that I worked with Samuel I got to know and love him as my own child. He was always very respectful and liked by everyone he came in contact with. He was a very good teacher who loved working with the children there, especially the most challenging one's.

Samuel is a devoted father, loving husband, caring son and brother. His wife and small children are depending on his physical presents and financial support. It would be unjust to separate him from his family. He is a good man. He's not a killer, rapes nor a theft. His only crime was not knowing certain things.

I'm pleading to you in behalf of his family to not separate him from his wife and small children. They have suffered enough, please don't punish them.


Thank You,

Catherine Taylor

Catherine Taylor

# John Street Baptist Church

**43 JOHN STREET, P.O. Box 2696**
**WORCESTER, MASSACHUSETTS, 01613**
Phone: (508) 753-4991 † Office Phone: (508) 752-8808

*Motto: Prayer, Purpose, and Focus*

**Rev. (Dr.) Roosevelt Hughes, Jr., Pastor**

FOUNDED 1884

November 4, 2006

To Whom It May Concern:

### Character Reference – Samuel J. Lewis

I have known Samuel (Sam) Lewis for nearly seven years in various capacities at John Street Baptist Church. As Co-Chair of the Men's Council and Chairperson of the Trustee Board, I have had the opportunity and privilege to work with Samuel Lewis on various projects affecting Men's and Children's Health and Health Education. These were community based and family-oriented programs that he initiated while working at Family Health Services in Worcester, MA.

Sam is very personable. Not only did he get along very well with members of the Men's Council at the Church, but also with parishioners in other auxiliary organizations within the church. He is very organized, resourceful, talented, efficient, and extremely competent. He is always very willing to help.

Sam is of good moral character.

Sam's yearning to continue to learn, grow, and share his talent and knowledge with the Worcester community coupled with his good moral character strongly affirm that he has an even brighter future. It is my fervent hope and belief that Sam would be best served if he could continue to be a valuable asset to the community.

If you have any questions, please do not hesitate to contact me at (508) 757-5455.

Sincerely,

Ibiyekaribo B. Sokari
Chairperson, Trustee Board

**PROCLAIMING God's FAITHFULNESS THROUGHOUT ALL GENERATIONS.**
**"Thy faithfulness is unto all generations."** - PSALM 119:90

# John Street Baptist Church

**43 JOHN STREET**
**WORCESTER, MASSACHUSETTS, 01609**
Phone: (508) 753-4991 † Office Phone: (508) 752-8808

*Motto: Prayer, Purpose, and Focus*

**Rev. (Dr.) Roosevelt Hughes, Jr., Pastor**

Founded 1884

November 4, 2006

To Whom it May Concern,

As a pastor, over the years I have had the opportunity to work with and closely observe many young men and women. Sam Lewis is one of those young men I have had the pleasure of observing and getting to know over the years.

I met Sam Lewis about 15 years ago. I have watched him grow and mature into a man of integrity; a terrific father, and husband.

To my knowledge, at various times over the years, Sam was the principal provider for his family. He was so committed to his role as provider that at times he worked two and three jobs; always showing love, care and interest when dealing with the needs of his all of his children.

In all of this, Sam continued to go to college to improve himself; desiring to be an even better provider of his family's livelihood and at times holding down multiple jobs to meet their needs.

I believe he has gone far beyond the expected to ensure the well-being of his family and deserves the opportunity to continue.

Sam Lewis has always been hard-working, self-motivated and highly respected since I have known him. I believe that his work ethics, skills and concern for his family will serve as an asset to the community at large.

Thank you for considering this letter of character reference.

Yours truly,

Rev. Dr. Roosevelt Hughes, Jr.

*Proclaiming God's Faithfulness Throughout All Generations.*
*"Thy faithfulness is unto all generations." - Psalm 119:90*

# SOUTHBRIDGE EVENING News

NEWSSTAND 50¢

INFORMING THE TOWNS OF SOUTHBRIDGE, STURBRIDGE, CHARLTON, BRIMFIELD, HOLLAND AND WALES SINCE 1923

WEDNESDAY, APRIL 28, 2004

southbridgeeveningnews.com



## BUSINESS

FATHOM IMAGING
FOCUSES UNDER WATER

**PAGE A4**

*Support your fave softball player*

## INSIDE

| | |
|---|---|
| DEATHS.............. | A2 |
| LOTTERY............. | A2 |
| BUSINESS........... | A4 |
| OPINION............. | A6,7 |
| STATE/WORLD.. | A10,11 |
| CALENDAR......... | A8 |
| SPORTS.............. | B1-4 |

## SPORTS

WARRIOR TRACK
SWEEPS WOLVERINES

**PAGE B1**

# Southbridge dropout rate up

## Bialy details drop-out plan

BY DANIELLE WILLIAMSON
NEWS STAFF WRITER

SOUTHBRIDGE — The principal of Southbridge High School believes that one entity cannot be blamed for the dropout rate. Rather, it is a community-wide issue.

"Everyone shares a role to end this massive problem," Principal Joseph Bialy said last night to the School Committee in a presentation on the school's 2002-2003 dropout rate, which increased by more than a third from the previous year.

"We should be looking

*Please Read MEETING, page A12*

## LOCAL TEEN UNHAPPY WITH SCHOOL SYSTEM

BY DANIELLE WILLIAMSON
NEWS STAFF WRITER

SOUTHBRIDGE — Erica Rosario didn't drop out of high school because she was failing her classes. Her most recent report card, she said, was all As and Bs.

The lifelong Southbridge resident didn't drop out because she was addicted to drugs or alcohol, because she had to work to support a family, or because she couldn't get along with other students.

Although the 18-year-old is pregnant now, her pregnancy wasn't a catalyst for her leaving Southbridge High School. Rather, Rosario said, it was the school's atmosphere that led her to walk out the doors without looking back.

"I didn't like it at all," Rosario said. "Just the way that school is — curriculum, the building, everything."

Rosario, who dropped out of Southbridge High School in December, will soon earn her General Equivalency Diploma (GED) through a program at YOU Inc., on Charlton Street. She plans to attend The Salter School in Worcester before enrolling in a four-year university.

She is one of 29 students — or 5 percent — who have dropped out so far this school year.

The most recent state Department of Education (DOE) report on dropout rates,

*Please Read STUDENT, page A12*



*Danielle Williamson photo*

**YOU Inc. Educational Specialist Samuel Lewis looks over the shoulder of Erica Rosario, 18. Rosario dropped out of Southbridge High School in December, and will soon earn her GED.**

> *School got boring for me. Teachers don't teach individually. They just write things on the board.*
>
> — Erica Rosario,
> Southbridge High School dropout

**A12** SOUTHBRIDGE EVENING NEWS • Wednesday, April 28, 2004

# Dropout wasn't happy with school system

## STUDENT
continued from page A1

released earlier this month, shows that the rate for Southbridge High School in the 2002-2003 school year was 8.7 percent, and increased by more than a third from the previous year. In other words, one out of every 12 students dropped out.

"A lot of students are good academically, but when they're in school, they don't get engaged," said Samuel Lewis, educational specialist for YOU Inc., and Rosario's GED teacher. "They're not embraced; they're pushed aside."

Eleven students are studying for the GED through YOU Inc.'s program. Ten of them are Southbridge High School dropouts.

Rosario completed three years of high school at Bay Path Regional Vocational Technical High School, which for the most part, she enjoyed. She said that after 11th grade, she was ready for a change, and decided to go to Southbridge.

After becoming disenchanted with the school, its physical condition, and some of its teachers, she chose to leave.

"School got boring for me," she said. "Teachers don't teach individually. They just write things on the board."

In addition, she had difficulty concentrating in some classes because they were crowded.

"They need to build a bigger school; that school's so small. You look up at the roofs, and they're coming apart in some places."

Rosario said her parents weren't thrilled with her decision to drop out, but they were comforted by the fact that she was planning to get her GED.

Rosario's older brother graduated from Southbridge High School, and her mother has her GED.

It could have been worse, she said.

"I know so many kids who are doing drugs and don't go to school," she said. "I was in honors classes; I got good grades."

Rosario learned she was pregnant shortly after she dropped out. She is due at the end of July, and knows that she must continue to educate herself so she can become financially stable.

She works at McDonald's in Charlton, and takes GED classes at YOU Inc. from 9 a.m. to noon, Mondays through Thursdays.

Lewis said many students respond well to the individualized instruction he provides in his classroom.

He said language and cultural barriers prevent many students from succeeding in traditional classrooms.

"As far as academic and professional achievements, [Southbridge High School] teachers have them. But the environment has changed. There's a new class sitting in front of you and it needs to be engaged."

Lewis said he tries to engage his students by considering each student's culture and background.

"Teachers need to be innovative. If subjects are taught in a linear way, you're going to lose people. I try to bring in a lot of different, real-world scenarios."

However, he said, teachers cannot be solely blamed for dropout rates.

Socioeconomic factors also come into play, he said.

"If someone's economic situation is bad, how can you focus on school?" Lewis said.

In addition, tough financial times, keep school departments from performing as well as they would like. There is not enough money to build a new school, or hire enough teachers to keep class size small and personal: two measures Lewis and Rosario believe would lower the dropout rate.

Lewis said low morale because of budget constraints probably filters down from administrators to teachers, teachers to students.

"They're suffering the same kinds of dilemmas that students are facing," Lewis said.

*Danielle Williamson may be reached at (508) 909-4133, or by e-mail at dwilliamson@stonebridge-press.com.*

8 of 27 DOCUMENTS

Copyright 2006 Worcester Telegram & Gazette, Inc.
All Rights Reserved
TELEGRAM & GAZETTE (Massachusetts)

July 25, 2006 Tuesday
FINAL EDITION

**SECTION:** LOCAL NEWS; Pg. B1

**LENGTH:** 620 words

**HEADLINE:** Lewis trial jury chosen;
`Holy war' weapons case

**BYLINE:** Lee Hammel, TELEGRAM & GAZETTE STAFF

**DATELINE:** WORCESTER

**BODY:**

A jury was selected yesterday in U.S. District Court for the weapons trial of a Worcester man who allegedly expressed his intention to die in a holy war.

Fourteen jurors will hear opening arguments in federal court today in the case of Samuel J. Lewis, also known as Shaheed Lewis, formerly of 56 Chino Ave. and 236 Constitution Ave. He is charged with 17 counts of making false statements or false records while acquiring weapons, mostly from gun shops, in Webster, Northboro, Gardner, Lunenburg and Shrewsbury between Aug. 1, 2002, and Sept. 17, 2003.

Federal defense lawyers Timothy G. Watkins and William W. Fick contended that Mr. Lewis is a victim of selective law enforcement because he is a black man who has converted to Islam. But Judge F. Dennis Saylor IV rejected their argument and ordered the trial to go forward.

Although the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives began its investigation in August 2003 in conjunction with the FBI's Joint Terrorism Task force, Mr. Lewis is not charged with terrorist crimes. Assistant U.S. Attorneys B. Stephanie Siegmann and David H. Hennessy said that Lewis bought 32 firearms between November 2000 and October 2003, making false statements in connection with acquiring 16 of them.

The statements allegedly falsely stated his place of residence or that he was buying the weapons for himself rather than for someone else.

Mr. Lewis' lawyers presented evidence that whites and non-Muslims were not prosecuted as severely as Mr. Lewis has been.

But Judge Saylor ruled that the executive branch has "the general power to determine which laws to enforce and against whom to enforce them." While that broad power is not unfettered, the judge ruled, Mr. Lewis did not present the required "clear evidence" that the Supreme Court has ruled is necessary to show that the prosecution acted unjustifiably such as basing its actions on "race, religion or other arbitrary classification."

Judge Saylor cited allegations by the government that Mr. Lewis is not "similarly situated" to others the defense said were not so heavily prosecuted. He quoted the government as citing Mr. Lewis' ex-wife as saying that he had become increasingly anti-American over the past three years and expressing an intention to die in a jihad or holy war.

She said that he had traveled to either Syria or Somalia for a month in the spring of 2003, expressed an interest in moving to the Middle East, and that he used the first name "Shaheed," which means among other things "martyr," Judge Saylor said in a pretrial ruling.

Gun buyer convicted of giving false info to weapons dealers; Prosecutors

ATF learned from the Diplomatic Security Service that Mr. Lewis received a new passport after reporting a lost passport in 2001, and that can be a tactic to "clean" a passport of evidence of travel to countries linked to terrorism-related activities, Judge Saylor wrote.

The government contends Mr. Lewis is much more dangerous than the usual caliber of defendant who has made a false statement to acquire a firearm. Judge Saylor said "there is considerable evidence that the defendant poses a substantial danger of violence and a possible connection to terrorist activities."

"While the government is not permitted to prosecute him (Mr. Lewis) because he has converted to Islam," Judge Saylor wrote in a footnote, "it is not required to ignore that fact when considering his possible connections to terrorist or anti-American activities - particularly in light of the evidence that he has traveled to Middle Eastern countries with terrorist activities and expressed a desire to die in a jihad. Likewise, his deliberate choice of name - which he, not his parents, selected - is a relevant fact that law enforcement may take into account in assessing the evidence against him."

**LOAD-DATE:** July 27, 2006

4 of 27 DOCUMENTS

Copyright 2006 Worcester Telegram & Gazette, Inc.
All Rights Reserved
TELEGRAM & GAZETTE (Massachusetts)

August 2, 2006 Wednesday
FINAL EDITION

**SECTION:** LOCAL NEWS; Pg. B3

**LENGTH:** 379 words

**HEADLINE:** Gun buyer convicted of giving false info to weapons dealers;
Prosecutors alleged anti-American bent

**BYLINE:** Lee Hammel, TELEGRAM & GAZETTE STAFF

**DATELINE:** WORCESTER

**BODY:**

A Worcester man whose alleged anti-American sentiments came to the attention of the government has been convicted in U.S. District Court on charges of making false statements when buying 16 firearms.

Samuel J. Lewis, also known as Shaheed Lewis, 33, of 23 Mount Vernon St., was convicted Monday by a jury on 15 counts of making false statements while buying 16 weapons between August 2002 and September 2003. The weapons were bought from licensed dealers Clarence Edgar Floyd of Lunenburg; Sparky's Gun Shop in Webster; Village Gun Shop in Northboro; Match Shot Firearms in Gardner; Wayne's Weaponry in West Boylston; and The Gun Room in Shrewsbury.

The jury found Mr. Lewis not guilty on two other charges: making false statements to hide the identity of the true purchaser of two weapons.

Judge F. Dennis Saylor IV set sentencing for Nov. 13. Mr. Lewis faces a maximum of 5 years in prison followed by 3 years of supervised released and a $250,000 fine.

The prosecution said that Mr. Lewis bought the firearms and lied about his home address to the firearms dealers while he was enrolled in Catholic Charities' Homeward Bound program. The program provides housing to homeless families and prohibits possession of firearms.

Later he got housing through the Worcester Housing Authority transitional housing program and concealed from the authority the purchase of the weapons costing more than $4,000, according to Assistant U.S. Attorneys B. Stephanie Siegmann of the U.S. attorney's anti-terrorism and national security unit and David H. Hennessy of the U.S. attorney's Worcester office.

Mr. Lewis' lawyers, federal defenders Timothy G. Watkins and William W. Fick, had contended that their client, a black man who had converted to Islam, was being selectively prosecuted because of his race and religion.

The government alleged that Mr. Lewis had traveled to Syria or Somalia, that he was becoming increasingly anti-American and that he said that he wished to die in a holy war.

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives began its investigation in August 2003 in conjunction with the FBI's Joint Terrorism Task Force. The investigation also involved the U.S. Department of Housing and Urban Development, Massachusetts State Police and Worcester Police Department.

**LOAD-DATE:** August 3, 2006